MASCHOFF BRENNAN GILMORE
   ISRAELSEN & MAURIEL, LLP
Sterling A. Brennan (USBN 10060)
   *sbrennan@mabr.com*
L. Rex Sears (USBN 8548)
   *rsears@mabr.com*
95 South State Street, Suite 800
Salt Lake City, UT 84111
(801) 297-1850

Attorneys for Plaintiff
HOMIE TECHNOLOGY, INC.

DHILLON LAW GROUP INC.
Andrew K. Mann (*pro hac vice pending*)
   *akmann@dhillonlaw.com*
Christopher G. Renner (*pro hac vice pending*)
   *cgrenner@dhillonlaw.com*
Jonathan M. Shaw (*pro hac vice pending*)
   *jshaw@dhillonlaw.com*
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(415) 433-1700

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HOMIE TECHNOLOGY, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, an Illinois non-profit association; ANYWHERE REAL ESTATE INC., a Delaware corporation; KELLER WILLIAMS REALTY, INC., a Texas corporation; HOMESERVICES OF AMERICA, INC., a Delaware corporation; HSF AFFILIATES, LLC, a Delaware limited liability company; RE/MAX LLC, a Delaware limited liability company; and WASATCH FRONT REGIONAL MULTIPLE LISTING SERVICE, INC., a Utah corporation,<br><br>              Defendants. | Case No. 2:24-cv-00616<br><br>**COMPLAINT**<br><br><br>Jury Trial Demanded |

Plaintiff Homie Technology, Inc. ("Homie"), by and through its undersigned attorneys, brings this action for damages and injunctive relief under the antitrust laws of the United States and of the State of Utah, demanding a trial by jury under Rule 38 of the Federal Rules of Civil Procedure. For its Complaint against the defendants named and described herein (collectively, "Defendants"), Homie alleges the following:

### I.    NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      For over 50 years, residential real estate in the United States has been primarily marketed through the multiple listing service(s) ("MLS(s)") owned by members of Defendant National Association of Realtors ("NAR").

2.      NAR and its members control competition in the residential real estate brokerage industry by controlling the nation's MLSs. NAR has frequently used its control over MLSs to exclude new market entrants to the benefit of NAR and its members but to the detriment of consumers. NAR and its members have abused the market power conferred upon them by their control over the MLS system, time and time again.

3.      Residential real estate brokerage is a stagnant industry dominated by firms competing with legacy technology and business models. Competition from innovative market entrants armed with new technologies and business models has been predicted for years. But the long-awaited emergence of disruptive new entrants has been stalled by the anticompetitive conduct of traditional brokerages acting through NAR.

4.      The anticipated wave of disruptive innovation and entry into the residential real estate brokerage market has not yet occurred because Defendants conspired to prevent it. Using their control of the MLS, Defendants imposed rules nationwide that erected substantial barriers to

1

entry for new competitors, thereby elevating the price of residential real estate brokerage services well above competitive levels. Consumers of residential real estate brokerage services (*e.g.*, home sellers) have prosecuted civil actions to recover a measure of these overcharges. But they were not the only victims of Defendants' unlawful actions; the thwarted new market entrants, such as Homie, have been substantially injured and damaged as well.

5.     Homie brings this action to recover the damages it suffered as another victim of the Defendants' conspiracy—damages suffered as an excluded competitor foreclosed by the Defendants' conduct from effective competition in the relevant market. Had Homie been allowed to compete with Defendants and their co-conspirators, it would have gained market share at Defendants' expense while posing a competitive check on Defendants' ability to charge exorbitant prices for brokerage services to consumers. By excluding Homie and other new entrants, Defendants, in a single stroke, harmed competition, harmed consumers, and caused injury and damages to Homie.

6.     Defendants' conspiracy involved the creation of a market structure that facilitated boycotts of new entrants, such as Homie, by incumbent real estate brokerages. The terms of this conspiracy were contained in NAR rules that govern access to the MLS. NAR allowed brokers representing home sellers and home buyers to use NAR's MLSs only if those brokers agreed to adhere to and help implement terms that significantly restrain competition. Thus, innovative entrants, seeking to compete on price and other terms of service attractive to home sellers or home buyers, have been stymied by traditional real estate brokers who acted in concert through the MLS to promulgate a web of rules and practices that created substantial barriers to competition.

7.      Defendants Anywhere Real Estate, Inc., Keller Williams Realty, Inc., RE/MAX LLC, HomeServices of America, Inc., and HSF Affiliates, LLC (together, the "Corporate Defendants") played an active role in NAR and have required franchisees, brokerages, and individual realtors to join and implement NAR's anticompetitive agreements to secure the benefit of each Corporate Defendant's brand, brokerage infrastructure, and other support. Because these are the leading brokers in the United States, their participation in the conspiracy and implementation and enforcement of its terms was essential to the success of the conspiracy. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants and further their common goals by allowing brokers to forestall competition from lower-priced alternatives.

8.      Defendants used their control of the MLSs—and Corporate Defendants their franchise agreements, employee policies and procedures manuals, and their leadership roles in NAR and local realtor associations—to require brokers in local residential real estate markets to adhere to NAR's rules, including the rules at issue in this case, and thereby helped implement and enforce the conspiracy. The Corporate Defendants further implemented the conspiracy alleged herein by reviewing and reissuing NAR's rules, including the rules at issue in this case, at yearly NAR meetings and by serving on the boards and committees of NAR and of NAR's state and local associations in Utah and across the country, including the Utah Association of Realtors ("UAR") and local realtor boards throughout Utah, which implement and enforce compliance with NAR's rules.

9.      By participating in an association that promulgates rules facilitating the exclusion of competitors, by requiring franchisees, groups, and individuals to join and adhere to the

anticompetitive agreement alleged herein, and by taking numerous steps in furtherance of the conspiracy, the Corporate Defendants agreed with each other and NAR to participate in, facilitate, and implement the conspiracy.

## II.    JURISDICTION AND VENUE

10.    Homie brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and injunctive relief.

11.    This Court has subject matter jurisdiction over Homie's federal antitrust claim pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

12.    This Court has subject matter jurisdiction over Homie's pendent state law claims (for violations of the Utah Antitrust Act and tortious interference with economic relations) pursuant to 28 U.S.C. § 1367. Homie's state law claims arise out of the same common nucleus of operative facts as Homie's federal law claim.

13.    Homie has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

14.    This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant: (1) will be properly served; (2) transacted business in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District.

15.    Venue is proper in this District under 15 U.S.C. §§ 15 & 22, and under 28 U.S.C. § 1391(b), because each Defendant transacted business, was found, had agents, and/or resided in

this District; a substantial part of the events giving rise to Homie's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

16.    Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and this District. Defendants do business across state lines.

### III.    THE PARTIES

17.    Plaintiff Homie is a Delaware corporation with its principal place of business located at 299 South Main Street #2400, Salt Lake City, Utah 84111. Homie is a technology-driven industry disrupter. Homie streamlines residential real estate transactions for both sellers and buyers of homes and offers customers significant savings compared to the high commissions charged by traditional real estate brokerages.

18.    Defendant NAR has over 1.4 million individual members (sometimes called "realtors") providing residential real estate brokerage services across the United States. Its 54 state and territorial realtor associations and over 1,200 local realtor associations are members of and overseen by NAR. NAR is a trade association headquartered at 430 N. Michigan Avenue, Chicago, Illinois 60622, and is incorporated under the laws of the State of Illinois. NAR promulgates rules governing the operation of the approximately 500 MLSs affiliated with NAR through their ownership or operation by NAR's state, local, and territorial associations. NAR's rules, policies, and practices govern the conduct of its members in all 50 states and several United States territories, including the conduct of all of NAR's individual member brokers and their affiliated

agents and sales associates. NAR engages in a substantial volume of commerce in this District, with approximately 19,000 members in Utah.

19.     Defendant Wasatch Front Regional Multiple Listing Service, Inc. ("WFRMLS"), d/b/a UtahRealEstate.com, is the dominant MLS in Utah and one of the largest MLSs in the United States. Over 95% of all homes listed for sale in Utah are marketed through WFRMLS. WFRMLS is an NAR-affiliated MLS governed by NAR rules and owned and controlled by local associations of NAR in Utah. WFRMLS is headquartered at 230 West Towne Ridge Parkway Suite 400, Sandy, Utah 84070, and is incorporated under the laws of the State of Utah.

20.     Defendant Anywhere Real Estate, Inc. (formerly Realogy Holdings Corp.) is a real estate brokerage company with its headquarters at 175 Park Avenue, Madison, New Jersey 07940, and is incorporated under the laws of the State of Delaware. It is the nation's largest real estate brokerage and owns, operates, and franchises many real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Gardens Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate. This Complaint will refer to Anywhere Real Estate, Inc. and all of its wholly owned or controlled subsidiaries, affiliates, and franchises as "Anywhere." Anywhere engages in a substantial volume of commerce in this District, brokering billions of dollars of home sales in this District annually.

21.     Defendant HomeServices of America, Inc. ("HSA") is the second-largest residential real estate brokerage firm in the United States. HSA is an indirectly owned subsidiary of Berkshire Hathaway Inc. HSA is headquartered at 6800 France Avenue, Suite 610, Eina, Minnesota 55435, and is incorporated under the laws of the State of Delaware. HSA is the majority owner of Defendant HSF Affiliates, LLC ("HSF Affiliates"). HSF Affiliates operates many real estate

franchise networks, including HomeServices, Prudential Real Estate, and Real Living. Additionally, in 2017, HSA acquired The Long & Foster Companies, Inc. ("L&F"), a large private residential real estate company in the United States. BHH Affiliates, LLC is a subsidiary of HSF Affiliates LLC and offers real estate brokerage services. HSF Affiliates is incorporated under the laws of the State of Delaware. This Complaint will refer to HSA, HSF Affiliates, L&F, their predecessors, BHH Affiliates, LLC, and their wholly owned or controlled subsidiaries or affiliates as "HomeServices." HomeServices engages in a substantial volume of commerce in this District, brokering billions of dollars of home sales in this District annually.

22.     Defendant RE/MAX, LLC franchises local RE/MAX brokers with approximately 80,000 sales associates throughout the United States and Canada. It is headquartered at 5075 S. Syracuse Street, Denver, Colorado 80237, and is incorporated under the laws of the State of Delaware. This Complaint will refer to RE/MAX, LLC, its predecessors, and its wholly owned or controlled subsidiaries or affiliates as "RE/MAX." RE/MAX engages in a substantial volume of commerce in this District, with its franchises brokering more than a billion dollars of home sales in this District annually.

23.     Defendant Keller Williams Realty, Inc. is one of the nation's largest real estate brokerages. It is headquartered at 12212 South Mopac Expressway, Austin, Texas 78746, and is incorporated under the laws of the State of Texas. It is a privately held company. It franchises local Keller Williams brokers around the United States and Canada, which have approximately 1,000 offices and more than 174,000 sales associates. This Complaint will refer to Keller Williams Realty, Inc., its predecessors, and its wholly owned or controlled subsidiaries or affiliates as

"Keller Williams." Keller Williams engages in a substantial volume of commerce in this District, brokering billions of dollars of home sales in this District annually.

24.     Multiple franchisees and brokers of the Corporate Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the NAR rules at issue in this case in the geographic areas in which they operate. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## IV.     FACTUAL ALLEGATIONS

### A.     Industry Background

25.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker; and (2) the individual real estate licensee or agent. Brokers supervise agents who work directly with consumers. Agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences. Brokers often provide agents with branding, advertising, and other services that help the agents complete transactions.

26.     Although there is no legal impediment to consumers buying and selling homes without the assistance of a real estate broker, consumers typically choose to work with a broker. In 2023, according to NAR, 89% of home sellers and 89% of home buyers sold or bought their homes with the assistance of a real estate broker. Consumers' preferences for engaging the services of a real estate broker to assist with the purchase or sale of a home have proven durable over time. In 2017, according to NAR, 92% of home sellers and 87% of home buyers sold or bought their homes with the assistance of a real estate broker.

27.     The vast majority of brokered home sales involve members of NAR and of NAR's state and local associations. NAR members are governed by NAR's Code of Ethics.

28.     Although home buyers typically work with real estate brokers to purchase a home, they typically find those homes themselves. In 2024, NAR reported that only 28% of buyers found the home they purchased through their real estate broker, with the remaining 72% finding the home they purchased online or through other means unassisted by a real estate broker.

29.     Most brokers and their individual agents occupy dual roles: they operate as seller-brokers for some home sales and as buyer-brokers for other home sales.

30.     The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells.

31.     A seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the listing. A listing agreement typically states that the seller-broker has the exclusive right to market the seller's home. The listing agreement specifies the total commission a home seller will pay the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-broker if the buyer has a broker.

32.     If the buyer has a broker, the seller or the seller-broker pays the buyer-broker a commission out of the total commission paid by the seller. In other words, buyer-brokers—who assist their clients in negotiating against the seller—commonly receive their compensation from the total commission paid by the seller, not from the buyer they represent.

33.     When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer-broker will be compensated by a commission received from the seller-broker.

34.     The vast majority of homes marketed for sale and sold in the United States are marketed through an MLS. In 2020, according to NAR, "91% of sellers [nationwide] listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home." Home sellers' preferences for listing their property on the MLS have proven durable over time. In 2024, NAR reported that at least 88% of all sellers nationwide listed their homes on the MLS.

35.     MLSs are joint ventures among virtually all brokers operating in local or regional areas. The MLS combines its members' home listings information into a database, usually in electronic form. The MLS then makes these data available to all licensed real estate professionals who are members of the MLS. By listing in the MLS, a broker can market properties to a large set of potential buyers. By searching the MLS, a broker representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs.

36.     Brokers regard participation in their local MLS as critical to their ability to compete with other brokers for home sellers and buyers. An MLS is thus a market-wide joint venture of competitors that possesses substantial market power: To compete successfully, a broker must be a member; to be a member, a broker must adhere to any restrictions the MLS imposes. By virtue of nearly industry-wide participation and control over important data, brokers offering MLSs possess and exercise market power in the provision of real estate brokerage services to home buyers and sellers in local markets throughout the country.

37.    The state, territorial, and local associations of NAR own NAR-affiliated MLSs. The substantial majority of MLSs nationwide are NAR-affiliated MLSs. NAR's Board of Directors and its Multiple Listing Issues and Policies Committee (which reports to the NAR Board of Directors) issues the policies governing MLSs. NAR promulgates rules, policies, and practices governing the conduct of NAR-affiliated MLSs that are set forth annually in the Handbook on Multiple Listing Policy ("Handbook"). NAR and its affiliated state and local associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics.

38.    Commissions of 5% to 6%, split between the seller-broker and the buyer-broker, are common across the country and in Utah. These high and elevated commissions are the result of rules promulgated by the Defendants that restrained competition from brokers seeking to compete by offering lower prices. Specifically, through the "Buyer-Broker Compensation Rule" Defendants required sellers to make blanket, unilateral offers of compensation to buyer-brokers as a condition of marketing properties through the MLS. This offer of compensation to buyer-brokers is sometimes called a "BAC," or buyer-agent commission, in the industry. Because the offer of compensation was displayed in the MLS, buyer-brokers would steer their clients away from sellers offering low buyer-broker commissions and towards sellers offering high buyer-broker commissions. By giving buyer-brokers the ability through the MLS to detect and punish price discounting by seller-brokers, NAR's Buyer-Broker Compensation Rule, described at greater length below, created a fundamentally anticompetitive market structure that systematically excludes brokers like Homie seeking to compete by offering lower commissions.

39.     Home buyers would have resisted this steering if they could have. But Defendants ensured buyers would not learn of the steering by suppressing the information consumers required to detect and resist steering by their buyer-brokers. NAR's "Commission-Filter Rules and Practices," "Commission-Concealment Rules," and "Free-Service Rule," all described below, individually and cumulatively had the effect of reinforcing the fundamentally anticompetitive market structure created by the Buyer-Broker Compensation Rule.

40.     Because the rules that facilitated this anticompetitive scheme were promulgated through the MLS, Defendants needed to ensure that nearly all listings continued to flow through the MLS in order to achieve their anticompetitive goal of excluding low-price competitors. They accomplished this through another NAR rule, the "Clear Cooperation Policy," also described below.

41.     Together, NAR's Buyer-Broker Compensation Rule, Commission-Filter Rules and Practices, Commission-Concealment Rules, Free-Service Rule, and the Clear Cooperation Policy (together, "NAR's Exclusionary Rules and Policies") imposed substantial barriers to the entry and expansion of brokers offering low prices to compete across the United States and in Utah.

42.     NAR's Exclusionary Rules and Policies have been the subject of substantial antitrust enforcement under Section 1 of the Sherman Act. A consumer class was awarded $1.8 billion in damages from a jury as compensation for overcharges by Defendants and their co-conspirators. *See* Jury Verdict at 2, *Burnett v. Nat'l Assoc. of Realtors*, No. 4:19-cv-00332 (W.D. Mo. Oct. 31, 2023), ECF No. 1294. The various rules comprising NAR's Exclusionary Rules and Policies have together and separately been the subject of investigation by the Antitrust Division of the Department of Justice since 2018. In November 2020, the Antitrust Division challenged the

Commission-Concealment Rules, the Free-Service Rule, and the Commission-Filter Rules and Practices as violations of Section 1. *See* Complaint at 1-2, 5-10, *United States v. Nat'l Assoc. of Realtors*, No. 20-cv-3356 (D.D.C. Nov. 19, 2020), ECF No. 1 On information and belief, the Antitrust Division's investigation of the remaining components of NAR's Exclusionary Rules and Policies is ongoing. And the United States Ninth Circuit Court of Appeals upheld the sufficiency of a complaint challenging NAR's Clear Cooperation Policy under Section 1 brought by an excluded rival to the MLSs. *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834–35 (9th Cir. 2022).

### B.    Homie Was a Competitive Threat to Defendants

43.    In 2015, NAR released the "DANGER Report," which detailed threats, risks, and challenges to the industry that it and its members controlled. Among the list of 10 risks facing the industry was "commissions spiral downward."

44.    Homie was launched in 2015, the year the DANGER Report was issued. Homie's entry and unimpeded expansion promised to bring the new competition identified by the DANGER Report as looming on the horizon.

45.    Residential real estate was ripe for disruption with technology, and consumers were primed for an alternative to the traditional, high-priced brokerage services offered by Defendants. Homie's business model was to disrupt the traditional real estate brokerage model by returning artificially inflated commissions to consumers, competing away the supracompetitive prices engendered by Defendants' decades-long conspiracy.

46.    Homie saved customers, on average, thousands of dollars on each home sale in fees and commissions. Sellers listing with Homie would pay a low flat fee or a low commission, in

either scenario paying Homie less than they would have paid to traditional real estate brokers charging the industry standard 5%–6% of the selling price. As part of their low-cost selling strategy, sellers using Homie would commonly make an offer of compensation to buyer-brokers that was somewhat below the BAC offered by sellers represented by traditional brokers, including the Corporate Defendants. Buyers using Homie would receive some or all of any BAC offered by the seller.

47.    Homie also competed with new technology, including a consumer-facing app that automated portions of the sales process for both sellers and buyers. By automating portions of the sales process, Homie lowered its costs, which, in turn, allowed it to lower the price of its brokerage services to consumers.

48.    After launching in Utah, Homie had a phased expansion plan that included launching across the United States in each state and territory. Sophisticated investors funded expansion plans forecasted to expand Homie's operations nationwide within five years. Having validated its model in Utah, Homie had become a competitive threat to Defendants in markets across the country, markets that, like Utah, had been the subject of Defendants' anticompetitive conduct for decades.

49.    Homie's 2015 entry into the real estate brokerage market in Utah was initially successful. Homie was, at various times between 2017 and 2021, among the five largest brokerages by market share in the state. In 2019, a study conducted by researchers at Brigham Young University in Provo, Utah, concluded that homes listed through Homie sold eight days faster and for a 1.2% higher price than comparable homes sold by traditional listing agents and brokers, despite the lower prices for brokerage services charged by Homie. Consumers in Utah

saved millions of dollars in brokerage fees by using Homie rather than a traditional real estate broker.

50.    Homie's initial success sparked an anticompetitive campaign among Homie's competitors to exclude Homie. The campaign against Homie was facilitated by NAR's Exclusionary Rules and Policies, each and every one of which hampered Homie's ability to compete in Utah, permanently depressing Homie's market share, revenue, and profitability.

51.    Homie was subject to both express and tacit boycotts in Utah by incumbent brokerages, some affiliated with the Corporate Defendants, boycotts organized through the MLS, online social media platforms, and public statements. These boycotts, which were facilitated by NAR's Exclusionary Rules and Policies, had their natural and intended effect on Homie's business, gradually but inexorably reducing its market share, revenue, and profits until the firm was unable to compete effectively despite a business model that, before Defendants' predation, had proven its viability.

52.    Homie competed vigorously in an effort to overcome the anticompetitive conduct facilitated by NAR's Exclusionary Rules and Policies, pouring millions of dollars into modifications and adjustments to its business model to address and overcome that conduct. Consequently, Homie's customer acquisition and marketing costs soared as its market share plateaued and then fell.

53.    Homie offered brokerage services to both sellers and buyers. The anticompetitive effects of NAR's Exclusionary Rules and Policies adversely impacted Homie's provision of brokerage services to both sellers and buyers.

54.     As alleged at greater length below, the Buyer-Broker Compensation Rule, the Commission-Filter Rules and Practices, and the Commission-Concealment Rules facilitated express and tacit boycotts of Homie's operations on behalf of sellers. This steering away from Homie listings, well documented in its records, MLS records (and likely Defendants' records), and local media, had anticompetitive effects, diminishing Homie's ability to compete. Homie's sell-side customers were often dissatisfied with the low numbers of potential buyers brought by buyer-brokers to tour their listed properties when working with Homie, which was the natural, foreseeable, and intended effect of the steering facilitated by the Buyer-Broker Compensation Rule, the Commission-Filter Rules and Practices, and the Commission-Concealment Rules.

55.     As alleged at greater length below, the Free Service Rule and the Commission-Concealment Rules created substantial barriers to Homie's provision of brokerage services to buyers. As a new entrant, Homie naturally sought to attract business by offering discounted brokerage services to buyers. But the Free-Service Rule and the Commission-Concealment Rules frustrated this strategy by allowing buyer-brokers to falsely represent their services as "free" when in fact they were anything but free and allowing competing brokers to conceal from consumers the nature and extent of the BAC. In this market environment, Homie's attempts to compete for buy-side business by rebating some or all of the buyer-broker commission—a fee that Defendants by their conduct had successfully concealed from buyers—were unsuccessful, as consumers were deprived of the information that would have helped them to understand the value proposition offered by Homie.

56.     Together, the Buyer-Broker Compensation Rule, the Commission-Filter Rules and Practices, and the Commission-Concealment Rules were a significant barrier to Homie's

expansion on the sell-side, and the Free-Service Rule and the Commission-Concealment Rules had the same effect on Homie's buy-side business, and all of them separately and together caused injury and damages to Homie. Because all of NAR's Exclusionary Rules and Policies were promulgated and enforced through the MLS, Homie attempted to avoid the MLS entirely by marketing properties off the MLS, including through its website and mobile app, as so-called private listings. The Clear Cooperation Policy eliminated this possibility, injuring Homie by eliminating alternative marketing avenues that would have allowed it to avoid the pervasive effects of Defendants' anticompetitive conduct, including NAR's Exclusionary Rules and Policies and the tacit and express boycotts of Homie facilitated by NAR's Exclusionary Rules and Policies.

57.    By excluding Homie in Utah, Defendants were also able to exclude Homie nationwide by frustrating its plans for nationwide expansion. Homie's inability to compete effectively in Utah deprived it of the investment capital and scale necessary to enter markets nationwide. Thus, Defendants harmed consumers in Utah and nationwide by excluding Homie in Utah.

### C.    NAR's Exclusionary Rules and Policies

58.    Acting by and through NAR, Defendants conspired and acted in concert to promulgate and enforce NAR's Exclusionary Rules and Policies that excluded new entrants seeking to compete by offering buyers or sellers opportunities to transact at lower prices than those traditionally charged by NAR members. NAR's Exclusionary Rules and Policies were widely adopted and enforced by NAR-affiliated MLSs nationwide, including by WFRMLS. They were, therefore, agreements among competing real estate brokers to reduce and limit competition among brokers. NAR's Exclusionary Rules and Policies, individually and in their cumulative effect,

substantially diminished the ability and incentive of brokerages such as Homie to compete with lower prices, thus simultaneously harming consumers and those excluded competitors.

59.     One such rule was the Buyer-Broker Compensation Rule, which NAR promulgated in 1996 and enforced as a mandatory provision of the MLS Handbook until August 2024. The 2023 MLS Handbook described the Buyer-Broker Compensation Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further stated: "Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by seller-brokers to other participants to discuss terms and conditions of possible cooperative relationships."

60.     The Buyer-Broker Compensation Rule was exclusionary. Because the blanket offer was required to be made available to every buyer broker using the MLS (*i.e.*, virtually all buyer-brokers) and could be compared to the blanket offers that every other seller-broker must post to operate on the MLS, the Buyer-Broker Compensation Rule created tremendous pressure on sellers to offer the high, standard commission that had long been maintained in this industry. Seller-brokers knew that if the published blanket offer was less than the standard commission, many buyer-brokers would "steer" home buyers to the residential properties that provide the higher standard commission. The Corporate Defendants understood and intended this effect of the Buyer-Broker Compensation Rule, and they instructed and trained their franchisees and agents to offer

relatively higher buyer-broker commissions as a seller-broker and, when acting as a buyer-broker, to avoid transacting with seller-brokers offering relatively lower buyer-broker commissions.

61.     By encouraging and facilitating steering, the Buyer-Broker Compensation Rule enabled brokers to avoid doing business with or otherwise retaliate against buyer-brokers who tried to compete by offering significant discounts. In a Federal Trade Commission/Department of Justice workshop, one discounter explained: "We've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers," after it offered a lower commission on the MLS. The discounter estimated: "40% of agents will go out of their way, above and beyond, and push hard not to show or sell your home if you don't offer a 2.8% or 3% commission." As another commentator explained: "Essentially, the MLS listing acts as a tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters."

62.     Thus, in his 2016 presentation to competing brokerages and other participants at a major industry event, Defendant Keller Williams' CEO reported that his firm's research had found that "limited service discount brokers' market share in the United States is at an all-time low." He enthusiastically reported that competitors' efforts to gain business by offering discounted commissions had become "irrelevant."

63.     These exclusionary effects of the Buyer-Broker Compensation Rule caused injury and damages to Homie in Utah and erected high barriers to Homie's entry into other markets controlled by NAR-affiliated MLSs nationwide. During the period that the Buyer-Broker Compensation Rule was in effect, incumbent brokerages in Utah organized express and tacit boycotts of Homie's listings facilitated by the Buyer-Broker Compensation Rule by steering

buyers away from those listings. In addition to being an anticompetitive practice that had the purpose and effect of harming Homie, these steering practices also constituted blatant breaches of the fiduciary duties owed by the participating agents to their buyer-principals.

64.     Brokerages used the comment field of WFRMLS to communicate to Homie their intent not to show properties listed by Homie with low buyer-broker commissions. For example, during the period that the Buyer-Broker Compensation Rule was in effect, Homie received the following messages in the comment field of WFRMLS, messages which vividly illustrate the exclusionary steering facilitated by NAR's Exclusionary Rules and Policies:

- "If you up the commission, I will bring my buyers. If not, I will not. It's a disservice to your client. Please educate them. Please let them know that. I truly have a buyer that would possible [*sic*] buy this house. I won't show it until the commission is raised."

- "Put a unit number and better directions on the listing. And. [*sic*] Get a key for the supra box. And bac [*sic*] at 3%."

- "I'm sure it would sell if you changed the BAC to 3%."

- "[R]aise Commission to 3%"

65.     Homie received emails from NAR-member brokers during the period that the Buyer-Broker Compensation Rule was in effect, setting forth in detail the exclusionary steering facilitated by NAR's Exclusionary Rules and Policies:

Hey Homie,

I just wanted to let you know that I feel you are doing your client a great disservice by offering just a $1000 BAC on this property at ███████ in

Lehi. I will be showing a client many homes in this area over the next few days all offering 2.5%-3% BAC and your listing would be one I would otherwise show them but because of your BAC offering which is laughable I will not be including your listing in what I choose to show them and I am certain I am not the only licensed professional who will be doing the same. It's one thing to be willing to work for nothing on your end and provide limited services but to think that buyers agents out there will be willing to work for $500 or $1000 with all the time and effort we put into finding our clients the perfect home and helping them through the contract, negotiations, inspections, financing, closing, etc. is sad and unprofessional on your part and will most certainly lead to minimize market exposure for your client, longer time on the market and a lesser sales price than what they would get otherwise. I wouldn't have an issue with Homie and would happily show your listings if you'd offer a fair and reasonable BAC but since you are not you won't get a showing out of me unless a client specifically asks for one on your listings.

66.    Homie received text messages from NAR-member brokers during the period that the Buyer-Broker Compensation Rule was in effect, setting forth in detail the exclusionary steering facilitated by NAR's Exclusionary Rules and Policies:

Hi Josh. I had your home on a list of 4 to show to my buyers tonight. Removed it from the list after I saw the 1.5% BBC [*i.e.*, the buyer-broker commission]. I could always show it and then negotiate up the BBC in the contract but figured,

why go through the hassle when we have three other great listings paying 2.5-4%.

Anyway. Please tell your sellers for me.

67.     The exclusionary steering facilitated by NAR's Exclusionary Rules and Policies was widely covered by the local media in Utah. The news program Get Gephardt of 2KUTV aired a piece entitled "Realtors accused of conspiring to fix Commission in new lawsuit," showcasing a couple selling their home. The couple claimed outside agents bullied them regarding their BAC—pushed to offer or raise BAC, punished by agents refusing to bring buyers, hounded with phone calls, and forced to hear rumors and bad-mouthing regarding their brokerage.

68.     Local NAR members in Utah used Facebook groups to coordinate boycotts of Homie's listings with low buyer-broker commissions during the period that the Buyer-Broker Compensation Rule was in effect, sometimes marked with the hashtag "#boycottHOMIE." One such Facebook group was called the Wasatch Front Agents group, which had over a thousand members. On these Facebook groups, brokers exchanged information about their intent to steer buyer clients away from properties listed by Homie for sale in Utah. For example, one post stated: "I know several agents that omit [H]omie listings from their hotsheets. They would be wise to counsel their sellers on the affect [*sic*] of such low BAC."

69.     Realtors in Utah also encouraged one another on Facebook groups not to show homes to Homie-represented buyers during the period that the Buyer-Broker Compensation Rule was in effect. One agent wrote: "I'll admit right now I am NOT going to take time to show a Homie buyer one of my listings." Berkshire Hathaway and Coldwell Banker franchisees in Utah publicly advertised that they would not work with Homie-represented buyers.

70.    The exclusionary campaign against Homie was also conducted through the local associations of NAR in Utah that own and control WFRMLS. Local associations of NAR in Utah encouraged agents to steer clients away from Homie—one of their own members. For example, during the period that the Buyer-Broker Compensation Rule was in effect, a Salt Lake Board of Realtors training featured instruction on how to effectively disparage Homie in discussions with potential home sellers. A new Homie agent recorded the instructor teaching 75 or so new real estate agents during a state-mandated course. On that recording, the instructor stated: "[T]he challenge with some of these models, which shall remain nameless, is a race to the bottom." The instructor, quickly forgetting to keep the model—and the company behind it—nameless, continued and explained: "All a Homie sign is, is a For Sale by Owner sign."

71.    Local NAR associations in Utah advertised against Homie—again, one of their own members. For example, during the period that the Buyer-Broker Compensation Rule was in effect, highway billboards erected by local NAR associations in Utah encouraged consumers to select higher priced brokers to list their homes instead of Homie.

72.    Other local NAR associations in Utah held trainings during the period that the Buyer-Broker Compensation Rule was in effect, in which they coached selling brokers to offer high BAC.

73.    Another set of such rules and policies was NAR's Commission-Filter Rules and Practices, which NAR promulgated in or before May 2012 and enforced as a mandatory provision of the MLS Handbook until November 2021. NAR's Commission-Filter Rules and Practices allowed buyer-brokers to filter MLS listings that would be shown to buyers based on the level of buyer-broker commissions offered. Once this filtering was performed, some MLSs further

permitted buyer-brokers to affirmatively choose not to show certain homes to potential home buyers if the buyer-broker would make less money because of lower commissions. For example, buyer-brokers or agents could use MLS software to filter out any listing where a buyer-broker would receive less than 2.5% commission on the home sale. In blatant breach of their fiduciary obligations to their clients, the buyer-broker would then provide to its home buyer customer only those listings where the buyer-broker would be paid a 2.5% commission or more if the home sale is completed—usually without disclosing to the buyer customer that the buyer-broker was limiting the potential homes to consider.

74.     According to Policy Statement 7.58 of NAR's Handbook, for example, "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by seller-brokers." National Association of REALTORS®, Handbook on Multiple Listing Policy 2020 (32nd ed. 2020), at 24 (Policy Statement 7.58); *accord id.* at 43 (Virtual Office Website (VOW) Policy) ("A VOW may exclude listings from display based only on objective criteria, including . . . cooperative compensation offered by seller-broker, or whether the seller-broker is a Realtor®.").

75.     NAR's Commission-Filter Rules and Practices, which were widely adopted by NAR-affiliated MLSs, including by WFRMLS, were exclusionary. The Commission-Filter Rules and Practices facilitated steering by helping buyer-brokers conceal from potential home buyers any property listings offering lower buyer-broker commissions. The Commission-Filter Rules and Practices reinforced and facilitated the steering made possible by the Buyer-Broker Compensation Rule.

76.     These exclusionary effects of the Commission-Filter Rules and Practices caused injury and damages to Homie in Utah and erected barriers to Homie's entry into markets controlled by NAR-affiliated MLSs nationwide. During the period the Commission-Filter Rules and Practices were in effect, brokers used the software of WFRMLS to filter out listings of Homie sellers based on their low BAC and to exclude those listings from those presented to buyer clients. NAR-member brokers exchanged information about the use of the Commission Filer Rules and Practices to exclude Homie, sharing screenshots of examples of filtered results from WFRMLS to exclude Homie listings and referencing Homie by name.

77.     Another such rule was NAR's Free-Service Rule, which NAR promulgated in or before January 1997 and maintained in its Code of Ethics and Standards of Practice until January 2022. Pursuant to the Free-Service Rule, buyer-brokers were permitted to misrepresent to home buyers that their services were "free." Because home sellers offer commissions and buyers do not pay their buyer-brokers directly, it can be difficult for buyers to appreciate that they are nevertheless sharing the cost of the buyer-broker's services with the seller. NAR's Free-Service Rule, which had been widely adopted by NAR-affiliated MLSs, including by WFRMLS, and by the UAR and local associations of realtors in Utah, compounded this problem by allowing buyer-brokers to mislead buyers into thinking that the buyer-broker's services were free when, in truth, they were not.

78.     The Free-Service Rule was implemented in Standard of Practice 12-1 of the NAR Code of Ethics, which allowed buyer-brokers to represent their services as free or without cost if they expected to receive compensation from a third party, such as the seller or seller-broker, so long as the buyer-broker disclosed the source of that payment.

79.     NAR's Free-Service Rule was exclusionary. NAR's Free-Service Rule allowed brokers to mislead buyers by obscuring the fact that buyers have a stake in what their buyer-brokers are being paid for their services. Buyer-broker fees, though nominally paid by the home's seller, are ultimately paid out of the buyer's funds from the purchase price of the house. If buyers are told that buyer-broker services are "free," they are less likely to think to negotiate a lower buyer-broker commission or to view buyer-broker rebate offers as attractive. In these ways, NAR's Free-Service Rule reduced demand for—and competition from—buyer-brokers attempting to compete through low prices.

80.     These exclusionary effects of the Free-Service Rule caused injury and damages to Homie in Utah and erected barriers to Homie's entry into markets controlled by NAR-affiliated MLSs nationwide. During the period the Free-Service Rule was in effect, incumbent brokerages in Utah falsely and widely advertised their services as being "free" to buyers, through roadside billboards and other means, thereby reducing the incentive of buyers to seek out the services of a brokerage, such as Homie, that would offer them the ability to economize on those costs, and reducing demand for Homie's services. WFRMLS allowed and facilitated this advertising by continuing to provide MLS access to brokers in Utah advertising their services as "free."

81.     Another set of such rules was NAR's Commission-Concealment Rules, which NAR promulgated in or before May 2012 and maintained as an optional provision of the MLS Handbook until November 2021. NAR's Commission-Concealment Rules recommended that MLSs prohibit disclosing to prospective buyers the total commissions offered to buyer-brokers. All or nearly all NAR-affiliated MLSs, including WFRMLS, adopted a prohibition on disclosing commissions offered to buyer-brokers. This means that while buyer-brokers could see the

commission that was being offered to them if their home buyer purchased a specific property—a commission that will ultimately be paid through the home purchase price that the home buyer, represented by the buyer-broker, pays—MLSs concealed this fee from home buyers.

82.     The Commission-Concealment Rules were laid out in several places in NAR's Handbook, including Policy Statement 7.58, Policy Statement 7.23, Policy Statement 7.3; Section IV.1.a of the Virtual Office Websites ("VOW") Policy; and Sections 18.3.1 and 19.15 of the Model MLS Rules. Rule 10.2 of the 2020 Rules and Regulations of the WFRMLS prohibited communicating to consumers the "Compensation offered to Cooperating Brokers."

83.     NAR's Commission-Concealment Rules were exclusionary and caused anticompetitive effects on both the sell- and buy-side of the market.

84.     The Commission-Concealment Rules facilitated exclusionary steering, reinforcing the effects of the Buyer-Broker Compensation Rule. Buyer-brokers could and did steer potential home buyers away from properties with low commission offers by filtering out, failing to show, or denigrating homes listed for sale that offered lower commissions than other properties in the area. When buyers cannot see commission offers, they cannot detect or resist this type of steering, making exclusionary steering more likely.

85.     The Commission-Concealment Rules also reinforced the effects of the Free Service Rule, further depriving consumers of information relating to the nature and extent of the BAC offered to buyer-brokers, and thus reducing demand for the services of buyer-brokers attempting to compete with low prices, including Homie.

86.     The exclusionary effects of the Commission-Concealment Rules caused injury and damages to Homie in Utah and erected barriers to Homie's entry into markets controlled by NAR-

affiliated MLSs nationwide. During the period when the Commission-Concealment Rules were in effect, incumbent brokerages in Utah organized express and tacit boycotts of Homie's listings by steering buyers away from those listings, as alleged above. These express and tacit boycotts were facilitated by the Commission-Concealment Rules. The Commission-Concealment Rules also created entry barriers for Homie operating on the buy-side of the market by reducing its ability to compete using low prices.

87.    Another such rule is NAR's Clear Cooperation Policy, which NAR promulgated in 2019 as a mandatory provision of the MLS Handbook. NAR's Clear Cooperation Policy generally requires brokers to list publicly marketed properties on the MLS within one business day. Section 17 of the Handbook provides:

> Within one (1) business day of marketing a property to the public, the seller-broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.

88.    The Clear Cooperation Policy is exclusionary. The Policy prohibits brokerages seeking to compete by offering lower prices from doing so by avoiding the use of the MLS for some portion of their listings. One purpose and effect of the Policy is to enforce and magnify the effect of NAR's Buyer-Broker Compensation Rule, Commission Filer Rules and Practices, Commission-Concealment Rules, and Free Services Rule by preventing brokers seeking to avoid

those rules from doing so. The Clear Cooperation Policy also tends to prevent the creation of rival listing networks that might arise to challenge the dominance of the NAR-affiliated MLS system.

89.    There are numerous reasons why a home seller might prefer not to list their home on an MLS. For example, the seller may want to limit the number of potential showings; the seller may want to test the waters and retain the option to pull the home off the market without the downward price pressure that attaches to a de-listed property; the seller may already know willing buyers to whom they would prefer to sell their home; the seller may prefer to avoid the expense of repairing and staging their home for potential buyers; the seller may wish to preserve their privacy and avoid disclosing details about themselves or their property, as required by an MLS; or the seller may want the sale to move faster or slower than the typical closing process through an MLS.

90.    The seller also may not want to list their home on an MLS because they do not wish to comply with NAR's Exclusionary Rules and Policies. For example, a seller may not want to comply with the Buyer-Broker Compensation Rule by making a unilateral blanket offer of compensation to the buyer-broker.

91.    There are also numerous reasons why a potential home buyer may want to buy a home without using an MLS. For example, the buyer may already know the seller, or the counterparties may have the same broker. The buyer also may not wish to comply with or be affected by NAR's Exclusionary Rules and Policies.

92.    Under the Clear Cooperation Policy, however, NAR prohibits its members from publicly marketing for sale any homes that are not listed on an MLS operated by an NAR affiliate. The Clear Cooperation Policy protects MLSs that are operated by NAR affiliates from competition

from alternative platforms, including innovators like Homie that offer private listings, customized services, and lower transaction costs to buyers and sellers seeking the same.

93.     These exclusionary effects of the Clear Cooperation Policy have caused injury and damage to Homie in Utah and erected barriers to Homie's entry into markets controlled by NAR-affiliated MLSs nationwide. The Clear Cooperation Policy was adopted by WFRMLS.

94.     A 2019 consumer survey revealed the powerful cumulative effects of NAR's Exclusionary Rules and Policies. The survey found: "Many homeowners don't realize how much it actually costs to sell a home. 45% of home sellers don't know they are expected to pay the buyer's agent commission. Only 35% know that the standard, total commission fee is about 6% of their home's final sale price." By creating a market where consumers are simultaneously charged supracompetitive prices and deprived of the ability or incentive to search for alternatives, Defendants and their co-conspirators diminished the ability and incentive of innovative new entrants such as Homie to compete away those supracompetitive prices by offering lower prices.

95.     Homie lost business as a result of the exclusionary steering facilitated by NAR's Exclusionary Rules and Policies. This lost business depressed Homie's profitability, reduced its access to capital necessary to invest and grow, and made it a less effective competitor in Utah and nationwide.

96.     After signing a buyer contract with Homie, one Homie buyer client emailed Homie:

I actually need to cancel the buyer agreement/contract. I have had several realtors

refuse to show me properties when I mentioned that I was working with Homie

and now I found a great house but the listing agent told me that if I use [H]omie

as my realtor or have [H]omie loans for my financing then she would have to

'warn the seller' about the terrible experience she has had with Homie. For the record, I think [H]omie is great but I don't want to miss out on my chance at the right home. Please cancel my buyer agreement.

97.     Another Homie client canceled a listing with Homie, reporting: "[W]e found that a good number of Realtors do not care to work with Homie. We had multiple calls from realtors stating that they didn't want to show our home with Homie. I wonder how many sales we missed. We found that most realtors do not like Homie and discourage it to their clients."

98.     Another Homie client canceled a listing with Homie, reporting: "After having no success with my sale I asked a friend, who is a realtor, why I wasn't getting any traffic to my house. He informed that realtors in the State of Utah were actively avoiding doing business with people listed on Homie because it was taking away from their jobs and commission. If no one was coming to see my home because their realtor wasn't suggesting it then I wasted my money going with Homie and now I get to spend more money and hire an agent. Extremely dissatisfied."

99.     On another occasion, a Homie buyer client emailed Homie to say that an NAR-member seller-broker had rejected his good faith offer. That Homie buyer client explained: "Sounds like they just rejected the offer based on us working with you."

100.    Yet another Homie buyer client reported to Homie that an NAR-member listing agent had canceled the prospective buyer's appointment to see a listing because the buyer was viewing the listed property on their own, with support from Homie, rather than through a traditional agent.

101.    As Homie's market share declined, competing brokers in Utah discussed publicly the success of their anticompetitive campaign to exclude Homie, with one agent writing that, in

competing with incumbent real estate brokerages in Utah, Homie had broken the "unwritten rules" of the "tight-knit realtor community" in Utah and, in competing in Utah, had tried to be "members of a club nobody wanted them to be a part of a part of."

> **D.    NAR Requires Local Associations to Agree to Anticompetitive Restraints**

102.    NAR successfully requires its members, including state and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned by local realtor associations, to fully comply with NAR's Exclusionary Rules and Policies and with other rules contained in NAR's Handbook on Multiple Listing Policy and NAR's Code of Ethics.

103.    NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."  National Association of REALTORS®, Handbook on Multiple Listing Policy 2022 (34th ed. 2022), at 9. Violations of the Code of Ethics can lead to loss of MLS access.

104.    NAR threatens its individual and associational members with expulsion for failing to comply with the Code of Ethics. NAR's Code of Ethics states: "Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of

Directors from membership in the National Association." National Association of REALTORS®, Code of Ethics and Arbitration Manual 2022, Preface, at 1.

105.    One or more local realtor associations own each of the NAR-affiliated MLSs, and NAR requires those realtor associations to ensure that its MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy and to NAR's Code of Ethics. Thus, each local realtor association and MLS agreed to the anticompetitive restraints challenged herein and play a central role in the implementation and enforcement of those restraints.

106.    Because access to the NAR-affiliated MLSs is a commercial necessity for all brokers and individual realtors, all brokers and individual realtors must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, the majority of which are NAR-affiliated MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property. Thus, NAR's Exclusionary Rules and Policies have substantial anticompetitive effects in markets nationwide.

107.    NAR has established and disseminated model rules for local realtor associations and the MLSs that these local associations own and operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

108.    One of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these valuable insurance benefits from realtor associations and MLSs that fail to comply with these mandatory provisions. Under the

terms of the Handbook, NAR's state and local associations, and the MLSs owned by those state and local associations, "must conform their governing documents to the mandatory MLS policies established by [NAR's] Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program." National Association of REALTORS®, Handbook on Multiple Listing Policy 2022 (34th ed. 2022), at iii.

109.    NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

### E.    Corporate Defendants Participate In, Facilitate, and Implement the Conspiracy

110.    The Corporate Defendants have agreed to adopt, promote, implement, and enforce NAR's Exclusionary Rules and Policies through their intimate involvement in NAR governance and imposition of NAR rules on local real estate associations and the Corporate Defendants' affiliated franchisees, brokers, and employees. By participating in an association that prevents member institutions from allowing their associates to compete with each other for commissions— and agreeing to follow and enforce its anticompetitive rules—the Corporate Defendants have joined the conspiracy and have played a central role in its implementation and enforcement.

111.    The Corporate Defendants participated in, implemented, and facilitated the conspiracy in at least four ways, detailed further below: (1) their executives and franchisee representatives attended NAR meetings, supervise NAR's operations, and review and vote on NAR rules; (2) they and their franchisees assisted in NAR's enforcement of the rules; (3) they and

their franchisees participated in local realtor associations that have adopted and enforced NAR's rules, including NAR's Exclusionary Rules and Policies; and (4) they required their franchisees and realtors to join NAR and the MLSs and comply with NAR rules, including NAR's Exclusionary Rules and Policies.

112.    First, representatives from each of the Corporate Defendants and their franchisees regularly attended biannual NAR meetings and hold leadership positions in the organization. Senior executives of the Corporate Defendants have served on NAR's governing board of directors, which includes regional vice presidents. NAR's organizational structure is displayed on its website:

/ / /

/ / /

https://cdn.nar.realtor//sites/default/files/nar_governing_bodies_2023-09-13.png?_gl=1*n0qvpn*_gcl_au*MTM3Njg2MzExMi4xNzIxMDU1Njgx



As the foregoing organization chart illustrates, all regional vice presidents are part of NAR's board of directors. And many of those regional vice presidents are senior representatives of Corporate Defendants. For example:

a.      Steve Medeiros, a broker associate at Keller Williams Realty, is a 2024 NAR Regional Vice President.

b.      Jay S. Mitchell, a managing broker at Berkshire Hathaway HomeServices RW Towne Realty, is a 2024 NAR Regional Vice President.

c.      Faron W. King, the broker owner of Coldwell Banker High Country Realty, is a 2024 NAR Regional Vice President.

d.      Bernice Helman, a Regional Vice President of Coldwell Banker Real Estate Group, is a 2024 NAR Regional Vice President.

e.      Scott Wendl, the owner of RE/MAX Precision, is a 2024 NAR Regional Vice President.

f.      Amy Bladow, a Regional Sales Manager/Managing Broker of Century 21 Judge Fite Company, is a 2024 NAR Regional Vice President.

g.      Marvin Jolly, a Regional Senior Vice President at Berkshire Hathaway HomeServices PenFed Realty, is a 2024 NAR Regional Vice President.

h.      Connie Fogle, an associate broker at Century 21 High Desert, was a 2023 NAR Regional Vice President.

i.      Kevin Sigstad, the President of RE/MAX Premier Properties, was a 2023 NAR Regional Vice President.

j.      Dale Chumbley, a realtor at Windermere Real Estate NW Living—operated by HSF Affiliates—was a 2022 NAR Regional Vice President.

k.      Bart Miller, a realtor at RE/MAX Results, was a 2022 NAR Regional Vice President.

l.      Tiffanie Mai-Ganske, a realtor at RE/MAX Country Real Estate, was a 2021 NAR Regional Vice President.

m.      Scott Matthias, who was a realtor at RE/MAX Professionals Inc., was a 2021 NAR Regional Vice President.

n.      Deborah Baisden, a realtor at Berkshire Hathaway HomeServices RW Towne Realty, was a 2020 NAR Regional Vice President.

o.      Kaki Lybbert, a real estate agent at Century 21 Judge Fite Company, was a 2020 NAR Regional Vice President.

p.      Rod Helm, a realtor at Coldwell Banker Realty, was a 2019 NAR Regional Vice President.

q.      Chris Rost, a real estate agent at Coldwell Banker Antrim Piper Wenger Realtors, was a 2019 NAR Regional Vice President.

r.      Jim Gamble, the owner of The Gamble Group/Keller Williams Realty, was a 2018 NAR Regional Vice President.

s.      Scott Kesner, the broker owner of Century 21 The Edge, was a 2018 NAR Regional Vice President.

t.      Julie DeLorenzo, the owner of Julie DeLorenzo Realty/Keller Williams Realty Boise, was a 2017 NAR Regional Vice President.

u.      Betty McTamney, an associate broker and the director of recruiting and coaching at RE/MAX 440, was a 2016 NAR Regional Vice President.

v.      JoAnne Poole, a branch manager at Berkshire Hathaway HomeServices Homesale Realty, was a 2016 NAR Regional Vice President.

w.     Faye Nelson, a realtor at RE/MAX Professionals, was a 2016 NAR Regional Vice President.

Corporate Defendants also dominated the Leadership Team that manages NAR's day-to-day operations. For example, the following representatives of the Corporate Defendants were part of NAR's leadership team:

a.     Tracy Kasper, the owner of Berkshire Hathaway HomeServices Silverhawk Realty, was NAR's 2023 President-Elect.

b.     Jennifer Wauhob, a realtor at Better Homes and Gardens Real Estate Gary Greene, was NAR's 2023 Vice President of Association Affairs.

c.     Shannon King, a residential realtor at Coldwell Banker Realty, was NAR's 2022 Vice President of Association Affairs.

d.     Charlie Oppler, the CEO and managing partner of Prominent Properties Sotheby's International Realty, was NAR's 2022 Immediate Past President.

e.     Charlie Oppler, the CEO and managing partner of Prominent Properties Sotheby's International Realty, was NAR's 2021 President.

f.     John Flor, a listing specialist and broker associate at Six Lakes Realty powered by Keller Williams Realty Diversified, was NAR's 2020 Treasurer.

g.     Mabel Guzman, a sales broker at Coldwell Banker Residential Brokerage, was NAR's 2020 Vice President of Association Affairs.

h.     Charlie Oppler, the CEO and managing partner of Prominent Properties Sotheby's International Realty, was NAR's 2020 President-Elect.

i.      John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company, was NAR's 2019 President.

j.      Tracy Kasper, the owner of Berkshire Hathaway HomeServices Silverhawk Realty, was NAR's 2019 Vice President of Advocacy.

k.      Elizabeth Mendenhall, the CEO of RE/MAX Boone Realty in Columbia, Missouri, was NAR's 2019 Immediate Past President.

l.      Elizabeth Mendenhall, the CEO of RE/MAX Boone Realty in Columbia, Missouri, was NAR's 2018 President.

m.      Larry Keating, the broker owner of RE/MAX Jeferson City, was an Association Leadership 2018 NAR committee liaison.

n.      Fritzi Barbour, who was the broker in charge of Berkshire Hathaway Home Services C. Dan Joyner, REALTORS, was a law and policy 2018 NAR liaison.

o.      Tracy Kasper, the owner of Berkshire Hathaway HomeServices Silverhawk Realty, was a REALTOR® Party Member Involvement 2017 committee liaison.

p.      Christine Hansen, the owner of Century 21 Hansen Realty, was a Consumer Relations 2017 committee liaison.

q.      Michael Labout, a branch broker at ERA Shields, a subsidiary of Anywhere, was an NAR Vice President for 2016.

r.      Linda Rheinberger, a realtor at Berkshire Hathaway Home Services Nevada Properties, was a REALTOR® Party Community Engagement 2016 committee liaison.

113.    HSA has explained its role in NAR as follows: "As an industry leader, we have a responsibility to actively participate in shaping our industry and its current and future business model. The HomeServices executive leadership and CEOs of our operating companies drive these important discussions as leaders within the National Association of Realtors . . . and at the regional and local levels of the MLS organizations." This statement appeared on HSA's webpage from at least 2017 through 2022, when it was removed by HSA.

114.    The following representatives from the Corporate Defendants or their franchisees participated specifically in the NAR Multiple Listing Issues and Policies Committee, responsible for reviewing and reissuing the Handbook during the relevant years:

a.    Andy Bencosme, the principal broker and co-owner of Century 21 Village Realty, was the 2023 chair.

b.    Johnny Mowad, a broker realtor at Ebby Halliday Realtors—owned by Berkshire Hathaway HomeServices—was the 2023 vice chair.

c.    Jeffrey Levine, a broker and sales associate at Coldwell Banker, was the 2022 chair.

d.    Andy Bencosme, the principal broker and co-owner of Century 21 Village Realty, was the 2022 vice chair.

e.    Jon Coile, the Vice President of MLS & Industry Relations at HomeServices of America, was the 2021 chair.

f.    Jeffrey Levine, a broker and sales associate at Coldwell Banker, was the 2021 vice chair.

g.      Shad Bogany, a realtor at Better Homes and Gardens Real Estate Gary Green, was the 2020 committee liaison.

h.      Jon Coile, the Vice President of MLS & Industry Relations at HomeServices of America, was the 2020 vice chair.

i.      Sam DeBord was the managing broker at Coldwell Banker Danforth and the 2019 committee liaison.

j.      Shad Bogany, a realtor at Better Homes and Gardens Real Estate Gary Green, was the 2018 committee chair.

k.      Sam DeBord was the managing broker at Coldwell Banker Danforth and the 2018 committee vice chair.

l.      Shad Bogany, a realtor at Better Homes and Gardens Real Estate Gary Green, was the 2017 committee vice chair.

m.      Rich Harris, the principal broker at Coldwell Banker Pro West Ashland, was the 2016 committee chair.

n.      Jeanne Radsick, the owner of Century 21 Hometown Realty and then a realtor at Century 21 Jordan-Link & Co, was the 2015 committee chair.

115.    By virtue of their leadership positions in NAR, these and other representatives from the Corporate Defendants were responsible for formulating, reviewing, and approving NAR's Exclusionary Rules and Policies. NAR approves and issues a new MLS Handbook each year; changes to NAR's MLS policy and Professional Standards are discussed and approved at NAR's yearly meetings by NAR committees on which representatives from each Corporate Defendant serve. The NAR Board of Directors has final approval on additions and amendments to MLS rules

and regulations. The Board consistently and repeatedly reissued NAR's Exclusionary Rules and Policies challenged herein before gradually repealing some, but not all, of those Rules and Policies within the past four years as antitrust condemnation of those Rules and Policies accelerated.

116.    Second, each Corporate Defendant assisted NAR with ensuring compliance with the NAR rules. Local realtor associations and the NAR Board of Directors are responsible for the enforcement of NAR's MLS rules and regulations. As noted above, representatives from the Corporate Defendants served on NAR's Board of Directors, which considers all written complaints involving alleged violations of NAR's rules and regulations. Representatives from the Corporate Defendants also served on the compliance committees of local realtor organizations.

117.    Third, in each of the areas in which the NAR-affiliated MLSs operate (and elsewhere), the Corporate Defendants collaborated with local realtor associations to implement and enforce NAR's rules, including NAR's Exclusionary Rules and Policies, in furtherance of the combination and conspiracy alleged herein. Executives of franchisees of each Corporate Defendant have participated in the governance of the local realtor associations that own and operate NAR-affiliated MLSs (and participate in the governance of other local realtor associations), and they implement the conspiracy by requiring compliance with the NAR rules, including NAR's Exclusionary Rules and Policies, and adoption of standard form contracts implementing the NAR rules.

118.    For example, the WFRMLS Executive Committee and Board of Directors currently consists of representatives from the Corporate Defendants' franchisees and other operations, including:

a.    DeAnna Robbins, managing broker at Summit Sotheby's International Realty;

b.      Christy Vail, a realtor at KW Success Keller Williams Realty; and

c.      Ron Snow, a broker owner at RE/MAX Associates.

119.    Representatives of the Corporate Defendants currently serve as officers of UAR, including Adam Kirkham, a broker at Summit Sotheby's International Realty, who is the President of UAR, and Aaron Drussel, owner of Better Homes and Gardens Real Estate Momentum, who is the Treasurer of UAR.

120.    Representatives of the Corporate Defendants currently serve on the Board of Directors of the Salt Lake Board of REALTORS, one of the owners of WFRMLS, including:

a.      Jodie Osofsky, a realtor at Summit Sotheby's International Realty;

b.      Amy Gibbons, a realtor at Keller Williams South Valley;

c.      Rob Ockey, the VP and Managing Broker at Berkshire Hathaway HomeServices Salt Lake City;

d.      Janice Smith, a sales associate at Coldwell Banker Realty;

e.      Laura Fidler, a realtor at Summit Sotheby's International Realty; and

f.      Jenni Barber, a realtor at Berkshire Hathaway HomeServices.

121.    Representatives of the Corporate Defendants currently serve on the Board of Directors of the Utah Central Association of REALTORS, one of the owners of WFRMLS, including:

a.      Daniel Dixon, an area branch broker at RE/MAX Associates Pleasant Grove;

b.      Liesha Geddes, a managing broker at Coldwell Banker Realty;

c.      Allison Greetham, a realtor at Berkshire Hathaway Elite Real Estate;

d.      Peter Morkel, a realtor at Keller William Westfield, Peter Morkel Real Estate

Group;

e.      Becca Summers, a realtor at Keller William Westfield, Seasons Real Estate;

f.      Garth Frandsen, a real estate agent at RE/MAX Bridge Realty;

g.      Heidi Blake, a realtor at Berkshire Hathaway HomeServices, The Blake Walker

Group; and

h.      Denice Waybrant, a realtor at ERA Brokers Consolidated.

122.    Representatives of the Corporate Defendants currently serve on the Board of

Directors of the Northern Wasatch Association of REALTORS, one of the owners of WFRMLS,

including:

a.      Fabian Amarillo, a realtor at Keller William Success, Amarillo Realty Group;

b.      Shannon Kee, a realtor at Better Homes and Gardens Real Estate Momentum;

c.      Devi Cooper, a real estate agent at RE/MAX Associates;

d.      Cory Berdinner, a realtor at Keller Williams Success Realty;

e.      Kristie Nelson, a team owner at KW Success Keller Williams Realty, Knection

Homes; and

f.      Russie Edwards, a team leader at KW Success Realty.

123.    Representatives of the Corporate Defendants currently serve on the Board of

Directors of the Cache Valley Association of REALTORS, one of the owners of WFRMLS,

including:

a.      Kim Phipps, a realtor at Berkshire Hathaway HomeServices;

b.      Isabel Jones, a realtor at Keller Williams Success; and

45

     c.     Kristina Eck, a realtor at Keller Williams Success.

124.    Finally, each Corporate Defendant also agreed to participate in, implement, and/or facilitate the conspiracy by imposing NAR's rules, including NAR's Exclusionary Rules and Policies, on its franchisees, affiliates, and realtors. Until just recently, each Corporate Defendant required its franchisees, affiliates, and realtors to join NAR, follow NAR's Code of Ethics, and join a local realtor association and/or MLS, which required compliance with NAR's Exclusionary Rules and Policies. Each Corporate Defendant required its realtors and franchisees to abide by NAR rules as a condition of doing business with the Corporate Defendants and to secure the benefits of their brands, infrastructure, and other resources that support their brokerage operations.

125.    Until at least October 2023, Anywhere required its franchisees and realtors to comply with NAR rules and regulations, including NAR's Exclusionary Rules and Policies. According to the 2020 Form 10-K Annual Report of Anywhere's predecessor, Realogy, filed with the U.S. Securities and Exchange Corporation and at all times relevant to this Complaint, Anywhere "participate[d] in many multiple listing services ('MLS')," and was "a member-owner of certain MLSs, and a member of the National Association of REALTORS® ("NAR") and respective state realtor associations and, accordingly, [is] subject to each group's rules, policies, data licenses, and terms of service, which specify, among other things, how [they] may access and use MLS data and listings and how MLS data and listings must be displayed on [their] and [their] franchisees' websites and mobile applications."

126.    Until at least October 2023, HSA likewise required its franchisees and realtors to comply with NAR rules and regulations, including NAR's Exclusionary Rules and Policies.

127.    Until at least October 2023, Keller Williams required its franchisees and realtors to comply with NAR rules and regulations, including NAR's Exclusionary Rules and Policies. Specifically, Keller Williams required: "All associates representing Keller Williams Realty[] [w]ill become members of their local Board/Association of REALTORS® and MLS . . . ." Testimony from Keller Williams' founder, Gary Keller, at a recent trial confirmed that Keller Williams required that all franchisees, members, and associated agents and brokers become members of NAR. This requirement ensured that all Keller Williams-affiliated agents and brokers must abide by NAR's Exclusionary Rules and Policies. Keller Williams trained or instructed its agents to enforce the Buyer-Broker Compensation Rule, to tell customers they cannot reduce their offer of compensation to buyer-brokers or buyer-brokers will not show the home, to take a stand for 6% total commissions (if a seller pushed back, Keller Williams' agents were permitted to suggest 5.99%), and to always offer 3% to the buyer agent.

128.    Until at least October 2023, RE/MAX required its franchisees and realtors to comply with NAR rules and regulations, including NAR's Exclusionary Rules and Policies. RE/MAX required its franchisees to "agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS® (or comparable organization)." RE/MAX's brokerage agreements required that brokers "maintain membership" in the "National Association of REALTORS® ('NAR') . . . [and] abide by the Code of Ethics promulgated by NAR and all of the rules and regulations of NAR and each local or regional MLS in which Broker participates." This requirement ensured that all RE/MAX-affiliated agents and brokers abided by NAR's Exclusionary Rules and Policies.

129.    Thus, by developing and reissuing NAR's Exclusionary Rules and Policies, enforcing the rules through NAR and local realtor association leadership, imposing the rules on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations, and MLSs and comply with their rules, each Corporate Defendant has agreed to participate in and implemented and/or facilitated the conspiracy.

### F.    Market Power

130.    The relevant market for the claims asserted herein is the bundle of services provided to homebuyers and sellers by residential real estate brokers with MLS access. Defendants' control of NAR-affiliated MLSs gives Defendants the ability to impose NAR's Exclusionary Rules and Policies. Access to the MLSs is critical for brokers to compete and assist home buyers and sellers in the areas in which those MLSs operate.

131.    The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the NAR-affiliated MLSs operate. Nearly all homes sold in these geographic areas were listed on the MLS by brokers subject to the MLS and NAR rules and standards. The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood and typically prefer to work with a broker who knows the area in which they are interested.

132.    One relevant geographic market for the claims asserted herein is Utah. Consumers looking to buy or sell homes in Utah retain the services of brokers located and licensed in Utah and

do not consider the services of brokers located and licensed outside of Utah to be reasonable substitutes for the services of brokers located in the state.

133.    Corporate Defendants, through their co-conspirator franchisees and other conspiring brokers in the areas in which the MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas.

134.    Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS, including WFRMLS in Utah, and their dominant share of the local market.

135.    Any brokers in the areas in which the NAR-affiliated MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the NAR-affiliated MLSs through their co-conspirators (*i.e.*, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers or, alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

136.    For an alternative listing service to compete effectively with one of the NAR-affiliated MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the NAR-affiliated MLS. No such alternative listing network exists today, in part due to the anticompetitive effects of the Clear Cooperation Policy. Indeed, the absence of listing services that

compete with the NAR-affiliated MLSs (or other MLSs) reflects the very substantial barriers to entry. Moreover, NAR advises MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms."

## V.    CLAIMS FOR RELIEF

### A.    <u>First Claim for Relief</u>

(Violation of Section 1 of the Sherman Act)

137.    Homie incorporates the preceding paragraphs as if set forth in full hereat.

138.    The adoption and enforcement of NAR's Exclusionary Rules and Policies by Defendants reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers that restrain competition in the relevant markets.  The conspiracy alleged above and challenged in this action has had an anticompetitive effect in the relevant product and geographic markets and unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

139.    The conspiracy alleged is *per se* illegal, or in the alternative is unlawful subject to a "quick look" or under the Rule of Reason.

140.    As a result of Defendants' conduct, Homie has suffered injury and damages, including lost profits and lost enterprise value.

141.    Homie has suffered antitrust injury due to Defendants' illegal conduct. Homie was excluded by NAR's Exclusionary Rules and Policies, the cumulative effect of which was to diminish Homie's ability and incentive to compete using lower prices, to reduce Homie's revenue

and profit, and to deprive Homie of the economies of scale, scope, access to capital, commercial

validation and learning-by-doing necessary to compete effectively. Homie suffered injury of the

type that the antitrust laws were intended to prevent and that flows from that which makes

Defendants' acts unlawful.

### B.    Second Claim for Relief

(Violation of Utah Antitrust Act)

142.    Homie incorporates paragraphs 1 through 136 as if set forth in full hereat.

143.    The conspiracy alleged herein violates Section 76-10-3104 (1) of the Utah Antitrust

Act, Utah Ann. Code, § 76-10-3101 *et seq.*

### C.    Third Claim for Relief

(Tortious Interference with Economic Relations)

144.    Homie incorporates paragraphs 1 through 136 as if set forth in full hereat.

145.    Defendants and their co-conspirators knowingly and intentionally interfered with

Homie's existing and potential economic relations through improper means, causing injury to

Homie.

146.    As set forth above, Defendants and their co-conspirators knowingly and

intentionally interfered with Homie's existing and potential economic relations, including by

steering consumers away from Homie's clients, causing Homie's clients to cancel their contracts

with Homie, and causing Homie's business partners not to renew their existing contracts with

Homie.

147.    Defendants and their co-conspirators interfered with Homie's existing and potential

economic relations by improper means and for improper purposes, including by utilizing

anticompetitive rules to steer consumers away from Homie and implementing an illegal group boycott against Homie. The actions of Defendants and their co-conspirators were not privileged in any way.

### VI.    PRAYER FOR RELIEF

Homie requests the following relief:

A.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

B.    That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and award Homie actual damages in an amount to be determined at trial, such amount to be trebled as permitted by law;

C.    That the Court award Homie a permanent injunction under Section 16 of the Clayton Act, enjoining the Defendants from conspiring as alleged herein, including through the enforcement of NAR's Clear Cooperation Policy;

D.    That the Court award Homie pre- and post-judgment interest on any recovery;

E.    That the Court award Homie its costs of suit, including reasonable attorneys' fees and expenses as permitted by law; and

F.    That the Court award Homie such other relief as the Court may deem just and proper.

/ / /

/ / /

## VII.    JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Homie hereby demands a trial by jury of all claims so triable in this lawsuit.

Dated: August 22, 2024                    Respectfully submitted,

                                          MASCHOFF BRENNAN

                                          */s/ Sterling A. Brennan*
                                            Sterling A. Brennan

                                          Attorneys for HOMIE TECHNOLOGY, INC.