Amy F. Sorenson (8947)
Annika L. Jones (16483)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email: asorenson@swlaw.com
         aljones@swlaw.com

*Attorneys for Defendant Keller Williams
Realty, Inc.*

Boris Bershteyn (admitted *pro hac vice*)
Sam Auld (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: 212.735.3834
Facsimile: 917.777.3834
Email: boris.bershteyn@skadden.com
         sam.auld@skadden.com

David C. Kully (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
800 17th Street N.W. Suite 1100
Washington, DC  20006
Telephone: 202.469.5415
Email: david.kully@hklaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HOMIE TECHNOLOGY, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, an Illinois non-profit association; ANYWHERE REAL ESTATE INC., a Delaware corporation; KELLER WILLIAMS REALTY, INC., a Texas corporation; HOMESERVICES OF AMERICA, INC., a Delaware corporation; HSF AFFILIATES, LLC, a Delaware limited liability company; and RE/MAX LLC, a Delaware limited liability company,<br><br>Defendants. | **KELLER WILLIAMS REALTY, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>[Oral Argument Requested]<br><br>Case No. 24-cv-00616-DAK-JCB<br><br>District Judge: Hon. Dale A. Kimball<br>Magistrate Judge: Hon. Jared C. Bennett |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ....................................................................................................................1

BACKGROUND .......................................................................................................................3

I.      Real Estate Agents' Roles in Helping People Sell and Buy Homes....................................3

II.     Keller Williams.................................................................................................................4

III.    NAR's Rules And Policies.................................................................................................4

IV.    Home Buyers and Sellers Allege That the NAR Rules Inflated Commissions ..................6

V.     Homie Rapidly Grows and Then Rapidly Declines............................................................7

VI.    Homie Alleges That the NAR Rules Were Adopted to Boycott It .....................................8

ARGUMENT ............................................................................................................................9

I.      HOMIE FAILS TO ADEQUATELY ALLEGE ANY OF ITS CLAIMS ........................9

A.    Homie Fails to Allege Facts Suggesting That Keller Williams Agreed to Boycott
Homie.............................................................................................................................10

B.    The Complaint Should Be Dismissed Because Homie Lacks Antitrust Standing
and Fails to State a Claim for Tortious Interference..........................................................19

II.     THE COURT LACKS PERSONAL JURISDICTION OVER KELLER
WILLIAMS.....................................................................................................................20

A.    Keller Williams Is Not Subject to General Jurisdiction in Utah.......................................21

B.    Keller Williams Is Not Subject to Specific Jurisdiction in Utah ......................................22

CONCLUSION.........................................................................................................................25

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A AAA Custom Plumbing Corp. v. National Telemedicine Center Inc.*,
2011 WL 588748 (D. Colo. Feb. 9, 2011) .......................................................................... 23

*Abney v. Philip Morris USA Inc.*,
2024 WL 915008 (D.N.M. Mar. 4, 2024) .......................................................................... 21

*Allergy Research Group LLC v. Rez Candles Inc.*,
2022 WL 1004214 (D. Utah Apr. 4, 2022) .......................................................................... 10

*Armstrong v. JPMorgan Chase Bank National Ass'n*,
633 F. App'x 909 (10th Cir. 2015) .......................................................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................... 9

*Automotive Alignment & Body Service, Inc. v. State Farm Mutual Automobile Insurance Co.*,
953 F.3d 707 (11th Cir. 2020) .......................................................................... 19

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................... 9, 10, 18

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*,
691 F. App'x 515 (10th Cir. 2017) .......................................................................... 10, 16

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) .......................................................................... 10, 16

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
92 F.4th 381 (2d Cir. 2024) .......................................................................... 2, 14, 15, 16, 18

*Dental Dynamics, LLC v. Jolly Dental Group, LLC*,
946 F.3d 1223 (10th Cir. 2020) .......................................................................... 20

*Eastern States Retail Lumber Dealers' Ass'n v. United States*,
234 U.S. 600 (1914) .......................................................................... 13

*Estate of Lockett v. Fallin*,
841 F.3d 1098 (10th Cir. 2016) .......................................................................... 9

*Glover By & Through Dyson v. Boy Scouts of America*,
   923 P.2d 1383 (Utah 1996)..................................................................17

*Hartford Fire Insurance Co. v. California*,
   509 U.S. 764 (1993)..................................................................1, 2, 12, 13, 15

*InterVest, Inc. v. Bloomberg, L.P.*,
   340 F.3d 144 (3d Cir. 2003)..................................................................16

*Jicarilla Apache Tribe v. Supron Energy Corp.*,
   728 F.2d 1555 (10th Cir. 1984) ..................................................................17

*Jien v. Perdue Farms, Inc.*,
   2020 WL 5544183 (D. Md. Sept. 16, 2020) ..................................................................17

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984)..................................................................22

*KM Enterprises, Inc. v. Global Traffic Technologies, Inc.*,
   725 F.3d 718 (7th Cir. 2013) ..................................................................24

*Llacua v. Western Range Ass'n*,
   930 F.3d 1161 (10th Cir. 2019) ..................................................................10, 11, 15, 17, 18

*Madden v. Petland Summerville, LLC*,
   2021 WL 5770294 (D.S.C. Dec. 6, 2021) ..................................................................23

*National Institute of First Assisting, Inc. v. Ass'n of Operating Room Nurses, Inc.*,
   2020 WL 8189594 (D. Colo. Sept. 11, 2020) ..................................................................11

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
   472 U.S. 284 (1985)..................................................................11

*Old Republic Insurance Co. v. Continental Motors, Inc.*,
   877 F.3d 895 (10th Cir. 2017) ..................................................................21

*Peay v. BellSouth Medical Assistance Plan*,
   205 F.3d 1206 (10th Cir. 2000) ..................................................................24, 25

*Santora v. Starwood Hotel & Resorts Worldwide, Inc.*,
   580 F. Supp. 2d 694 (N.D. Ill. 2008) ..................................................................23

*Slagle v. ITT Hartford*,
   102 F.3d 494 (11th Cir. 1996) ..................................................................12

*Vora v. C4 Therapeutics, Inc.*,
      2023 WL 4899568 (D. Colo. Aug. 1, 2023) ....................................................21

*Walden v. Fiore*,
      571 U.S. 277 (2014)................................................................................20, 22

*Wenz v. Memery Crystal*,
      55 F.3d 1503 (10th Cir. 1995) ...............................................................20, 22

*XMission, L.C. v. Fluent LLC*,
      955 F.3d 833 (10th Cir. 2020) .........................................................20, 21, 23

*XMission, L.C. v. PureHealth Research*,
      105 F.4th 1300 (10th Cir. 2024) ............................................................20, 22

## INTRODUCTION

Plaintiff Homie Technology, Inc.'s complaint should be dismissed because it fails to plead facts plausibly suggesting that Keller Williams Realty, Inc. ("Keller Williams") agreed to boycott Homie, tortiously interfered with its contracts, or is even subject to personal jurisdiction in Utah. At bottom, Homie—a competitor of franchisees affiliated with Keller Williams—is trying to piggyback on antitrust lawsuits previously brought against Keller Williams (and many other participants in the residential real estate industry) by home sellers and buyers alleging that certain rules adopted by the National Association of REALTORS® ("NAR") inflate real estate agent commissions. But Homie fails to allege Keller Williams did anything in Utah, much less agreed to boycott Homie there—or anywhere. And even if Homie could escape those pleading deficiencies, Supreme Court precedent bars Homie from recycling alleged "price fixing" into an alleged agreement to boycott a competitor like Homie.

**First**, Homie's claims under the Sherman Act and the Utah Antitrust Act fail because Homie pleads no evidence that Keller Williams agreed to boycott Homie's efforts to compete to provide brokerage services to home buyers and sellers. Instead, Homie alleges that NAR rules supposedly governing the conditions for listing homes for sale on NAR-affiliated Multiple Listing Services artificially inflated commissions that sellers paid to real estate agents and reduced interest in the "discounted" commissions that Homie offered agents. Those allegations, however, just repackage "price fixing" claims asserted by home sellers and buyers in *Burnett v. National Association of Realtors*, *Moehrl v. National Association of Realtors*, and *Batton v. National Association of Realtors* into a group boycott claim. And the Supreme Court has squarely held that an alleged agreement to inflate prices, by "definition," is not a group boycott. *Hartford Fire Ins.*

*Co. v. California*, 509 U.S. 764, 803 (1993).

The only material allegations that Homie does not borrow from *Burnett* and *Batton*—social media posts and messages by anonymous real estate agents requesting that Homie offer higher commissions—are plainly insufficient to plead that Keller Williams joined a boycott. Those social media posts and messages are not even alleged to have been made by Keller Williams or its affiliates. Instead, Homie alleges they were made by unidentified real estate agents working at "[l]ocal NAR members" in Utah. (ECF No. 1 ("Compl.") ¶ 68.) But even if Homie had identified the messages and posts' authors, they could not be attributed to Keller Williams because Keller Williams only "franchis[es]" brokerages in Utah (*id*. ¶ 23), and Homie does not allege Keller Williams directed franchisees to deliver these messages or make these posts.

In any case, the posts and messages do not suggest that anybody boycotted Homie, but instead state that buyer agents would "happily show [Homie] listings if [it] offer[s] a fair and reasonable" commission. (Compl. ¶ 65.) As the Supreme Court has held, boycotts are not "concerted refusal[s] to engage in particular transactions until the terms of those transactions are agreeable." *Hartford Fire*, 509 U.S. at 803-04. Furthermore, "[i]t is decidedly not indicative of a conspiracy that a group of similarly situated market participants would object, individually and separately to" accepting lower commissions "that could cut into their profits." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 409 (2d Cir. 2024).

**Second**, Homie's complaint should also be dismissed because Homie lacks antitrust standing and fails to state a claim for tortious interference for the reasons explained in NAR's motion to dismiss. Keller Williams fully joins NAR's arguments, which explain that the Supreme Court has barred competitors like Homie from seeking to recover lost profits under the antitrust

laws, especially when market conditions supposedly created by defendants' alleged conspiracy benefitted Homie. In addition, Homie's tortious interference claims are especially weak against Keller Williams because Homie fails to allege Keller Williams did anything to interfere with Homie's contracts.

**Third**, the complaint should also be dismissed because the Court lacks personal jurisdiction over Keller Williams. The Court lacks general jurisdiction over Keller Williams because Homie fails to allege that Keller Williams is at home (or, for that matter, did anything) in Utah and it lacks specific jurisdiction because Homie fails to allege Keller Williams took action in support of the alleged boycott of Homie in Utah. Instead, Homie improperly tries to impute to Keller Williams alleged acts by agents working for independently owned and operated franchisees. But Homie fails to allege, as it must, that Keller Williams directed any of their actions.

## BACKGROUND

### I.    Real Estate Agents' Roles in Helping People Sell and Buy Homes

People can buy and sell their homes themselves, but about 90% prefer using a local real estate agent. (Compl. ¶ 26.) Agents market homes for sale through a Multiple Listing Service, "which is the number one source for sellers to list their home." (*Id*. ¶ 34.) Sellers have had a "durable" preference for listing their homes on an MLS because it allows them to attract "a large set of potential buyers." (*Id*. ¶¶ 34-35.) Buyers also prefer finding their home using an MLS because it permits their agents to provide them "with information about all the listed homes in the area." (*Id*.) Driven by those consumer preferences, agents' participation "in their local MLS . . . is critical [for] their ability to compete with other brokers for home sellers and buyers." (*Id*. ¶ 36.)

Agents commonly earn commissions for assisting home sellers and buyers with their

purchase or sale that "are calculated as a percentage of a home's sale price." (*Id*. ¶ 26.)  According to Homie, it is "common" for sellers to pay "5% to 6%" of the home sale's price in commission to agents, which is "split between" the seller's agent and the buyer's agent. (*Id*. ¶ 38.)

## II.        Keller Williams

Keller Williams is headquartered in Austin, Texas, and franchises independently owned and operated real estate brokerages around the United States.  (Compl. ¶ 23.)  Keller Williams is not a real estate brokerage, does not own or operate any brokerages in Utah, and does not employ real estate agents here.  (Declaration of Debbie Gardner ("Gardner Decl."), attached as **Exhibit A**, ¶¶ 4, 6-7.)  Nor does Keller Williams have offices located here.  (*Id*. ¶ 4.)  Keller Williams exercises no control over franchisees' day-to-day operations.  (*Id*. ¶ 6.)

## III.       NAR's Rules And Policies

NAR is a trade association comprised of real estate agents, salespeople, and other real estate industry professionals.  (Compl. ¶ 18.)  NAR also allegedly counts "over 1,200 local realtor associations" as members and "approximately 500 MLSs" are affiliated with NAR because they are operated by those local realtor associations.  (*Id*.)

NAR purportedly promulgated and "enforced" rules governing the conditions for listing homes for sale on a NAR-affiliated MLS.  (*Id*.)  NAR allegedly adopted the "Buyer-Broker Compensation Rule" in 1996 (*id*. ¶ 59), and it supposedly required individuals who list their home on a NAR-affiliated MLS to offer a commission to buyers' agents (*id*. ¶¶ 38; 59).  Agents allegedly prefer that their clients purchase homes through NAR-affiliated MLSs because the Buyer-Broker Compensation Rule required that "offer[s] of compensation [be] displayed in the MLS."  (*Id*. ¶ 38.)  By requiring sellers to post offers of commission to buyers' agents in the MLS, the Buyer-

Broker Compensation Rule allegedly motivated sellers to offer "high" commissions. (*Id.* ¶ 60.) Although sellers unilaterally decide the commission offered to buyers' agents, Homie alleges that "40% of agents will go out of their way . . . to not show" homes where the commission is less than "2.8% or 3%." (*Id.* ¶ 61.)

NAR allegedly adopted the "Free Service Rule" in 1997, which supposedly allowed agents who were members of NAR-affiliated MLSs to tell buyers that their services were "free." (*Id.* ¶ 77.) Agents could purportedly tell buyers their services were "free" because "home sellers offer commissions and buyers do not directly pay" their agents. (*Id.*)

In 2012, NAR allegedly promulgated the "Commission Filter Policy" that permitted buyers' agents to filter homes listed on MLSs affiliated with NAR based on "objective criteria," including the commission being offered by sellers. (*Id.* ¶ 74.) The other objective criteria that agents could use to filter listings included "geography or location," "price," and the "type of property."[1] NAR rescinded the Commission Filter Rule in "November 2021." (*Id.* ¶ 73.)

NAR allegedly adopted an "optional provision" in 2012 ("Commission Disclosure Rule") that recommended that affiliated MLSs not disclose to prospective buyers the commission offered to buyers' agents. (*Id.* ¶ 81.) NAR rescinded the optional Commission Disclosure Rule in November 2021. (*Id.*) In 2019, NAR adopted the "Clear Cooperation Rule," requiring sellers' agents to list a home on their local MLSs within one day of marketing it to buyers. (*Id.* ¶ 87.)

Homie alleges that the foregoing NAR rules and policies ("NAR Rules") helped drive listings away from brokers offering discount commission because their listings failed to attract

---

[1]    Nat'l Ass'n of Realtors, *Handbook on Multiple Listing Policy* (32nd ed. 2020), https://www.nar.realtor/sites/default/files/documents/NAR-HMLP-2020-v2.pdf.

sufficient attention and showings from buyers' agents. (*Id.* ¶¶ 80, 84, 94-95.) According to Homie, the NAR Rules show "[r]ealtors [were] conspiring to fix Commission" (*id.* ¶ 67) and that defendants conspired to secretly "inflate commissions to consumers" (*id.* ¶ 45). Homie nevertheless alleges that 55% of home sellers know they are expected to offer compensation to buyers' agents and know that the typical total commission—split between buyers' and sellers' agents is about 6% of the home price. (*Id.* ¶ 94.)

Keller Williams is not a member of NAR and played no role in the enactment, enforcement, or implementation of the NAR Rules. (Gardner Decl. ¶¶ 5.) Homie alleges that Keller Williams generally "requir[ed]" its franchisees . . . to join NAR and MLSs, and comply with the NAR Rules. (Compl. ¶ 111.) Independent-contractor agents at franchisees affiliated with Keller Williams purportedly attended NAR meetings, participated in local realtor associations, and voted to approve the NAR Rules. (*Id.*)

## IV.        Home Buyers and Sellers Allege That the NAR Rules Inflated Commissions

In 2019, putative classes of home sellers in *Burnett v. National Association of Realtors,* No. 19-CV-00332 (W.D. Mo.), and *Moehrl v. National Association of Realtors,* 19-CV-01610 (N.D. Ill.), filed lawsuits alleging that the NAR Rules reflected an agreement among NAR and brokerages to inflate commissions. Two years later, a putative class of home buyers asserted parallel claims. *Batton v. National Association of Realtors,* 1:21-CV-00430 (N.D. Ill.). The home seller plaintiffs in *Burnett* alleged that the Buyer-Broker Compensation Rule was the "cornerstone of Defendants' conspiracy" to inflate commissions paid by home buyers. (ECF No. 759 ¶ 3.) The *Burnett* plaintiffs also alleged that the Free Service Rule (*id.* ¶ 44), the Commission Filter Policy (*id.* ¶ 99) and the Commission Disclosure Rule (*id.* ¶ 102) were part of the defendants' agreement

to inflate commissions as they created "strong incentives" for buyers' agents "to steer their buyer clients toward homes where the buyer broker would receive a greater commission percentage" (*id.* ¶ 22).

Like Homie, the *Burnett* plaintiffs alleged that the NAR Rules motivated buyers' agents "to not show homes to their clients where the seller is offering a lower adversary / buyer commission, or they will give priority to showing homes with higher adversary / buyer commission offers first." (*Id.* ¶ 9.)  The class in *Moehrl* asserted these same allegations on behalf of home sellers in a different geographic area.  (ECF No. 84 ¶¶ 4, 9, 70, 76-77, 79-80.)  And the putative class in *Batton* asserted parallel allegations on behalf of home buyers.  (ECF No. 84 ¶¶ 8, 12.)

*Burnett* went to trial last year resulting in a jury verdict for the home seller plaintiffs.  (ECF No. 1294).  No judgment was entered.  Before and after trial, the plaintiffs in *Burnett* and *Moehrl* reached settlements with various parties totaling nearly $1 billion, of which over $200 million has already been granted final approval.  *Burnett*, ECF No. 1487.

## V.    Homie Rapidly Grows and Then Rapidly Declines

Homie "was launched in 2015" aiming to "disrupt" the "traditional real estate brokerage model" in Utah.  (Compl. ¶ 45.)  Homie purportedly tried to do so by becoming a member of the "[l]ocal associations of NAR in Utah" (*id.* ¶ 70) and listing homes for sellers on NAR-affiliated MLSs (*id.* ¶ 46).  But as part of its "low-cost" commission strategy, Homie made "offer[s] of compensation to buyer-brokers that w[ere] somewhat below" the commissions offered by other brokerages in Utah.  (*Id.*)

Although the NAR Rules had been in place when Homie launched (and well before that time), Homie allegedly became "among the five largest brokerages" in Utah between 2017 and

2021.  (*Id*. ¶ 49.)  Homie alleges that houses sold faster and for higher prices when listed though Homie.  (*Id*.)  Armed with its alleged success in Utah, Homie purportedly sought to "expand [its] operations nationwide."  (*Id*. ¶ 48.)

Yet at some unidentified time after 2021, Homie's "market share, revenue, and profits" allegedly fell until Homie "was unable to compete effectively."  (*Id*. ¶ 51.)  As its business prospects dimmed, Homie "blam[ed] a souring real estate market."[2]  Homie also reportedly "built its business off of first-time home buyers and sellers," and that market dried up by 2022, with "rising interest rates . . . affecting how much business Homie was bringing in."[3]

## VI.     Homie Alleges That the NAR Rules Were Adopted to Boycott It

Homie alleges that defendants, along with "multiple franchisees and brokers" (Compl. ¶ 24), agreed to "both express and tacit boycotts" of Homie (*id*. ¶ 51).  Defendants' supposed boycott of Homie was allegedly "facilitated" by the NAR Rules and "organized through the MLS, online social media platforms, and public statements."  (*Id*. ¶ 50.)  Even though the NAR Rules were adopted years before Homie existed, defendants, their affiliates, and franchisees purportedly agreed to those Rules to foil the competitive threat posed by Homie's "discounted" commissions.  (*Id*. ¶ 55.)

Homie alleges that defendants somehow organized their boycott through public comments, social media, and messages it received from real estate agents.  (*Id*. ¶¶ 64-66.)  Yet Homie does

---

[2]     Shannon Sollitt, *Homie, the Utah company meant to 'disrupt' real estate, sheds its last agents*, Salt Lake Tribune (Apr. 19, 2024), https://www.sltrib.com/news/business/2024/04/19/homie-utah-company-meant-disrupt/.

[3]     Kelly Cannon, *What happened to Homie?*, Salt Lake Tribune (Nov. 9, 2023), https://www.sltrib.com/news/2023/11/09/with-layoffs-hitting-homie-whats/.

not attribute the actual comments or social media messages to specific defendants—and none to Keller Williams.  Also, the substance of the comments demonstrates that buyer agents were not refusing to show houses listed by Homie, but were dissatisfied with the commission being offered:

- "If you up the commission, I will bring my buyers. If not, I will not."  (*Id.* ¶ 64.)

- "I wouldn't have an issue with Homie and would happily show your listings if you'd offer a fair and reasonable" commission.  (*Id.* ¶ 65.)

- "I had your home on a list of 4 to show to my buyers tonight. Removed it from the list after I saw the 1.5% BBC [i.e., the buyer-broker commission]."  (*Id.* ¶ 66.)

"Local NAR members in Utah" also allegedly used "Facebook groups" to express their distaste for the commissions offered by Homie, "sometimes mark[ing] [posts] with '#boycottHOMIE.'"  (*Id.* ¶ 68.)  Homie does not identify anybody who made these online statements and messages, when they were made, or that anybody coordinated their communications.  Homie identifies one innocuous public statement by Keller Williams' CEO (*id.* ¶ 62), but does not allege that it is about Homie or connected to the social media posts or messages. Rather, Homie alleges that Keller Williams' CEO reported "that his firm's research had found that limited service discount brokers' market share in the United States is at an all-time low."  (*Id.*) Homie does not allege that this research was inaccurate.

## ARGUMENT

## I.    HOMIE FAILS TO ADEQUATELY ALLEGE ANY OF ITS CLAIMS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  But the Court "need not accept legal conclusions contained in the complaint as true."  *Est. of Lockett v. Fallin*,

841 F.3d 1098, 1107 (10th Cir. 2016). In testing a complaint against a motion to dismiss, a Court "may consider facts subject to judicial notice—including facts that are a matter of public record." *Armstrong v. JPMorgan Chase Bank Nat'l Ass'n*, 633 F. App'x 909, 911 (10th Cir. 2015) (not selected for publication). Homie must also supply the same factual support for its claim under the Utah Antitrust Act because "the federal and state statutes are essentially coextensive." *Allergy Rsch. Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *3 (D. Utah Apr. 4, 2022) (unpublished).

When the plaintiff alleges antitrust claims, courts "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" to discovery. *Twombly*, 550 U.S. at 558 (citation omitted). The Tenth Circuit has heeded this charge, concluding that "the need for plausibility in the complaint" is driven by "the high costs and frequent abuses associated with antitrust discovery." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).

### A.      Homie Fails to Allege Facts Suggesting That Keller Williams Agreed to Boycott Homie

Homie's boycott claims against Keller Williams should be dismissed because Homie fails to allege anything suggesting that Keller Williams agreed to a boycott. "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself," and plaintiffs must therefore allege each defendant "consciously committed themselves to a common scheme designed to achieve an unlawful objective." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174, 1179 (10th Cir. 2019). Plaintiffs must also allege that defendants' conspiracy "make[s] economic sense," *id*. at 1181, and "[a]n inference of conspiracy is impermissible if the defendants' conduct is consistent with other, equally plausible explanations," *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017) (not selected for publication).

The Tenth Circuit has provided two paths for satisfying these requirements. First, a plaintiff may plead "direct evidence" of conspiracy—"evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Llacua*, 930 F.3d at 1177. Second, a plaintiff may plead "circumstantial" evidence of conspiracy by alleging that the defendants engaged in parallel conduct that "raises a suggestion of a preceding agreement." *Id.* at 1179 n.29. But parallel conduct must come with "plus factors" that "tend to exclude the possibility of independent action." *Id.* at 1178-79.

Here, Homie tries in vain to allege Keller Williams agreed to a group boycott through (1) the NAR Rules and (2) anonymous statements and messages complaining about the commissions offered by Homie. Neither theory plausibly suggests Keller Williams agreed to do anything relating to Homie, much less boycott it.

### 1. Homie fails to allege direct or indirect evidence plausibly suggesting the NAR Rules reflect a boycott.

The NAR Rules do not suggest Keller Williams agreed to boycott Homie. The term "group boycott" has a specific meaning: "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (citation omitted). Plaintiffs "must" therefore allege the boycott was "multilateral" and that "the boycotters kn[e]w that they are refusing to engage in business relations." *Nat'l Inst. of First Assisting, Inc. v. Ass'n of Operating Room Nurses, Inc.*, 2020 WL 8189594, at *5 (D. Colo. Sept. 11, 2020) (Tymkovich, J.) (unpublished).

Here, Homie alleges that NAR Rules were adopted to "facilitate" defendants' alleged boycott (Compl. ¶ 51), but this is evasive language designed to cover up fatal legal flaws.

Controlling law forecloses Homie from recasting alleged "price fixing" into a group boycott. And even if the law were different, the timing of the events alleged in the complaint shows that Homie's "facilitation" theory is implausible.

**The NAR Rules supposedly inflated commissions, not facilitated a boycott.** The NAR Rules do not plausibly suggest a boycott because Homie's allegations impermissibly refashion a supposed conspiracy to fix commissions (as alleged by home buyers and sellers) into a conspiracy to boycott Homie. "[A] conspiracy to charge an inflated price is not a 'boycott.'" *Slagle v. ITT Hartford*, 102 F.3d 494, 499 (11th Cir. 1996); *see also Hartford Fire*, 509 U.S. at 803. The Supreme Court in *Hartford Fire* scoured over 100 years of jurisprudence to provide a "precise definition of the word boycott." 509 U.S. at 800. "The proper definition of 'boycott' arises when the defendants seek the "forbearance from . . . trade" with the boycott target and to punish it beyond refusing the target's price terms. *Id.* at 803-04. By contrast, the Court explained that boycotts do not include claims that defendants only had a "concerted refusal to engage in particular transactions until the terms of those transactions are agreeable." *Id.* at 804. In emphasizing the distinction between a boycott and an agreement to fix prices, the Court offered the following illustration from the circumstances that helped coin the word "boycott":

> [B]oycott . . . was first used in 1880, to describe the collective action taken against Captain Charles Boycott . . . . The Land League . . . demanded that landlords reduce their rents and . . . urged tenants to avoid dealing with those who failed to do so. Boycott did not bend to the demand and instead ordered evictions. In retaliation, the tenants . . . resolved not to have anything to do with him . . . no one would supply him with food.
>
> [I]f Captain Boycott's tenants had agreed among themselves that they would refuse to renew their leases unless he reduced his rents, that would have been a concerted agreement on the terms of the leases, but not a boycott. The tenants, of course, did more than that; they refused to engage in other, unrelated transactions with Boycott—e.g., selling him food—unless he agreed to their terms on rents. It is this expansion of the refusal to deal beyond the targeted transaction that gives great coercive force to a commercial boycott:

unrelated transactions are used as leverage to achieve the terms desired.

*Id*. at 800-03.  The Court held that this distinction between price fixing and group boycotts was critical because "if a concerted agreement, say, to include a [particular price] in all contracts is a 'boycott' because it excludes all buyers who won't agree to it, then by parity of reasoning every price fixing agreement would be a boycott also."  *Id.* at 802; *see also E. States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914) (lumber retailers' agreement to not purchase from lumber wholesalers that sell directly to customers was a boycott because it "sought an objective—the wholesale dealers' forbearance from retail trade—that was collateral to [the retailers'] transactions with the wholesalers").

Here, Homie effectively admits that the NAR Rules cannot plead a boycott because it claims that those Rules amounted to "[r]ealtors . . . conspiring to fix Commission" paid in home sales.  (Compl. ¶ 67; *see also id*. ¶¶ 38, 45.)  Homie also admits that the NAR Rules were already challenged by "consumer class[es]" alleging that the Rules artificially inflated commissions paid by sellers and buyers in *Burnett*, *Moehrl*, and *Batton*.  (*Id*. ¶ 42.)  And despite trying to recast those allegations of price fixing into a group boycott, Homie fails to allege the NAR Rules enforced any agreement to "forbear[] from . . . trade" or punish Homie beyond refusing the discount commissions Homie offered.  *Hartford Fire*, 509 U.S. at 803-04.  Instead, Homie's theory is only that the NAR Rules facilitated agents' refusals to show homes listed with Homie until it "raise[d]" the commission being offered to buyer agents.  (Compl. ¶ 64.)  By "definition," that cannot plead a group boycott because all it tries to allege is "a concerted refusal to engage in particular transactions until [the commission being offered was] agreeable" to agents.  *Hartford Fire*, 509 U.S. at 803-04.

13

**Alleged timing shows that the NAR Rules were not adopted to boycott Homie.**  Even if the law were different and Homie's allegations somehow fit the definition of a boycott, Homie fails to allege that Keller Williams "kn[e]w that [it was] refusing to engage in business relations" with Homie, *First Assisting*, 2020 WL 8189594, at *5, when the NAR Rules were adopted or enforced.  For one, Homie undermines any inference that the NAR Rules were adopted to boycott Homie because the NAR Rules were adopted up to <u>20 years</u> before Homie even existed.  (Compl. ¶ 59.)  *See Pontiac Police*, 92 F.4th at 403 (declining to infer group boycott because "[m]any of the allegations long predate and are not plausibly connected to" the alleged boycott).

Homie also undermines any inference that NAR Rules were enforced to thwart Homie because some of those Rules were <u>repealed</u> just as Homie's business was booming.  When Homie thrived in the presence of those rules but suffered in their absence, its allegations that the rules "facilitated" a conspiracy to harm it make no sense.  *Pontiac Police*, 92 F.4th at 406-07 (conspiracy to boycott BrokerTec-MarketAxess alliance implausible because "one of the Boycott Defendants . . . actually 'assist[ed]' the BrokerTec-MarketAxess alliance").  In fact, Homie alleges that it became one of the "five largest brokerages" in Utah in 2021, yet also alleges that—in the same year—NAR rescinded two rules supposedly designed to doom Homie's business.  (Compl. ¶¶ 73; 81.)

2.    <u>The alleged public comments and messages do not plausibly suggest Keller Williams joined a boycott against Homie.</u>

Homie alleges that Keller Williams participated in a boycott "through the MLS, social media platforms, and public statements" (Compl. ¶ 51), but those allegations are neither direct nor circumstantial evidence that Keller Williams joined a group boycott.  As a threshold matter, the social media posts, online messages, and public comments cannot plead a group boycott because

14

they declare, at best, that unidentified agents, acting unilaterally, would be willing to show houses listed by Homie, just not for the commissions offered by Homie.  (Compl. ¶ 64 ("If you up the commission, I will bring my buyers. If not, I will not.").)  And as explained above, those allegations fail as a matter of law because alleging that defendants had a "concerted refusal to engage in particular transactions until the terms of those transactions are agreeable" does not, by "definition," establish a group boycott.  *Hartford Fire*, 509 U.S. at 803-04.

**Not direct evidence.**  "[T]here are no factual allegations . . . that explicitly establish, without the need for inferences, the existence of an agreement," *Llacua*, 930 F.3d at 1178, because none of the statements come close to "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy," *Pontiac Police*, 92 F.4th at 391.  Moreover, the online statements and messages that Homie quotes fall well short of direct evidence against Keller Williams because they: (1) were not made by Keller Williams and (2) do not establish that anybody boycotted Homie, but instead demonstrate that individual agents would "happily show [Homie] listings if [it] offer[s] a fair and reasonable" commission.  (Compl. ¶ 65.)  *See Pontiac Police*, 92 F.4th at 396 ("Plaintiffs contend that statements by . . . former . . . executive constitute direct evidence of a conspiracy [but] Plaintiffs fail to allege that the executive was in a position to know whether a conspiracy existed.").  Homie tries to escape these flaws by relying on anonymous social media posts "sometimes marked with the hashtag #boycottHOMIE."  (Compl. ¶ 68.)  But Homie does not identify who made these posts, allege Keller Williams had any connection to them, or allege that these posts were anything but an agent unilaterally expressing her views about Homie.  And "[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a [S]ection 1 violation" because "a business may

'deal, or refuse to deal, with whomever it likes, as long as it does so independently.'" *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (citation omitted); *accord Christy Sports,* 555 F.3d at 1194.

      **Not circumstantial evidence.**  The public comments and messages Homie relies on also fail to provide circumstantial evidence that Keller Williams joined a group boycott for three reasons.  **First**, Homie relies on social media comments made by "Local NAR-members in Utah" (Compl. ¶ 68), but those allegations are insufficient because they are "generic and undifferentiated, and categorize the alleged wrongdoers as a group," *Pontiac Police*, 92 F.4th at 408; *see also Bristow*, 691 F. App'x at 519 ("[I]t is particularly important to make clear exactly who is alleged to have done what to whom . . . as distinguished from collective allegations.").  Homie also fails to identify a single "time, place, or person" who made the comments on social media, much less allege that Keller Williams made similar statements in parallel alongside other defendants. *Bristow*, 691 F. App'x at 519 (not selected for publication); *see also Pontiac Police*, 92 F.4th at 409 ("alleg[ing] that Boycott Defendants lodged identical complaints" against upstart competitors was too generic to plausibly suggest a group boycott).  In fact, the single public statement Homie attributes to Keller Williams in the complaint—observing that "limited service" brokerages' market shares are at "an all-time low" (Compl. ¶ 62)—does nothing to suggest a boycott because it was merely an observation about market conditions and not about Homie or any action to exclude Homie.

      **Second**, even if Homie identified the "[l]ocal NAR members in Utah" who supposedly posted these social media comments and messages (*id.* ¶ 68), they could not be attributed to Keller Williams because it only "franchises" brokerages in Utah (*id.* ¶ 23).  Conduct by a franchisee

cannot be imputed to the franchisor unless the franchisor "retain[ed] day-to-day control of the franchisee." *Glover By & Through Dyson v. Boy Scouts of Am.*, 923 P.2d 1383, 1386 (Utah 1996); *see also Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir. 1984) ("[A]ffiliation does not by itself necessarily imply conspiracy to restrain trade."). Indeed, even alleging that the franchisor "influenced the result to be achieved" is insufficient; the plaintiff must instead allege that the franchisor <u>directed</u> the franchisees actions. *Glover*, 923 P.2d at 1386.

Here, Homie fails to allege that Keller Williams did anything to direct any franchisee to post any message or statement about Homie. In fact, Homie fails to allege that Keller Williams did <u>anything</u> in Utah, much less directed its franchisees to boycott Homie. Instead, Homie attempts to impute the unidentified real estate agents' comments to Keller Williams just because some of those agents may have (but were not alleged to have) worked for franchisees "affiliated" with Keller Williams. (Compl. ¶ 51.) But mere "affiliation does not . . . imply conspiracy to restrain trade." *Jicarilla*, 728 F.2d at 1561; *see also Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *4 (D. Md. Sept. 16, 2020) (unpublished) (dismissing corporate affiliates because plaintiffs "us[ed] largely generic language, and without any explanation beyond baldly alleging a corporate relationship").

**Third**, the social media comments and public statements that Homie relies on suggest only that it was the commissions Homie offered—and not a conspiracy—that motivated individual agents to unilaterally disfavor showing houses listed with Homie. "An inference of conspiracy is impermissible if the defendants['] . . . conduct is consistent with . . . rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Llacua*, 930 F.3d at 1179-80. Moreover, "[i]t is decidedly not indicative of a conspiracy that a group of similarly

situated market participants would object, individually and separately, to a . . . development that could cut into their profits." *Pontiac Police*, 92 F.4th at 409.

*Twombly* illustrates the complaint's shortcomings. The *Twombly* plaintiffs alleged that the defendants engaged in parallel acts of resistance and even "sabotage" designed to stave off new competition. 550 U.S. at 550-51. Although the plaintiffs argued that this parallel resistance pleaded a boycott, the Supreme Court held it provided "no reason to infer that the [defendants] had agreed among themselves" to boycott the new competition because "resisting competition is routine market conduct." *Id*. And "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a §1 violation against almost any group of competing businesses would be a sure thing." *Id*.; *see also Pontiac Police*, 92 F.4th at 403 ("The most Plaintiffs plausibly allege is that the Boycott Defendants . . . pursued their own respective business interests, preferred to maintain a reliable and profitable market structure, and were averse to . . . changes that might disadvantage them.")

Homie fails to allege circumstantial evidence of a group boycott because all it alleges is that unidentified agents stated they deprioritized showing homes listed with Homie because "many" non-Homie listed "homes . . . offer[ed]" the opportunity to earn higher commissions. (Compl. ¶ 65.) But those allegations merely confirm that it was in agents' "[r]ational economic self-interest," *Pontiac Police*, 92 F.4th at 403, to prioritize showing homes to potential buyers where they would earn more commission, particularly because agents concluded that commissions offered by Homie were not "fair" (Compl. ¶ 65). Thus, the Court should not infer a boycott because, "[a]s a matter of economic reality, it was in each Defendant's interest" to seek higher commissions. *Llacua*, 930 F.3d at 1175.

**B.**     **The Complaint Should Be Dismissed Because Homie Lacks Antitrust Standing and Fails to State a Claim for Tortious Interference**

As shown in NAR's motion to dismiss, Homie's complaint should also be dismissed because Homie fails to allege antitrust standing or a claim for tortious interference. To conserve the Court's resources, Keller Williams fully joins NAR's brief, particularly because the Supreme Court has squarely held that a competitor in Homie's position lacks antitrust standing for several reasons.

Homie's tortious interference claims also suffer from glaring deficiencies against Keller Williams because it relies on generic group pleading rather than alleging that Keller Williams interfered with any of Homie's contracts with home buyers or sellers. *See Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 732 (11th Cir. 2020) ("The allegation that '[t]he Defendants' steered customers away from 'the Plaintiffs' makes it impossible . . . to determine which of the 28 body shops it is alleged to have harmed through tortious interference."). Indeed, Homie's group pleading just tries to paper over its inability to allege that Keller Williams operates real estate brokerages in Utah or otherwise participates in the local real estate market there. *See supra* Section I.A.2. And any actions taken by independently owned and operated franchisees affiliated with Keller Williams cannot be imputed to it because Homie fails to allege that Keller Williams directed any franchisee to interfere with Homie's contracts. *See id.*[4]

---

[4]    Keller Williams likewise joins the arguments made by Anywhere Real Estate, Inc., RE/MAX, LLC, HomeServices of America, Inc., and HSF Affiliates LLC demonstrating that Homie's claims are time-barred.

## II.      THE COURT LACKS PERSONAL JURISDICTION OVER KELLER WILLIAMS

Homie fails to establish that Keller Williams is subject to either general or specific jurisdiction. "[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). Jurisdiction can be general or case-specific. *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1229 n.2 (10th Cir. 2020). Either way, the Court's analysis focuses on whether the allegations specific to a defendant establishes jurisdiction over that defendant. *See Walden v. Fiore*, 571 U.S. 277, 282-83 (2014). While the court presumes that well-pleaded facts are true, that presumption does not extend to conclusory allegations or legal conclusions. *See Wenz*, 55 F.3d at 1505. Courts accept those well-pleaded facts as true "unless they are controverted by sworn statements." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 836 (10th Cir. 2020).

"A federal court may not exercise personal jurisdiction over an out-of-state defendant unless (1) an applicable statute authorizes service of process on that defendant and (2) the exercise of statutory jurisdiction comports with constitutional due process." *Id.* at 839. Because "Utah's long-arm statute . . . confers jurisdiction to the fullest extent permitted by the due process clause . . . [t]he two-step analysis thus collapses . . . into a single due-process inquiry." *Id.* While "[p]ersonal jurisdiction can be acquired through either general jurisdiction or specific jurisdiction," *id.* at 840, due process always requires the plaintiff to show that the "defendant purposefully established minimum contacts in the forum State," *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1307 (10th Cir. 2024).

As discussed below, Homie fails to allege any facts establishing that Keller Williams is subject to either general or specific jurisdiction.

A.    **Keller Williams Is Not Subject to General Jurisdiction in Utah**

This Court lacks general jurisdiction over Keller Williams because it is not at home in Utah. "A person is subject to general jurisdiction within a State if its contacts with the State are so 'continuous and systematic' that the person is essentially at home in the State." *Fluent*, 955 F.3d at 840 (citation omitted). "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." *Old Republic Ins. v. Cont'l Motors*, 877 F.3d 895, 904 (10th Cir. 2017). With "'respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Vora v. C4 Therapeutics*, 2023 WL 4899568, at *4 (D. Colo. Aug. 1, 2023) (unpublished) (quoting *Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014)).

Keller Williams is nowhere close to being at home in Utah. It is incorporated in Texas, not Utah. (Compl. ¶ 23.) Keller Williams' principal place of business is also in Texas and most of its employees are there. (Gardner Decl. ¶ 2.) By contrast, Keller Williams has no offices in Utah, and does not offer real estate brokerage services here. (*Id*. ¶¶ 4, 6-7.)

Homie impermissibly tries to muddle these indisputable facts by alleging that Keller Williams, together with its "affiliates, . . . broker[ed] billions of dollars of home sales in this District annually." (Compl. ¶ 23.) But those "allegations are insufficient to establish personal jurisdiction" over Keller Williams because "they constitute group pleading" by melding Keller Williams together with independently owned and operated franchisees. *Abney v. Philip Morris USA Inc.*, 2024 WL 915008, at *5 (D.N.M. Mar. 4, 2024) (unpublished); *see also Fluent*, 955 F.3d at 847 ("[J]urisdiction must be based on the conduct of the defendant itself."). Indeed, Homie's

attempt to conflate actions by independently owned and operated franchisees with actions by Keller Williams gives no basis for the Court to assess Keller Williams' "contacts with the forum State . . . individually" as required by the Supreme Court.  *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984); *see also id.* ("[J]urisdiction over a parent corporation [does not] automatically establish jurisdiction over a wholly owned subsidiary.").  Thus, Keller Williams is not subject to general jurisdiction in Utah because Keller Williams is far from being at home here.

### B.    <u>Keller Williams Is Not Subject to Specific Jurisdiction in Utah</u>

Homie also cannot establish that this Court has specific jurisdiction over Keller Williams because Homie fails to allege that Keller Williams took requisite "suit-related" action in Utah.  "Specific jurisdiction is very different" than general jurisdiction "because for a court to exercise specific jurisdiction, the suit must aris[e] out of or relat[e] to the defendant's contacts with the forum."  *PureHealth*, 105 F.4th at 1308.  "The contacts needed for this kind of jurisdiction often go by the name "purposeful availment," which obligates the plaintiff to show that "(1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries arise out of or relate to those activities."  *Id*.  A defendant's "suit-related conduct must create a substantial connection with the forum State" that "must arise out of contacts that the defendant himself creates with the forum State," and cannot be based on "contacts he makes by interacting with other persons affiliated with the State."  *Walden*, 571 U.S. at 284-86.

Here, apart from conclusory boilerplate—which is not entitled to a presumption of truth, *see Wenz*, 55 F.3d at 1505—Homie fails to allege any suit-related conduct by Keller Williams, much less suit-related conduct in, directed at, or causing effects in Utah.  Instead, according to Homie, the only conduct in Utah was (1) "[l]ocal NAR members in <u>Utah</u> us[ing] Facebook groups

to coordinate boycotts of Homie"; (2) "Realtors <u>in Utah</u> also encourag[ing] one another on Facebook groups not to show homes to Homie-represented buyers"; and (3) "the exclusionary campaign against Homie was [being] conducted through the <u>local</u> associations of NAR in <u>Utah</u>." (Compl. ¶¶ 68-72) (emphasis added).

Homie does not, however, allege that Keller Williams participated in any of that conduct in Utah or directed franchisees to make any statement about Homie, take any action against Homie, or use social media to "carry out" the supposed boycott. Nor could Homie make those allegations: Keller Williams has no operations in Utah, is not a real estate brokerage, does not employ real estate agents in Utah, does not control its franchisees' day-to-day operations, and is not a member of NAR, much less a member of the local associations of NAR in Utah. (Gardner Decl. ¶¶ 4-7.) Instead, Homie tries to manufacture jurisdiction by attributing actions by local real estate agents at independently owned and operated franchisees in Utah to Keller Williams, but that falls far short of the defendant-specific conduct demanded by the Tenth Circuit. *See Fluent*, 955 F.3d at 847; *see also A AAA Custom Plumbing Corp. v. Nat'l Telemedicine Ctr. Inc.*, 2011 WL 588748, at *2 (D. Colo. Feb. 9, 2011) (unpublished) (lumping all defendants together "not only prevent[s] the Court from determining whether the unchallenged facts constitute a legitimate cause of action, but also from being able to confidently find that the Court can exercise personal jurisdiction over each defendant"). And Homie's attempt to rest only on its allegations that independent franchisees in Utah are affiliated with Keller Williams (Compl. ¶¶ 23-24) fares no better because it is well-settled "the mere fact that a franchisor has franchisees in a particular state does not subject it to that state's jurisdiction." *Santora v. Starwood Hotel & Resorts Worldwide, Inc.*, 580 F. Supp. 2d 694, 700 (N.D. Ill. 2008); *see also Madden v. Petland Summerville, LLC*, 2021 WL 5770294, at *4 (D.S.C.

Dec. 6, 2021) (unpublished) (granting motion to dismiss because actions that were "[franchisee's] alone" could not be attributed to franchisor for jurisdictional purposes).

Homie would also make no headway by seeking to establish personal jurisdiction based on Keller Williams' "nationwide contacts" under Section 12 of the Clayton Act. For starters, while the Tenth Circuit has not squarely addressed whether nationwide contacts could give rise to personal jurisdiction in Utah, most of the Courts of Appeals that have addressed Section 12's scope have held that it does not authorize limitless nationwide jurisdiction. *See, e.g.*, *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013) (collecting cases). In fact, most courts hold that Section 12 authorizes personal jurisdiction only in the district in which the defendant is found, inhabits, or transacts business. *See id.* Homie establishes none of those requirements here because Keller Williams has no operations in Utah. *See supra* Section I.A.2.

Even if Section 12 authorized a "national contacts" test, Homie would still fall short of pleading personal jurisdiction over Keller Williams. Under a "national contacts" statute, courts must still assess the extent of the defendant's conduct relative to the plaintiff's claim and the forum state because "due process requires something more" than mere "minimum contacts with the United States as a whole." *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210-12 (10th Cir. 2000).

Here, Homie does not plead any such facts connected to Keller Williams. It cannot rely on the refrain that independently owned and operated franchisees allegedly participated on various NAR boards and committees (Compl. ¶¶ 112-24) and its generic allegation that Keller Williams required franchisees to "become members" of local NAR associations and MLSs (*id.* ¶ 127). Homie does not assert that any of those alleged acts took place in Utah or that they were directed

at Homie, much less both. *See Peay*, 205 F.3d at 1212 (directing courts to consider "the extent of the defendant's contacts with the place where the action was filed" even where statute provides for nationwide service of process).[5]

Homie's complaint should therefore be dismissed against Keller Williams for lack of personal jurisdiction.

## CONCLUSION

For these reasons, Keller Williams asks the Court to grant its motion to dismiss the complaint with prejudice.

---

[5] Alternatively, if the Court concluded that personal jurisdiction exists under Section 12 of the Clayton Act but dismissed Homie's Sherman Act claim for failure to state a claim, the Court should decline to exercise jurisdiction over Homie's state law claims and dismiss Keller Williams for lack of personal jurisdiction because Section 12 would be inapplicable without the Sherman Act claim. *Batton v. Nat'l Ass'n of Realtors*, 2024 WL 689989, at *11 (N.D. Ill. Feb. 20, 2024) ("[N]ow that the Court has dismissed Plaintiffs' claim for injunctive relief, there is no longer any claim under which nationwide jurisdiction is authorized. Consequently, the Clayton Act's jurisdictional basis 'drop[s] out of the case' and is not considered in the personal jurisdiction analysis.").

Dated: October 18, 2024

Amy F. Sorenson (8947)
Annika L. Jones (16483)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
Telephone:  801.257.1900
Facsimile:  801.257.1800
Email:  asorenson@swlaw.com
            aljones@swlaw.com

.

Respectfully submitted,

*/s/ Boris Bershteyn*
Boris Bershteyn (admitted *pro hac vice*)
Sam Auld (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:  212.735.3834
Facsimile:  917.777.3834
Email:  boris.bershteyn@skadden.com
            sam.auld@skadden.com

David C. Kully (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
800 17th Street N.W. Suite 1100
Washington, DC  20006
Telephone:  202.469.5415
Email:  david.kully@hklaw.com

*Attorneys for Defendant Keller Williams Realty, Inc.*