Juliette P. White, USB #9616
Hannah Ector, USB #17980
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Tel:  801.532.1234
JWhite@parsonsbehle.com
HEctor@parsonsbehle.com

*Attorneys for Defendant RE/MAX, LLC*
(additional counsel admitted *pro hac vice* listed in signature block)

Jason W. Hardin, USB #8793
FABIAN VANCOTT
95 South State, Suite 2300
Salt Lake City, UT 84111
Tel: 801.323.2235
jhardin@fabianvancott.com

*Attorneys for Defendant Anywhere Real Estate Inc.*
(additional counsel admitted *pro hac vice* listed in signature block)

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HOMIE TECHNOLOGY, INC., a Delaware corporation,<br><br>      Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, an Illinois non-profit association; ANYWHERE REAL ESTATE INC., a Delaware corporation; KELLER WILLIAMS REALTY, INC., a Texas corporation; HOMESERVICES OF AMERICA, INC., a Delaware corporation; HSF AFFILIATES, LLC, a Delaware limited liability company; RE/MAX LLC, a Delaware limited liability company; and WASATCH FRONT REGIONAL MULTIPLE LISTING SERVICE, INC., a Utah corporation,<br><br>      Defendants. | **JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT BY DEFENDANTS ANYWHERE REAL ESTATE INC. AND RE/MAX, LLC**<br><br>[Oral Argument Requested]<br><br>Case No. 2:24-cv-00616-DAK-JCB<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Jared C. Bennett |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION, RELIEF SOUGHT, AND GROUNDS FOR RELIEF ................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

I.  Overview of the Residential Real Estate Industry. ............................................................ 3

II.  The Challenged NAR Rules ................................................................................................ 4

III.  Homie Alleges It Was Successful and Rapidly Gained Market Share in Utah from 2015 until 2021 While the Challenged NAR Rules Were in Effect. .................................. 5

IV.  Homie Alleges a Competitor Boycott Scheme Harmed Its Business After 2021. ............. 6

V.  Homie Does Not Plead Any Facts Relating to Participation in the Group Boycott Scheme by Anywhere or RML. .......................................................................................... 7

LEGAL STANDARD ................................................................................................................... 8

ARGUMENT ................................................................................................................................. 9

I.  The Court Should Dismiss Homie's Claim Based on the Nationwide NAR Rules. ........... 9

A.  As a competing real estate broker, Homie lacks antitrust standing to challenge a conspiracy based on the NAR Rules that allegedly increased prices. ...................................................................................................................... 9

1.  Competitors, as opposed to consumers, lack antitrust standing to challenge increased prices because they benefit from those prices. ......... 10

2.  Homie has not alleged that it suffered an antitrust injury from the alleged higher prices for brokerage services that it attributes to the NAR Rules. .......................................................................................... 12

3.  Homie has not alleged that its injury directly resulted from the NAR Rules. .................................................................................................... 13

4.  As a competing real estate broker, Homie is not an efficient enforcer of the antitrust laws as applied to the NAR Rules. ................................. 14

B.  Homie's claim based on the NAR Rules is time-barred. ....................................... 16

II.  The Court Should Dismiss Homie's Claims Based on a Local Boycott of Homie. ........... 17

A.  The Complaint's allegations of a conspiracy are implausible. ............................. 17

B.  Homie has failed to allege that Anywhere or RML participated in any conspiracy. ........................................................................................................... 20

i

      C.     Homie lacks antitrust standing to pursue its boycott theory. ................................ 22

III.    The Court Should Dismiss Homie's State-Law Claims. ..................................................... 24

CONCLUSION ................................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Abraham v. Intermountain Health Care Inc.,*
    461 F.3d 1249 (10th Cir. 2006) ...............................................................10, 14, 15

*Adamson v. Volkswagen Grp. of Am., Inc.,*
    2023 WL 167081 (D. Colo. Jan. 12, 2023)......................................................14, 15

*Allergy Research Grp. LLC v. Rez Candles Inc.,*
    2022 WL 1004214 (D. Utah Apr. 4, 2022)..............................................................24

*Am. Airlines v. Christensen,*
    967 F.2d 410 (10th Cir. 1992) ...............................................................................24

*Arista Recs. LLC v. Lime Grp. LLC,*
    532 F. Supp. 2d 556 (S.D.N.Y. 2007)....................................................................12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................................8, 13

*Ass'n of Surgical Assts. v. Nat'l Bd. of Surg. Tech. & Surg. Assist.,*
    2023 WL 7277313 (D. Colo. Sept. 29, 2023) ................................................ *passim*

*Assoc. Gen. Contractors v. Cal. St. Council of Carpenters,*
    459 U.S. 519 (1983)........................................................................................10, 16

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)...............................................................................................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................ *passim*

*Belnap v. Steward Health Care Sys. LLC,*
    2020 WL 619402 (D. Utah Feb. 10, 2020)............................................................11

*Bolinger v. First Multiple Listing Service, Inc.,*
    838 F. Supp. 2d 1340 (N.D. Ga. 2012)..................................................................22

*Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n,*
    691 F. App'x 515 (10th Cir. 2017) ..........................................................................3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)........................................................................................11, 25

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.,*
    846 F.3d 1297 (10th Cir. 2017) .............................................................................18

*Burnett v. Nat'l Ass'n of Realtors*,
No. 19-CV-00332-SRB...........................................................................7, 15

*Compliance Mktg., Inc. v. Drugtest, Inc.*,
2010 WL 1416823 (D. Colo. Apr. 7, 2010)..................................................10

*Crocs, Inc. v. Australia Unlimited, Inc.*,
2008 WL 4426170 (D. Colo. Sept. 25, 2008) ...........................................14, 15

*CVB, Inc. v. Corsicana Mattress Co.*,
604 F. Supp. 3d 1264 (D. Utah 2022)...............................................11, 13, 14

*Daniel v. Am. Bd. of Emergency Med.*,
269 F. Supp. 2d 159 (W.D.N.Y. 2003) .........................................................12

*Eldridge v. Johndrow*,
345 P.3d 553 (Utah 2015) .............................................................................24

*Frost v. ADT, LLC*,
947 F.3d 1261 (10th Cir. 2020) .......................................................................9

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) ........................................................16

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
416 F. Supp. 3d 1189 (D. Colo. 2019).................................................14, 15, 23

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016).........................................................................15

*Hackman v. Dickerson Realtors, Inc.*,
520 F. Supp. 2d 954 (N.D. Ill. 2007) ...........................................................19

*Hackman v. Dickerson Realtors, Inc.*,
557 F. Supp. 2d 938 (N.D. Ill. 2008) .......................................................19, 20

*Herrera v. City of Espanola*,
32 F.4th 980 (10th Cir. 2022) .........................................................................8

*Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op., Inc.*,
872 F.2d 931 (10th Cir. 1989) .......................................................................16

*L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*,
863 F. Supp. 2d 1066 (D. Colo. 2012)......................................................22, 23

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019) ..............................................................8, 19, 20

*Margae, Inc. v. Clear Link Techs., LLC*,
  2008 WL 5377932 (D. Utah Dec. 22, 2008)...........................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...........................................................................................10, 13

*Mitchell v. Wells Fargo Bank*,
  2019 WL 488284 (D. Utah Feb. 7, 2019)..............................................................25

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020)....................................................................15

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)...............................................................................................18

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
  36 F.3d 565 (7th Cir. 1994) ..................................................................................10

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)...............................................................................................18

*Park v. El Paso Bd. of Realtors*,
  764 F.2d 1053 (5th Cir. 1985) ..........................................................3, 13, 20, 21

*In re Platinum & Palladium Antitrust Litig.*,
  449 F. Supp. 3d 290 (S.D.N.Y. 2020)...................................................................15

*PLS.com LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) .............................................................................23, 24

*PS Audio, Inc. v. Allen*,
  2018 WL 5309834 (D. Colo. Aug. 10, 2018) ......................................................14

*PSW, Inc. v. VISA U.S.A., Inc.*,
  2006 WL 519670 (D.R.I. Feb. 28, 2006)..............................................................12

*Re/Max Int'l v. Realty One, Inc.*,
  900 F. Supp. 132 (N.D. Ohio 1995)......................................................................12

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................................24

*Ryan v. Microsoft Corp.*,
  147 F. Supp. 3d 868 (N.D. Cal. 2015) ..................................................................17

*Seay v. Okla. Bd. of Dentistry*,
  2021 WL 1394478 (W.D. Okla. Apr. 12, 2021) ...................................................16

*Serfecz v. Jewel Food Stores*,
  67 F.3d 591 (7th Cir. 1995) ................................................................................14

*Sharp v. United Airlines*,
  967 F.2d 404 (10th Cir. 1992) ......................................................................10, 13

*Sitzer v. Nat'l Ass'n of Realtors*,
  420 F. Supp. 3d 903 (W.D. Mo. 2019) ...............................................................15

*Sprint Nextel Corp. v. AT & T Inc.*,
  821 F. Supp. 2d 308 (D.D.C. 2011) ....................................................................12

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*,
  940 F. Supp. 1026 (E.D. Tex. 1996) ...................................................................12

*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006) ...............................................................9, 10, 11

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ..............................................................................17

*TravelPass Grp., LLC v. Caesars Entm't Corp.*,
  2019 WL 5691996 (E.D. Tex. Aug. 29, 2019) ...................................................24

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
  964 F.2d 1022 (10th Cir. 1992) ..........................................................................19

*United States v. Penn*,
  2021 WL 4521904 (D. Colo. Oct. 4, 2021) ........................................................20

*Vaught v. Chaudhry's Inv. Grp., Inc.*,
  2010 WL 11627524 (D. Kan. May 7, 2010) .......................................................21

*Vincent v. Utah Plastic Surgery Soc.*,
  2013 WL 4782354 (D. Utah Sept. 5, 2013) ........................................................11

**Statutes, Rules & Regulations**

15 U.S.C. § 15(a) ...........................................................................................................10

15 U.S.C. § 15b ..............................................................................................................16

Clayton Act ...............................................................................................................10, 14

Fed. R. Civ. P. 12(b)(6) ........................................................................................ *passim*

Sherman Act ........................................................................................................... *passim*

Utah Code Ann. § 76-10-3117 ......................................................................................16

## INTRODUCTION, RELIEF SOUGHT, AND GROUNDS FOR RELIEF

Homie Technology, Inc. ("Homie") is a failed real estate brokerage that is trying to blame its problems on two supposed antitrust violations. Both supposed violations fail on the face of the Complaint under established law.

**First**, Homie inappropriately seeks to ride the coattails of other antitrust cases brought by *consumers* of real estate brokerage services. In those other cases, people who used real estate brokers to sell homes challenged rules set by the National Association of Realtors ("NAR"),[1] alleging that the NAR Rules artificially increased the prices they paid for brokerage services. Homie, however, did not buy brokerage services; it sold them. If Homie's allegations in its Complaint are credited, and the NAR Rules did increase the price of brokerage services, then home sellers (the consumers of brokerage services) might be harmed but real estate brokerages (the providers of the services) would be *helped* because the brokerages would either make more money or take market share by charging less. **And Homie is a broker!** As a *seller* of brokerage services, not a consumer of them, it would be helped by higher prices.

And indeed, that is exactly what Homie alleges. It alleges that the NAR Rules artificially inflated real estate commissions, *e.g.*, Compl. ¶ 38, that Homie sought to take advantage of the inflated commissions by entering the market and offering discounted brokerage services, *e.g.*, *id.* ¶¶ 45-46, and that within just a few years it became one of the five largest brokers in Utah by doing so, *e.g.*, *id.* ¶ 49. In cases like this brought by a competitor, not consumers, courts from the U.S. Supreme Court to the Tenth Circuit and this District have not hesitated to dismiss claims for lack of antitrust standing and antitrust injury. This Court should do the same.

---

[1] These rules are collectively referred herein as the "NAR Rules."

1

Further proof that Homie would have been helped, not hurt, by the challenged NAR Rules is that it never challenged them within the statute of limitations period. The most recent NAR Rule that Homie challenges was adopted in 2019—when Homie was active and allegedly successful in Utah. To the extent Homie's antitrust claim is premised on the NAR Rules, it is therefore barred by the four-year statute of limitations under the Sherman Act.

**Second,** perhaps recognizing that it can't ride consumers' coattails, Homie pivots and alleges that other brokers conspired to boycott Homie, claiming that "Homie's initial success sparked an anticompetitive campaign among Homie's competitors to exclude Homie." *Id.* ¶¶ 50-51. The essence of Homie's boycott claim is that brokers representing buyers refused to show Homie-listed homes to their clients because Homie offered them insufficient commissions.

This claim fails for several reasons. First, the existence of the alleged conspiracy is implausible. Homie does not allege any details showing that Utah brokers agreed to boycott Homie listings, much less when, where, or how they did so. An agreement, moreover, is unnecessary to explain why brokers allegedly would complain about or avoid Homie's listings. According to Homie's own allegations, the other brokers attempted to negotiate or avoided the Homie listings because they simply wouldn't get paid enough. In cases like this, where independent, economic incentives fully explain the alleged market behavior, courts consistently dismiss allegations of conspiracies that lack well-pleaded support.

Second, as to Anywhere Real Estate, Inc. ("Anywhere") and RE/MAX, LLC ("RML"), the Complaint lacks any well-pleaded allegation of how Anywhere or RML organized, joined, directed, or participated in a boycott of Homie. Anywhere is a parent company, and RML is a franchisor. The Complaint does not allege that they did anything in Utah. The only non-conclusory allegations addressing Anywhere or RML are that independent real estate agents associated with

their respective brands participated in NAR and MLS-related boards involved in rulemaking. *See id.* ¶¶ 110-23. But the alleged group boycott is separate from the NAR Rules—there isn't a Rule saying "boycott Homie." Although Homie alleges the NAR Rules "facilitated" the boycott, *e.g.*, *id.* ¶¶ 6, 9, 40, 50-52, 54, 56, this conclusory allegation is contentless and does not support a claim.

Elsewhere, Homie points to communications allegedly sent to Homie brokers by individual Utah brokers complaining about Homie's low commissions. *See id.* ¶¶ 64-66. Those communications undermine rather than support a supposed conspiracy by reinforcing the independent economic reasons for brokers not to bring buyers to Homie listings. In all events, none of those communications is alleged to have come from Anywhere or RML.

Finally, Homie's state law claims turn on the viability of its federal antitrust claims. Because the antitrust claims do not survive Rule 12(b)(6), the Court should dismiss Homie's state law claims as well. In short, Homie has no claim for its own failed business model.

## **FACTUAL BACKGROUND**[2]

### I.    **Overview of the Residential Real Estate Industry.**

Consumers often hire real estate brokers to help them sell and buy homes. "Seller brokers" help sellers find a buyer, negotiate a price and terms, and finalize a home sale. "Buyer brokers," on the other hand, help buyers find a property, negotiate a price and terms, and close the sale. *See generally Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1058 (5th Cir. 1985). Brokerage firms, like Homie and its competitors, offer both seller broker and buyer broker services. Compl. ¶ 46.

According to Homie, brokers frequently use a "Multiple Listing Service" or "MLS" to help their clients buy and sell homes. *See id.* ¶¶ 34-37. MLSs are "joint ventures" comprised of

---

[2] As required in a Rule 12(b)(6) motion, all well-pleaded allegations in Homie's Complaint are assumed true. *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 518 (10th Cir. 2017).

"virtually all brokers operating in local or regional areas," which aggregate "members' home listings information into a database, usually in electronic form," and make this data "available to all licensed real estate professionals who are members of the MLS." *Id.* ¶ 35. The MLS at issue in this case is the Wasatch Front Regional Multiple Listing Service ("WFRMLS"). *See id.* ¶ 19.[3] Seller brokers use MLSs to spread the word about the homes they are trying to sell, and buyer brokers use MLSs to efficiently find "information about all the listed homes in the area that match the buyer's housing needs." *See id.* ¶¶ 35-36.

Brokers, of course, want to get paid for their work. They are typically paid on commission "when the home sells." *Id.* ¶ 30. As Homie alleges, home sellers "typically" enter into agreements with seller brokers, in which home sellers agree to pay seller brokers a commission based on a percentage of the home's final sale price. *Id.* ¶ 31. According to Homie, seller brokers historically have offered to pay part of their commission to buyer brokers who "assist their clients in negotiating against the seller," and the offers were "displayed in the MLS." *Id.* ¶¶ 31-32, 38. Buyers would therefore enter into agreements with buyer brokers acknowledging that the buyer brokers would be paid "out of the total commission paid by the seller[s]" to their seller brokers. *Id.* ¶¶ 31-32. Homie alleges that "[c]ommissions of 5% to 6%, split between the seller-broker and the buyer-broker, are common across the country and in Utah." *Id.* ¶ 38.

## II.    The Challenged NAR Rules.

The National Association of Realtors ("NAR") is a professional association comprised of "over 1.4 million individual members (sometimes called 'realtors')," who are real estate brokers and agents "providing residential real estate brokerage services across the United States." *Id.* ¶ 18.

---

[3] Homie dismissed WFRMLS from the lawsuit without prejudice on October 11, 2024. *See Homie Tech., Inc. v. Nat'l Ass'n of Realtors, et al.*, 2:24-cv-00616-DAK-JCB, at Dkt. 63 (Notice of Dismissal).

NAR allegedly "promulgates rules governing the operation of the approximately 500 MLSs affiliated with NAR through their ownership or operation by NAR's state, local, and territorial associations," and thereby governs the conduct of NAR realtor-members and all NAR owned or governed MLSs in all 50 states, including Utah (and including the now-dismissed WFRMLS). *Id.*

Homie challenges several NAR Rules as anticompetitive. One is the "Buyer-Broker Compensation Rule." *See, e.g.*, *id.* ¶¶ 38, 59-61, 63-66. Adopted in 1996, the Buyer-Broker Compensation Rule allegedly requires all home listings on an MLS to include an offer of compensation to buyer brokers. *Id.* ¶ 59. Homie also challenges:

- a NAR Rule adopted in 2012 that allegedly "allowed buyer-brokers to filter MLS listings that would be shown to buyers based on the level of buyer-broker commissions offered," *id.* ¶ 73 (the "Commission-Filter Rule");

- a NAR Rule adopted in 1997 that allegedly permitted buyer brokers to represent to buyers that their services were "free," *id.* ¶ 77 (the "Free-Service Rule");

- a NAR Rule adopted in 2012 that "recommended that MLSs prohibit disclosing to prospective buyers the total commissions offered to buyer-brokers," *see id.* ¶ 81 (the "Commission-Concealment Rule"); and

- a NAR Rule adopted in 2019 that required the posting of public listings on an MLS "within one business day," *see id.* ¶ 87 (the "Clear Cooperation Policy").

Collectively, Homie alleges that the NAR Rules had the effect of artificially inflating real estate commissions paid to brokers. *See id.* ¶ 4.

### III. Homie Alleges It Was Successful and Rapidly Gained Market Share in Utah from 2015 until 2021 While the Challenged NAR Rules Were in Effect.

"Homie was launched in 2015," *id.* ¶ 44, and as a "new entrant" in the Utah market sought to "disrupt the traditional real estate brokerage model by returning artificially inflated commissions to consumers," including through initial offerings in Utah of "discounted brokerage services to buyers." *Id.* ¶¶ 45, 55. As a "discount broker," Homie asserts that it deployed "new technology,

including a consumer-facing app that automated portions of the sales process for both sellers and buyers," which "allowed it to lower the price of its brokerage services to customers." *Id.* ¶ 47.

According to Homie, its 2015 "entry into the real estate brokerage market in Utah was initially successful," and "at various times between 2017 and 2021," Homie was "among the five largest brokerages by market share in the state." *Id.* ¶ 49. All the NAR Rules Homie challenges were in effect during all or some of this time period. *See id.* ¶¶ 59, 73, 77, 81, 87.

## IV. Homie Alleges a Competitor Boycott Scheme Harmed Its Business After 2021.

According to Homie, its initial success "sparked an anticompetitive campaign among Homie's competitors to exclude Homie" through "both express and tacit boycotts." *Id.* ¶¶ 50-51. The problem, Homie alleges, was Homie's low offers of compensation for buyer brokers. *See id.* ¶ 55. Certain local buyer brokers—whom Homie does not identify and certainly not with information specific to any of the defendants—allegedly found Homie's low offers insulting. For instance, some local buyer brokers told Homie that the "effort [buyer brokers] put into finding [their] clients the perfect home and helping them through the contract, negotiations, inspections, financing, closing, etc.," made Homie's low commission offers "sad and unprofessional." *Id.* ¶ 65. In its Complaint, Homie includes several other similar alleged communications from unidentified competitors that it received, including in the comments field of WFRMLS, in emails and text messages, and on social media. *See, e.g.*, *id.* ¶¶ 64-66, 68-69. Homie asserts that these communications from unnamed local brokers complaining about their commission offerings and often seeking to negotiate them, show "exclusionary steering" by the defendants, *see id.* ¶ 67, which eventually rendered Homie "unable to compete effectively despite a business model that, before [d]efendants' predation, had proven its viability." *Id.* ¶ 51.

Homie seeks to recover damages for its alleged lost profits, market share, and revenue under the theory that the alleged boycotts by the defendants violated federal and state antitrust law.

*Id.* ¶¶ 50-52. Although Homie alleges that the boycotts were in some unspecified way "facilitated by NAR's Exclusionary Rules and policies," *id.* ¶ 50, it acknowledges that the supposed boycotts were different from the NAR Rules because Homie alleges that the boycotts arose long after the Rules were in place. *Compare id.* ¶¶ 59, 73, 77, 81, 87 (Rules promulgated in 1996, 1997, 2012, and 2019), *with id.* ¶¶ 49-50 (boycott "sparked" following Homie's success from 2015-2021). The alleged boycotts, moreover, were local to Utah, *id.* ¶ 51 ("boycotts in Utah"), whereas the NAR Rules are alleged to have applied nationally. And NAR did not direct the boycott, which allegedly occurred directly "among Homie's competitors." *Id.* ¶ 50.

## V. Homie Does Not Plead Any Facts Relating to Participation in the Group Boycott Scheme by Anywhere or RML.

Homie does not name its local competitors as defendants in the Complaint. Instead, it names NAR, *id.* ¶¶ 2, 59; the now-dismissed local MLS, WFRMLS, which is a "NAR-affiliated MLS governed by NAR rules" and "owned and controlled by local associations of NAR in Utah," *see id.* ¶ 19; and a group of national brokerages and/or franchisors, including Anywhere and RML, that Homie asserts have principals who influenced the promulgation of the NAR Rules (collectively, the "Corporate Defendants"), *id.* ¶ 110.[4]

Homie does not allege that Anywhere or RML participated in a Utah conspiracy to boycott Homie. The Complaint alleges only that a boycott was organized by unnamed "incumbent brokerages" in Utah, some of which may be "affiliated with the Corporate Defendants." *Id.* ¶ 51.

---

[4] While Anywhere accepts Homie's allegations as true for purposes of this motion only, in the real world Anywhere opposed many of the NAR Rules challenged by Homie, including for example the Buyer-Broker Compensation Rule and the Clear Cooperation Policy. *See, e.g.*, *Burnett v. Nat'l Ass'n of Realtors*, Case No. 19-CV-00332-SRB (W.D. Mo.), Dkt. 1478 (Suggestions in Support of Final Approval of Realogy Holdings Corp.'s Nationwide Class Settlement) at 11 ("[I]t is the position of [Anywhere] that the mandatory nature of the NAR Cooperative Compensation Rule should be rescinded. It is also the position of [Anywhere] that offers of compensation that are made to buyer brokers should be transparently available to consumers, not just to brokers.").

The Complaint does not plead facts about any specific local entity participating in a boycott, much less that Anywhere or RML had any role in directing any of the unidentified local entities.

## **LEGAL STANDARD**

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means a plaintiff has pleaded facts allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177 (10th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). Thus, "[w]hen a complaint alleges 'facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*

The requirements of Rule 12(b)(6) apply with full force to antitrust complaints. In particular, *Twombly*, an antitrust case, teaches that "mere allegations of parallel conduct, absent additional contextual facts, fail to state a plausible conspiracy claim." *Id.* at 1174-75 (citing *Twombly*, 550 U.S. at 556-57). "[W]hen the antitrust claim relies solely on circumstantial facts of parallel behavior," moreover, "the conspiracy is not plausible if in light of common economic experience the alleged conduct is equally likely to result from independent action." *Id.* at 1175 (citing *Twombly*, 550 U.S. at 567-68).

A Rule 12(b)(6) motion is a proper way to adjudicate certain threshold issues. Statute of limitations issues are ripe for determination under Rule 12(b)(6) where, as here, the complaint affirmatively pleads that the relevant acts occurred outside the limitations period. *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) ("[A] statute of limitations defense may be

appropriately resolved on a Rule 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished."); *Frost v. ADT, LLC*, 947 F.3d 1261, 1267 (10th Cir. 2020) ("Although some affirmative defenses may present more difficult questions, the 'statute of limitations defense is unusual in that . . . its effectiveness may well appear on the face of the complaint' as we find it does here.") (quoting Wright & Miller, *Fed. Practice and Procedure* § 1277 (3d ed. 2002) (Aug. 2019 update)). Finally, antitrust complaints are readily dismissed under Rule 12(b)(6) when the complaint fails to plead facts plausibly establishing that the plaintiff has "antitrust standing." *See, e.g.*, *Tal v. Hogan*, 453 F.3d 1244, 1253, 1257-58 (10th Cir. 2006). Here, Homie's allegations should be dismissed for each of these reasons.

## ARGUMENT

Homie seeks to blame its failed business on two supposed antitrust violations, one linked to certain national NAR Rules and another linked to a supposed Utah-specific group boycott of Homie. Both supposed violations fail as a matter of law and should be dismissed.

### I. The Court Should Dismiss Homie's Claim Based on the Nationwide NAR Rules.

Homie's claim based on the NAR Rules both fails on the merits and is time-barred.

#### A. As a competing real estate broker, Homie lacks antitrust standing to challenge a conspiracy based on the NAR Rules that allegedly increased prices.

At the most fundamental level, Homie's claim based on the NAR Rules fails because Homie is a provider of brokerage services, not a consumer of them, and it therefore suffered no harm from an alleged increase in the price of those services. Courts in the Tenth Circuit frequently dismiss antitrust complaints brought by competitors under Rule 12(b)(6) for failure to establish antitrust standing. *See, e.g.*, *Tal*, 453 F.3d at 1252-53, 1257-58 (affirming Rule 12(b)(6) dismissal of competitor-plaintiff Section 1 bid rigging claim because plaintiff "did not suffer a cognizable antitrust injury"). This Court should do the same.

### 1. Competitors, as opposed to consumers, lack antitrust standing to challenge increased prices because they benefit from those prices.

A Sherman Act plaintiff must first establish "antitrust standing," demonstrating that it "is a proper party to bring a private antitrust action." *Tal*, 453 F.3d at 1253 (citing *Assoc. Gen. Contractors v. Cal. St. Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)).[5] To establish antitrust standing, a plaintiff must show "(1) an antitrust injury and (2) a causal connection between the defendant's antitrust violation and their alleged antitrust injury." *Compliance Mktg., Inc. v. Drugtest, Inc.*, 2010 WL 1416823, at *4 (D. Colo. Apr. 7, 2010) (citing *Tal*, 453 F.3d at 1253). "An antitrust injury is 'an injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006)). A "causal connection" exists only if the "antitrust injury resulted directly from the antitrust violation." *Sharp v. United Airlines*, 967 F.2d 404, 407 n.2 (10th Cir. 1992).

Relevant here, a plaintiff lacks antitrust standing to challenge a conspiracy from which it "stand[s] to gain." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 336-37 (1990) (finding no antitrust injury where plaintiff was "benefited rather than harmed" by the allegedly unlawful activity). In particular, a competitor may not "recover damages for any conspiracy by [defendants] to charge higher than competitive prices." *Matsushita*, 475 U.S. at 582-83. After all, "increased prices cause[] [a competitor] no injury, let alone antitrust injury." *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 572 (7th Cir. 1994).

---

[5] This antitrust-specific requirement flows from the text and structure of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which confers a private right of action under federal antitrust law only to persons "injured in [their] business or property by reason of anything forbidden in the antitrust laws," *Tal,* 453 F.3d at 1253.

Courts in the Tenth Circuit frequently dismiss antitrust complaints brought by competitors under Rule 12(b)(6) for failure to establish proper antitrust standing. *See, e.g.*, *Tal*, 453 F.3d at 1252-53, 1257-58 (affirming Rule 12(b)(6) dismissal of competitor-plaintiff Section 1 bid rigging claim because plaintiff "did not suffer a cognizable antitrust injury"); *Ass'n of Surg. Assts. v. Nat'l Bd. of Surg. Tech. & Surg. Assist.*, 2023 WL 7277313, at *9 (D. Colo. Sept. 29, 2023) (dismissing group boycott conspiracy claim under Rule 12(b)(6) because plaintiff-association did not establish antitrust standing because injury arose from "the rigors of competition itself," rather than an "injury to competition"); *Belnap v. Steward Health Care Sys. LLC*, 2020 WL 619402, at *4 (D. Utah Feb. 10, 2020) (dismissing competitor-plaintiff Section 1 claim for lack of antitrust injury and disregarding multiple allegations of alleged injuries that "d[id] not constitute antitrust injuries because they [were] injuries to [plaintiff] as a competitor, not injuries to the competitive process"); *Vincent v. Utah Plastic Surg. Soc'y*, 2013 WL 4782354, at *8-9 (D. Utah Sept. 5, 2013) (dismissing plaintiffs' antitrust claim for failing to adequately allege that defendants' deceptive marketing tactics "had an anticompetitive effect on the market generally," beyond just the plaintiffs), *aff'd*, 621 F. App'x 546 (10th Cir. 2015).

Indeed, courts must be especially cognizant of these rules where, as here, a competitor business, rather than a consumer, pursues an action under the antitrust laws. "The antitrust laws . . . were enacted for the protection of competition not competitors." *Tal*, 453 F.3d at 1258 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). When competitors try to challenge a conspiracy from which they stood to gain, therefore, courts in this District and across the country routinely dismiss their complaints under Rule 12(b)(6) on antitrust standing grounds.[6]

---

[6] *See, e.g.*, *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1294 (D. Utah 2022) (dismissing plaintiff-competitor's price-fixing claim for lack of antitrust injury, where the conclusory injury allegations did not plausibly show how a competitor "who stands to benefit from

### 2. Homie has not alleged that it suffered an antitrust injury from the alleged higher prices for brokerage services that it attributes to the NAR Rules.

As a discount broker competitor, Homie stood to gain from the artificially high prices it alleges the NAR Rules created, which means it cannot plead a plausible antitrust injury. *See* Compl. ¶¶ 4-7. Homie even touts the success it achieved *operating under the very NAR Rules* it attacks: "Homie's 2015 entry into the real estate brokerage market in Utah was initially successful." *Id.* ¶ 49; *see also id.* ¶ 51 (alleging that Homie had "a business model that, before [d]efendants' predation, had proven its viability"). Homie was "among the five largest brokerages by market share in the state" "at various times between 2017 and 2021," *id.* ¶ 49, when the challenged NAR Rules were in effect, *see id.* ¶ 59 ("Buyer-Broker Compensation Rule," adopted in 1996); ¶ 73 ("Commission-Filter Rules," adopted in 2012); ¶ 77 ("Free-Service Rule," adopted in 1997); ¶ 81 ("Commission-Concealment Rules," adopted in 2012); and ¶ 87 ("Clear Cooperation Policy," adopted in 2019). This is not surprising, since high prices tend to help competitors by allowing

---

a price increase, can bring a price-fixing claim against" defendant-competitors); *Sprint Nextel Corp. v. AT & T Inc.*, 821 F. Supp. 2d 308, 319 (D.D.C. 2011) (finding no antitrust standing for competitor-plaintiffs where the alleged injuries focused on individual competitor harm: "Harm to *consumers* by way of increased prices is the type of injury the antitrust laws were designed to prevent, but it is not an injury-in-fact that *competitors* suffer.") (emphasis in original); *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 570 (S.D.N.Y. 2007) ("[I]f $9.95 per month was higher than a competitive market price, such conduct would harm consumers and violate the Sherman Act, but as a competitor of the joint ventures, Lime Wire would suffer no injury and indeed 'stood to gain from any conspiracy to raise the market price.'") (quotation omitted); *PSW, Inc. v. Visa U.S.A., Inc.*, 2006 WL 519670, at *9 (D.R.I. Feb. 28, 2006) ("[T]he federal antitrust laws do not allow recovery for potentially advantageous 'injuries.'"); *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 182 (W.D.N.Y. 2003) (no antitrust injury where plaintiff "seeks to engage in or benefit from the same activity" it alleges to be unlawful), *aff'd*, 428 F.3d 408 (2d Cir. 2005); *Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 940 F. Supp. 1026, 1036 (E.D. Tex. 1996) ("Because Plaintiffs stand to gain from any conspiracy to raise prices, they do not have the requisite 'antitrust injury' necessary to maintain a Section 1 claim for a conspiracy to fix prices at higher levels."); *Re/Max Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 155 (N.D. Ohio 1995) ("Instead of alleging that it has been disadvantaged by the competition-reducing effect of the alleged Re/Max no-recruitment agreement, Realty One has alleged a benefit."), *aff'd in relevant part*, 173 F.3d 995 (6th Cir. 1999).

them to undercut price and expand market share while still making a profit. *See, e.g.*, *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1294 (D. Utah 2022) ("[Plaintiff's] reliance on conclusory allegations that '[d]efendants' anticompetitive conduct has harmed other competing [] suppliers' is insufficient to show how it, as a competitor who stands to benefit from a price increase, can bring a price-fixing claim against [d]efendants.").

Indeed, the Fifth Circuit held just that in a case involving similar facts. In *Park v. El Paso Board of Realtors*, a discount broker-plaintiff "alleged that the defendant-brokers [conspired to] set an artificially high price for commissions." 764 F.2d 1053, 1069 (5th Cir. 1985). Writing one year before the Supreme Court's decision in *Matsushita*, the Fifth Circuit explained that "[s]etting an artificially high price for a product potentially harms consumers; but normally one would not expect it to harm competitors who try to undercut the set price. Quite the reverse: price fixing ordinarily helps these competitors by allowing them to capture a larger share of the market than they would if the prevailing price were lower." *Id. Park* therefore affirmed a district court's finding that a discount broker had not suffered an antitrust injury from a price-fixing conspiracy. *See id. Matsushita* confirmed that these economic realities vitiate antitrust standing as a matter of law, which is why district courts writing after *Matsushita* (and especially after *Iqbal* and *Twombly*) routinely dismiss similar challenges under Rule 12(b)(6). *See supra*, note 6 (collecting cases dismissing complaints on these grounds).

In short, Homie has not alleged that it suffered an antitrust injury from alleged higher prices for brokerage services. For this reason alone, its antitrust claims should be dismissed.

### 3.    Homie has not alleged that its injury directly resulted from the NAR Rules.

Homie's challenge to the NAR Rules also fails on the element of causation because it has not plausibly alleged that its market failure "resulted directly from" the NAR Rules. *Sharp*, 967

F.2d at 407 n.3; *CVB, Inc.*, 604 F. Supp. 3d at 1294. To the contrary, Homie alleges facts showing that its experience was causally ***disconnected*** from the NAR Rules because Homie both gained and lost market share while the NAR Rules were in place. A plaintiff who pleads that it first succeeded, then failed, under the same supposed anticompetitive conditions cannot plausibly claim causation. *Ass'n of Surgical Assts.*, 2023 WL 7277313, at *2; *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189, 1204 (D. Colo. 2019). The only reasonable inference to be drawn from the allegations in the Complaint is that Homie failed for reasons other than the NAR Rules. One such alternative reason is obvious here: the effects of the pandemic on the Utah housing market, including the cratering of home sales and skyrocketing of delinquent mortgage rates. *See* U.S. DEP'T OF HOUS. & URB. DEV., OFF. OF POL'Y DEV. & RSCH, COMPREHENSIVE HOUSING MARKET ANALYSIS, SALT LAKE CITY, UTAH (2020), at 16-17; *PS Audio, Inc. v. Allen*, 2018 WL 5309834, at *2 n.2 (D. Colo. Aug. 10, 2018) ("[C]ourt[s] may take judicial notice of the contents of a government website.").

### 4.   As a competing real estate broker, Homie is not an efficient enforcer of the antitrust laws as applied to the NAR Rules.

Homie's claim also fails because it is not an "efficient enforcer" of the antitrust laws. *See Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1268 (10th Cir. 2006) (A plaintiff is not an "efficient enforcer" of the antitrust laws, and therefore cannot seek damages under them, when there are "more directly-injured possible plaintiffs.").

"[O]nly those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under [Clayton Act] § 4." *Adamson v. Volkswagen Grp. of Am., Inc.*, 2023 WL 167081, at *6 (D. Colo. Jan. 12, 2023) (quoting *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995)); *see id.* at *9 (granting Rule 12(b)(6) motion to dismiss antitrust claim); *see also, e.g., Crocs, Inc. v. Australia Unlimited, Inc.*, 2008 WL

4426170, at *3 (D. Colo. Sept. 25, 2008) (granting Rule 12(b)(6) motion to dismiss antitrust counterclaim: "In considering whether a plaintiff is an efficient enforcer of the antitrust laws, relevant factors are 'the directness or remoteness' of the plaintiff's injury, whether others were more directly injured than the plaintiff, and whether the plaintiff has economic interest in preserving competition in the marketplace.") (citing *Abraham*, 461 F.3d at 1268); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 305 (S.D.N.Y. 2020) ("efficient enforcer" status "turns 'chiefly on whether the plaintiff is a consumer or a competitor'") (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016)), *aff'd in relevant part*, 61 F.4th 242 (2d Cir. 2023).

Homie is not the most efficient enforcer of the antitrust laws as applied to the NAR Rules because it was a provider of brokerage services, not a consumer of them. Homie seeks to recover for alleged losses it sustained to its business, not for alleged losses suffered by consumers, and hence cannot be deemed an "efficient enforcer" with respect to the NAR Rules it challenges. *See Crocs*, 2008 WL 4426170, at *3; *see also Adamson*, 2023 WL 167081, at *9 (dismissing antitrust claim because it "pa[id] lip service to an antitrust injury" but ultimately "ma[de] clear that the real injury [plaintiff] seeks to vindicate is one suffered by [it], not competition") (quoting *GDHI*, 416 F. Supp. 3d at 1203). Direct victims of the alleged violation (*i.e.*, consumers) are more efficient enforcers, and they have already brought and recovered on claims. *See, e.g., Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019); *Burnett*, 2023 WL 11666529 (verdict); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 783 (N.D. Ill. 2020). The consumers' recovery in the other cases demonstrates the lack of need for a competitor to pursue a follow-on action untethered to remedying harms to competition generally. *See Abraham*, 461 F.3d at 1268 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for

allowing a more remote party [to bring suit].") (alteration in original) (quoting *Assoc. Gen. Contractors*, 459 U.S. at 542).

**B.      Homie's claim based on the NAR Rules is time-barred.**

Finally, Homie's lack of antitrust injury arising from the NAR Rules is reinforced by the fact that it operated (and succeeded) for years under the NAR Rules without challenging them and only brought suit after alleged and separate boycott activities by defendants, which are addressed below. Homie's claim based on the NAR Rules is therefore time-barred because Homie brought it more than four years after the last of the challenged NAR Rules was adopted.

Under the Sherman Act (as well as the Utah Antitrust Act), claims must be brought within four years "after the cause of action accrued." 15 U.S.C. § 15b; Utah Code Ann. § 76-10-3117(2). To restart the statute of limitations, a plaintiff must plead acts that are "not merely a reaffirmation of a previous act," but instead constitute "a new and independent act that injured plaintiff anew." *Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op., Inc.*, 872 F.2d 931, 934 (10th Cir. 1989) (citation omitted). "[T]he acts in question must be distinct from the acts outside the limitations period, but they must continue the same conspiracy." *Id.* at 933. "Merely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act" that restarts the statute of limitations. *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071-72 (N.D. Cal. 2016).

Homie alleges the NAR Rules it challenges were adopted as early as 1996, and the most recent Rule—the Clear Cooperation Policy—was adopted in 2019, while Homie was actively gaining market share in Utah. Compl. ¶¶ 49, 59, 87. To the extent Homie seeks to ground its antitrust claim on any of the challenged NAR Rules, the claim is time-barred because the Complaint does not include any "new and independent" acts inside the limitations period that "continue the same conspiracy." *E.g.*, *Seay v. Okla. Bd. of Dentistry*, 2021 WL 1394478, at *2

(W.D. Okla. Apr. 12, 2021) (explaining that a claim based on the effects of a rule or statute generally accrues when the rule is adopted), *aff'd*, 2022 WL 984378 (10th Cir. Apr. 1, 2022); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (affirming Rule 12(b)(6) dismissal of Section 1 conspiracy claim because defendant's alleged acts within the limitations period were reaffirmations of policies adopted prior to bankruptcy discharge); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884-85 (N.D. Cal. 2015) (dismissing antitrust claim as untimely because plaintiffs alleged "only that Microsoft maintained and *reaffirmed* its *preexisting* non-solicitation agreements after 2009," which did not plead a continuing violation that restarted the Sherman Act's limitations period) (emphases added).

For all these reasons, Homie's claim based on the NAR Rules should be dismissed.

## II. The Court Should Dismiss Homie's Claims Based on a Local Boycott of Homie.

Homie's alternative claim is that other brokers in Utah agreed to engage in a group boycott against it. This claim fails for at least three reasons. *First*, the allegations of a conspiracy are implausible and unsupported. *Second*, Homie has failed to allege that Anywhere or RML participated in the alleged conspiracy. And *third*, Homie lacks antitrust standing to challenge the alleged boycott.

### A. The Complaint's allegations of a conspiracy are implausible.

The critical flaw making Homie's alleged boycott scheme implausible is that its own allegations explain why avoiding Homie listings was the economically rational thing for any local buyer broker to do, quite apart from any agreement with other brokers.[7] As Homie alleges, it paid low commissions to buyer brokers, costing them thousands to tens of thousands of dollars per sale.

---

[7] In the real world, brokers showed Homie listings to their clients because they had duties to act in the best interest of their clients regardless of their own incentives. But since this is a motion to dismiss, Anywhere and RML take Homie's allegations as true for purposes of the motion.

*See* Compl. ¶ 55 ("As a new entrant, Homie naturally sought to attract business by offering discounted brokerage services to buyers"), ¶ 65 (noting that buyer brokers would not be "willing to work for $500 or $1000" commissions when so many sellers offer commissions of "2.5%-3%"); *see also id.* ¶ 64 ("I'm sure it would sell if you changed the [buyer broker commission] to 3%"; "Raise Commission to 3%"). When, as here, "[t]he complaint itself gives reasons to believe" that the alleged conspirators "would see their best interests in" refusing to deal with the defendant, a plaintiff fails to state an antitrust claim unless it makes credible allegations of direct evidence of an agreement. *Twombly*, 550 U.S. at 568. Homie's Complaint lacks any such allegations, so its boycott claim fails.

To state a claim under the Sherman Act, "a plaintiff must allege facts establishing (1) 'the existence of an agreement or conspiracy between two or more competitors to restrain trade,' and (2) that the restraint is unreasonable." *Ass'n of Surgical Assistants*, 2023 WL 7277313, at *2 (quoting *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017)). An agreement or conspiracy is required because a unilateral refusal to deal with any party is not a violation of the antitrust laws. *See, e.g.*, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 & n.2, 450 (2009) (explaining that the antitrust laws impose no general "duty to deal" with a competitor and "certainly . . . no duty to deal under terms and conditions that the rivals find commercially advantageous"). At the Rule 12(b)(6) stage, a complaint alleging a violation of Section 1 must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. This requires plausible factual allegations that the defendants demonstrated a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Plaintiffs cannot meet this burden with bare-bone accusations or the use of antitrust buzzwords. *See Ass'n of*

*Surgical Assistants*, 2023 WL 7277313, at *8 (citations omitted); *accord TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992) ("A complaint is subject to dismissal where it does little more than recite the relevant anti-trust laws.").

Allegations of an illegal agreement come in two forms: direct or circumstantial. *Llacua*, 930 F.3d at 1174. Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted. With direct evidence the fact finder is not required to make inferences to establish fact." *Id.* at 1177. To qualify as direct evidence of an agreement to boycott, allegations must be "sufficient[ly] particular[] as to the time, place, [and] persons who may have been involved in coming to an illegal agreement." *Ass'n of Surgical Assistants*, 2023 WL 7277313, at *8. For example, direct evidence includes "reports, memoranda, or tapes of meetings" establishing an agreement. *Llacua*, 930 F.3d at 1179.

Circumstantial evidence, by contrast, includes evidence that actors engaged in "parallel conduct," *id.* at 1174–75, for example if multiple actors "refus[e] to do business with" the plaintiff and make "defamatory comments" about it, *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 968 (N.D. Ill. 2007) ("*Hackman I*"), or "encourage[]" others to boycott the plaintiff, *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 946 (N.D. Ill. 2008) ("*Hackman II*"). To survive a Rule 12(b)(6) motion, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "[T]he conspiracy is not plausible if in light of common economic experience the alleged conduct is equally likely to result from independent action." *Llacua*, 930 F.3d at 1175. That is, the alleged parallel conduct must additionally include alleged "plus factors" that "tend to exclude the possibility of independent action." *Id.* at 1179.

Homie cannot proceed without direct evidence of an agreement because the Complaint shows that the economically rational thing for each buyer broker to do would be to avoid Homie's listings that paid little to no compensation for the work of securing a buyer to close on the home sale. To overcome this economic reality, Homie needs to allege facts directly showing an agreement. But it makes no such allegations whatsoever. The Complaint does not allege with any particularity "the time, place, or persons who may have been involved in coming to an illegal agreement." *Ass'n of Surgical Assistants*, 2023 WL 7277313, at *8. It does not "mention any purported exchange or conversation [that] plausibly indicate[s]" that the local brokers were "taking anything other than independent action." *Id.* And the Complaint makes literally no effort to tie any of this conduct to any of the Corporate Defendants.

The closest Homie comes to pleading facts suggesting an agreement are its allegations that local brokers posted comments online with the hashtag "#boycottHOMIE." Compl. ¶ 68. But "encouragement absent agreement is not enough to state an antitrust claim" for an alleged group boycott. *Hackman II*, 557 F. Supp. 2d at 946 (quotation omitted). An individual is free to share his or her own intent not to do business with a company, Compl. ¶ 68, so long as that person does not "reach[] an anticompetitive agreement with" others to do so. *Hackman II*, 557 F. Supp. 2d at 946.

### B.  Homie has failed to allege that Anywhere or RML participated in any conspiracy.

In addition, to bring a Section 1 claim against a particular defendant, the plaintiff must do more than allege that an agreement existed. It must also allege the defendant itself "participated in [the] conspiracy." *Llacua*, 930 F.3d at 1181; *Park*, 764 F.2d at 1061-62; *see also United States v. Penn*, 2021 WL 4521904, at *2 (D. Colo. Oct. 4, 2021). Here, Homie does not allege facts that make it plausible to conclude that Anywhere or RML "participated in" any agreement, so its claim fails for that reason as well. *Llacua*, 930 F.3d at 1181. This issue is even more acute in the context

of a franchisor and franchisee because conduct by a franchisee cannot be imputed to a franchisor unless the franchisor directed the franchisee's actions. *See Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir. 1984) ("[A]ffiliation does not by itself necessarily imply conspiracy to restrain trade.") (citations omitted); *accord Glover By & Through Dyson v. Boy Scouts of Am.*, 923 P.2d 1383, 1386 (Utah 1996) (reasoning a franchisor is "not liable for the tortious acts of its franchisee . . . because the franchisor did not retain day-to-day control of the franchisee but, rather, merely influenced the result to be achieved") (cleaned up).

Nowhere in its Complaint does Homie allege that Anywhere or RML participated in the local boycott. Indeed, the Complaint acknowledges that Anywhere and RML did not boycott listings, stating only that some of the local brokerages who refused to do business with it were "affiliated with the Corporate Defendants." Compl. ¶ 51. In Anywhere's case, the best Homie can do is to allege that some Coldwell Banker franchisees advertised that they would not do business with Homie. *Id.* ¶ 69; *see also id.* ¶ 20. The allegations against RML are similarly lacking. RML is a franchisor that contracts with independently owned and operated franchises, but there are no allegations in the Complaint related to RML's alleged boycott of Homie or even of any alleged boycott by RML's Utah franchisees.

In short, these allegations do not suffice to show that Anywhere or RML participated in the alleged conspiracy. A corporation can only be held to have participated in a conspiracy if its agents did so on its behalf. *Park*, 764 F.2d at 1061-62; *see also Margae, Inc. v. Clear Link Techs., LLC*, 2008 WL 5377932, at *1 (D. Utah Dec. 22, 2008) ("[A] corporation can only act through its agents."). And "[a] franchise agreement, without more, does not make the franchisee an agent of the franchisor." *Vaught v. Chaudhry's Inv. Grp., Inc.*, 2010 WL 11627524, at *2 (D. Kan. May 7, 2010). Although the Complaint alleges that Anywhere franchises Coldwell Banker brokerages and

RML franchises the RE/MAX brand, the Complaint does not allege facts showing that the local franchisees were agents of Anywhere or RML, nor that the franchisees acted on behalf of Anywhere or RML. Homie could have sued the local brokerages who carried out the alleged boycotts, but it chose not to do so.

Nor can Homie rely on the alleged involvement of Anywhere or RML in the adoption of the NAR Rules to generate an inference that either participated in the alleged local boycott. *Contra* Compl. ¶ 50 (alleging that the local boycott was "facilitated by NAR's Exclusionary Rules and policies"). To connect one alleged conspiracy to the other, it would need to do more than conclusorily assert that the NAR Rules "facilitated" a concerted boycott—for example, plausibly allege that the NAR Rules *required* a concerted boycott or otherwise directly established it, and that Anywhere or RML further agreed to participate in the same. *See Bolinger v. First Multiple Listing Service, Inc.*, 838 F. Supp. 2d 1340, 1359-61 & n.22 (N.D. Ga. 2012) ("The Court agrees with [d]efendants and concludes that [p]laintiffs have not alleged sufficient facts to make a plausible showing that [d]efendants agreed or conspired to fix broker commissions by virtue of the adoption, enforcement, or agreement with [an MLS's] rules.") (dismissing a Section 1 claim under Rule 12(b)(6)). The Complaint alleges no such thing here: there was no "boycott Homie" NAR Rule or anything like it.

### C.    Homie lacks antitrust standing to pursue its boycott theory.

Homie's boycott claim also fails for lack of antitrust standing because Homie's "own claimed injury" "is different from the alleged injury to *consumers*." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1090 (D. Colo. 2012) (emphasis in original).

The Complaint alleges that consumers suffered the following injuries: elevated prices of residential real estate brokerage services, Compl. ¶ 4; breaches of fiduciary duties, *id.* ¶¶ 63, 73; and misleading terms, *id.* ¶ 79. Those are the alleged antitrust injuries in this case, and Homie can

only become an enforcer of the antitrust laws to the extent it suffered the same injuries. *L-3 Commc'ns Corp.*, 863 F. Supp. 2d at 1090. But it did not. Homie alleges it suffered a different set of injuries: diminished ability and incentive to compete using lower commission prices, reduced revenue and profit, and loss of "economies of scale, scope, access to capital, commercial validation and learning-by-doing necessary to compete effectively." Compl. ¶ 141. Because Homie's "own claimed injury is not the same as the alleged antitrust injury, this too requires dismissal of the Sherman Act claim." *L-3 Commc'ns Corp.*, 863 F. Supp. 2d at 1090 (dismissing Sherman Act claim where plaintiff alleged that it lost "business opportunities" and that consumers "paid higher prices for services"). Homie cannot hijack the harms suffered by consumers to vindicate its own private interests as a competitor.

Another district court in this Circuit reached a similar conclusion in *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189 (D. Colo. 2019). The complaint there also alleged that consumers suffered from prices that "remained substantially higher than they would be" absent the alleged anticompetitive conduct. *Id.* at 1203. But the competitor-plaintiff did not allege that it suffered from those higher prices. Instead, it suffered "lost revenues, lost business value, and potentially the destruction of its entire business." *Id*. The court concluded that these injuries were not antitrust injuries because they had "no adverse effect on competition or consumers." *Id.* Because the plaintiff's claimed injury was "different" than the injury to consumers, the plaintiff lacked antitrust standing to vindicate the consumers' interests. *Id.* Just so here.

*PLS.com, LLC v. Nat'l Ass'n of Realtors* is not to the contrary. 32 F.4th 824 (9th Cir. 2022); *see* Compl. ¶ 42. There, the Ninth Circuit concluded that a rival to traditional MLSs, the Pocket Listing Service ("PLS"), possessed antitrust standing to challenge the NAR rule requiring publicly listed properties to be placed on an MLS. *PLS.com*, 32 F.4th at 832. In doing so, however, the

Ninth Circuit reiterated that "a competitor has standing to assert a Sherman Act claim 'only when the claimed injury flows from acts harmful to consumers,'" *id.* (quoting *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir. 1995)), and that "the harm claimed by the plaintiff" must "correspond[] to the rationale for finding a violation of the antitrust laws in the first place." *Id.* In that case, the Ninth Circuit found that the "consumers" of listing services were the real estate agents who used them, and that the harm those real estate agents suffered—the elimination of an alternative listing service that did not impose the typical MLS rules, *id.* at 830—matched the harm suffered by PLS itself, *id.* at 832-33. Homie's Complaint is instantly distinguishable from the facts of *PLS.com* because its alleged exclusionary harm is distinct from the alleged harm to consumers of broker services resulting from inflated real estate commission rates. As explained above, if anything, the same higher prices that would hurt consumers would *help* Homie by allowing it to charge less and gain market share—exactly as it allegedly did. Homie therefore does not have antitrust standing under the facts set forth in its Complaint.

## III.    The Court Should Dismiss Homie's State-Law Claims.

Once this Court has dismissed Homie's federal antitrust claim, it should dismiss Homie's state law claims as well. The Utah Antitrust Act tracks the Sherman Act, so resolving the federal claim resolves the state statutory claim. *Am. Airlines v. Christensen*, 967 F.2d 410, 414 (10th Cir. 1992); *TravelPass Grp., LLC v. Caesars Entm't Corp.*, 2019 WL 5691996, at *8 n.10 (E.D. Tex. Aug. 29, 2019). The same is true of the tortious interference claim. It requires a predicate showing that the defendant acted "by improper means." *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015). Where, as here, the means are alleged to be improper on the basis that they violate antitrust law, the tortious interference claim necessarily fails if the antitrust claim cannot launch. *Allergy Research Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *9 (D. Utah Apr. 4, 2022).

24

In the alternative, the Court should decline to exercise supplemental jurisdiction over the state law claims and dismiss them without prejudice. *Mitchell v. Wells Fargo Bank*, 2019 WL 488284, at *1 (D. Utah Feb. 7, 2019) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.") (quotation omitted).

## CONCLUSION

This case is a perfect example of why courts remain wary of antitrust claims brought by competitors. The antitrust laws are intended to foster competition, and competition produces both winners and losers. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-89 (1977). The competitive losers will always be tempted to find the competition unfair and seek to make their opponents pay the Sherman Act's treble damages. *Id.* But allowing failed competitors to sue hurts consumers. It reduces the amount of money available to consumers, increases the price of doing business (and thus the cost of goods) through attorney fees, and threatens to discourage even procompetitive actions when they would harm a competitor. *Cf. Twombly*, 550 U.S. at 558 (noting the immense cost of antitrust discovery for defendants and for the courts). This Court should dismiss Homie's Complaint in its entirety for failure to state a claim on which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: October 18, 2024

Respectfully submitted,

*/s/ Jeffrey A. Levee*
*(Signed by Jason W. Hardin with permission of Jeffrey A. Levee)*

Jeffrey A. Levee, *pro hac vice*
JONES DAY
555 South Flower St, 50th Floor
Los Angeles, California 90071
Tel: (213) 489-3939
jlevee@jonesday.com

Eddie Hasdoo, *pro hac vice*
JONES DAY
110 N. Wacker, Suite 4800
Chicago, Illinois 60606
Tel: (312) 782-3939
ehasdoo@jonesday.com

Juliette P. White, USB #9616
Hannah Ector, USB #17980
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Tel: 801.532.1234
JWhite@parsonsbehle.com
HEctor@parsonsbehle.com

*Attorneys for Defendant RE/MAX, LLC*

*/s/ Aaron Van Oort*
*(Signed by Jason W. Hardin with permission of Aaron Van Oort)*

Aaron Van Oort, *pro hac vice*
Kevin Wagner, *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, MN 55402
Tel: (612) 766-7000
aaron.vanoort@faegredrinker.com
kevin.wagner@faegredrinker.com

Josh Mahoney, *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
320 S Canal St.
Suite 3300
Chicago, IL 60606
Tel: (312) 212-6500
josh.mahoney@faegredrinker.com

Paul Saint-Antoine, *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
1 Logan Square # 2000
Philadelphia, PA 19103
Tel: (215) 988-2700
paul.saint-antoine@faegredrinker.com

Stacey Anne Mahoney, *pro hac vice*
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
stacey.mahoney@morganlewis.com

Kenneth Michael Kliebard, *pro hac vice*
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
Tel: (312) 324-1000
kenneth.kliebard@morganlewis.com

William T. McEnroe, *pro hac vice*
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5001
william.mcenroe@morganlewis.com


Jason W. Hardin, USB #8793
FABIAN VANCOTT
95 South State, Suite 2300
Salt Lake City, UT 84111
801-323-2235
jhardin@fabianvancott.com

*Attorneys for Defendant Anywhere Real Estate Inc.*