Thomas R. Lee (5991)
John J. Nielsen (11736)
SCHAERR | JAFFE
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
(202) 787-1060
tlee@schaerr-jaffe.com
jnielsen@schaerr-jaffe.com

Mike Bonanno (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I St NW, Suite 900
Washington, DC 20005
(202) 538-8225
mikebonanno@quinnemanuel.com

*Attorneys for Defendant NATIONAL ASSOCIATION OF REALTORS®*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HOMIE TECHNOLOGY, INC., a Delaware corporation, <br><br>         Plaintiff, <br><br>    v. <br><br> NATIONAL ASSOCIATION OF REALTORS, an Illinois non-profit association; ANYWHERE REAL ESTATE INC., a Delaware corporation; KELLER WILLIAMS REALTY, INC., a Texas corporation; HOMESERVICES OF AMERICA, INC., a Delaware corporation; HSF AFFILIATES, LLC, a Delaware limited liability company; RE/MAX LLC, a Delaware limited liability company; and WASATCH FRONT REGIONAL MULTIPLE LISTING SERVICE, INC., a Utah corporation, <br><br>         Defendants. | **NATIONAL ASSOCIATION OF REALTORS' 12(b)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT** <br><br> Case No.: 24-cv-00616-DAK-JCB <br><br> Judge Dale A. Kimball <br> Magistrate Judge Jared C. Bennett |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

DEFENDANT NAR'S MOTION TO DISMISS ............................................................1

PRELIMINARY STATEMENT ...............................................................................1

HOMIE'S ALLEGATIONS ....................................................................................3

I.    Homie Challenges NAR Policies That Were In Place Long Before Homie Launched Its Business.........................................................................3

II.    Homie Became One Of The Largest Brokers In Utah Notwithstanding The NAR Policies That Allegedly Inflated Brokerage Commissions And Excluded New Entrants..............................................................................5

III.    Local Real Estate Agents In Utah Purportedly Boycotted Homie In Response To Homie's Success ..............................................................5

LEGAL STANDARD ..........................................................................................6

ARGUMENT .....................................................................................................6

I.    Homie Has Not Plausibly Alleged Antitrust Injury ...............................................6

A.    Homie Cannot Allege It Suffered An Antitrust Injury Flowing From High Commissions Allegedly Caused By NAR Policies.................8

B.    Homie's Own Allegations Show It Was Not Foreclosed Or Excluded By NAR's Policies......................................................13

1.    Homie's Own Allegations Establish That It Overcame The Purported Barriers To Entry It Attributes To The Alleged Conspiracy ...............................................................14

2.    At Most, Homie Alleges Harm to a Single Competitor, Which Is Not Enough To Establish Antitrust Injury ...........................15

3.    Homie's Allegations About The Clear Cooperation Policy Do Not Establish It Was Excluded From The Market Or That NAR's Policies Erected Barriers To Entry ............................................18

C.    Homie Does Not Allege Defendants Participated In Any Boycott Of Homie Or Otherwise Agreed to Boycott Homie ..................19

II.    Homie Has Not Asserted A Valid Tortious Interference Claim ..........................22

CONCLUSION.................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Abraham v. Intermountain Health Care Inc.*,
461 F.3d 1249 (10th Cir. 2006) ...........................................................7

*Allergy Rsch. Grp. LLC v. Rez Candles Inc.*,
2022 WL 1004214 (D. Utah Apr. 4, 2022)..........................7, 16, 17, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................6, 16

*Atl. Richfield Co. v. USA Petroleum Co.* (*ARCO*),
495 U.S. 328 (1990)............................................................6, 7, 8, 18

*Bell Atl. Corp v. Twombly*,
550 U.S. 544 (2007)..................................................................6, 22

*Bright v. Moss Ambulance Service, Inc.*,
824 F.2d 819 (10th Cir. 1987) .............................................................18

*Brixen & Christopher Architects, P.C. v. State*,
2001 UT App 210, 29 F.3d 650 ...........................................................7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)....................................................................6, 7

*Bunnell v. Bills*,
368 P.2d 597 (Utah 1962)...................................................................24

*C.R. England v. Swift Trans. Co.*,
2019 UT 8, 437 P.3d 343 ...................................................................24

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ...........................................................20

*City of Chanute, Kan. v. Williams Nat. Gas Co.*,
955 F.2d 641 (10th Cir. 1992) .............................................................22

*Cohlmia v. St. John Med. Ctr.*,
693 F.3d 1269 (10th Cir. 2012) ...........................................................17

*CVB, Inc. v. Corsicana Mattress Co.*,
2024 WL 4505044 (D. Utah Oct. 16, 2024) .........................................9

*CVB, Inc. v. Corsicana Mattress Co.*,
604 F.Supp. 3d 1264 (D. Utah 2022)....................................................9

*Dias v. City & Cnty. of Denver*,
    567 F.3d 1169 (10th Cir. 2009) ................................................................6

*Eldridge v. Johndrow*,
    2015 UT 21, 345 P.3d 553 ..................................................................22

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*,
    407 F.3d 1091 (10th Cir. 2005) ........................................................7, 18

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    507 F.Supp. 3d 1289 (D. Kan. 2020) ..............................................15

*Insight Equity A.P. X, LP v. Transitions Optical, Inc.*,
    2016 WL 3610155 (D. Del. July 1, 2016) ......................................15

*J. Allen Ramey, M.D., Inc. v. Pac. Found. For Med. Care*,
    999 F.Supp. 1355 (S.D. Cal. 1998) ..................................................9

*Jicarilla Apache Tribe v. Supron Energy Corp.*,
    728 F.2d 1555 (10th Cir. 1984) ........................................................21

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
    190 F.3d 775 (7th Cir. 1999) ............................................................9

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ..................................................16, 22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................8, 11

*Mink v. Knox*,
    613 F.3d 995 (10th Cir. 2010) ..........................................................3

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ........................................................................20

*N.M. Oncology v. Presbyterian Healthcare Servs.*,
    169 F.Supp. 3d 1204 (D.N.M. 2016) ..............................................15

*Papasan v. Allain*,
    478 U.S. 265 (1986) ..........................................................................6

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ..............................................................8

*Reazin v. Blue Cross and Blue Shield of Kan.*,
    899 F.2d 951 (10th Cir. 1990) ........................................................18

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d 958 (10th Cir. 1994) ...................................................................15

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
  22 F.4th 103 (2d Cir. 2021) .....................................................................20

*Sharp v. United Airlines, Inc.*,
  967 F.2d 404 (10th Cir. 1992) ...................................................................7

*St. Benedict's Dev. Co. v. St. Benedict's Hosp.*,
  811 P.2d 194 (Utah 1991)........................................................................22

*Stamatakis Indus., Inc. v. King*,
  965 F.2d 469 (7th Cir. 1992) ...................................................................15

*Stiles v. Walmart, Inc.*,
  639 F.Supp. 3d 1029 (E.D. Cal. 2022)...........................................8, 9, 15

*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006) .................................................................7

*Triesault v. Greater Salt Lake Bus. Dist.*,
  2005 UT App 489, 126 P.3d 781 ..............................................................23

*TruGreen Companies, L.L.C. v. Mower Bros., Inc.*,
  2008 UT 81, 199 P.3d 929 ........................................................................23

*VidAngel LLC v. ClearPlay, Inc.*,
  703 F.Supp. 3d 1329 (D. Utah 2023)..................................................22, 24

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
  796 F.2d 1216 (10th Cir. 1986) ................................................................21

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969)..................................................................................19

## Rules

Federal Rule of Civil Procedure 12(b)(6) ...............................1, 6, 7, 8, 12, 16

## Other Authorities

Restatement (Second) of Torts § 766............................................................23

## DEFENDANT NAR'S MOTION TO DISMISS

Defendant National Association of REALTORS® (NAR) hereby moves for dismissal of Plaintiff Homie Technology, Inc.'s Complaint (ECF 1) under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

For Homie's antitrust claims to survive a motion to dismiss, Homie must plead that it suffered an "antitrust injury," which is an injury that flows from a reduction in competition caused by the Defendants' unlawful actions. It has not done so. Homie claims Defendants architected a scheme to raise prices and exclude a wave of new competitors. But Homie's *factual* allegations fail to connect Homie's injuries (lost profits and market share) to the ways in which Defendants' alleged conduct supposedly harmed competition (through higher prices and increased barriers to entry). Homie's factual allegations instead show that Homie (1) stood to *benefit* from the higher prices caused by the alleged conspiracy; (2) overcame any barriers to entry caused by the alleged conspiracy; or (3) was harmed by something *other* than Defendants' actions. None of these allegations suffice to establish antitrust injury, which is fatal to Homie's antitrust claims.

*First*, Homie fails to allege it was harmed by a conspiracy designed to inflate residential real estate brokerage commissions through policies adopted by NAR. As a real estate brokerage, Homie stood to *benefit* from higher commissions. If the policies challenged by Homie in fact elevated brokerage commissions, that would have enabled Homie to increase its own commissions (making more money on each transaction) or attract more clients with lower commissions (increasing its transaction volume). According to Homie's allegations, that is precisely what happened. Homie claims it became one of the top brokerages in Utah by charging commissions that were just below the supposedly inflated levels imposed by NAR's policies. In fact, Homie claims that high commissions purportedly caused by NAR's policies attracted Homie to enter the

1

market in the first place.  Because Homie could not have been injured by what it alleges were inflated commissions, and it would have benefited from them if they were in fact inflated, Homie has failed to allege an antitrust injury flowing from the price effects of NAR's policies.

**Second**, Homie fails to allege facts suggesting NAR's policies excluded Homie and other discount brokers from the market.  Homie claims that NAR's policies discouraged Homie's competitors (other real estate agents) from showing homes listed by discount brokers, but this claim is refuted by Homie's own factual allegations.  Homie claims that it entered the market in 2015—years after all but one of the challenged NAR policies were in place—and that it succeeded. In fact, according to its own account, Homie quickly became one of the largest brokers in Utah— and sustained that status for several years—despite the supposedly exclusionary effects of NAR's policies.  Because Homie's own allegations establish that it overcame any barriers to entry created by NAR's policies and succeeded, it has failed to plausibly allege it was excluded from the market by those policies.

**Third**, Homie fails to establish an antitrust injury flowing from the alleged group boycott described in its Complaint.  Homie alleges that, after its initial success, it was targeted by a group boycott organized by local real estate agents, but none of the alleged boycott activities are connected to Defendants in any way.  Homie does not allege that any Defendant directed local real estate agents to boycott Homie, that local real estate agents agreed with Defendants to boycott Homie, or that Defendants agreed among themselves to boycott Homie.  Because there is nothing in the Complaint connecting Defendants to the purported boycott that harmed Homie's business, Homie's boycott allegations are not tethered to an antitrust injury caused by ***Defendants'*** conduct.

Homie's remaining tortious interference claim fails for similar reasons.  A tortious interference claim requires proof that a defendant knowingly and intentionally interfered with an

2

existing or expected business arrangement. But Homie has not alleged facts connecting any Defendant to intentional interference with Homie's business (or, for that matter, any action that specifically targeted Homie).

Because Homie has failed to plead these key elements of its claims, Defendant NAR respectfully submits that Homie's Complaint should be dismissed.

**HOMIE'S ALLEGATIONS**

For the purposes of this Motion only, NAR assumes all factual allegations in Homie's Complaint are true. *See*, *e.g.*, *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010).

## I.    Homie Challenges NAR Policies That Were In Place Long Before Homie Launched Its Business

NAR is a national trade association of roughly 1.5 million members, including residential real-estate brokers, agents, property managers, appraisers, and other real estate professionals. Compl. ¶ 18. Over 1,200 local associations of REALTORS® also are members of NAR. *Id.*

Many local associations of REALTORS® operate multiple listing services (MLSs). *Id.* ¶ 37. "MLSs are joint ventures among virtually all brokers operating in local or regional areas." *Id.* ¶ 35. "The MLS combines its members' home listings information into a database, usually in electronic form." *Id.* "The MLS then makes these data available to all licensed real estate professionals who are members of the MLS." *Id.* "By listing in the MLS, a broker can market properties to a large set of potential buyers." *Id.* "By searching the MLS, a broker representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs." *Id.*

In addition to public advocacy on behalf of its members, home buyers, and home sellers, NAR provides guidance and promulgates a code of ethics for its members. Specifically, NAR publishes a Handbook on Multiple Listing Policy (MLS Handbook), which is intended to provide

3

guidance to associations of REALTORS® in the operation of MLSs. Ex. A (2024 MLS Handbook) at 5[1]; *see also* Ex. B (2020 MLS Handbook). The Handbook contains four categories of policies and model rules: Mandatory, Recommended, Optional, and Informational. Ex. A at 3. To use the REALTOR® trademark and access NAR-provided insurance, MLSs operated by associations of REALTORS® must adopt and follow the Mandatory model rules in the MLS Handbook. *Id.* NAR also publishes a Code of Ethics and Standards of Practice, which is applied to individual REALTORS®. *See* Compl. ¶ 27; Ex. C (Code of Ethics and Standards of Practice) at 1.

Homie's Complaint challenges the following NAR policies and guidance, which it claims were adopted and enforced to increase real estate brokerage commissions and exclude discount brokers from the market:

| Source | Homie Shorthand | Adopted | Repealed | Citation |
|---|---|---|---|---|
| MLS Handbook Policy Statement 7.23 | "Broker-Buyer Compensation" Rule | 1996 | 2024 | Compl. ¶¶ 38, 59; Ex. B at 50 |
| NAR Code of Ethics Standard of Practice 12-1 | "Free-Service" Rule | 1997 | 2022 | Compl. ¶ 77; Ex. C at 6 |
| MLS Handbook Section 18.3.1 | "Commission-Concealment" Rule | 2012 | 2021 | Compl. ¶ 81; Ex. B at 99 |
| MLS Handbook Policy Statement 7.58 | "Commission-Filter" Rule | 2012 | 2021 | Ex. B at 39 |
| MLS Handbook Policy Statement 8.0 | "Clear Cooperation" Rule | 2019 | n/a | Compl. ¶ 87; Ex. A at 53; Ex. B at 48 |

---

[1] Exhibit pages refer to the ECF page numbers in the header.

## II. Homie Became One Of The Largest Brokers In Utah Notwithstanding The NAR Policies That Allegedly Inflated Brokerage Commissions And Excluded New Entrants

"Homie was launched in 2015." Compl. ¶ 44. "Homie's business model was to disrupt the traditional real estate brokerage model by returning artificially inflated commissions to consumers, competing away the supracompetitive prices *engendered by Defendants' decades-long conspiracy*." *Id.* ¶ 45 (emphasis added).

"Sellers listing with Homie would pay a low flat fee or a low commission, in either scenario paying Homie less than they would have paid to traditional real estate brokers charging the industry standard 5%–6% of the selling price." *Id.* ¶ 46. "As part of their low-cost selling strategy, sellers using Homie would commonly make an offer of compensation to buyer-brokers that was somewhat below the [commission] offered by sellers represented by traditional brokers . . . ." *Id.* According to its Complaint, Homie "offers customers significant savings compared to the high commissions charged by traditional real estate brokerages." *Id.* ¶ 17.

"Homie's 2015 entry into the real estate brokerage market in Utah was initially successful." *Id.* ¶ 49. "Homie was, at various times between 2017 and 2021, among the five largest brokerages by market share in the state." *Id.*

Throughout this period, all the challenged NAR policies and guidance were in effect. *Id.* ¶¶ 59, 73, 77, 81, 87.

## III. Local Real Estate Agents In Utah Purportedly Boycotted Homie In Response To Homie's Success

According to Homie's allegations, "Homie's initial success sparked an anticompetitive campaign among Homie's competitors to exclude Homie." *Id.* ¶ 50. Homie alleges that this campaign was executed by local real estate agents in Utah who complained about the low commissions offered on Homie-listed properties by: (1) telling Homie through the comment field

in the local MLS that they refused to show Homie's listings to their clients unless it increased the commissions it was offering to buyer's agents, *id.* ¶ 64; (2) sending emails and text messages to Homie suggesting that they might refuse to show their buyer-clients Homie listings, *id.* ¶¶ 65–66; and (3) "us[ing] Facebook groups to coordinate boycotts of Homie listings with low buyer-broker commissions," *id.* ¶¶ 68–69.  None of these actions are attributed to any Defendant.

## LEGAL STANDARD

To withstand a Rule 12 motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff must plead facts—not just legal conclusions. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (cleaned up).  When reviewing, the court assumes the truth of "all well-pleaded facts in the complaint, and draw[s] all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).  The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## ARGUMENT

### I.    Homie Has Not Plausibly Alleged Antitrust Injury

A private antitrust plaintiff may not recover damages by simply showing it has suffered an "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  "Instead, a plaintiff must prove the existence of '***antitrust*** injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990) (*ARCO*) (quoting *Brunswick*, 429 U.S. at 489) (emphasis in original).

"The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems

from a competition-*reducing* aspect or effect of the defendant's behavior." *ARCO*, 495 U.S. at 344. (emphasis in original). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489. In other words, the plaintiff's injury must flow directly from the alleged manifestation of harm on competition (*i.e.*, higher prices, reduced output, or lower quality). *Allergy Rsch. Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *4 (D. Utah Apr. 4, 2022) (unpublished) ("Anticompetitive effects [from which an antitrust injury may flow] include, for example, barriers to market entry, reduced output, or supracompetitive prices.").

The assessment of whether a plaintiff has sustained antitrust injury is "[t]he threshold inquiry in analyzing whether a plaintiff may pursue an antitrust claim." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006) (citation omitted). And this threshold question must be resolved under both federal law and the Utah Antitrust Act. *See Brixen & Christopher Architects, P.C. v. State*, 2001 UT App 210, ¶ 33 n.14, 29 F.3d 650 ("We note that the federal antitrust statute is nearly identical to the Utah counterpart . . . . Thus, we look to the expansive body of federal antitrust law for guidance in evaluating a civil antitrust claim under the Utah Antitrust Act.").

Where a plaintiff fails to allege facts that plausibly suggest it has sustained an antitrust injury, dismissal is warranted under Rule 12. *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) ("Because we conclude that Elliott has not alleged an antitrust injury, its antitrust claims necessarily fail . . . The district court thus properly dismissed Elliott's antitrust claims for failure to state a claim."); *see Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) (affirming dismissal of antitrust claims because plaintiff "did not suffer a cognizable antitrust injury"); *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992) (affirming

dismissal on a Rule 12 motion to dismiss because plaintiff's "alleged harm . . . [was] not necessarily the result or manifestation of a reduction in competition," but rather, "tangential to any alleged harm in those markets" and "at most an indirect consequence of the demise of an individual competitor"). That is the case here.

### A. Homie Cannot Allege It Suffered An Antitrust Injury Flowing From High Commissions Allegedly Caused By NAR Policies

As a threshold matter, Homie cannot claim it has suffered an antitrust injury flowing from higher prices allegedly caused by NAR's policies and guidance. Courts, including the Supreme Court, have consistently reasoned that a plaintiff cannot suffer an antitrust injury caused by a conspiracy among its competitors to raise prices. *ARCO*, 495 U.S. at 337 ("A competitor 'may not complain of conspiracies that . . . set minimum prices at *any* level.'" (internal citation omitted) (emphasis in original)); *CVB, Inc. v. Corsicana Mattress Co.*, 604 F.Supp. 3d 1264, 1294 (D. Utah 2022) (dismissing competitor antitrust claim which only alleged damages from being unable to charge prices as high as its own competitors); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122–24 (2d Cir. 2007) (affirming an antitrust claim's dismissal because plaintiff "did not suffer an injury from increased prices," but instead the "consumers who were forced to buy at higher prices (or inferior quality)" due to market power); *Stiles v. Walmart, Inc.*, 639 F.Supp. 3d 1029, 1046 (E.D. Cal. 2022) (finding it "unnecessary to decide whether a jury could agree that [competitors] kept prices too high" because a plaintiff cannot "sue her competitors for driving up prices").

In such circumstances, the plaintiff stands to *benefit* from the alleged reduction in competition (higher prices) because it can make more money by unilaterally raising its own prices or lowering its prices to increase its own sales volume. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83 (1986) ("Nor can respondents recover damages for any

conspiracy by petitioners to charge higher than competitive prices in the American market.  Such conduct . . . could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price . . .”); *CVB, Inc. v. Corsicana Mattress Co.*, 2024 WL 4505044, at *7 (D. Utah Oct. 16, 2024) (unpublished) (dismissing amended complaint after finding that “CVB cannot recover for a conspiracy that raises market price, as these restrictions, though harmful to competition, actually ***benefit*** competitors by making supracompetitive pricing more attractive.  If one or more of the Seller Defendants did raise prices, this would give CVB the opportunity to undercut their prices and possibly increase its market share.”) (cleaned up); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777–78 (7th Cir. 1999) (a “conspiracy of a firm's competitors” to raise prices “could only help the firm, by providing an umbrella under which it could sell a large quantity at a supracompetitive price generating supracompetitive profits just by setting price in between the conspirators' price and the lower, competitive price that would prevail in the absence of the conspiracy;”  such a firm has no antitrust injury) (Posner, J.); *Stiles*, 639 F.Supp. 3d at 1046 (“[Plaintiff] does not have standing to sue her competitors for driving up prices. She, like her competitors––-and unlike consumers—would benefit from artificially inflated prices.  If prices increased and consumers were forced to pay more, they could sue; [Plaintiff] cannot.” (internal citations omitted)); *see also J. Allen Ramey, M.D., Inc. v. Pac. Found. For Med. Care*, 999 F.Supp. 1355, 1358, 1364 (S.D. Cal. 1998) (granting summary judgment on claim alleging that “price-fixing scheme stifles competition and innovation by rewarding the status quo and discouraging state-of-the-art medical care” based on a failure to prove antitrust injury because, “as a competitor, Plaintiff could only benefit from artificially high prices”).

In this case, Homie alleges that Defendants conspired to adopt and enforce policies through NAR to artificially inflate real estate brokerage commissions.  Compl. ¶ 38 (alleging that NAR's

"rules" produced "elevated commissions" of "5% to 6%"). In other words, Homie claims Defendants and their alleged co-conspirators—including "traditional brokerages," Compl. ¶¶ 3, 6, 17, which are Homie's competitors—conspired to raise prices. And as a competitor to the alleged conspirators, Homie stood to benefit from the higher prices imposed by the supposed conspiracy.

Homie in fact alleges the elevated commissions caused by the alleged conspiracy enticed Homie to enter the market and compete in the first place. According to Homie, as a result of NAR's longstanding policies, "[r]esidential real estate was ripe for disruption with technology, and consumers were primed for an alternative to the traditional, high-priced brokerage services offered by Defendants." Compl. ¶ 45. "Homie's business model was to disrupt the traditional real estate brokerage model by returning artificially inflated commissions to consumers, competing away *the supracompetitive prices engendered by Defendants' decades-long conspiracy*." *Id.* (emphasis added).

Once Homie launched its business, it intentionally charged commissions slightly below the levels it now claims to have been imposed as a result of NAR's policies. *Id.* ¶ 46 ("Sellers listing with Homie would pay a low flat fee or a low commission, in either scenario paying Homie less than they would have paid to traditional real estate brokers charging the industry standard 5%–6% of the selling price."). According to Homie, its clients would "commonly make an offer of compensation to buyer-brokers that was *somewhat below* the [commission] offered by sellers represented by traditional brokers." *Id.* (emphasis added). Thus, Homie intentionally set its prices just below the allegedly inflated commission rates caused by NAR's policies to attract more business.

By its own account, this strategy succeeded. Homie started its business in Utah in 2015. *Id.* ¶ 44. Within two years, it was "among the five largest brokerages by market share in the state."

10

*Id.* ¶ 49.  And that success persisted through at least 2021.  *Id.*  In other words, Homie, as a competitor to the members of the alleged conspiracy, took advantage of the elevated prices it attributes to the conspiracy, and experienced durable commercial success for several years.  That means Homie has not suffered an antitrust injury flowing from the NAR policies that allegedly inflated brokerage commissions.  *See Matsushita*, 475 U.S. 574 at 586 (holding that "these alleged conspiracies could not have caused respondents to suffer an 'antitrust injury' . . . because they actually tended to benefit respondents").

Homie's allegations parallel those where other courts have rejected antitrust claims based on a failure to allege antitrust injury.  For example, in *Matsushita*, U.S. television manufacturers alleged that Japanese television manufacturers had "illegally conspired to drive American firms from the American [] market."  475 U.S. at 577–78.  One of the alleged conspiracies they challenged involved the so-called "five-company rule," under which "each Japanese producer was permitted to sell only to five American distributors."  *Id.* at 581.  The Supreme Court observed that the American television manufacturers could not "recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output" because "[s]uch restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive."  *Id.* at 583 (emphasis in original).  Applying this principle, the Court held that the Japanese manufacturers' agreement to limit the number of dealers in the United States did not give American manufacturers, as their competitors, "a cognizable claim . . . for antitrust damages" because they had not suffered an antitrust injury caused by the five-company rule.  *Id.*

Lower courts have extended the Supreme Court's reasoning to dispose of claims at the pleading stage based on a failure to plead antitrust injury.  For example, in *Maui Jim, Inc. v.*

*SmartBuy Guru Enterprises*, a "discount" sunglasses retailer filed an antitrust counterclaim against an upstream manufacturer—Maui Jim—alleging that the manufacturer had orchestrated a conspiracy to increase the price of Maui Jim sunglasses by threatening to boycott dealers that sold the plaintiff its sunglasses. 386 F.Supp. 3d 926, 936–37 (N.D. Ill. 2019). The district court granted Maui Jim's Rule 12 motion based on a failure to plead antitrust injury. *Id.* at 947. The court held that "allegations . . . that Maui Jim eliminated other competitors that did not adhere to Maui Jim's alleged artificially high price restraints," failed to establish antitrust injury because, as a "direct competitor of Maui Jim," the plaintiff stood to benefit from the higher prices caused by the alleged conspiracy. *Id.* at 944 ("On this ground alone, [Plaintiff's] Sherman Act claim should be dismissed.").

These allegations closely resemble Homie's claims in this case. Homie alleges that Defendants, as part of their supposed conspiracy to inflate brokerage commissions, used NAR policies to "avoid doing business with" discount brokerages. Compl. ¶ 61. Even if that were true, as a direct competitor to the alleged conspirators, Homie stood to benefit from elevated brokerage commissions, just like the discount retailers in *Maui Jim* benefitted from the higher prices imposed by the alleged conspiracy in that case.

Similarly, in *Rockbit Industries U.S.A., Inc. v. Baker Hughes, Inc.*, the district court dismissed a conspiracy claim based on a failure to plead antitrust injury, even though the plaintiff insisted its alleged price-fixing conspiracy was just one part of an "overall scheme" intended to drive it out of business. 802 F.Supp. 1544, 1548 (S.D. Tex. 1991). The plaintiff in that case— Rockbit, a manufacturer of oil drilling equipment—alleged that one of its competitors—Baker Hughes—entered into a conspiracy with another competitor—Reed Tool Company—to eliminate discounts on certain products. *Id.* at 1547 ("The alleged agreement purportedly led to higher prices

on sales of these drill bits by Baker Hughes and Reed than would have prevailed absent the alleged conspiracy."). Citing established precedent concerning antitrust injury, the defendant argued the "alleged conspiracy . . . to charge higher than competitive prices for bits would benefit, not injure, Rockbit. Rockbit could respond to the alleged conspiracy by raising its prices, thus reaping windfall profits, or by maintaining lower—but still profitable—prices and taking sales away from the claimed conspirators." *Id.* at 1548. In response, Rockbit contended that it had suffered an antitrust injury because the defendant "tried to drive Rockbit out of business as part of an overall scheme to protect the conspiracy." *Id*. at 1548. The district court rejected this "overall scheme" argument, reasoning that because "Rockbit could not have suffered injury as a result of a price-fixing conspiracy, it cannot prevail even if it were a target of the conspiracy." *Id*. at 1549.

Applying the *Rockbit* court's reasoning here yields the same result. Even if Homie and other discount brokerages were "targeted" by the alleged conspiracy to inflate commissions using NAR policies as part of some "overall scheme"—which Homie has not alleged—Homie still would not be able to plead an antitrust injury because it stood to benefit from higher commissions resulting from the supposed conspiracy.

### B.     Homie's Own Allegations Show It Was Not Foreclosed Or Excluded By NAR's Policies

Homie also suggests that NAR's policies harmed competition by creating insurmountable barriers to entry for discount brokerages, like Homie. *See*, *e.g.*, Compl. ¶ 41 ("Together, NAR's Buyer-Broker Compensation Rule, Commission-Filter Rules and Practices, Commission-Concealment Rules, Free-Service Rule, and the Clear Cooperation Policy . . . imposed substantial barriers to the entry and expansion of brokers offering low prices to compete . . ."); *id.* ¶¶ 55–56, 63, 76, 80, 86, 93, 135 (same); *id.* ¶ 4 (alleging Defendants conspired to "prevent" a "wave of disruptive innovation"); *id.* ¶ 56 (alleging the policies "substantially diminished the ability and

incentive of brokerages such as Homie to compete with lower prices, thus simultaneously harming consumers and those excluded competitors"); *id.* ¶ 61 ("[T]he Buyer-Broker Compensation Rule enabled brokers to avoid doing business with or otherwise retaliate against buyer-brokers who tried to compete by offering significant discounts."). But Homie's sweeping claims about barriers to entry and exclusion are not supported by allegations of ***fact*** that explain ***how*** the challenged NAR policies raised entry barriers or excluded competition. Indeed, Homie's specific factual allegations refute the notion that NAR's policies created barriers to entry or otherwise impeded competition from discount brokers.

### 1. Homie's Own Allegations Establish That It Overcame The Purported Barriers To Entry It Attributes To The Alleged Conspiracy

While Homie claims that NAR's rules and policies erected barriers that "hampered Homie's ability to compete in Utah," "permanently depress[ed] Homie's market share," and rendered it "unable to compete effectively despite a business model that, before Defendants' [alleged] predation, had proven its viability," Compl. ¶¶ 50–51, it fails to explain ***how*** NAR's rules or policies (and not something else) raised barriers to entry or otherwise had those effects on its business. In fact, the factual allegations in Homie's Complaint tell the opposite story. Homie specifically alleges it overcame any impediments allegedly created by NAR's longstanding rules when it entered the market in 2015, *id.* ¶ 49, "validated its model in Utah," *id.* ¶ 48, and was "successful," *id.* ¶ 49. Indeed, according to Homie's account, it was "among the five largest brokerages by market share in the state" between 2017 and 2021. *Id.*

These allegations preclude a finding that Homie has adequately pleaded an antitrust injury based on some sort of market foreclosure, exclusion, or barriers to entry. When a plaintiff has an opportunity to compete and experiences commercial success, it cannot meet its burden to plead antitrust injury through conclusory allegations about foreclosure or exclusion. *See*, *e.g.*, *In re*

*EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 507 F.Supp. 3d 1289, 1366 (D. Kan. 2020) (granting summary judgment based on a failure to show antitrust injury where the plaintiffs "had the opportunity to compete" and "in some instances . . . succeeded . . . when it offered more competitive pricing"); *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, 2016 WL 3610155, at *9 (D. Del. July 1, 2016) (unpublished) ("A plaintiff that had an opportunity to compete for exclusive contracts did not suffer an antitrust injury by failing to obtain them.").

### 2.  At Most, Homie Alleges Harm to a Single Competitor, Which Is Not Enough To Establish Antitrust Injury

Homie's allegations also suggest that after Homie successfully competed and gained market share for years, NAR's longstanding policies somehow abruptly "hampered Homie's ability to compete in Utah, permanently depressing Homie's market share."  Compl. ¶ 50.  But even if the Court were to credit these conclusory (and illogical) allegations, that too would not be enough for Homie to plead antitrust injury.  As a matter of law, injury to a single competitor, standing alone, is not enough to prove antitrust injury.  *See Stiles*, 639 F.Supp. 3d at 1051 ("The exclusion of one competitor is evidence of 'antitrust injury' only if it is emblematic of some broader effect on the market, such as the exclusion of an 'entire class' of suppliers." (citation omitted)); *N.M. Oncology v. Presbyterian Healthcare Servs.*, 169 F.Supp. 3d 1204, 1212 (D.N.M. 2016) (dismissing plaintiff's antitrust claims on standing grounds because "Plaintiff has alleged only ordinary business losses and not an antirust injury").  The reason for this principle is that antitrust laws are intended to protect competition, not individual competitors, and injuries to individual competitors are often the result of competition, not a symptom of harm to the consumers that antitrust laws were meant to protect.  *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) ("A producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than from each other." (quoting *Stamatakis Indus., Inc. v. King*, 965 F.2d

469, 471 (7th Cir. 1992))).

Homie attempts to cure this defect by alleging that "Homie's inability to compete effectively in Utah deprived it of the investment capital and scale necessary to enter markets nationwide," thereby "harm[ing] consumers in Utah and nationwide." Compl. ¶ 57. But that too will not suffice. In fact, these allegations are exactly the type of conclusory claims that other courts have found to be insufficient to establish antitrust injury at the pleading stage. *See Iqbal*, 556 U.S. at 678 (holding that mere "conclusory statements" will not suffice to withstand a motion to dismiss); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1178 (10th Cir. 2019) (mere "inferences" and "circumstantial evidence" are insufficient to "nudge an antitrust conspiracy allegation beyond the line from possible to plausible").

For example, in *Allergy Research Group. LLC v. Rez Candles Inc.*, when confronted with similar claims, Judge Campbell granted a Rule 12 motion to dismiss antitrust claims based on a failure to plead antitrust injury. 2022 WL 1004214 (D. Utah Apr. 4, 2022) (unpublished). In that case, a company that was reselling dietary supplements through Amazon.com filed an antitrust counterclaim against a supplement manufacturer. *Id.* at *1. The reseller alleged the manufacturer's vertical distribution agreements amounted to an unlawful group boycott of the plaintiff because they barred distributors from supplying the plaintiff with products to re-sell on Amazon. *Id.* at *1, *3, *8. To establish that it had sustained an antitrust injury, the reseller alleged:

- The manufacturer "illegally acquired, maintained, and exercised power in the Relevant Market through anticompetitive acts . . . [and thus] impaired rivals leading to the anticompetitive effects of lower output, higher prices, and fewer options for consumers." *Id.* at *2.

- The agreements "created barriers to entry, limited the supply and variety of products available, inhibited the growth and development of competitors, and artificially raised and maintained the price paid by consumers in the Relevant Market." *Id.*

- "[T]he group boycott has hindered [the reseller's] ability to build its reputation and

brand in some of the most important retail and online marketplaces" and it "has obtained lower revenues than it would have obtained in a competitive market."  *Id.*

- The reseller's "market position is a sliver of what it could and would be in a competitive market, and it has not been able to bring new, efficient, and desirable consumer innovations to its customers because of [the manufacturer's] conduct."  *Id.*

Judge Campbell granted the manufacturer's motion based on a failure to allege antitrust injury, reasoning that while the reseller had alleged harm to itself (because it could not sell the manufacturer's products), its "vague and conclusory statements about the effects [the manufacturer's] actions have had on competition . . . do not allege harm to competition."  *Id.* at *4.  Because "[a]n antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare," the court found that the reseller had failed to allege antitrust injury.  *Id.* (*quoting Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012)).

The same problems are in Homie's complaint.  Using strikingly similar language to the allegations in *Allergy*, Homie alleges:

- "Using their control of the MLS, Defendants imposed rules nationwide that erected substantial barriers to entry for new competitors, thereby elevating the price of residential real estate brokerage services well above competitive levels."  Compl. ¶ 4.

- "Had Homie been allowed to compete with Defendants and their co-conspirators, it would have gained market share at Defendants' expense while posing a competitive check on Defendants' ability to charge exorbitant prices for brokerage services to consumers."  *Id.* ¶ 5.

- "[I]nnovative entrants, seeking to compete on price and other terms of service attractive to home sellers or home buyers, have been stymied by traditional real estate brokers who acted in concert through the MLS to promulgate a web of rules and practices that created substantial barriers to competition."  *Id.* ¶ 6.

- NAR's polices "imposed substantial barriers to the entry and expansion of brokers offering low prices to compete across the United States and in Utah."  *Id.* ¶ 41.

- "These exclusionary effects . . . have caused injury and damage to Homie in Utah and erected barriers to Homie's entry into markets controlled by NAR-affiliated MLSs

nationwide." *Id*. ¶¶ 63, 76, 80, 86, 93.

These allegations are insufficient to allege antitrust injury, for the same reasons Judge Campbell explained in *Allergy*.

Conclusory claims that Defendants foreclosed competition from Homie or excluded Homie from the market are not enough to establish antitrust injury in this case. While they may be enough to show Homie was harmed, the antitrust laws do not protect individual competitors. Homie must allege specific facts to explain how harm to a single firm in the market (Homie) is probative of harm to competition in the market as a whole. *Reazin v. Blue Cross and Blue Shield of Kan.*, 899 F.2d 951, 960 (10th Cir. 1990) (holding that, to establish antitrust injury, the "adverse impact must be on *competition*, not on any individual competitor or on plaintiff's business" (emphasis in original)); *Bright v. Moss Ambulance Serv., Inc.,* 824 F.2d 819, 824 (10th Cir. 1987) ("Whether a practice violates the antitrust laws is determined by its effect on competition, not its effect on an individual competitor."). Homie has not met that burden because it has not alleged facts suggesting that firms offering meaningful competition were in fact excluded from the market and that their exclusion (and not something else) harmed consumers in any way. *Elliott Indus. Ltd. P'ship* 407 F.3d at 1125 (stating that an injury is not an antitrust injury if "it has no adverse effect on competition or consumers" (quoting *ARCO*, 495 U.S. at 337)).

### 3. Homie's Allegations About The Clear Cooperation Policy Do Not Establish It Was Excluded From The Market Or That NAR's Policies Erected Barriers To Entry

Finally, Homie's allegation that the Clear Cooperation Policy "eliminated" the possibility of "marketing properties off the MLS, including through its website and mobile app," Compl. ¶ 56, is also insufficient to establish Homie was excluded from the market by NAR's policies. As acknowledged in Homie's Complaint, the Clear Cooperation Policy does not "eliminate" the possibility of marketing listings outside of the MLS. Instead, the Clear Cooperation Policy

requires only that participants must submit listings to the MLS within one business day of making them public *in addition* to any other location where the listing is marketed. Compl. ¶ 87. And Homie's Complaint fails to allege facts that explain how it was harmed by a requirement to market publicly advertised listings within the MLS—in addition to anywhere outside the MLS—as a condition of MLS participation. The Clear Cooperation Policy only required Homie to distribute its publicly marketed listings broadly, making them available to other brokerages participating in the MLS (where, in return, Homie could view listings marketed by other brokers in a single location). Thus, there are no facts alleged in Homie's Complaint to suggest that the Clear Cooperation Policy harmed Homie (or competition) in any way.

### C.    Homie Does Not Allege Defendants Participated In Any Boycott Of Homie Or Otherwise Agreed to Boycott Homie

In addition to its complaints about NAR's policies, Homie asserts that its "initial success sparked an anticompetitive campaign among Homie's competitors to exclude Homie." Compl. ¶ 50. Specifically, Homie alleges that *after* it entered the market and experienced success for years—notwithstanding the challenged NAR policies—it was later "subject to both express and tacit boycotts in Utah by incumbent brokerages, some affiliated with the Corporate Defendants, boycotts organized through the MLS, online social media platforms, and public statements." *Id*. ¶ 51. Once again, however, Homie fails to allege specific facts that establish it sustained an antitrust injury from these supposed boycotts because it fails to allege that Defendant participated in these boycotts in any way.

To plead antitrust injury, a plaintiff must plead specific facts to show it was harmed by a reduction in competition caused *by the defendants*. Injuries caused by the actions of non-conspirators do not count. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 126–27 (1969) (stating that a plaintiff cannot establish antitrust injury based on "other factors independent

of [a defendant's] unlawful conduct"); *see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 118 (2d Cir. 2021) ("We thus reject the attempts of [] Plaintiffs to impose liability for transactions that Defendants did not control and of which they were likely not even aware.") (cleaned up).

Homie's alleged boycotting harms flowed from the independent actions of local real estate agents—not Defendants. In support of its boycott claims, Homie points to: (1) five vague instances where real estate agents—none of which are alleged to be Defendants—asked Homie to increase its commissions or otherwise complained about the commissions offered for Homie listings, Compl. ¶¶ 64–66; (2) comments made by individual real estate agents in Facebook groups that suggest they might not show homes listed by Homie to buyers, *id.* ¶¶ 68–69; (3) a billboard advertisement placed by a local association to promote certain brokers, *id.* ¶ 71; and (4) one individual offering an opinion during a meeting of local real estate agents that Homie's model represented a "race to the bottom." *Id.* ¶¶ 70, 72.

None of these actions has anything to do with Defendants. Homie does not allege any Defendant directly commented on Homie or otherwise boycotted Homie. Nor has Homie alleged that the actions of any local real estate agent in Utah that purportedly boycotted Homie was controlled by any Defendant.

"The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself," *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006), and to satisfy that requirement, a plaintiff must plead that the alleged participants had "a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Yet, critically, Homie does not allege any agreement among Defendants—or with anyone else—to boycott Homie.

To address this gap, Homie again falls back to conclusory assertions. It claims that "some" of the brokerages that purportedly declined to show buyers' houses listed with Homie were "affiliated with the Corporate Defendants," Compl. ¶ 51, but it does not plead any facts sufficient to show the Corporate Defendants somehow controlled or directed their actions. Mere "affiliation," however defined, is not sufficient to impute liability for an antitrust conspiracy. *See Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir. 1984) (noting that "affiliation does not by itself necessarily imply conspiracy to restrain trade") (citations omitted). It also contends NAR's rules "encouraged" and "facilitated" the supposed boycotts, *see* Compl. ¶¶ 70–75, even though NAR's Code of Ethics, which is incorporated by reference in Homie's complaint, expressly prohibits the sort of "boycott" that is alleged by Homie.[2] Moreover, Homie does not (and cannot) allege facts that plausibly suggest NAR's policies were adopted in furtherance of a conspiracy to boycott discount brokerages, which means adoption of the policies alone does not establish that NAR entered into an unlawful agreement with local agents to boycott Homie. *See Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1224 n.1 (10th Cir. 1986) ("For a group boycott to exist, there must be an agreement among conspirators . . . "). At bottom, none of Homie's boycott allegations establish a plausible claim for antitrust injury because none of them suggest any Defendant agreed with any local agent to boycott Homie.

This leaves Homie's allegations suggesting that Defendants joined the supposed boycott solely based on their participation in NAR. Compl. ¶ 9 ("By participating in an association that promulgates rules facilitating the exclusion of competitors, by requiring franchisees, groups, and individuals to join and adhere to the anticompetitive agreement alleged herein, and by taking

---

[2] All REALTORS® must act in the best interest of their clients, which "does not include the obligation to share commissions, fees, or to otherwise compensate another broker." Ex. C at 4 (Article III).

numerous steps in furtherance of the conspiracy, the Corporate Defendants agreed with each other and NAR to participate in, facilitate, and implement the conspiracy."); *see also id.* ¶¶ 110–129. But that alone is not evidence of an antitrust conspiracy.  In fact, such allegations are the "exact type . . . [that] *Twombly* considered in holding that parallel conduct, absent some additional type of contextual evidence, is generally not sufficient to nudge an antitrust conspiracy allegation beyond the line from possible to plausible." *Llacua*, 930 F.3d at 1178 (citing *Twombly*, 550 U.S. at 556–67).  If, indeed, Homie's claims "suffice to allege a plausible § 1 agreement, all members of [a trade] association could be deemed to have entered into an antitrust conspiracy simply because they joined the association, participated in its governance, and agreed to abide by its rules . . . .  This is simply not the law." *Id.* at 1181.

Because Homie has failed to allege facts connecting Defendants to the supposed boycott activities of local real estate agents, it has failed to allege an antitrust injury flowing from Defendants' actions with respect to the purported boycotts.  *See City of Chanute, Kan. v. Williams Nat. Gas Co.*, 955 F.2d 641, 652 (10th Cir. 1992) (stating that claims of antitrust injury "are compensable only when the injury flows directly from the [allegedly] unlawful act").

## II.    Homie Has Not Asserted A Valid Tortious Interference Claim

"The elements of tortious interference under Utah law are: (1) intentional interference with existing or potential economic relations, (2) by improper means; (3) that causes injury to the plaintiff." *VidAngel LLC v. ClearPlay, Inc.*, 703 F.Supp.3d 1329, 1336 (D. Utah 2023) (citing *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553).  Homie has failed to show the requisite intent to state a valid tortious interference claim.

To sustain a claim for tortious interference, a plaintiff must demonstrate that a defendant has "intentionally and improperly cause[d] one of the [contracting] parties not to perform the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) (citing

Restatement (Second) of Torts § 766 (Am. Law Inst. 1979)).  And, critically, any determination of causation cannot be based on "speculation."  *See Triesault v. Greater Salt Lake Bus. Dist.*, 2005 UT App 489, ¶ 14, 126 P.3d 781 (citation omitted); *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 15, 199 P.3d 929 (there "must be evidence that rises above speculation and provides a reasonable . . . estimate of damages").

Here, Homie's tortious interference claim is based on the same underlying conduct as its antitrust claims; that is, that Defendants "utiliz[ed] anticompetitive rules . . . causing Homie's clients to cancel their contracts . . . and caus[ed] Homie's business partners not to renew their existing contracts."  *See* Compl. ¶¶ 147, 146.  In support of this theory and its allegation that it "lost business," *id.* ¶¶ 95, Homie cites five anecdotal examples of customers cancelling contracts or listings,  *id.* ¶¶ 96–100.  Each one of these examples, however, fails to plead any causal link between Defendants and the alleged contractual interference.

The first, for instance, states only that a local real estate agent threatened to "'warn the seller' about the terrible experience she has had with Homie."  Compl. ¶ 96.  The second suggests that a client cancelled a listing because some real estate agent "didn't want to show our home with Homie." *Id.* ¶ 97.  The third recounts one account of a Homie client who hypothesized that their home listing was getting no traffic because some REALTORS® might not have been "suggesting it" to their clients.  *Id.* ¶ 98.  The fourth describes an incident where a Homie client guessed that it "[s]ounds like" his offer to buy a home was rejected "based on us working with [Homie]."  *Id.* ¶ 99.  And the fifth story is a game of telephone, in which a supposed NAR-member listing agent told a Homie client, who later told Homie, that their viewing appointment was cancelled because "the buyer was viewing the listed property on their own."  *Id.* ¶ 100.

None of these instances alleges any link between cancelled contracts and illegal conduct by Defendants.  At best, they cast blame on individual real estate agents for being disinclined to work with Homie.  But none of these examples shows how Defendants "intentionally" induced any former Homie clients to cancel their contracts.  *See VidAngel*, 703 F.Supp. at 1337 ("[M]erely attracting another business's customers with a competing product is not the same thing as driving them away."); *see also C.R. England v. Swift Trans. Co.*, 2019 UT 8, ¶ 17, 437 P.3d 343 ("'Where persons have merely pursued their own ends without any desire or intention of causing another to breach his contract, they should not be held liable for the other's breach.'") (quoting *Bunnell v. Bills*, 368 P.2d 597, 603 (Utah 1962)).  Indeed, Homie fails to provide any allegation of fact that connects any defendant to any of these anecdotes.  Absent such allegations, Homie has failed to allege that any Defendant intentionally interfered with Homie's current or future business relationships and its tortious interference claim should be dismissed. *See, e.g., Leigh Furniture*, 657 P.2d 293, 306 (Utah 1982) (noting that even conduct that is "overly zealous[,] . . . aggressive[,] or abrasive" fails to satisfy the required intent element in a claim for intentional interference with economic relations).

## CONCLUSION

Defendant National Association of REALTORS® respectfully asks the Court to dismiss Homie's Complaint.

Dated:  October 18, 2024

/s/ *Thomas Rex Lee*
Thomas R. Lee (5991)
John J. Nielsen (11736)
SCHAERR | JAFFE
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
(202) 787-1060
Tlee@schaerr-jaffe.com
Jnielsen@schaerr-jaffe.com

Michael D. Bonanno
Mikebonanno@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005-3314
(202) 538-8000

*Attorneys for Defendant National Association of Realtors*®

## DUCivR 7-1(a)(4) CERTIFICATION

In accordance with DUCivR 7-1(a)(4) and the Federal Rules of Civil Procedure, I hereby certify that this document complies with the applicable word limit of 7,750 words for a Motion for Relief Authorized by Rule 12. This document, excluding any caption, table of contents, table of authorities, signature block, certificate of service, certification, exhibits, and attachments as applicable, is comprised of 7,689 words.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies on this 18th day of October 2024, a copy of the foregoing document was filed with the Clerk of the Court to be served upon counsel of record via the Court's ECF system.

/s/ <u>*Thomas Rex Lee*</u>
Thomas R. Lee
