MASCHOFF BRENNAN GILMORE
  ISRAELSEN & MAURIEL, LLP
Sterling A. Brennan (USBN 10060)
  *sbrennan@mabr.com*
L. Rex Sears (USBN 8548)
  *rsears@mabr.com*
95 South State Street, Suite 800
Salt Lake City, UT 84111
Telephone: (801) 297-1850

Attorneys for Plaintiff
HOMIE TECHNOLOGY, INC.

DHILLON LAW GROUP INC.
Andrew K. Mann (*pro hac vice*)
  *akmann@dhillonlaw.com*
Christopher G. Renner (*pro hac vice*)
  *cgrenner@dhillonlaw.com*
Jonathan M. Shaw (*pro hac vice*)
  *jshaw@dhillonlaw.com*
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: (415) 433-1700

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HOMIE TECHNOLOGY, INC., a Delaware corporation,<br><br>               Plaintiff,<br><br>v.<br><br>NATIONAL ASSOCIATION OF REALTORS, an Illinois non-profit association; ANYWHERE REAL ESTATE INC., a Delaware corporation; KELLER WILLIAMS REALTY, INC., a Texas corporation; HOMESERVICES OF AMERICA, INC., a Delaware corporation; HSF AFFILIATES LLC, a Delaware limited liability company; and RE/MAX, LLC, a Delaware limited liability company,<br><br>               Defendants. | Case No. 2:24-cv-00616-DAK-JCB<br><br>**PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>**Oral Argument Requested**<br><br>District Judge:    Hon. Dale A. Kimball<br>Magistrate Judge:  Hon. Jared C. Bennett |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

Introduction ......................................................................................................................... 1

1.  Statement of Facts ....................................................................................................... 2

2.  Legal Standard ............................................................................................................. 4

Argument ............................................................................................................................. 4

3.  Sherman Act ................................................................................................................. 4

   3.1.  *Homie Has Alleged a Violation of the Sherman Act.* ...................................... 4

   3.2.  *Homie Has Standing Under the Clayton Act.* ................................................ 10

   3.3.  *Homie Has Alleged an Injury in Fact.* ........................................................... 10

   3.4.  *Homie Has Alleged an Antitrust Injury.* ........................................................ 12

   3.5.  *Homie's Injuries are Sufficiently Direct.* ...................................................... 18

   3.6.  *Homie's Claims are Timely.* .......................................................................... 19

4.  State Law Claims ....................................................................................................... 22

   4.1.  *Homie Has Stated a Plausible Tortious Interference Claim.* ........................ 22

   4.2.  *Homie's Utah Antitrust Act Claim Survives.* ................................................ 25

5.  This Court Has Personal Jurisdiction over RML, HSA, HSF, and Keller Williams.............. 26

   5.1.  *This Court Has Personal Jurisdiction over RML, HSA, HSF, and Keller Williams as a Result of Their Participation in an Unlawful Conspiracy with Local Co-Conspirators.* ..................................................................... 26

   5.2.  *This Court Also Has Personal Jurisdiction over HSA and Keller Williams under Section 12 of the Clayton Act.* ......................................................... 28

Conclusion ........................................................................................................................ 32

# TABLE OF AUTHORITIES

*Aldrich v. McCulloch Properties, Inc.*,
  627 F.2d 1036 (10th Cir. 1980) ................................................................ 20

*Allergy Research Group LLC v. Rez Candles Inc.*,
  No. 2:21-cv-73-TC-JCB, 2022 WL 1004214 (D. Utah Apr. 4, 2022) ............... 13, 14

*Am. Agencies, LLC v. Sloan*,
  No. 2:13-cv-00283-JNP-CMR, 2020 WL 7024911 (D. Utah Nov. 30, 2020) ......... 24

*Andrx Pharm. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ........................................................... 13, 19

*Application to Enforce Admin. Subpoenas Duces Tecum of SEC v. Knowles*,
  87 F.3d 413 (10th Cir. 1996) .................................................................. 29

*Associated Gen. Contractors, Inc. v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ......................................................................... 11, 18

*Association of Surgical Assistants v. National Board of Surgical Technology & Surgical Assisting*,
  No. 22-cv-02363-MEH, 2023 WL 7277313 (D. Colo. Sept. 29, 2023) ............ 17, 19

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ........................................................................... 12

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*,
  843 F.3d 1225 (10th Cir. 2016) ............................................................. 20

*Automotive Alignment & Body Service, Inc. v. State Farm Mutual Automobile Insurance Co.*,
  953 F.3d 707 (11th Cir. 2020) ............................................................... 25

*Bd. of Cnty. Comm'rs. v. Wilshire Oil Co.*,
  523 F.2d 125 (10th Cir. 1975) ........................................................... 30, 31

*Belnap v. Steward Health Care System LLC*,
  No. 2:19-cv-00330-DAK, 2020 WL 619402 (D. Utah Feb. 10, 2020) .................. 17

*Berkshire Bank v. Lloyds Banking Grp. Plc*,
  No. 20-1987-cv, 2022 WL 569819 (2d Cir. Feb. 25, 2022) ............................ 26

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ............................................................... 15

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) ........................................................................... 19

iii

*Black v. Acme Mkts., Inc.*,
    564 F.2d 681 (5th Cir. 1977) ................................................................................. 30

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) ...................................................................................... 8, 18

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................................................ 12

*Budde v. Ling-Temco-Vought, Inc.*,
    511 F.2d 1033 (10th Cir. 1975) ......................................................................... 31

*Budicak, Inc. v. Lansing Trade Grp., LLC*,
    No. 2:19-CV-2449-JAR-ADM, 2020 WL 758801 (D. Kan. Feb. 14, 2020) ........... 29

*Burnett v. Nat'l Ass'n of Realtors*,
    No. 4:19-cv-00332-SRB, 2022 WL 17741708 (W.D. Mo. Dec. 16, 2022) .................. 5, 10, 18

*Celtig, LLC v. Patey*,
    347 F. Supp. 3d 976 (D. Utah 2018) ............................................................ 26, 27

*Champagne Metals v. Ken-Mac Metals, Inc.*,
    458 F.3d 1073 (10th Cir. 2006) .................................................................... 4, 21

*City of Chanute v. Williams Natural Gas Co.*,
    955 F.2d 641 (10th Cir. 1992) ............................................................................. 8

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
    92 F.4th 381 (2d Cir. 2024) ................................................................................. 9

*Clinton v. Sec. Benefit Life Ins. Co.*,
    63 F.4th 1264 (10th Cir. 2023) ............................................................................ 4

*Cohlmia v. St. John Med. Ctr.*,
    693 F.3d 1269 (10th Cir. 2012) ......................................................................... 12

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ........................................................................................... 18

*CounselNow, LLC v. Deluxe Small Bus. Sales Inc.*,
    430 F. Supp. 3d 1247 (D. Utah 2019) ............................................................... 23

*CVB, Inc. v. Corsicana Mattress Co.*,
    604 F. Supp. 3d 1264 (D. Utah 2022) ............................................................... 15

*DAT Sols., LLC v. Convoy, Inc.*,
    No. 3:22-cv-00088-IM, 2023 WL 3058057 (D. Or. Apr. 24, 2023) ........................ 12

*E. States Retail Lumber Dealers' Ass'n v. United States*,
   234 U.S. 600 (1914) ................................................................................. 6, 7, 8

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*,
   273 U.S. 359 (1927) ........................................................................................ 30

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992) .......................................................................................... 5

*Eldridge v. Johndrow*,
   345 P.3d 553 (Utah 2015) .............................................................................. 22

*First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*,
   No. 2:15-cv-00229-DN, 2016 WL 7350319 (D. Utah Dec. 19, 2016) ................. 24

*FTC v. Procter & Gamble Co.*,
   386 U.S. 568 (1967) .......................................................................................... 6

*GDHI Marketing LLC v. Antsel Marketing LLC*,
   416 F. Supp. 3d 1189 (D. Colo. 2019) ............................................................. 19

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
   416 F. Supp. 3d 1189 (D. Colo. 2019) ............................................................. 14

*Glover By & Through Dyson v. Boy Scouts of America*,
   923 P.2d 1383 (Utah 1996) ............................................................................ 23

*Go–Video, Inc. v. Akai Elec. Co.*,
   885 F.2d 1406 (9th Cir. 1989) ........................................................................ 29

*Hammes v. AAMCO Transmissions, Inc.*,
   33 F.3d 774 (7th Cir. 1994) ............................................................................ 15

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ........................................................................................ 20

*Hart v. Salois*,
   No. 14–4053, 2015 WL 1020369 (10th Cir. Mar. 10, 2015) .............................. 28

*Illinois Tool Works, Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006) ............................................................................................ 6

*In re Credit Default Swaps Auctions Litigation*,
   710 F. Supp. 3d 895 (D.N.M. 2023) ............................................................ 27, 28

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp 2d 671 (S.D.N.Y. 2012) ............................................................... 28

*In re Platinum & Palladium Antitrust Litigation*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) ........................................................................... 18

*In re Travel Agent Commission Antitrust Litigation*,
    583 F.3d 896 (6th Cir. 2009) ....................................................................................... 21

*Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*,
    817 F.2d 639 (10th Cir. 1987) ..................................................................................... 10

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*,
    863 F.3d 1178 (9th Cir. 2017) ..................................................................................... 17

*Interstate Cir. v. United States*,
    306 U.S. 208 (1939) ....................................................................................................... 7

*J. Allen Ramey, M.D., Inc. v. Pacific Foundation For Medical Care*,
    999 F. Supp. 1355 (S.D. Cal. 1998) ............................................................................ 15

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ........................................................................................................... 6

*Jicarilla Apache Tribe v. Supron Energy Corp.*,
    728 F.2d 1555 (10th Cir. 1984) ..................................................................................... 7

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
    190 F.3d 775 (7th Cir. 1999) ....................................................................................... 16

*L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*,
    863 F. Supp. 2d 1066 (D. Colo. 2012) ........................................................................ 14

*Leigh Furniture & Carpet Co. v. Isom*,
    657 P.2d 293 (Utah 1982) ..................................................................................... 22, 25

*Licari v. Best Western International, Inc.*,
    No. 2:11–cv–603, 2013 WL 3716523 (D. Utah July 12, 2013) .............................. 23

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) ..................................................................................... 5

*Mallory v. Brigham Young University*,
    2012 UT App 242, 285 P.3d 1230 ............................................................................... 23

*Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................................................... 15

*Maui Jim, Inc. v. SmartBuy Guru Enterprises*,
    386 F. Supp. 3d 926 (N.D. Ill. 2019) .......................................................................... 15

*Melea, Ltd. v. Jawer, SA,*
  511 F.3d 1060 (10th Cir. 2007) ............................................................... 26

*Moehrl v. Nat'l Ass'n of Realtors,*
  492 F. Supp. 3d 768 (N.D. Ill. 2020) ........................................................ 5

*Monument Builders of Greater Kansas City, Inc., v. Am. Cemetery Ass'n,*
  No. 84–2469–S, 1990 WL 269872 (D. Kan. Oct. 18, 1990) .................... 29

*Mumford v. ITT Com. Fin. Corp.,*
  858 P.2d 1041 (Utah Ct. App. 1993) ........................................................ 23

*Mun. Utils. Bd. v. Alabama Power Co.,*
  934 F.2d 1493 (11th Cir. 1991) ................................................................ 18

*Nat'l Soc'y of Pro. Eng'rs v. United States,*
  435 U.S. 679 (1973) ................................................................................. 7

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.,*
  311 F. Supp. 2d 1048 (D. Colo. 2004) ...................................................... 9

*Orval Sheppard Real Estate Co. v. Valinda Freed & Associates, Inc.,*
  608 F. Supp. 354 (M.D. Ala. 1985) .......................................................... 6

*Park v. El Paso Board of Realtors,*
  764 F.2d 1053 (5th Cir. 1985) ............................................................. 15, 16

*Penne v. Greater Minneapolis Area Bd. of Realtors,*
  604 F.2d 1143 (8th Cir. 1979) ............................................................. 6, 8, 9

*Phone Directories Co. v. Contel Corp.,*
  786 F. Supp. 930 (D. Utah 1992) ............................................................. 31

*Pinkerton v. United States,*
  328 U.S. 640 (1946) ................................................................................. 7

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,*
  507 F.3d 117 (2d Cir. 2007) ..................................................................... 15

*Pulse Network, LLC v. Visa, Inc.,*
  30 F.4th 480 (5th Cir. 2022) ..................................................................... 19

*Robertson v. Sea Pines Real Est. Cos., Inc.,*
  679 F.3d 278 (4th Cir. 2012) ................................................................. 4, 5

*Rockbit Industries U.S.A., Inc. v. Baker Hughes, Inc.,*
  802 F. Supp. 1544 (S.D. Tex. 1991) ......................................................... 15

*Ryan v. Microsoft Corp.*,
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ............................................................ 21, 22

*SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*,
   48 F.3d 39 (1st Cir. 1995) ............................................................................... 18

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*,
   22 F.4th 103 (2d Cir. 2021) ............................................................................. 7

*SCO Grp., Inc. v. Int'l Bus. Machs. Corp.*,
   879 F.3d 1062 (10th Cir. 2018) ....................................................................... 22, 24

*Seay v. Oklahoma Board of Dentistry*,
   No. CIV-17-682-D, 2021 WL 1394478 (W.D. Okla. Apr. 12, 2021) ................... 21

*Sharp v. United Airlines, Inc.*,
   967 F.2d 404 (10th Cir. 1992) ......................................................................... 18

*Sitzer v. Nat'l Ass'n of Realtors*,
   420 F. Supp. 3d 903 (W.D. Mo. 2019) ............................................................. 5

*Sizova v. Nat'l Inst. of Standards & Tech.*,
   282 F.3d 1320 (10th Cir. 2002) ....................................................................... 31

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
   131 F.3d 874 (10th Cir. 1997) ......................................................................... 10, 13, 14

*St. Benedict's Development Co. v. St. Benedict's Hospital*,
   811 P.2d 194 (Utah 1991) ............................................................................... 22, 24

*Stamatakis Indus., Inc. v. King*,
   965 F.2d 469 (7th Cir. 1992) ........................................................................... 12

*Stiles v. Walmart, Inc.*,
   639 F. Supp. 3d 1029 (E.D. Cal. 2022) ............................................................ 15

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006) ....................................................................... 17

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
   305 F.3d 1124 (10th Cir. 2002) ....................................................................... 13

*Thompson v. Metro. Multi-List, Inc.*,
   934 F.2d 1566 (11th Cir. 1991) ....................................................................... 13

*Triesault v. Greater Salt Lake Business District*,
   126 P.3d 781, 2005 UT App 489 (Utah Ct. App. 2005) ................................... 24

*TruGreen Companies, L.L.C. v. Mower Brothers, Inc.*,
   199 P.3d 929, 2008 UT 81 (Utah 2008) .......................................................................... 24, 25

*United States v. Scophony Corp. of Am.*,
   333 U.S. 795 (1948) .......................................................................................................... 30

*US Magnesium, LLC v. ATI Titanium LLC*,
   No. 2:17-cv-923-DB, 2019 WL 1755427 (D. Utah Apr. 19, 2019) ........................................ 24

*Van Ornum v. Am. Med. Ass'n*,
   No. 2:14-cv-921-RJS-EJF, 2017 WL 9481020 (D. Utah Mar. 16, 2017) .......................... 29, 30

*Vincent v. Utah Plastic Surgery Society*,
   No. 2:12–CV–1048 TS, 2013 WL 4782354 (D. Utah Sept. 5, 2013) .................................... 17

*Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) ................................................................................................ 15

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*,
   756 F.2d 1467 (10th Cir. 1985) .........................................................................................11

*Yellow Pages Cost Consultants, Inc. v. GTE Directories*,
   951 F.2d 1158 (9th Cir. 1991) ..................................................................................... 13, 19

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969) .........................................................................................11, 12, 19, 20

## Statutes

15 U.S.C. § 1 ...................................................................................................................... 4

15 U.S.C. § 15 ............................................................................................................... 10, 13

15 U.S.C. § 15b ................................................................................................................. 19

15 U.S.C. § 22 ................................................................................................................... 28

28 U.S.C. § 1391(c) ........................................................................................................... 29

Utah Code Ann. § 76-10-926 .............................................................................................. 26

## Rules

Fed. R. Civ. Pro. 4(k)(1)(C) ............................................................................................... 28

## Regulations

Utah Admin. Code r. 162-2f-401a ...................................................................................... 24

Plaintiff Homie submits this consolidated response to the motions to dismiss filed by defendants National Association of Realtors ("NAR"), Anywhere Real Estate Inc. ("Anywhere"), Keller Williams Realty, Inc. ("Keller Williams"), HomeServices of America, Inc. ("HSA"), HSF Affiliates LLC ("HSF"), and RE/MAX, LLC ("RML").

Homie requests oral argument, unless the Court is inclined to deny the motions on the papers.

## Introduction

This is a simple, but important, antitrust case. Competing real estate brokers, acting through NAR, adopted rules and policies promulgated through the multiple listing services ("MLSs") controlled by NAR's members. These rules and policies systematically discriminated against real estate brokerages that, like Homie, sought to compete by offering lower prices and had the predictable effect of excluding Homie and other low-price competitors, causing consumer prices to increase above competitive levels. Defendants Anywhere, Keller Williams, RML, HSA, and HSF (together, "Corporate Defendants") joined the conspiracy and furthered its ends in Utah and nationwide—both by working with NAR to adopt and annually reaffirm its anticompetitive rules and practices and also by requiring their affiliates in Utah and elsewhere to adopt and enforce them. Multiple antitrust actions brought by consumers and government enforcers followed. But those actions did not compensate Homie for the harm it suffered as a direct result of Defendants' conspiracy.

As an excluded competitor injured by these same NAR rules and policies, Homie brings this action to recover its damages caused by Defendants' conspiracy. Defendants claim that Homie lacks standing to sue as a competitor challenging a price-fixing conspiracy, but it is settled law that, as an excluded competitor injured by Defendants' conspiracy to maintain their high prices,

Homie has standing.  Defendants also claim that Homie must allege their individual participation in each aspect of the alleged conspiracy, but no such requirement is found in the case law.  Instead, Defendants are responsible for the normal and foreseeable results of their concerted action. Defendants' arguments controvert bedrock principles of causation in tort cases: having fashioned a weapon and placed that weapon in the hands of their members and affiliates with instructions to use it, Defendants are liable for the effects of the weapon's discharge in Utah.  Homie's claims are timely, and the jurisdictional arguments of a subset of the Corporate Defendants are not well-founded.  For these reasons, and as set forth at greater length below, Defendants' motions to dismiss should be denied.

1.     **Statement of Facts**

NAR and its members control competition in the residential real estate brokerage services market in Utah and nationwide through their control over the MLS, access to which is necessary to compete effectively in the relevant market.  (Compl. ¶ 2.)  Relevant background facts about the residential real estate brokerage industry are alleged in Paragraphs 25–38 of the Complaint.

Using their control of the MLS, Defendants promulgated rules that erected substantial barriers to entry and expansion for new lower-price competitors.  (Compl. ¶ 4.)  One rule, the Buyer-Broker Compensation Rule, required sellers in the MLS to make a unilateral offer of compensation to buyer brokers, which allowed buyer brokers to steer customers away from sellers offering low cooperative commissions.  (*Id.* ¶¶ 59–72.)  Another set of rules, the Commission-Filter Rules and Practices, allowed buyer brokers using the MLS to discriminate against sellers offering lower commissions to buyer brokers and to exclude those listings from search results presented to consumers.  (*Id.* ¶¶ 73–76.)  Another rule, the Free-Service Rule, allowed NAR members to advertise that buyer broker services were free when, in fact, commissions were

included in the sales price paid by the buyer.  (*Id.* ¶¶ 77–80.)  Another set of rules, the Commission-Concealment Rules, allowed NAR members to conceal and suppress information about the commissions offered to buyer-brokers.  (*Id.* ¶¶ 81–86.)

Together, this comprehensive system of anticompetitive restraints made the MLS a tool to detect and punish lower-price brokerages, giving MLS members the ability and incentive to engage in anticompetitive conduct to exclude their low-price competitors.  (Compl. ¶¶ 38, 61.)  The Buyer-Broker Compensation Rule created the ability and incentive to engage in steering, and the Commission-Filter Rules and Practices, the Free-Service Rule, and the Commission-Concealment Rules suppressed information that would have allowed home buyers to detect and prevent that steering by their brokers.  (*Id.* ¶¶ 38–39.)  Ensuring that discount brokerages would be unable to circumvent the anticompetitive effects of these rules by marketing properties off of the MLSs controlled by NAR, NAR promulgated another rule, the Clear Cooperation Policy, mandating that publicly marketed listings be included in the MLS, where they would be subject to the anticompetitive effects of these rules.  (*Id.* ¶¶ 87–93.)  Together, NAR's Exclusionary Rules and Policies ("ERPs") created substantial barriers to entry and expansion of competitors seeking to compete by offering lower prices.  (*Id.* ¶¶ 4, 6, 41, 50–57, 63, 76, 80, 86, 93.)

As NAR required, its ERPs were implemented by the dominant MLS in Utah and were enforced by its Utah affiliates.  (Compl. ¶¶ 18–19, 27, 37, 59, 73, 77, 81, 87, 93, 102–09.)  NAR's Utah affiliates took additional overt acts furthering the anticompetitive purposes of the ERPs.  (*Id.* ¶¶ 70–72.)  The ERPs injured Homie: Existing customers terminated their relationships with Homie, and new customers were deterred from dealing with Homie, causing Homie lost market share and lost profits.  (*Id.* ¶¶ 5, 43–57, 63–69, 76, 80, 86, 88, 93, 94–101.)  NAR's ERPs were also adopted and enforced by NAR affiliates nationwide, erecting barriers to entry across the

country.  (*Id.* ¶¶ 4, 48, 57–58, 95, 106.)  By reducing the ability and incentive of discount brokerages to compete by offering low prices, NAR's ERPs harmed competition, causing consumer prices for brokerage services to increase above competitive levels.  (*Id.* ¶¶ 4–6, 38, 41, 45, 58, 79, 85–86, 88, 94, 141.)

The Corporate Defendants joined in this conspiracy, working with NAR to promulgate the ERPs, requiring their affiliates to implement them both in Utah and nationwide, and training them to impose those rules over the objections of their customers.  (Compl. ¶¶ 7–9; 24, 110–29.)

## 2.    Legal Standard

This Court needs no primer on Rule 12 motions.  Instead, Homie emphasizes two points. First, Homie is entitled to all plausible inferences that can be drawn from the Complaint's well-pled allegations of fact.  *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023). And in drawing those inferences, the Court must consider that "it is certainly economically rational for a group of established firms to attempt to keep an aggressive competitor out of the market, whether they are doing so to protect profits or simply to guard market share."  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1086–87 (10th Cir. 2006) (reversing summary judgment). Second, the plausibility standard is a "low bar," lower than the standard at summary judgment. *Clinton*, 63 F.3d at 1276 (citation omitted).

Argument

## 3.    Sherman Act

### 3.1.    *Homie Has Alleged a Violation of the Sherman Act.*

Sherman Act Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  NAR's ERPs are concerted action under Section 1.  *See Robertson v. Sea Pines Real Est.*

4

*Cos., Inc.*, 679 F.3d 278, 286–87 (4th Cir. 2012) (collecting cases).  The ERPs themselves, as embodied in NAR's MLS Handbook and Code of Ethics, are direct evidence of agreement under Section 1.  *Id.* at 289–90; *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174 n.24 (10th Cir. 2019) ("Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement.").[1]  The Complaint alleges that the Corporate Defendants participated in the conspiracy by joining with NAR in formulating, promulgating, and enforcing NAR's ERPs and by causing their affiliates to implement them.  *Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-cv-00332-SRB, 2022 WL 17741708, at *7–9 (W.D. Mo. Dec. 16, 2022) (denying summary judgment on the issue of Corporate Defendants' participation in NAR's ERPs); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 778–79 (N.D. Ill. 2020) (denying motion to dismiss on the same issue); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 911–13 (W.D. Mo. 2019) (same).

NAR's ERPs are unreasonable restraints of trade because they create barriers to the entry and expansion of competitors seeking to compete using lower prices.  (Compl. ¶¶ 4, 6, 41, 50–57, 63, 76, 80, 86, 93.)  The Supreme Court has repeatedly held that erecting barriers to entry or expansion harms competition.  In *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 485 (1992), the Court stated, "[O]ne of the evils proscribed by the antitrust laws is the creation

---

[1] NAR misleadingly cites *Llacua* for the proposition that trade association membership does not, without more, establish a Sherman Act conspiracy.  (NAR Mem. at 22.)  In *Llacua*, the plaintiffs lacked direct evidence of agreement among the defendants (because the trade association did not have a rule mandating the challenged conduct) and were attempting to infer the existence of that agreement through circumstantial evidence, including the defendants' membership in the association.  Homie is not alleging that Defendants must have agreed to some other agreement because they were NAR members; instead, Homie is alleging that Defendants *did agree* to the specific NAR ERPs at issue here.  Those allegations directly evidence concerted action.  *See Llacua*, 930 F.3d at 1180 & n.30.

5

of entry barriers to potential competitors…." *See also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984) (holding conduct to be anticompetitive if it "could either harm existing competitors or create barriers to entry of new competitors…"), *abrogated on other grounds by Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  Creating barriers to entry or expansion is particularly problematic where a small, aggressive competitor, such as Homie, stands ready, willing, and able to compete by offering lower prices but is thwarted by the defendants' conduct.  *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 578 (1967) (conduct held anticompetitive where it "may substantially reduce the competitive structure of the industry by raising entry barriers and dissuading the smaller firms from aggressively competing").

Some components of NAR's ERPs create barriers to competition because they give the parties to those agreements the ability and incentive to steer customers away from clients represented by discount brokers. *E. States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 612 (1914) (holding unlawful concerted action that had the "natural consequence" of inducing refusals to deal); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1147–50 (8th Cir. 1979) (reversing summary judgment on challenge to MLS rules that facilitated refusals to deal with low-price brokerage).  Homie's Complaint alleges the anticompetitive effects of the Defendants' concerted action in the form of express and tacit boycotts of Homie in Utah, the natural and intended effect of the market structure created by NAR's ERPs.  (Compl. ¶¶ 50–51; 54–55; 60–72; 75–76; 79–80; 83–86; 94–101.)  Defendants cite *Orval Sheppard Real Estate Co. v. Valinda Freed & Associates, Inc.*, 608 F. Supp. 354, 357 (M.D. Ala. 1985) for the proposition that steering is not a Section 1 violation (HSA Mem. at 19), but *Sheppard* actually holds that an *agreement* among competing real estate agents to steer *is* a Section 1 violation—indeed a *per se* illegal one. 608 F. Supp. at 359.  Other components of NAR's ERPs are anticompetitive because they

"substantially deprive[] the customer of the ability to utilize and compare prices in selecting" brokers. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692–93 (1973) (cleaned up).

Notably, Defendants make no effort to contest the sufficiency of Homie's allegations that NAR's ERPs are unreasonable restraints of trade or its allegations of Defendants' market power in a relevant antitrust market (Compl. ¶¶ 130–37.)  Instead, Defendants argue that Homie was required to separately and independently satisfy the elements of a Section 1 violation with respect to their participation in the hundreds or even thousands of refusals to deal Homie suffered with respect to specific transactions in Utah as a result of NAR's ERPs.  (NAR Mem. at 19–22; RML & Anywhere Mem. at 17–22; HSA Mem. at 16–19; Keller Williams Mem. at 10–18.)  This argument is a red herring; no such requirement is found in the case law.  It suffices that Defendants agreed to a common course of action—NAR's ERPs—that is concerted action within the meaning of Section 1 and had the foreseeable consequence of inducing MLS participants to refuse to deal with discount brokerages, including Homie.  *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939) (inferring unlawful Section 1 conspiracy to accomplish "necessary consequence" of the concerted action);  *E. States*, 234 U.S. at 612 (inferring unlawful Section 1 conspiracy to accomplish refusals to deal that followed as a "natural consequence" of the concerted action); *see also Pinkerton v. United States*, 328 U.S. 640, 645–48 (1946) (each member of a conspiracy is legally responsible for acts that are "reasonably foresee[able] as a necessary or natural consequence of the unlawful agreement").[2]  Although Keller Williams (Mem. at 14) argues that

---

[2] NAR's cases (NAR Mem. 19–22) are distinguishable.  *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 118 (2d Cir. 2021), involved alleged damages suffered in transactions with competitors of the alleged conspirators rather than in transactions with the alleged conspirators or their affiliates.  *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir. 1984), stands only for the proposition that interlocking corporate directorates are not *per se* violations of Section 8 of the Clayton Act and has literally nothing to

Homie was not the specifically intended victim of the Defendants' conspiracy, it is sufficient that Homie's injury as an excluded competitor was "foreseeable." *Blue Shield of Va. v. McCready,* 457 U.S. 465, 479 (1982) ("The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators.").

*Eastern States* illustrates the principle. There, the defendant association agreed to circulate a list of wholesalers engaged in competitive activities antithetical to the goals of the association's retail members. 234 U.S. at 608–09. The Supreme Court held that the evident purpose and "natural consequence" of the "concerted action" of circulating the list was to induce the refusals to deal. *Id.* at 612. The concerted action—the exchange of the list—violated Section 1 due to its exclusionary tendencies even though "there [wa]s no agreement among the retailers to refrain from dealing with listed wholesalers[] nor [wa]s there any penalty annexed for the failure to do so[.]" *Id.* at 608. It sufficed that the concerted action "had, and was intended to have, the natural effect of causing such retailers to withhold their patronage from the concern listed." *Id.* at 609.

The agreement in *Eastern States* is similar in many respects to the Buyer Broker Compensation Rule, one component of NAR's ERPs. *Penne* is an even closer analogue. In that case, the plaintiff brokerage challenged an MLS rule requiring discount brokerages to be identified as such in MLS listings, which the plaintiff contended facilitated various forms of exclusionary conduct at the plaintiff's expense, including—as alleged by Homie as well—steering of customers away from the plaintiff's customers (called "blacklisting" in *Penne*) and statements by MLS

---

do with this case. The plaintiff's claim failed in *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 652–53 (10th Cir. 1992), because its injury flowed from conduct not violative of the Sherman Act, not because the injury was too removed from the alleged conduct.

participants deprecating plaintiff. 604 F.2d at 1148–49. Evidence that the MLS rule (the concerted action at issue in that case) "facilitate[d]" these anticompetitive effects established a triable issue under Section 1. *Penne* imposed no requirement that the defendant be specifically involved in each refusal to deal facilitated by its rules.[3]

In a variant of this argument, Defendants claim that it was their affiliates, and not themselves, that refused to deal with Homie in Utah and that they cannot be held responsible for the conduct of their Utah affiliates. (NAR Mem. at 20–23; Keller Williams Mem. at 16–17; RML & Anywhere Mem. at 20–22; HSA Mem. at 18–19.) They impermissibly ignore the allegations that the Defendants instructed and bound their Utah affiliates to adopt, implement, and enforce NAR's ERPs, which makes the Defendants responsible for the foreseeable results of that conduct. The Complaint alleges that NAR members in Utah were bound by NAR's Code of Ethics (Compl. ¶¶ 102–09), that NAR-affiliated MLSs in Utah were required to adopt the mandatory aspects of NAR's MLS Handbook (*id.*), and that Corporate Defendants through their franchise agreements and otherwise required their Utah affiliates to join NAR and abide by NAR's ERPs (*id.* ¶¶ 124–29). These allegations suffice to impute liability to the Defendants for the foreseeable conduct of their Utah affiliates. *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004) ("When the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be

---

[3] Keller Williams relies heavily on an out-of-circuit case, *City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*, 92 F.4th 381 (2d Cir. 2024), but that case is distinguishable because the plaintiff sought to infer the existence of an alleged antitrust conspiracy from circumstantial evidence and parallel conduct among the defendants rather than adducing direct evidence in the form of trade association rules, as Homie does. *Pontiac* relates to the inference of an agreement, not to the liability of a conspirator for the foreseeable results of an agreement once proven.

held directly liable as a single enterprise with the subsidiary under the Sherman Act" (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 773–74 (1984))).   Indeed, this very argument was rejected when Defendants made it in *Burnett*, where the court denied them summary judgment.  *Burnett*, 2022 WL 17741708, at *8 (rejecting argument that the Corporate Defendants "cannot be held liable for their conduct of their associated brokers" in Missouri and elsewhere when the Defendants had "encouraged or directed compliance" with the Buyer-Broker Compensation Rule).[4]

### 3.2. *Homie Has Standing Under the Clayton Act.*

"To maintain standing to bring an antitrust claim under § 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff must show (1) an 'antitrust injury;' and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997).  Homie has satisfied both elements.

### 3.3. *Homie Has Alleged an Injury in Fact.*

"A plaintiff seeking to recover damages under the antitrust laws must show injury in fact, that is, a causal connection between the defendant's actions violative of the Sherman Act and the actual injury to the plaintiff's business." *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 650 (10th Cir. 1987) (cleaned up).  The fact of injury may be established by "reasonable inference from the proof of defendants' wrongful acts and their tendency to injure

---

[4] Dispositively, Keller Williams admits that allegations that a "franchisor <u>directed</u> the franchisees [*sic*] actions" would suffice to impute liability to Keller Williams.  (Keller Williams Mem. at 17) (emphasis in the original).  HSA admits that allegations that a franchisor controls the actions of the franchisee with respect to the conduct at issue in the case would suffice.  (HSA Mem. at 18–19.)  NAR would require the pleading of facts "sufficient to show the Corporate Defendants somehow controlled or directed their [Utah affiliates'] actions."  (NAR Mem. at 21.) These Defendants thus concede that Homie's allegations suffice.

plaintiffs' business[.]" *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123–24 (1969) (cleaned up).  An antitrust plaintiff need not show that the defendants' conduct was the sole cause of its injury, only that it was a material cause.  *Id.* at 114 n.9 ("It is enough that the illegality is shown to be a material cause of the [antitrust] injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling [its] burden of proving compensable injury[.]"); *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1478 (10th Cir. 1985) ("A plaintiff's burden to show injury in fact is satisfied by its proof of *some* damage flowing from the unlawful conspiracy, which may be established by reasonable inferences drawn from circumstantial evidence.") (cleaned up, emphasis original).

Homie alleges an injury in fact in the form of lost profits and market share caused by NAR's ERPs.  (Compl. ¶¶ 5, 43–57, 63–69, 76, 80, 86, 88, 93, 94–101.)  Defendants argue that Homie has not sufficiently alleged an injury in fact because Homie was, for a time, able to compete in the relevant market, and thus Homie's injuries lack a sufficient causal connection with NAR's ERPs as a matter of law.  (NAR Mem. at 14–15; RML & Anywhere Mem. at 13–14; Keller Williams Mem. at 14; HSA Mem. at 16–17.)  But, under *Zenith Radio*, Homie is required only to plead (and later prove) that the challenged conduct was a material cause, not the sole cause, of its injury, and in any event, "[a]n agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market."  *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 (1983).  Defendants' arguments about the materiality of the impact of the challenged conduct on Homie's business are fact-bound issues not susceptible to resolution on the pleadings.  *DAT Sols., LLC v. Convoy, Inc.*, No. 3:22-cv-00088-IM, 2023 WL

3058057, at *16 (D. Or. Apr. 24, 2023).[5]  It suffices at this stage to allege, as Homie has, conduct

that is plausibly anticompetitive and that had the tendency to injure Homie.  *Zenith Radio*, 395

U.S. at 123.

### 3.4.    *Homie Has Alleged an Antitrust Injury.*

Homie's injury is also an antitrust injury.  The antitrust injury requirement ensures that a

competitor bringing claims under the Clayton Act has interests aligned with those of consumers

and that the injury in fact suffered by the competitor plaintiff "stems from a competition-*reducing*

aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S.

328, 344 (1990) (emphasis in original).  Antitrust injury is "injury of the type the antitrust laws

were intended to prevent and that flows from that which makes defendants' acts unlawful.  The

injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts

made possible by the violation."  *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489

(1977).  A competitor's injury in fact must also be examined from the consumer's viewpoint, to

ensure that the alleged conduct also "affected the prices, quantity or quality of goods or services,

not just [the plaintiff's] own welfare." *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th

Cir. 2012) (citation omitted); *accord Stamatakis Indus., Inc. v. King,* 965 F.2d 469, 471 (7th Cir.

1992) ("The [Supreme Court's] antitrust injury doctrine…requires every plaintiff to show that its

loss comes from acts that reduce output or raise prices to consumers.") (cleaned up).

Homie's allegations easily establish an antitrust injury for at least two reasons.

*First*, Homie's injury in fact flows from an anticompetitive aspect of the conduct Homie

contends to be unlawful, namely the barriers to entry and expansion for competitors seeking to

---

[5] The two cases cited by NAR (NAR Mem. at 14) in support of this argument were decided at
summary judgment and are procedurally inapposite.

compete using lower prices.  Many cases recognize that injured competitors have standing to challenge antitrust violations that create barriers to entry into a market.  *See, e.g.*, *Sports Racing Servs.,* 131 F.3d at 883; *Andrx Pharm. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("A rival has clear standing to challenge the conduct of rivals that is illegal precisely because it tends to exclude competitors from the market.") (cleaned up); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991) ("As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market."); *Yellow Pages Cost Consultants, Inc. v. GTE Directories,* 951 F.2d 1158, 1161–62 (9th Cir. 1991) (finding GTE's refusal to deal with plaintiff consultants directly injured consultants, who were found to compete with GTE for advertisers).[6]

*Second*, competition was injured by excluding low-priced competitors, including Homie, from the market.  The barriers to entry and expansion created by NAR's ERPs resulted in higher prices for consumers.  (Compl. ¶¶ 4–6, 38, 41, 45, 58, 79, 85–86, 88, 94, 141.)  An increase in consumer prices resulting from dampened competitive market forces is redressable under the Clayton Act.  *McCready,* 457 U.S. at 482–83.   Because the injuries that NAR's ERPs caused Homie flow from conduct that also harmed competition and consumers, they are cognizable antitrust injuries.  *See Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1127–29 (10th Cir. 2002) (affirming jury verdict for competitor whose exclusion resulted in higher prices to customers). [7]

---

[6] NAR undercuts its argument by citing *Allergy Research Group LLC v. Rez Candles Inc.*, No. 2:21-cv-73-TC-JCB, 2022 WL 1004214, at *4 (D. Utah Apr. 4, 2022), for the proposition that "[a]nticompetitive effects [from which an antitrust injury may flow] include, for example, barriers to market entry, reduced output, or supracompetitive prices."  (NAR Mem. at 7.)

[7] NAR's attempt to analogize the complaint in *Allergy Research Group* to Homie's complaint falls flat.  (NAR Mem. at 16–17.)  The plaintiff in *Allergy Research Group* complained of a

All of Defendants' antitrust injury arguments turn on the premise that Homie is foreclosed from challenging anticompetitive conduct that raised the price of brokerage services because Homie is itself a broker.  (NAR Mem. at 8–13; Keller Williams Mem. at 19; RML & Anywhere Mem. at 12–13.)  But these arguments misconstrue the Complaint and misapply antitrust injury law.[8]

NAR argues that "a plaintiff cannot suffer an antitrust injury caused by a conspiracy among its competitors to raise prices."  (NAR Mem. at 8–10.)  But Homie is alleging a conspiracy to exclude competitors that had the effect of increasing prices rather than a conspiracy to fix prices directly, and its injuries flow from the barriers to entry created by NAR's ERPs rather than from the resulting supracompetitive consumer prices.  *Sports Racing Servs.*, 131 F.3d at 882 ("[T]he standing analysis must take into account the type of antitrust claim being asserted.").  Rivals who seek to compete with their competitors by offering low prices to consumers suffer antitrust injury when those competitors engage in exclusionary conduct to prevent that low-price competition.  *See*

_____

restriction on competition between dealers of the same manufacturer's products, or intrabrand competition, which normally has no obvious adverse effect on the interbrand competition of primary interest under the Sherman Act.  2022 WL 1004214, at *7–8.  Homie's allegations relate to interbrand competition and are much more specific than the conclusory allegations held insufficient in that case.

[8] Defendants rely on two opinions from one judge for the proposition that Homie's injury in fact (lost market share and lost profits) must be the same as the injury in fact suffered by consumers (higher prices).  (RML & Anywhere Mem. at 22–23.)  *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1090 (D. Colo. 2012) ("[T]he injury to the plaintiff and the injury to competition must be one and the same."); *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189 (D. Colo. 2019) (same).  In both cases, the court labeled this unsupported conclusion as dicta, as the Sherman Act claims failed for other reasons.  If the cited language from *L-3* means that a competitor plaintiff's injury must flow from the same *conduct* that harms consumers in order to have standing, it is correct.  But Defendants' interpretation of this language would lead to the absurd result—contrary to reams of appellate precedent—of eliminating competitor standing to sue entirely, as competitors would never suffer the same injury in fact that consumers did.

*Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 783 (7th Cir. 1994) (Posner, J.) (injuries of competitor plaintiff that "wanted to compete by underselling the other [competitors]" from conduct calculated "to prevent it from, or punish it for, doing this" were antitrust injuries); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) ("Competitors, however, may have standing to challenge practices used to enforce a price-fixing conspiracy."); *Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 67–68 (2d Cir. 1988) ("[T]o the extent a cartel member credibly asserts that it would be better off if it were free to compete—such that the member's interest coincides with the public interest in vigorous competition—we believe that the individual cartel member satisfies the antitrust injury requirement.").[9]

Defendants actually cite two cases showing that the injuries suffered by boycotted rivals seeking to undercut their competitors' prices are antitrust injuries that confer standing on those injured rivals. As here, *Park v. El Paso Board of Realtors*, 764 F.2d 1053 (5th Cir. 1985), involved

---

[9] NAR's other cases (NAR Mem. at 8–13) are distinguishable in accordance with this principle. In *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.7 (1986), the Court recognized that while a competitor was not injured by, and could not challenge, a simple conspiracy to raise prices, recovery *could* be had for some "other conduct" causally connected to a price-increasing conspiracy. Similarly, in *Stiles v. Walmart, Inc.*, 639 F. Supp. 3d 1029, 1046 (E.D. Cal. 2022), the court held that a competitor did not suffer injury from higher prices (in the section NAR cites) but could (in a discussion NAR ignores) recover for exclusionary conduct. The competitor plaintiff in *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1294 (D. Utah 2022), did not even allege that it was harmed by exclusionary conduct. *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122–24 (2d Cir. 2007), did not, in the portion of that opinion NAR cites, involve claims brought by an excluded competitor. The plaintiff in *J. Allen Ramey, M.D., Inc. v. Pacific Foundation For Medical Care*, 999 F. Supp. 1355, 1365 (S.D. Cal. 1998), suffered no antitrust injury because it sought damages based on its inability to participate in a price-fixing conspiracy and not based on exclusionary conduct aimed at frustrating its ability to compete with the cartel members. The plaintiffs in *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 386 F. Supp. 3d 926, 944–45 (N.D. Ill. 2019), and *Rockbit Industries U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1548 (S.D. Tex. 1991), failed to plausibly allege any exclusionary conduct.

anticompetitive conduct among real estate brokers at the expense of a low-price competitor. The plaintiff alleged that its rivals had both conspired to fix their own prices and to boycott the plaintiff in retaliation for its low prices. The Fifth Circuit left undisturbed the jury's liability verdict based on the boycott conspiracy while affirming the district court's refusal to base liability on the price-fixing conspiracy. *Park*, 764 F.2d at 1062–63, 1068–70. Similarly, in *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775 (7th Cir. 1999), the plaintiff alleged it was the victim of a boycott designed to prevent it from undercutting its rivals' prices. NAR cites the portion of the opinion in which Judge Posner explained that the plaintiff did not suffer an antitrust injury from its rivals' high prices, but NAR inexplicably fails to acknowledge that he also held that the plaintiff *did* suffer antitrust injury from the exclusionary conduct that prevented it from competing away its rivals' elevated prices. *Id.* at 777.

In a variant of this argument, Defendants argue that Homie cannot establish antitrust injury because it benefitted from higher prices by having the opportunity to gain market share by undercutting the Defendants' prices. (NAR Mem. at 10–13; RML & Anywhere Mem. at 9–13.) This same argument was rejected in both *JTC Petroleum* and *Park*. *See JTC Petroleum*, 190 F.3d at 778 (finding standing to challenge boycott enforcing price-fixing agreement despite the fact that "[a] conspiracy of a firm's competitors to [fix prices] could only help the firm, by providing an umbrella under which it could sell a large quantity at a supracompetitive price generating supracompetitive profits just by setting price in between the conspirators' price and the lower, competitive price that would prevail in the absence of the conspiracy."); *Park*, 764 F.2d at 1069–70 (finding standing to challenge boycott enforcing price-fixing agreement despite the fact that "price fixing ordinarily helps these competitors by allowing them to capture a larger share of the market than they would if the prevailing price were lower."); *see also Int'l Longshore & Warehouse*

*Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1186 (9th Cir. 2017) (excluded competitor suffered antitrust injury when it was "harmed directly" by efforts to enforce conspiracy that also benefitted plaintiff "by raising prices to supra-competitive levels"). This is unsurprising; the whole point of Defendants' boycott was to make it impossible for Homie to gain market share by undercutting their supracompetitive prices.[10]

NAR argues that Homie has failed to allege harm to competition, as opposed to harm to Homie alone. (NAR Mem. at 15–18.) This is incorrect. The Complaint alleges that NAR's ERPs had anticompetitive effects on *all* brokers seeking to compete by offering lower prices, not only on Homie, and that their effect manifested in higher prices market-wide. (Compl. ¶¶ 5 ("By excluding Homie and other new entrants, Defendants, in a single stroke, harmed competition, harmed consumers, and caused injury and damages to Homie."), 61–62 (alleging exclusion of brokerages other than Homie).)[11]

NAR's arguments that Homie has not sufficiently alleged that NAR's Clear Cooperation Policy harmed Homie or competition (NAR Mem. at 18–19) fail. The competitive effects of the Clear Cooperation Policy must be considered in the context of the entire exclusionary scheme

---

[10] The other cases cited by Defendants (RML & Anywhere Mem. at 10) are distinguishable. Although Defendants characterize *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) as involving a claim by a "competitor-plaintiff," the Tenth Circuit disagreed, writing instead that "Tal, Inc. was not a buyer or seller in the affected market." *Id.* at 1258. *Association of Surgical Assistants v. National Board of Surgical Technology & Surgical Assisting*, No. 22-cv-02363-MEH, 2023 WL 7277313, at *9 (D. Colo. Sept. 29, 2023), had the same fact pattern, and the complaint was dismissed for the same deficiency identified in *Tal*.

[11] In *Belnap v. Steward Health Care System LLC*, No. 2:19-cv-00330-DAK, 2020 WL 619402 (D. Utah Feb. 10, 2020), and *Vincent v. Utah Plastic Surgery Society*, No. 2:12–CV–1048 TS, 2013 WL 4782354 (D. Utah Sept. 5, 2013), two cases cited by RML & Anywhere, the plaintiffs, unlike Homie here, failed to adequately allege market-wide harm to competition in the form of increased prices.

achieved by NAR's ERPs, ensuring that brokers seeking to compete using low prices would be unable to avoid the anticompetitive effects of the ERPs by marketing listings entirely off of the MLS system. *Burnett*, 2022 WL 17741708 at \*4 (discussing role of Clear Cooperation Policy in NAR's ERPs); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (directing courts to consider the synergistic effects of a multi-faceted exclusionary scheme).

### 3.5. *Homie's Injuries are Sufficiently Direct.*

When consumers suffer injury as a result of competitors' exclusion from the market, the injury to the excluded competitors is "direct" for the purpose of assessing antitrust standing. *McCready*, 457 U.S. 483. Because of the direct causal connection between the injuries suffered by excluded competitors and the exclusionary conduct that they challenge, the case law uniformly holds that competitors also have standing to challenge exclusionary conduct that harms both consumers and those competitors themselves. *Associated Gen. Contractors*, 459 U.S. at 538–39 (identifying customers and competitors in the relevant market as the paradigmatic examples of entities with standing to challenge anticompetitive conduct); *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 43–44 (1st Cir. 1995) ("[T]he presumptively 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market."); *Mun. Utils. Bd. v. Alabama Power Co.*, 934 F.2d 1493, 1500 (11th Cir. 1991) ("Although the defendants' allegedly anticompetitive conduct would also injure consumers, such conduct would also directly injure [the plaintiffs] as competitors.").[12]

---

[12] HSA cites *In re Platinum & Palladium Antitrust Litigation*, 449 F. Supp. 3d 290, 305 (S.D.N.Y. 2020), which acknowledges the presumptively proper standing of competitors. (HSA Mem. at 15.) RML and Anywhere cite *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992), for the proposition that a plaintiff's injury in fact must result directly from the antitrust violation, but the plaintiff there was neither a customer nor a competitor in the affected market. They also cite two other inapposite cases. In *GDHI Marketing LLC v. Antsel Marketing*

Defendants argue that Homie is not an efficient enforcer of the antitrust laws against NAR's ERPs.  (RML & Anywhere Mem. at 14–16; HSA Mem at 20–24.)  But the fact that consumers have also sued for overcharges *they* suffered as a result of NAR's Exclusionary Rules and Policies does not deprive Homie of standing to bring a claim for *its* lost profit damages from the same conduct.  *Andrx*, 256 F.3d at 817; *Yellow Pages*, 951 F.2d at 1163.  There is no risk of duplicative recovery: Homie is not seeking to recover the overcharge suffered by consumers, and no third party would have standing to recover Homie's lost profits.  *Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 494 & n. 22 (5th Cir. 2022).  Although Defendants characterize Homie's damages claim as "speculative," they cite no reason that would be the case—and certainly no reason it would be the case as a matter of law.  Lost profits are an appropriate and traditional measure of damages when competitors challenge their foreclosure from a market.  Any difficulty in estimating the profits that would have been earned but for the illegal restraint is not a sufficient reason to find damages speculative—much less so on a motion to dismiss.  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–65 (1946); *Zenith Radio*, 395 U.S. at 123–24.

### 3.6.  *Homie's Claims are Timely.*

The statute of limitations for federal antitrust actions is four years.  15 U.S.C. § 15b.  The general rule is that an antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio*, 401 U.S. at 338.  But "[i]n the context of a continuing conspiracy to violate the antitrust laws…each time a plaintiff is

---

*LLC*, 416 F. Supp. 3d 1189, 1204 (D. Colo. 2019), the court found the plaintiff's allegations of a relevant market and power within that market to be insufficient, but Defendants here have not challenged Homie's pleading of those elements.  Defendants also cite *Association of Surgical Assistants*, 2023 WL 7277313, at *2, but neither the cited portion of that opinion (nor any other) relates to the pleading of causation in an antitrust case.

injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.*; s*ee also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (noting that the plaintiff is equally entitled to sue based on the most recent alleged harmful conduct as it is on the first impact of the continuing conduct).  The Tenth Circuit has held that "an overt act will restart the statute of limitations under the continuing conspiracy exception when the act is (1) a new and independent act that is not merely a reaffirmation of a previous act; and (2) the act inflict[s] new and accumulating injury on the plaintiff."  *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1248 (10th Cir. 2016).

The Corporate Defendants, but not NAR, argue that Homie's antitrust claim is time-barred because it was filed more than four years from the date any of NAR's ERPs were adopted.  (RML & Anywhere Mem. at 16–17, HSA Mem at 13–16.)  But *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980) (HSA Mem. at 13) provides that dismissal on these grounds is inappropriate unless "the dates given in the complaint make clear that the right sued upon has been extinguished," a standard not met here.  The Complaint alleges that NAR's ERPs were in effect and were being enforced within four years of the date the Complaint was filed. (Compl. ¶¶ 59, 73, 77, 81, 87, 93.)  It also alleges that the ERPs were reviewed and reissued annually at NAR's yearly meetings during this period.  (*Id.* at ¶¶ 8, 37, 115.)  And it alleges overt acts of steering as recently as earlier this year.  (*E.g.*, *id.* at ¶ 66.)  These allegations suffice to plead a continuing violation under *Auraria*.  In that case, a policy was implemented outside of the statute of limitations but was applied and enforced each year in a new set of transactions as new customers entered the relevant market.  So too here, as NAR's ERPs became applicable each year to a new

set of transactions brokered or potentially brokered by Homie, and new overt acts were taken to enforce the ERP. Thus, Homie's claims under the Sherman Act and its state law claims are timely.

The cases cited by RML and Anywhere (Mem. at 16–17) are distinguishable. *Seay v. Oklahoma Board of Dentistry*, No. CIV-17-682-D, 2021 WL 1394478, at *2 (W.D. Okla. Apr. 12, 2021), *aff'd on other grounds*, No. 21-6054, 2022 WL 984378, at *5 (10th Cir. Apr. 1, 2022), held only that an antitrust claim based on a rule passed once and never in relevant part amended accrued when the rule was first passed when there were no overt acts within the limitations period. But, as noted in the preceding paragraph, Homie's Complaint contains allegations of overt acts within the limitations period. *Seay* expressly relied upon the Tenth Circuit's test for continuing conspiracy as enunciated in *Champagne Metals*, and under that test, those recent overt acts render this a continuing conspiracy. 458 F.3d at 1089–90 (holding that conspirators' actions of pressuring third parties not to deal with plaintiff within the limitations period rendered the case a continuing conspiracy).

RML and Anywhere fare no better with two cases involving the mere maintenance of policies adopted outside the limitations period. In *In re Travel Agent Commission Antitrust Litigation*, 583 F.3d 896, 902 (6th Cir. 2009), an airline allegedly joined a conspiracy to pay no commissions to travel agents, entered bankruptcy, and after emerging from bankruptcy continued to pay no commissions. The court ruled that the post-bankruptcy continuation of the policy involved no new overt act but was merely the "rippling effect" of the prior policy. *Id.* Here, overt acts were committed within the limitations period—the annual review and reissuance of the rules and recent steering—that distinguish this case from *Travel Agent*. *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884–85 (N.D. Cal. 2015), similarly involved allegedly anticompetitive agreements

adopted once and for all outside the limitations period.  Again, those recent overt acts tolled the limitations period, with each constituting a new overt act, and distinguish this case from *Ryan*.

4.     **State Law Claims**

    *4.1.   Homie Has Stated a Plausible Tortious Interference Claim.*

Tortious interference occurs when a defendant (1) intentionally interferes with a plaintiff's existing or potential economic relationships, (2) via improper means, and (3) thereby causes injury to the plaintiff.  *SCO Grp., Inc. v. Int'l Bus. Machs. Corp.*, 879 F.3d 1062, 1081 (10th Cir. 2018).

Homie plausibly alleges each element of its tortious interference claim.  Homie alleges extensive facts showing that its existing and potential economic relationships with customers were frustrated by NAR's ERPs and by the foreseeable acts of the Defendants' affiliates in implementing them.  (Compl. ¶¶ 95–101.)  These allegations show the wrongful interference that gives rise to tort liability.  "Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy."  *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 306 (Utah 1982), *overruled on other grounds by Eldridge v. Johndrow*, 345 P.3d 553, 564 (Utah 2015).[13]  There is no requirement that Defendants have communicated directly with Homie's customers; it suffices that Defendant's conduct "repeatedly interrupted sales activities, caused [plaintiff]'s customers to comment and complain, and more than once caused a customer to leave the store."  *SCO Grp.*, 879 F.3d at 1083 (quoting *Leigh*, 657 P.2d at 306).

---

[13] By contrast, the plaintiff in *St. Benedict's Development Co. v. St. Benedict's Hospital*, 811 P.2d 194, 200 (Utah 1991)—which NAR cites—failed to allege that *any* of its existing contracts were breached or that the defendants' actions impaired the performance thereunder.  *Id.* at 201 ("There is no allegation in the complaint that any existing sublease…was breached or that performance under any of those subleases was in any way impaired by defendants' actions.").

As is true for the antitrust claim, the Defendants are liable for the interference that they directed and caused their Utah affiliates to engage in.  By directing their affiliates to implement and enforce NAR's ERPs, Defendants exercised sufficient control of their affiliates' conduct to be liable for the foreseeable effects of that conduct.  NAR bound its affiliates through the MLS Handbook and Code of Ethics, and the Corporate Defendants did the same through their employee and franchise agreements.  This degree of control over the "means and method" of the performance of their affiliates' conduct in Utah suffices to establish liability for the Defendants.  *Mallory v. Brigham Young University,* 2012 UT App 242, ¶¶ 20–21, 285 P.3d 1230.  Unlike *Glover By & Through Dyson v. Boy Scouts of America*, 923 P.2d 1383, 1386 (Utah 1996), the Defendants here specifically directed their affiliates in the conduct giving rise to liability.  This case is on all fours with *Licari v. Best Western International, Inc.*, No. 2:11–cv–603, 2013 WL 3716523, at *8–11 (D. Utah July 12, 2013), where the court applying Utah law found a triable issue of fact of the franchisor's liability for the actions of its franchisees taken pursuant to express instruction in the franchise agreement.

Interference with Homie's existing and potential economic relationships with its customers was the intended, foreseeable, and natural result of NAR's ERPs.  (Compl. ¶¶ 51, 54, 60.)  These allegations establish the intent element of the tort.  *CounselNow, LLC v. Deluxe Small Bus. Sales Inc.*, 430 F. Supp. 3d 1247, 1261–62 (D. Utah 2019) (Kimball, J.) (denying motion to dismiss when the complaint alleged defendant was "substantially certain that its actions would interfere with CounselNow's prospective business relations and that those prospective business relations actually existed."); *Mumford v. ITT Com. Fin. Corp.*, 858 P.2d 1041, 1044 (Utah Ct. App. 1993) ("However, even if the defendant does not act for the purpose of interfering or does not desire it but knows that the interference is substantially certain to occur as a result of defendant's action and is a necessary

consequence thereof, the interference is intentional."). And the alleged interference was achieved through wrongful means—violations of the Sherman Act and breaches of various Utah co-conspirators' fiduciary obligations to their principals through steering.[14] "The improper-means requirement 'is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules.'" *SCO Grp.*, 879 F.3d at 1083 (quoting *Leigh*, 657 P.2d at 306).

Defendants' contrary arguments are weak. NAR impermissibly contradicts Homie's allegations when it argues that Defendants' actions did not cause Homie's customers to cancel their contracts or listings. (NAR Mem. at 21–22.)[15] Those allegations state a claim under Utah law. In

---

[14] (*See* Compl. ¶¶ 62, 73.) A defendant's breach of its fiduciary duty is a violation of both Utah's regulations and common law and, therefore, constitutes "improper means" for tortious interference purposes. *St. Benedict's*, 811 P.2d at 201; Utah Admin. Code r. 162-2f-401a (obligating real estate agent to "uphold [various] fiduciary duties in the course of representing a principal," including full disclosure of all material facts); *see also Am. Agencies, LLC v. Sloan*, No. 2:13-cv-00283-JNP-CMR, 2020 WL 7024911, at *7 (D. Utah Nov. 30, 2020) (finding defendant's breach of duty to third party constituted "improper means" for plaintiff's tortious interference claim); *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-00229-DN, 2016 WL 7350319, at *1 (D. Utah Dec. 19, 2016) ("Michael Smith's breach of his fiduciary duty is the predicate improper means which enabled tortious interference by other agents of Northwest."); *but see US Magnesium, LLC v. ATI Titanium LLC*, No. 2:17-cv-923-DB, 2019 WL 1755427, at *3 (D. Utah Apr. 19, 2019) (declining to consider as improper means a breach of duty to a third party).

[15] NAR curiously relies on *Triesault v. Greater Salt Lake Business District*, 126 P.3d 781, 785, 2005 UT App 489, ¶ 14 (Utah Ct. App. 2005), for its causation argument. But the causation analysis in *Triesault* concerned a breach of fiduciary duty claim, not a tortious interference claim. *Compare id.* ¶¶ 14–16, *with id.* ¶¶ 17–19. And even if it had concerned the tortious interference claim, the court found no causation for the fiduciary duty claim because the plaintiff failed to provide an expert opinion on causation. *Id.* ¶¶ 11, 16. While causation is typically a *jury* issue in Utah, a court can find no causation on summary judgment when the plaintiff fails to provide expert opinion. *Id.* ¶¶ 14–16. But that does not justify determining the causation issue as a matter of law on a motion to dismiss. NAR's citation to *TruGreen Companies, L.L.C. v. Mower Brothers, Inc.*, 199 P.3d 929, 932–33, 2008 UT 81, ¶ 15 (Utah 2008), is similarly misguided. All *TruGreen* stands for is that lost profits, not unjust enrichment, is the appropriate measure of

*Leigh*, the Supreme Court found anecdotal evidence that one customer left after the interferer caused a scene at the store, plus the cumulative effect of the interferer's actions that distracted the store owner to the "detriment of [the store owner's] ability to attract and retain customers," sufficient. *Leigh*, 657 P.2d at 306. Here, the cumulative effect of the Defendants' ERPs and the conduct that they encouraged and enabled, including the active boycotts visible in online groups and elsewhere, led to Homie's customers leaving. (Compl. ¶¶ 95–100.)

Keller Williams and HSA rely on *Automotive Alignment & Body Service, Inc. v. State Farm Mutual Automobile Insurance Co.*, 953 F.3d 707, 731–33 (11th Cir. 2020), where the complaint failed due to "shotgun pleading," which left the defendants unable to tell what they were accused of. Here, by contrast, Homie alleges *specific actions* by *these Defendants* contributing to Defendants' anticompetitive conspiracy against Homie that resulted in Homie's loss of existing and potential economic relationships. Homie alleges that these Defendants assisted in the annual review and reissuance of NAR's ERPs (Compl. ¶ 8), served on boards and committees of NAR and its affiliates (*id.* ¶¶ 9, 112–14, 118, 120–23), required their franchisees and employees to adhere to NAR's rules (*id.* ¶¶ 7–8, 126–27), and that their affiliates acting under their direction refused to deal with Homie on specific transactions in Utah (*id.* ¶¶ 62–69). This is all the specificity required at this stage.

### 4.2. *Homie's Utah Antitrust Act Claim Survives.*

The Utah Antitrust Act instructs that its construction is to be "guided by interpretations given by the federal courts to comparable federal antitrust statutes…." Utah Code Ann. § 76-10-

---

damages for tortious interference. *Id.* ¶ 27. And, again, NAR cites a portion of a decision addressing something other than tortious interference.

926.  Thus, Homie's claim under the Utah Antitrust Act survives for the same reasons its Sherman

Act claim does.

**5.      This Court Has Personal Jurisdiction over RML, HSA, HSF, and Keller Williams.**

RML, HSA, HSF, and Keller Williams, but not NAR or Anywhere, argue that this Court

lacks personal jurisdiction over them.  Collectively, they purport to have written what amounts to

a comprehensive treatise on personal jurisdiction in antitrust cases.  But their treatise has two

significant omissions, either of which dooms their personal jurisdiction motions.

**5.1.    This Court Has Personal Jurisdiction over RML, HSA, HSF, and Keller Williams as a Result of Their Participation in an Unlawful Conspiracy with Local Co-Conspirators.**

Defendants fail even to mention the well-recognized conspiracy theory of jurisdiction.  As

Judge Parrish explained:

> In *Melea, Ltd. v. Jawer, SA*, 511 F.3d 1060, 1070 (10th Cir. 2007), the Tenth Circuit held a conspiracy directed at the forum can form the basis for personal jurisdiction if at least some act in furtherance of the conspiracy happens in the forum.  In *Newsome v. Gallacher*, 722 F.3d 1257, 1265–66 (10th Cir. 2013), the Tenth Circuit extended *Melea* to allow the assertion of personal jurisdiction over co-conspirators whose actions merely targeted the forum.  However, to meet their burden of establishing personal jurisdiction, plaintiffs "must offer more than 'bare allegations' that a conspiracy existed, and must allege facts that would support a prima facie showing of a conspiracy."  *Melea*, 511 F.3d at 1069 (quoting *Lolavar v. de Santibanes*, 430 F.3d 221, 229-30 (4th Cir. 2005)).
>
> In addition to making "a threshold showing that a conspiracy existed," plaintiffs must demonstrate "that the defendants participated therein."  *Lolavar v. de Santibanes*, 430 F.3d at 229 (*citing McLaughlin v. McPhail*, 707 F.2d 800, 807 (4th Cir. 1983)).

*Celtig, LLC v. Patey*, 347 F. Supp. 3d 976, 984 (D. Utah 2018). The Tenth Circuit has cited with

approval cases not requiring an agency relationship among co-conspirators.  *See Melea*, 511 F.3d

at 1069; *accord Berkshire Bank v. Lloyds Banking Grp. Plc*, No. 20-1987-cv, 2022 WL 569819, at

*2 (2d Cir. Feb. 25, 2022) ("[T]here is no requirement that a plaintiff demonstrate that a defendant

'directed, controlled, and/or supervised the co-conspirator who carried out the overt acts in the forum.'") (citation omitted).

*Celtig* was a diversity case where the torts—and thus the conspiracy—alleged were defined by Utah law. *Celtig*, 347 F. Supp. 3d at 985. By contrast, in *In re Credit Default Swaps Auctions Litigation*, 710 F. Supp. 3d 895, 941 (D.N.M. 2023), the court applied the conspiracy jurisdiction theory in an antitrust case, concluding that the plaintiffs' allegations sufficed under federal antitrust law to subject six of the nine defendants who challenged jurisdiction to personal jurisdiction under the conspiracy theory. *Id.*[16] With respect to the dismissed defendants, the court granted their motions only because "the allegations related to these three Defendants present insufficient detail to suggest that they 'participated' in the conspiracy. Notably absent from the Amended Complaint is any suggestion that these three Defendants engaged in any specific action with respect to the conspiracy, the CDS auctions, or the Plaintiffs." *Id.* That was no surprise; the allegations related to those entities were—as the court emphasized—limited to allegations concerning their citizenship, locations, ownership, and the general nature of their business operations but included "no other substantive allegations tying [those Defendants] to the conduct in this case." *Id.* at 938–41.

The contrast with this case could not be sharper. Corporate Defendants each participated directly in the conspiracy by participating in enacting and annually readopting NAR's ERPs and by requiring their affiliates in Utah to adopt and enforce the ERPs. (Compl. ¶¶ 7–9; 24, 110–29.) Their co-conspirator, NAR, also directed the conspiracy towards Utah, causing its Utah affiliates—

---

[16] Because the moving defendants were foreign entities, the question was whether they participated in a conspiracy with co-conspirators with minimum contacts with the United States rather than, as here, with the forum district. *Id.* at 938.

including the dominant MLS in Utah—to adopt and enforce the ERPs.  (Compl. ¶¶ 18–19, 27, 37, 59, 73, 77, 81, 87, 93, 102–09.)  NAR's Utah affiliates took additional overt acts in furtherance of the anticompetitive purposes of the ERPs.  (*Id.* ¶¶ 70–72.)  Under antitrust law, as *Credit Default Swaps* makes clear, that suffices to establish the participation of RML, HSA, HSF, and Keller Williams in a conspiracy involving Utah-based co-conspirators—including their own Utah affiliates (Compl. ¶ 24) and the Utah affiliates of their co-conspirators NAR and Anywhere—and conduct within Utah targeted at, and with a foreseeable effect in, Utah.  It is well-settled that "the fact that [a defendant was] involved in only a portion of [a conspiracy] does not undermine the existence of the conspiracy itself or [the defendant's role] as a participant." *In re Elec. Books Antitrust Litig.*, 859 F. Supp 2d 671, 690 (S.D.N.Y. 2012).

Under the conspiracy jurisdiction theory, the contacts of their Utah-based co-conspirators are imputed to, and establish this Court's jurisdiction over, RML, HSA, HSF, and Keller Williams. *See Hart v. Salois*, No. 14–4053, 2015 WL 1020369, at *4 (10th Cir. Mar. 10, 2015) ("[A] co-conspirator's presence within the forum might reasonably create the 'minimum contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum.") (brackets in original).  This Court should deny their jurisdiction motions on this ground alone.

### 5.2.   *This Court Also Has Personal Jurisdiction over HSA and Keller Williams under Section 12 of the Clayton Act.*

Personal jurisdiction over HSA and Keller Williams is also proper under Section 12 of the Clayton Act, 15 U.S.C. § 22.  In federal question cases, personal jurisdiction is valid if a federal statute authorizes service of process.  Fed. R. Civ. Pro. 4(k)(1)(C).  Section 12 of the Clayton Act provides for nationwide (even worldwide) service of process on corporate defendants.  15 U.S.C. § 22.  Although Section 12 has its own venue provision, the general federal statute places a

domestic corporation's residence anywhere it is subject to personal jurisdiction.   28 U.S.C. § 1391(c).

Courts outside the Tenth Circuit have split on the question of whether a plaintiff relying on nationwide service of process under Section 12 must also satisfy Section 12's venue provision or, instead, whether a plaintiff may establish personal jurisdiction under Section 12 while relying on the general federal venue statute to establish venue.  *Budicak, Inc. v. Lansing Trade Grp., LLC*, No. 2:19-CV-2449-JAR-ADM, 2020 WL 758801, at *3 n.20 (D. Kan. Feb. 14, 2020) (collecting cases).  Courts that have adopted the expansive view hold that nationwide service of process under the Clayton Act results in nationwide personal jurisdiction for any corporate defendant with minimum contacts with the United States.  *Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1415 (9th Cir. 1989).  Although the Tenth Circuit has not yet directly reached the issue, it has cited *Go-Video* approvingly for the proposition that "When the personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States." *Application to Enforce Admin. Subpoenas Duces Tecum of SEC v. Knowles*, 87 F.3d 413, 417 (10th Cir. 1996).

This Court and other district courts in the Tenth Circuit have adopted the more expansive reading of Section 12, allowing antitrust plaintiffs to establish personal jurisdiction over any defendant with minimum contacts with the United States.  *Van Ornum v. Am. Med. Ass'n*, No. 2:14-cv-921-RJS-EJF, 2017 WL 9481020, at *6 (D. Utah Mar. 16, 2017), *report and recommendation adopted*, No. 2:14–cv–00921–RJS–EJF, 2017 WL 4339653 (D. Utah Sept. 29, 2017); *Monument Builders of Greater Kansas City, Inc., v. Am. Cemetery Ass'n*, No. 84–2469–S, 1990 WL 269872, at *3–4 (D. Kan. Oct. 18, 1990) (predicting that the Tenth Circuit would follow

*Go-Video*).  This reading of Section 12 is consistent with the Tenth Circuit's expansive application of that provision to promote the remedial goals of the antitrust laws.  *Bd. of Cnty. Comm'rs. v. Wilshire Oil Co.*, 523 F.2d 125, 130 (10th Cir. 1975) ("It is…the purpose of 15 U.S.C. § 22 to liberalize rather than restrict venue in antitrust actions.") (cleaned up).

This Court should follow *Van Ornum* and find that Section 12 provides personal jurisdiction over HSA and Keller Williams, which as U.S. corporations have minimum contacts with the United States.  If the Court (a) declines to follow *Van Ornum* and instead reads Section 12 restrictively, and (b) finds the Complaint's allegations regarding the substantial business transacted by these Defendants in Utah insufficient (Compl. ¶¶ 21, 23), then Homie respectfully requests the opportunity to take limited jurisdictional discovery of the contacts of HSA and Keller Williams with Utah.  Under Section 12's venue provision, venue is proper as to a corporate defendant if, "in the ordinary and usual sense, it 'transacts business' [in that judicial district] of any substantial character."  *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 373 (1927).  The test is the "practical, everyday business or commercial concept of doing or carrying on business of any substantial character…." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948); *Wilshire Oil*, 523 F.2d at 128 ("[I]n determining whether a corporation is transacting business within a district, practical business conceptions are to be considered rather than hair-splitting legal technicalities.  It is not a lawyer's contest.").  Venue may be proper under Section 12 based solely on "purchasing activity as well as sales activity" in the forum state, and "the substantiality of the business transacted is to be judged from the point of view of the average businessman and not in proportion to the sales or revenues of the defendant[.]"  *Black v. Acme Mkts., Inc.*, 564 F.2d 681, 687 (5th Cir. 1977).  The business transacted in the forum need not be connected with the litigation. *Wilshire Oil*, 523 F.2d at 132.  And there is no requirement that the

30

defendant have offices or employees in the forum. *Id.* at 127–28. A holding company such as HSA may also transact business in the forum under Section 12 through the activities of its subsidiaries in the forum when it exercises some control over those subsidiaries' operations relevant to the plaintiff's antitrust claim. *Phone Directories Co. v. Contel Corp.*, 786 F. Supp. 930, 941–42 (D. Utah 1992).

The Court has discretion to order jurisdictional discovery. *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975) ("When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion."). A district court abuses that discretion if the denial prejudices a party. *Sizova v. Nat 'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002). "Prejudice is present where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* (cleaned up). Limited jurisdictional discovery is necessary here because the Complaint plausibly alleges that HSA and Keller Williams, two of the largest brokerage firms in the United States, transact business in this District within the meaning of Section 12, and because the declarations they submitted do not controvert the facts that would satisfy Section 12. Indeed, the Keller Williams declaration on its face discloses transactions in Utah likely sufficient to satisfy personal jurisdiction under Section 12. (ECF 70-1 ¶¶ 3, 6 (Keller Williams declaration showing that it transacts business with franchisees in Utah).) Franchise fees or expenditures flowing between Utah and HSA or Keller Williams would likely establish jurisdiction over them even under the restrictive reading of Section 12.

**Conclusion**

For all of the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: November 15, 2024                    Respectfully submitted,

Sterling A. Brennan
L. Rex Sears
MASCHOFF BRENNAN
    GILMORE ISRAELSEN & MAURIEL, LLP

Andrew K. Mann
Christopher G. Renner
Jonathan M. Shaw
DHILLON LAW GROUP, INC.

*/s/ Sterling A. Brennan*
    Sterling A. Brennan

Attorneys for Plaintiff HOMIE TECHNOLOGY, INC.

32

**CERTIFICATE OF WORD COUNT**

I, Sterling A. Brennan, certify pursuant to DUCivR 7-1(a)(6)(c) that the foregoing

document, "Plaintiff's Consolidated Response to Defendants' Motions to Dismiss," contains

10,747 words and complies with DUCivR 7-1(a)(4).

/s/ Sterling A. Brennan
Sterling A. Brennan

Attorneys for Plaintiff
HOMIE TECHNOLOGY, INC.