IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HOMIE TECHNOLOGY, | ) | |
| INC., a Delaware | ) | |
| Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:24-CV-00616DAK |
| NATIONAL ASSOCIATION | ) | |
| OF REALTORS, an | ) | |
| Illinois Non-Profit | ) | |
| Association, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |


BEFORE THE HONORABLE DALE A. KIMBALL

February 20, 2025


Zoom Motion to Dismiss Hearing

**Appearances of Counsel:**

```
For Homie Technology:    Christopher G. Renner
                         Andrew K. Mann
                         Jonathan M. Shaw
                         Attorneys at Law
                         Dhillon Law Group
                         2121 Eisenhower Avenue
                         Suite 608
                         Alexandria, Virginia 22314

                         Sterling Brennan
                         Attorney at Law
                         Maschoff Brennan
                         111 S. Main Street
                         Suite 600
                         Salt Lake City, Utah 84111

For National             Thomas R. Lee
Association of           Attorney at Law
Realtors:                Schaerr Jaffe
                         299 S. Main Street
                         Suite 1300
                         Salt Lake City, Utah 84111

                         Michael Domenic Bonanno
                         Attorney at Law
                         Quinn Emanuel Urquhart
                         & Sullivan LLP
                         1300 I Street NW
                         Suite 900
                         Washington, D.C. 20005

For Anywhere Real        Jason W. Hardin
Estate Inc.:             Attorney at Law
                         Fabian VanCott
                         95 S. State Street
                         Suite 2300
                         Salt Lake City, Utah 84111

                         Josh Mahoney
                         Attorney at Law
                         Faegre Drinker Biddle
                         & Reath LLP
                         320 S. Canal Street
                         Suite 3300
                         Chicago, Illinois 60606
```

**Appearances of Counsel (Continued):**

                          Aaron D. Van Oort
                          Attorney at Law
                          Faegre Drinker Biddle
                          & Reath LLP
                          2200 Wells Fargo Center
                          90 S. 7th Street
                          Minneapolis, Minnesota 55402

                          Kevin P. Wagner
                          Attorney at Law
                          Faegre Baker Daniels LLP
                          2200 Wells Fargo Center
                          90 S. Seventh Street
                          Minneapolis, Minnesota 55402

                          Paul H. Saint-Antoine
                          Attorney at Law
                          Faegre Drinker Biddle
                          & Reath LLP
                          One Logan Square
                          Suite 2000
                          Philadelphia, PA 19103

                          Stacey Anne Mahoney
                          Attorney at Law
                          Morgan Lewis & Bockius LLP
                          101 Park Avenue
                          New York, New York 10178

For Keller Williams:      Amy F. Sorenson
                          Attorney at Law
                          Snell & Wilmer LLP
                          15 W. South Temple
                          Suite 1200
                          Salt Lake City, Utah 84101

                          Boris Bershteyn
                          Attorney at Law
                          Skadden Arps Slate Meagher
                          & Flom LLP
                          One Manhattan West
                          New York, New York 10001

**Appearances of Counsel (Continued):**

|                          |                                    |
|--------------------------|------------------------------------|
|                          | David C. Kully                     |
|                          | Attorney at Law                    |
|                          | Holland & Knight LLP               |
|                          | 800 17th St NW                     |
|                          | Suite 1100                         |
|                          | Washington, D.C. 20006             |
| For Homeservices of America: | Bryon J. Benevento             |
|                          | Attorney at Law                    |
|                          | Dorsey & Whitney LLP               |
|                          | 111 S. Main Street                 |
|                          | Suite 2100                         |
|                          | Salt Lake City, Utah 84111         |
|                          | Scott E. Murray                    |
|                          | Attorney at Law                    |
|                          | Hoover Hull Turner LLP             |
|                          | 111 Monument Circle                |
|                          | Suite 4400                         |
|                          | Indianapolis, Indiana 62449        |
| For Re/Max, LLC:         | Juliette P. White                  |
|                          | Attorney at Law                    |
|                          | Parsons Behle & Latimer            |
|                          | 201 S. Main Street                 |
|                          | Suite 1800                         |
|                          | Salt Lake City, Utah 84145         |
|                          | Jeff Levee                         |
|                          | Attorney at Law                    |
|                          | Jones Day                          |
|                          | 555 S. Flower Street               |
|                          | 50th Floor                         |
|                          | Los Angeles, California 90071      |

Court Reporter:

Laura W. Robinson, FCRR, RPR, CSR
351 S. West Temple
3.303 U.S. Courthouse
Salt Lake City, Utah 84101
(801)201-9731

                              * * * * *

          THE COURT:  Good afternoon, everyone.

          MR. BRENNAN:  Good afternoon, Your Honor.

          MR. RENNER:  Good afternoon, Your Honor.

          THE COURT:  We're on a zoom hearing in the

matter of *Homie Technology, Inc., versus National*

*Association of Realtors, et al.*, 2:24-CV-616.

          Now for plaintiff, we have Mr. Sterling

Brennan; is that correct?

          MR. BRENNAN:  Yes.  Good afternoon, Your

Honor.

          THE COURT:  Good afternoon.  Mr. Christopher

Renner.

          MR. RENNER:  Good afternoon, Your Honor.

          THE COURT:  Good afternoon.  And

Mr. Jonathan Shaw, correct?

          MR. SHAW:  Yes, Your Honor.  Good afternoon.

          THE COURT:  Who is going to argue?

          MR. RENNER:  This is Mr. Renner, Your Honor.

I will argue for the plaintiff.

          THE COURT:  Mr. Renner, all right.  For

defendants we have Mr. Boris Bershteyn.

          MR. BERSHTEYN:  Good afternoon, Your Honor.

          THE COURT:  How do you pronounce that?  Did

```
 1    I do --

 2              MR. BERSHTEYN:  You did great.  It is

 3    Bershteyn.

 4              THE COURT:  Bershteyn.  Are you arguing?

 5              MR. BERSHTEYN:  I will be arguing a portion

 6    of the defendant's presentation for Keller Williams.

 7              THE COURT:  All right.  Mr. Michael Bonanno?

 8              MR. BONANNO:  Good afternoon, Your Honor.

 9    Michael Bonanno.  For National Association of

10    Realtors.

11              THE COURT:  Are you arguing?

12              MR. BONANNO:  Yes, I am, Your Honor.

13              THE COURT:  Everybody is arguing.  Mr. Jason

14    Hardin?

15              MR. HARDIN:  Yes, judge.  Good afternoon,

16    Your Honor, Jason Hardin from VanCott.

17              THE COURT:  You're arguing as well?

18              MR. HARDIN:  No, I am not arguing, Your

19    Honor.  For Anywhere, Kevin -- I'm sorry, Aaron Van

20    Oort will be arguing for Anywhere.

21              MR. VAN OORT:  Good afternoon, Your Honor.

22              THE COURT:  Let's see Aaron, I see that.

23    Good afternoon.  Mr. David Kully?

24              MR. KULLY:  Yes, Your Honor, here for Keller

25    Williams but I will not be arguing.
```

```
 1                    THE COURT:  All right.  Thank you.  Mr. Jeff
 2          Levee or Levee.
 3                    MR. LEVEE:  Good afternoon, Your Honor.
 4                    THE COURT:  Are you arguing?
 5                    MR. LEVEE:  I will be arguing for Re/Max,
 6          albeit I may well not argue at all because of the way
 7          our argument is configured.
 8                    THE COURT:  All right.  Mr. Scott Murray.
 9                    MR. MURRAY:  Yes.  Good afternoon, Your
10          Honor.  I will be arguing for Homeservices of
11          America, Inc. and HSF Affiliates, LLC.
12                    THE COURT:  Thank you.  And we have already
13          -- let's see, Mr. Aaron Van Oort, we -- did we
14          already get to you?
15                    MR. VAN OORT:  We did, Your Honor.  I'm with
16          Mr. Hardin and arguing for Anywhere.
17                    THE COURT:  And Mr. Kevin Wagner?
18                    MR. WAGNER:  Yes, Your Honor.  I am here as
19          well for Anywhere but I won't be arguing.
20                    THE COURT:  All right.  Is there anyone
21          else?
22                    MR. LEE:  Tom Lee, Your Honor, here for
23          National Association of Realtors.  Mike Bonanno will
24          be presenting the argument for our client.
25                    THE COURT:  All right, Mr. Lee.
```

1          MR. MAHONEY:  And Josh Mahoney, Your Honor,

2     on behalf of Anywhere.  Aaron Van Oort will be

3     arguing for our client.

4          MS. MAHONEY:  And Your Honor, I'll chime in

01:00:49  5     as the final lawyer for Anywhere, Stacey Ann Mahoney,

6     and Mr. Van Oort will be doing the honors for us

7     today.

8          THE COURT:  Thank you.

9          MS. MAHONEY:  Thank you.

01:01:00  10     MR. BENEVENTO:  Good afternoon, Your Honor.

11     Bryon Benevento, I'm with Scott Murray for

12     Homeservices of America and HSF Affiliates.  I will

13     not be arguing.

14          THE COURT:  All right.

01:01:11  15     MR. MANN:  Hello, Your Honor, this is Andrew

16     Mann on behalf of Homie Technology, Inc.  Mr. Renner

17     will be doing the arguing.

18          THE COURT:  Thank you.

19          MS. WHITE:  Your Honor, this is Juliette

01:01:23  20     White.

21          THE COURT:  I recognize you, as I did

22     Mr. Lee.

23          MS. WHITE:  And probably a few others on

24     this call, Your Honor, here on behalf of Re/Max.  But

01:01:35  25     I will not be arguing.

| | |
|---|---|
| 1 | THE COURT: All right. Anyone else? |
| 2 | MS. SORENSON: Yes, Your Honor. Amy |
| 3 | Sorenson for Keller Williams. I will not be arguing |
| 4 | today. |
| 01:01:45 5 | THE COURT: Thank you. I would hate to be |
| 6 | paying the bill for all of you, but I don't have to |
| 7 | worry about that. All right. These are defendants' |
| 8 | motions to dismiss and who is going to go first? |
| 9 | MR. BONANNO: Your Honor, I've drawn the |
| 01:02:07 10 | short straw to play the MC today, so I'll kick us |
| 11 | off. |
| 12 | THE COURT: Go ahead. |
| 13 | MR. BONANNO: What we have done prior to the |
| 14 | hearing, Your Honor, is confer with plaintiffs and we |
| 01:02:16 15 | have agreed on a proposed structure for the hearing, |
| 16 | subject to Your Honor's views, of course. What we |
| 17 | would like to do, if it is okay with Your Honor, is |
| 18 | to first proceed with the merits arguments where I'll |
| 19 | be presenting arguments, then we'll address antitrust |
| 01:02:27 20 | injury. |
| 21 | Mr. Bershteyn, for Keller Williams, will |
| 22 | then address the boycott arguments more specifically. |
| 23 | Mr. Murray, who represents Homeservices, intends to |
| 24 | do our statute of limitations argument. And then |
| 01:02:38 25 | Mr. Van Oort will have some closing remarks before we |

01:02:50

01:03:01

01:03:14

01:03:26

01:03:40

1  hand things off to Homie to respond to our arguments.

2  And then we'll have a limited rebuttal argument on

3  the merits.  And then at that point, we would shift

4  to personal jurisdiction.

5          THE COURT:  All right.  Go ahead.

6          MR. BONANNO:  Okay.  Thank you, Your Honor.

7  Mike Bonanno on behalf the National Association of

8  Realtors.  Your Honor, I'm going to kick things off

9  today and focus on antitrust injury.  It's a

10  threshold element in every private antitrust case the

11  private antitrust plaintiff has to plead to get past

12  the Rule 12 stage.  And we would respectfully submit,

13  Your Honor, that Homie has failed to meet that burden

14  here.

15          Antitrust injury has two prongs to the

16  analysis, as I'm sure Your Honor has seen in the

17  briefing.  The first is the plaintiff must plausibly

18  allege harm to competition.  And the second is the

19  plaintiff has to plausibly allege that its own

20  injuries directly flowed from the alleged production

21  competition.  And Homie, in this particular case, its

22  complaint misses the mark on both of those prongs,

23  either one of which would be a sufficient basis for

24  the court to dismiss the antitrust claims at this

25  stage.

So I'll start with the first element looking at harm to competition, Your Honor. I believe Homie's complaint references at least only two rather potential harms to the competition. The first is in the form of higher prices, and the second is with respect to barriers to entry.

I think given where we are in the briefing cycle, Your Honor, it doesn't appear that Homie is claiming any longer that it suffered an antitrust injury as a result of higher prices. And I think that is well founded because under the case law it is pretty clear that a competitor lacks standing to assert an antitrust injury based on a conspiracy to charge higher prices. I actually think we are in agreement there, we kind of cleared the deck a little bit.

So that leaves the allegations concerning the barriers to entry. What Homie has alleged is that the NAR policy as described in its complaint created barriers to entry. And there is no dispute between the parties, Your Honor, that barriers to entry can be harm to the competition. What the issue is, before the court right now, is that Homie has failed to plausibly allege that the particular policies that it's challenging in this case, actually

01:04:57

created barriers to entry.  What Homie has alleged in

its complaint, and I would respectfully submit, Your

Honor, that the most important paragraph in the

complaint is Paragraph 49.  I believe with that

paragraph Homie has pleaded itself out of an

antitrust case.  And this is what I mean by that.

Homie argues in its opposition that there

are four NAR policies that created a barrier to entry

as shown in the policy in this case.  All of them

01:05:12

were adopted in place out of 2012.  Homie didn't even

exist at the time the policies had been adopted and

put in place.  Homie comes along much later, in 2015,

starts its business from scratch as described in

Paragraph 49 of the complaint, enters the market from

01:05:31

scratch, and within just two years, Your Honor,

according to Homie, it became one of the five largest

brokerages in the state of Utah and it sustained that

status for several years until 2021.  And in 2021 is

two years after the last NAR policy that's described

01:05:51

in the complaint was adopted.  So we have this period

during which Homie entered the market from scratch

with no business, became very successful very

quickly, and that's according to its own count in

Paragraph 49 of its complaint.

01:06:01

Those allegations dispel the notion that any

1    policy at issue in this case created a barrier to

           2    entry or expansion.  What Judge Easterbrook explained

           3    in *Balmoro Hospital* is pretty common sense.  Any

           4    industry where new entrants can emerge and quickly

01:06:16   5    succeed, doesn't have barriers to entry.  And that's

           6    exactly what Homie has alleged.  And because it's

           7    relying on allegations about barriers to entry to

           8    establish antitrust injury, it's failed to establish

           9    that aspect of its case.  It hasn't plausibly alleged

01:06:29  10    harm to competition in the form of barriers to entry.

          11            So that is the first reason, Your Honor,

          12    that the complaint fails for antitrust injury and

          13    that's enough for you to get rid of the case and the

          14    antitrust claims on that basis.

01:06:42  15            There is a second independent ground that

          16    Homie fails to satisfy as well, and that's the

          17    causation prong.  Under the case law, it's clear that

          18    a plaintiff must plausibly allege that it suffered an

          19    injury that flows directly from the defendants'

01:06:55  20    conduct and that's not what's described in Homie's

          21    complaint.

          22            If you look at Homie's complaint,

          23    particularly paragraphs 50 and 51, Homie alleges

          24    injury in the form of lost market share and lost

01:07:07  25    profits.  And what it attributes to lost market share

1    and lost profits, too, is the actions of local agents

2    within the State of Utah that were purportedly

3    boycotting its listings or directing customers to

4    other listings.

01:07:20    5         There is no allegations in the complaint

6    that tie any of the defendants to those local boycott

7    activities.  Homie doesn't allege that NAR or any

8    other defendant agreed with any local agent to

9    boycott Homie.  It doesn't allege that any of the

01:07:35    10   defendants directed that activity.  There is just no

11   direct link at all and that defeats the actual injury

12   showing with respect to causation.  Now, how Homie

13   tries to compensate for this failure in its complaint

14   is to argue that all the defendants are on the hook

01:07:49    15   for any foreseeable consequence, as it characterizes,

16   that facilitates, or sorry, any foreseeable

17   consequence of the adoption of the policies.  And it

18   argues that because the policies facilitated the

19   conduct that it really harmed these local boycotts,

01:08:05    20   that that establishes antitrust injury.

21        The problem with that, Your Honor, is Homie

22   doesn't cite a single case for that proposition

23   because it doesn't exist.  There is no case holding,

24   as a matter of causation, that defendant can be on

01:08:18    25   the hook for conduct by independent actors years if

14

not decades later after it takes action under a

theory of antitrust injury or causation.  It just

doesn't exist.  What Homie does cite is a line of

cases about a Section 1 agreement under the Sherman

Act which stand for, at the end of the day, the

principle that to be liable for the damages caused by

a conspiracy, you have to have actually agreed to

participate in the conspiracy.

So for Homie to sustain that sort of theory

in the case based on the cases it cited, it needs to

make allegations that each of our clients agreed to

participate in these local brokered boycotts that

supposedly cause the injury that Homie sustained.  It

hasn't made those allegations, and for that reason it

doesn't satisfy the antitrust injury requirement

either.

And what I would submit, Your Honor, is

there is actually no limiting principle to what Homie

is advocating for as a theory of antitrust injury.

If you look at Homie's complaint, there is some

allegations about Facebook groups online where

supposedly local agents got together and decided to

boycott Homie and discuss not wanting to do business

with Homie.

Well, the theory that Homie is advocating

15

| | |
|---|---|
| | 1 for, for each of the defendants, extends to Facebook |
| | 2 as well.  Facebook created online groups.  It made |
| | 3 the mechanism available to facilitate the supposed |
| | 4 coordination between local agents on the ground. |
| 01:09:38 | 5 This foreseeability or facilitation theory extends to |
| | 6 Facebook just as much as it does any of the |
| | 7 defendants before the court. |
| | 8         THE COURT:  Assuming you're correct, is |
| | 9 there any way in your view that this complaint could |
| 01:09:50 | 10 be amended to satisfy your objections? |
| | 11         MR. BONANNO:  That's a good question, Your |
| | 12 Honor, and I think it's a fair one at this stage.  I |
| | 13 don't know the facts that Homie would assert to |
| | 14 establish direct participation by all of the |
| 01:10:05 | 15 defendants.  I do recognize this is their first |
| | 16 complaint and it may be premature for dismissal with |
| | 17 prejudice.  But it's hard to imagine, to be honest |
| | 18 with you, a scenario where they could allege |
| | 19 consistent with their obligations under the rules |
| 01:10:19 | 20 that any of our clients directly participated in the |
| | 21 conspiracy they claimed to have caused these |
| | 22 injuries. |
| | 23         THE COURT:  Go ahead. |
| | 24         MR. BONANNO:  What I would say, Your Honor, |
| 01:10:32 | 25 on the amendment point that I think is critical, as |

1    Your Honor knows, antitrust case discovery is

2    significant and it will be a significant undertaking

3    by everyone in this hearing and much broader.  I

4    think it's critical if the case were to proceed past

01:10:49  5    the pleading stage.  It is clearly articulated what

6    the Section 1 agreement is that Homie is challenging.

7        As we sit here today, it appears that

8    they're challenging the adoption of the rules which

9    for all reasons I just walked through are far

01:11:04  10   divorced from the actual injury they've alleged.  But

11   if they're going to allege something else, some other

12   agreement that is directly connected to the injury

13   they claim they sustained as a result of the boycott,

14   that needs to be clearly articulated so we know what

01:11:17  15   we're shooting at in discovery to dispel the notion

16   that any of our clients engaged in these supposed

17   conspiracies that harmed Homie.

18        I guess that I would pivot, Your Honor,

19   unless you have further questions about antitrust

01:11:32  20   injury, to touch briefly on the remaining claim in

21   Homie's complaint, its tortious interference claim.

22        THE COURT:  Go ahead.

23        MR. BONANNO:  It fails for many of the same

24   reasons we just walked through and principally that

01:11:42  25   to state a tortious interference under state law, the

```
 1    plaintiff has to allege that it was directly targeted

 2    by the actions of the defendants.  I think at best,

 3    even read in the light most favorable to Homie, Homie

 4    has alleged that the defendants engaged in conduct
```
01:11:58  5    that affected the public as a whole and the entire
```
 6    market and that's not sufficient to establish a

 7    tortious interference claim.  So for that reason,

 8    that claim should be dismissed as well.

 9            THE COURT:  Anything else?
```
01:12:12 10            MR. BONANNO:  I have nothing else, Your
```
11    Honor, unless you have questions for me on antitrust

12    injury.  I'm happy to hand it over to Mr. Bershteyn

13    to speak to a little more in detail about the boycott

14    arguments.
```
01:12:24 15            THE COURT:  Mr. Bershteyn?
```
16            MR. BERSHTEYN:  Good afternoon, again, Your

17    Honor.  Your Honor, you just heard from Mr. Bonanno

18    about why plaintiff can't state a claim based on NAR

19    policies.  Now, in a few places in the complaint,
```
01:12:36 20    there is a reference made by the plaintiff to these
```
21    express and tacit boycotts that it was subject to.

22    And what I will talk about very briefly is that why

23    those references cannot state some sort of a

24    freestanding boycott claim.  And that's not just for
```
01:12:53 25    one reason, but for a series of reasons.

First, not surprisingly, the word "boycott" has a particular meaning in the antitrust law. A meaning that the Supreme Court tackled in the *Hartford Fire* case. And it turns out that refusing to transact with someone, because you don't like the terms of the transaction, is not a boycott. Similarly here. When plaintiff alleges that the brokers were reluctant to show homes listed by Homie because Homie wouldn't pay them commissions that were high enough to motivate them to show those homes, that is quintessentially not a boycott. It's just an economic consequence of Homie's own decision to pay low commissions.

Now, you might hear Homie say all right, well, maybe it's not technically a boycott, but maybe it's some kind of other concerted action we're seeing among agents in the field that violates antitrust laws. The problem here, Your Honor, is the word "concerted." And what essentially Homie alleges is that it adopted a business model where it pays agents low commissions and what it is experiencing as its allegations, as it alleges, is complaints from agents. Complaints directly to Homie, complaints on social media.

THE COURT: Let me ask you a question. To

1  have a boycott, do you have to allege that the people

2  sat down in a room or got on a line and said, we're

3  going to -- we're not going to deal with these

4  people?  What level of activity would rise, in your

01:14:30  5  view, to be a boycott?

6        MR. BERSHTEYN:  Well, the agreement portion

7  of the boycott which I think is what Your Honor is

8  alluding to now.  That's exactly what -- exactly

9  where I wanted to go, requires a conscious commitment

01:14:43  10  to the same unlawful scheme.  And what we have here,

11  is agents reacting in a similar way to the same

12  obvious stimulus.  So -- so if, you know, it has sort

13  of been snowing here in New York and if I say that

14  the kids in my block can clear my driveway for $1,

01:15:06  15  I'm going to cause a lot of those kids to complain.

16  Some of them might even throw snowballs at my house.

17  Now, that's right or wrong, but it's not a

18  conspiracy.  It's a natural reaction to the same

19  stimulus.  There is something that the Supreme Court

01:15:23  20  taught about pleading antitrust claims in a *Twombly*

21  case is that you can't plead an agreement by saying

22  everybody reacted in a natural way to the same

23  economic stimulus.  That's really -- that's really a

24  fundamental problem not with just the boycott claim,

01:15:38  25  but with any agreement that plaintiff alleges here

1    based on the conduct of the agents.

2         There is no evidence that they actually

3    conspired either direct like sitting down in a room,

4    or indirect, like, you know, like any kind of

01:15:52  5    suspicious whiff of an agreement.

6         But there is a third problem, too.  The

7    third problem is that even if the agents whose

8    actions are described in the complaint had agreed,

9    and there is no reason to believe they had, none of

01:16:07  10   them are tied to the defendants here.  The plaintiff

11   can't just allege any agreement, must allege an

12   agreement among the defendants.  And not -- and there

13   is no action that is alleged in the complaint that is

14   actually traced to any of the corporate defendants.

01:16:24  15        And there is a -- there is sort of a fourth

16   layer of the problem here that in some sense I'll

17   address from the perspective of Keller Williams.

18   Even if we suspend disbelief about all of the

19   problems I just described, and somehow there could be

01:16:40  20   an agreement that is attributed to agents that have

21   some relationship with Keller Williams, Keller

22   Williams doesn't broker transactions in Utah.  Keller

23   Williams is a franchisor.  What it does is franchise

24   independently owned and operated eight brokerages

01:16:58  25   including in Utah.  But there is no allegation that

1    Keller Williams controls the day-to-day activities of

2    those brokerages let alone activities of its

3    independent contractor agents or its employees.

4         So that's yet a fourth layer of problems

01:17:15  5    here.  There is no boycott.  There is no agreement.

6    There is no connection to any defendant and there is

7    no conceivable connection to Keller Williams.  And I

8    think the number of problems the plaintiff's boycott

9    claim encounters, I think in some extent sheds some

01:17:33 10    light on Your Honor's question about whether it's

11    plausible that the complaint can be amended.

12         THE COURT:  Anything else?

13         MR. BERSHTEYN:  Nothing from me, Your Honor,

14    and I will now turn it over to Mr. Murray to address

01:17:48 15    statute of limitations.

16         THE COURT:  Thank you.

17         MR. MURRAY:  Good afternoon, Your Honor.

18    Again, I'm Scott Murray on behalf of Homeservices of

19    America, Inc., and HSF Affiliates, LLC.  And Your

01:17:58 20    Honor, we have also asserted these same arguments

21    that my colleagues have just argued and we join in

22    those arguments and I think they have done a great

23    job in explaining the various antitrust issues at

24    play here.  I have got good news, Your Honor, and

01:18:13 25    that is that you don't even have to get into the

antitrust issues because on the face of the
complaint, the plaintiff's own allegations
demonstrate that the statutes of limitations have run
on its claims.  So I think the easiest way Your Honor
to see that is to look at a timeline.  I do have one
prepared.  And with Your Honor's permission, could I
share my screen with you?

            THE COURT:  Sure.

            MR. MURRAY:  And everyone else on the call?

            THE COURT:  While you're doing that, you can
think about this question.  What about continuing
violations that might be within a statute of
limitations?

            MR. MURRAY:  Yes, Your Honor, I will address
that.  Are you able to see my screen, Your Honor?

            THE COURT:  I am not.  I don't know why.

            THE CLERK:  You should be able to, it's
enabled.

            MR. MURRAY:  All right.  How about now?

            THE COURT:  I see it now.

            MR. MURRAY:  Great.  So I think, Your Honor,
the easiest way to see the statute of limitations
problem is to just look at the timeline of
significant events that are alleged in the complaint.
And so we'll start with the most important date for

01:19:42
01:20:00
01:20:17
01:20:34
01:20:51

1  statute of limitations purposes is when did the

2  plaintiff file the complaint.  So the complaint was

3  filed on August 22nd of 2024, which means that the

4  claims that the plaintiff has asserted they all have

5  a four-year statute of limitations which means the

6  important date for our purposes today is August 22nd,

7  2020.

8          And the question for the court is whether

9  the plaintiff's causes of action accrued prior to

10  August of 2020 meaning the statute of limitations

11  would have already run before the plaintiff filed its

12  complaint.  So going back to the antitrust discussion

13  we just had, and as Your Honor heard, the plaintiff's

14  claims in this case are focused on certain rules that

15  were enacted by the National Association of Realtors.

16  And the first such rule, and probably the most

17  important rule that they're challenging is called the

18  buyer/broker compensation rule.  And that rule,

19  according to the complaint, was enacted in 1996.  So

20  almost 30 years ago.

21          The plaintiff also complains about what it

22  calls the Free Service Rule that was enacted in 1997.

23  It complains about what it calls the Filter Rule and

24  the Concealment Rule both of which were enacted in

25  2012.

24

```
 1              And then as we heard from Mr. Bonanno,
 2    plaintiff started its business in 2015.  So at the
 3    time that it started, four of the NAR rules that the
 4    plaintiff is challenging in this case were already in
 5    effect.  And that's important because as you have
 6    already heard here this afternoon, the plaintiff is
 7    alleging that these rules are exclusionary.  In fact,
 8    that's the term the plaintiff uses in the complaint
 9    itself to describe the rules.  It says that these
10    rules are exclusionary and it argues that the rules
11    created this impediment to its doing business.  And
12    in that kind of a case, in an antitrust case where a
13    plaintiff is claiming to have been excluded from the
14    market, I have got another slide here, we know this
15    is Judge Posner, a well-respected jurist in antitrust
16    law in the Seventh Circuit, and he has explained
17    along with other cases we cite in our brief, that in
18    this type of a case where the plaintiff is claiming
19    to have been excluded from the market, it's a
20    conventional form of antitrust injury and the
21    plaintiff suffers that injury immediately.  And even
22    though most of its damages would occur in the future,
23    the plaintiff can file suit immediately upon feeling
24    the impact of the exclusion and it can then seek the
25    future lost profits.  So that's the nature of this
```

```
 1   type of a claim.  So if we go back to the --
 2              THE COURT:  Let me ask -- but my question
 3   is, what if a plaintiff decides not to do that until
 4   four or five years later and then decides that they
 5   have been damaged so much that they can't wait any
 6   longer and then they file.  Does that mean that the
 7   statute has run because they could have filed on a
 8   prior basis?
 9              MR. MURRAY:  Your Honor, I think what they
10   would have to show, and I'll address that when I get
11   to the continuing conspiracy doctrine if that's okay
12   with you, but --
13              THE COURT:  Sure.
14              MR. MURRAY:  But the preview of that
15   argument is what they have to show is they have
16   suffered some new additional injury that is different
17   than the injury originally suffered when they were
18   first excluded from the market.  So I'll come back to
19   that point, Your Honor, if that's okay.
20              THE COURT:  That's fine.
21              MR. MURRAY:  So going back to the timeline,
22   just to finish this out, the plaintiff comes into the
23   market in 2015, it's immediately subject to the rules
24   that it says are exclusionary.  And so at that point
25   in time, the plaintiff could have filed its lawsuit
```

01:22:32  (line 5)
01:22:44  (line 10)
01:22:52  (line 15)
01:23:06  (line 20)
01:23:20  (line 25)

challenging those rules and it could have at that
time sought the future lost profits from having been
excluded from the market.

Now, maybe plaintiff would say well there is
a fifth rule that we're also challenging.  They
haven't made this argument but maybe they're going to
make the argument well there a fifth rule that
was enacted by NAR, this Clear Cooperation Policy,
and it was the keystone to all of the rules.  We
needed that rule until we were adversely effected.
And again, they haven't made that argument.  But
suppose they were to make the argument.  Well, as we
can see from the complaint, the clear cooperation
policy was enacted in 2019 which again is more than
four years prior to when the plaintiff filed its
lawsuit.  So again, if they -- if they thought that
was the keystone rule, they could have filed their
lawsuit then, and again they could have sought their
future lost profits.

Now, maybe the plaintiff says this goes sort
of to Your Honor's point, maybe the plaintiff is
going to argue, well, it took a while before we
started to feel the impact from these rules.  But the
plaintiff also describes in their complaint the fact
that in 2019, there were these other class action

lawsuits filed around the country. There was one
filed in Chicago, one filed in Kansas City. Later
there was one filed in Boston. They're all referred
to in the complaint. Those class actions were
brought on behalf of home sellers. But the theory in
those cases was the exact same theory that the
plaintiff is arguing here. The plaintiffs in those
class actions were arguing that home sellers were
harmed in part because discount brokers like Homie,
like the plaintiff here, were excluded from the
market. So we know that in 2019 those same arguments
were being made in federal courts around the country,
Homie refers to them in the complaint, and again,
even -- even if we need to find some date after 2015
where plaintiff should have filed its lawsuit, in
2019 when it saw these other claims being filed, it
again it should have filed its lawsuit at that point,
that's more than four years prior to the date that it
actually filed.

        And the last point from the timeline, Your
Honor, maybe the plaintiff will say, well, okay maybe
other discount brokers were excluded, but we, Homie,
were not excluded from the market until some later
date. But we know that is not true from the
complaint because the complaint itself cites to a

local news story in Salt Lake City and it's the Get
Gephardt News Program. And they cite to it in the
complaint as an example of the type of exclusionary
activity that the NAR rules cause. Well, we have
01:26:24  submitted a copy of that article with our motion to
dismiss, Your Honor, and it's Exhibit C to the
Homeservices motion, and I will just pull up a clip
of it. So this is the story referred to in the
complaint. And the first thing you can see, Your
01:26:40  Honor, is the date. The date of the story is April
of 2019. And this story, if you look at what we have
submitted, cited to by the plaintiff, it's a story
not just about some random couple or some random
discount broker being impacted by the NAR rules
01:27:00  allegedly, it's a story about this plaintiff. It's a
story about Homie.

So the very story published in 2019, cited
to in the complaint, is a story about how Homie is
supposedly being excluded from the market supposedly
01:27:19  because of NAR's rules. So at the latest, Your
Honor, we know that by April of 2019, Homie was
alleging that it was being adversely impacted by
NAR's rules and being excluded from the market. So
at the very latest, by April of 2019, the statute of
01:27:39  limitations began to run and it waited more than four

```
 1    years before it could file -- before it filed its

 2    lawsuit.

 3            Now going to Your Honor's point, and I'll

 4    stop sharing my screen here, going to Your Honor's

 5    point about well what about the Continuing Conspiracy

 6    Doctrine, there's two elements to the Continuing

 7    Conspiracy Doctrine that are important.  The first is

 8    that the plaintiff has to point to some new

 9    independent action that restarts the statute of

10    limitations.  It has to be something new.  It cannot

11    just be inertia.  It can't be a reaffirmation of a

12    prior agreement.  It has to be new.  And in this case

13    we're talking about NAR rules that have been in

14    place, in some cases for decades, at a minimum they

15    were in place for years.  NAR's rules don't have

16    expiration dates.  Once the rules are enacted,

17    they're enacted.  And so under the plaintiff's

18    theory, the rules are what supposedly have caused it

19    harm, those rules have been in place for a long time.

20    There is no new rule that it's pointing to that was

21    enacted within the statute of limitations period.

22            But secondly, Your Honor, they also have to

23    point to new damages, new injury, something new.  And

24    as we pointed out in the timeline, and as Judge

25    Posner has explained, if Homie had filed its lawsuit
```

1    back in 2015 or 2016 or 2017, whenever it would have

2    filed it within the four year statute of limitations,

3    it wouldn't have been seeking its future lost

4    profits, lost profits from 2022, 2023, 2024 and so

01:29:20  5    on, discounted to, you know, present day value.  But

6    it would have been seeking the very same damages that

7    it points to now as damages that it says reset the

8    statute of limitations.  Those aren't new damages.

9    It's the same damages that plaintiff could have

01:29:36 10    sought if it had filed its complaint timely.

11         So, Your Honor, unless you have any other

12    further questions, we would ask that you dismiss all

13    of the claims based on the statute of limitations.

14    And going to your other -- Your Honor's other

01:29:51 15    question about could an amendment save the complaint,

16    well, not on the statute of limitations.  The dates

17    already pled establish that these are untimely

18    claims.  Thank you, Your Honor.

19         THE COURT:  Thank you.

01:30:06 20         MR. VAN OORT:  So Your Honor, I'm last.  I'm

21    Aaron Van Oort for Anywhere and I'm going to put a

22    bow on this.

23         Your Honor, if you think Coldwell Banker,

24    Century 21, Sotheby's, that's Anywhere, that's my

01:30:21 25    client.  And what I'm going to do is address there

are three antitrust theories suggested by plaintiff's complaint. They have abandoned two of them and then one is still in dispute. So the first theory that was suggested was a price fixing theory going back to the NAR rules. That's what the consumers pleaded in their other cases. But as Mr. Bonanno explained, a price fixing theory that increases prices for brokerage services doesn't help a plaintiff like Homie that is providing brokerage services. That's the Supreme Court's decision in *Matsushita* and that's controlling. So I think you're going to hear Homie say we are not alleging a price fixing conspiracy. So --

THE COURT: Price fixing is usually for customers not competitors.

MR. VAN OORT: That's exactly right. So I think that they're going to say that's not what we're saying. So price fixing going back to the rules is out.

So the second theory that was suggested by the complaint is the one that Mr. Bershteyn addressed which is there is a suggestion that there was a local conspiracy, a local agreement, not to deal with Homie. That prong -- that theory fails for several reasons. The most notable, Your Honor, is that there

aren't allegations of a local agreement. And the
reason there needs to be specific allegations, Your
Honor asked about this, like how direct does this
have to be? The answer in this circumstance is
01:32:00 pretty doggone direct because this is the situation
where it is entirely economically rational to take
the conduct without an agreement. This what
Mr. Bershteyn said about snowing, but here is what
Homie alleges. The critical paragraph is 46 in their
01:32:18 complaint. They allege that their low cost strategy,
Your Honor, was that when they represented people
selling houses, they were going to make offers to pay
buyer/brokers less than other sellers were.

And so what happened is the buyer/broker
01:32:35 said, "I'm not going to go and take my client to a
Homie house because I'm going to make less." That's
an entirely rational economic action on its own.
That's what Homie alleges.

So in this case, this is *Iqbal* and *Twombly*,
01:32:52 where if it is rational to act independently, you
would have to have direct allegations of an
agreement. And there aren't any here. And as
Mr. Bershteyn said, there sure aren't any by the
actual defendants here which are franchisors and
01:33:06 national companies, not the locals. All right. And

```
 1   I think, it seemed pretty clear to me, that in

 2   Homie's briefing they're saying we are not alleging a

 3   local conspiracy is a separate antitrust violation.

 4           So I think price fixing is out.  I think

 5   local concerted refusal to deal is out.  So we're

 6   down to one claim, one alleged antitrust theory of

 7   violation, and one theory of causation and injury.

 8   The one alleged violation is the agreement to form

 9   the NAR rules.  That's the one -- that's the one

10   alleged violation.  And the one theory of injury and

11   causation is that those rules facilitated local

12   brokers to seeing prices and it allowed them to

13   choose not to interact with Homie and then if some of

14   them did that, then that made home sellers choose not

15   to deal with Homie.  That's the theory we're dealing

16   with.

17           And that theory fails for the reasons that

18   we have gone through.  As Mr. Murray explained, it's

19   time barred because you're going back to old rules,

20   that's number one.  Number two, as Mr. Bonanno

21   explained, that theory doesn't work because it didn't

22   create any barrier to entry because Homie pleaded

23   conclusively all of the rules were in place it

24   entered.  It entered and there it was and it

25   succeeded for a while and then it failed.  So
```

untimely, no barrier to entry.  And the third is that

the causal connection between those rules, back in

the day, and what Homie says actually hurt it, is too

speculative and attenuated on that.  So, and Your

Honor knows because Your Honor knows antitrust law,

the rule is proximate causation.  And antitrust

proximate causation doesn't extend to change that has

multiple lengths and multiple steps and they are

speculative and here they are.  And let me just walk

through what Homie's multi-length claim is.

Step one, the NAR rules made it possible for

buyer/brokers to see how much the sellers were

offering to pay them.  That's what it did.  Step

number two.  If buyer broker saw that a Homie seller

was offering them less than other sellers, some of

those buyer/brokers decided to try to influence their

clients to buy somebody else's house.  That's step

two.

So step one, is they see that less money is

offered.  Step two, is they try to do something about

it.  Step three is if enough clients decided not to

buy Homie's houses, then the seller would fire Homie,

some of those sellers.  And then step four is, if the

word gets around and enough sellers do that, they

won't hire Homie.  So Homie's theory here of

1    causation puts the decisions of buyer/brokers, the

2    decisions of home buying clients, the decisions of

3    Homie's seller clients and the decisions of other

4    people who might telemarket, all of that is required

01:36:26  5    for their theory of causation.  And antitrust doesn't

6    allow a treble damages action for something that

7    speculative and attenuated.  And the real question

8    for Homie, Mr. Bonanno says it, there is no case that

9    addresses -- that authorizes this and the real

01:36:43  10    question for them is to explain how this theory of

11    theirs is consistent with the Supreme Court's

12    *Associated General Contractors* holding which

13    forecloses anything that is speculative.

14           So with that, Your Honor, that's tying

01:36:58  15    everything up in a bow.  If you have questions, I'm

16    glad to answer them otherwise I'll turn it over to

17    plaintiff.

18           THE COURT:  Thank you.  Mr. Renner?

19           MR. RENNER:  Thank you, Your Honor.  Your

01:37:18  20    Honor, for an antitrust case this is a relatively

21    simple one and -- or at least I thought so before we

22    got on the call.  You have heard a lot of arguments

23    that are strawman arguments attacking theories that

24    Homie never raised, others were abandoned.  We have

01:37:36  25    been consistent from the beginning.

1          But let me take it from the top and I would

2     say that Mr. Van Oort is probably closest, but let's

3     go through this step-by-step and hopefully I'll

4     provide the court some useful context to the

5     allegations actually made in the complaint.

6          So the complaint alleges that the

7     defendants' used the market power of the MLS to

8     promulgate and enforce five rules that had the

9     purpose and effect of excluding brokerages seeking to

10    compete by offering lower prices.

11         In essence, as the complaint alleges with

12    specificity, the rules turn the MLS into a machine, a

13    tool, to detect and punish discounting.  And the

14    effects of the rules were vividly illustrated in Utah

15    where Homie was the victim of dozens of tacit and

16    formal boycotts directly at the hands of defendants'

17    members and affiliates implementing those NAR rules.

18         Now defendants don't contest Homie's

19    allegations that the rules are unreasonable

20    restraints of trade.  And that makes sense because

21    the rules have been challenged successfully by

22    plaintiffs in a number of actions in different

23    contexts.  Consumers have brought actions seeking the

24    overcharges attributable to the rules.  The

25    Department of Justice has filed suit and enjoined

some of the rules.  Competitors of the multiple

listing service have filed others.  There has been a

bevy of successful challenges under the Sherman Act

to the rules challenged by Homie.  So there is no

surprise in my mind that the defendants make no

serious effort to contend that Homie is not as

alleged an unreasonable restraint of trade.  Now what

defendants do do is they contest the sufficiency of

Homie's allegations of concerted action, of the other

element of the section one offense.  None of those

elements are well founded and I would like to offer

the court four observations.  The first point is

that --

THE COURT:  Well, before you go there, they

also talk about statute of limitations.  So I assume

you'll address that as well?

MR. RENNER:  I will, Your Honor.  Thank you

very much.  Yup.  The first point under concerted

action under the Sherman Act is that Homie has

sufficiently alleged an agreement among NAR members

to adhere to the NAR rules.

So the Supreme Court has held in an unbroken

line of cases stretching back over a century that

agreements among association members with respect to

the way in which they will compete with one another

is concerted action within the meaning of the Sherman
Act.  And it is those association rules are direct
evidence of agreement.  No further inference is
required.  The rules themselves are the agreement.
If you want to see us in action, you can consult the
Tenth Circuit's case in *Llacua,* footnote 24, which
provides that a plaintiff challenging the conduct
required by a trade association rule that governs the
conduct of its independent members, is direct
evidence of agreement.  No further action -- no
further -- nothing further is required.  No
inferences are required.  And so the defendants'
cases on this point are all distinguishable.  They
all involve analytically distinct fact patterns where
the plaintiff is attempting to support the inference
of an agreement from circumstantial evidence.  Homie
is not asking the court now or the jury later to
infer anything on the issue of concerted action.  The
rules themselves are concerted action.

    The second point is that Homie is not
required to separately allege an agreement among NAR
and NAR members in Utah to implement the rules.  This
is a critical point that's going to come up a couple
of times.  It comes up in connection with the Sherman
Act, it comes up with the Clayton Act, and I'm going

to spend a little bit of time because I think much
rides on this issue.

This argument is made in a number of
different ways but it was made very clearly by
Mr. Bonanno for NAR in his opening presentation.
Mr. Bonanno said Homie needed to allege an agreement
between NAR and NAR's members to implement the rules.
Homie hasn't done that, ergo you should dismiss.
Your Honor, that argument leads you directly into
clearly reversible error.

The Supreme Court has held in 16 separate
cases stretching back over a century that trade
association rules that govern the independent
activities of competing members are not only
agreements among the members proven by direct
evidence, but they are agreements among all of the
members. The agreement is among the association
members bound by the rule. So we can see this most
recently again *Llacua,* the Tenth Circuit case, but
this time footnote 30. So footnote 30 in *Llacua,* the
Tenth Circuit says just this. Agreements -- trade
association agreements that are enforced by the trade
association are agreements of, and now I'm quoting
the Tenth Circuit, "All members. All members."

Another example, a case that we cite in our

```
 1    opposition brief, National Professional Society of

 2    Engineers.  The National Professional Society of

 3    Engineers involved a rule restricting price

 4    competition promulgated by a trade association.  The

 5    Supreme Court never asked for evidence that the trade

 6    association, having once promulgated the rule, then

 7    subsequently agreed with any particular member to

 8    implement the rule.  No such evidence was asked for

 9    and no such evidence was required.  The agreement in

10    National Society of Professional Engineers was an

11    agreement among the members of the National Society

12    of Professional Engineers.  The agreement embodied in

13    the NAR rules challenged by Homie is an agreement of

14    all NAR members adhering to.  And when NAR suggests

15    that you need to find that there is a separate

16    agreement between NAR and its members to implement

17    the rule, it leads the court directly to clearly

18    reversible error.

19              Now, why does this matter?  Because it shows

20    that the members of the conspiracy in Utah, the NAR

21    members implementing the NAR rules, enforced by NAR,

22    that engage in this steering at Homie's -- to Homie's

23    detriment, were conspiracy members.  Homie suffered

24    its injury directly from conspiracy members and this

25    is alleged at length in the complaint.  The common
```

1    fallacy that we have heard over and over again this

2    afternoon that Homie's injuries were suffered at the

3    hands of third parties who were strangers to the

4    conspiracy.  Again, that's wrong, it's a matter of

01:44:31  5    black letter law.  The entities that caused Homie's

6    injury in Utah are conspiracy members, they're NAR

7    members, they're part of the conspiracy, they're not

8    third-parties.

9         The third point I want to make on Section 1

01:44:43  10    of the Sherman Act is that Homie is not required to

11    allege an express agreement to engage in steering.

12    Homie's a fortiori not required to allege an

13    agreement that expressly calls for steering against

14    Homie.  You see this in one of the briefs.  One of

01:45:07  15    the defendants wanted us to allege a, quote unquote,

16    boycott Homie.  Neither is required under the case

17    law.  What the case law teaches us is that the scope

18    of the agreement formed by a conspiracy were

19    challenging, are the acts and practices expressly

01:45:17  20    contemplated by the association rules as well as the

21    foreseeable consequences of those rules.  That's all

22    that's required and we have alleged more than that.

23    So the place to look here, Your Honor, is *Eastern*

24    *State Lumber.  So* in *Eastern State Lumber* there is

01:45:34  25    concerted action.  The concerted action in *Eastern*

1   *States* is the circulation of a list of companies that

2   are engaged in commercial conduct undesirable to the

3   conspirators.  The natural consequence, and I'm

4   quoting *Eastern States,* "The natural consequence of

01:45:53  5   the exchange of the list," which is the concerted

6   action in that case, "is to induce refusals to deal

7   by the parties of the information exchange with the

8   parties listed in the information."  There was no

9   requirement that the parties of the information

01:46:10 10   exchanged expressly agreed to boycott the firms that

11   were listed.  This wasn't an oversight.  The Supreme

12   Court just didn't -- didn't overlook the issue it is

13   not that, you know, the plaintiff chose not to

14   litigate it.  The Supreme Court expressly considered

01:46:24 15   and rejected that requirement which is the same

16   requirement you're being asked by the defendants to

17   adopt here.  There is no requirement -- there was no

18   requirement in *Eastern States* that there would be an

19   agreement to boycott anyone.  The agreement in

01:46:37 20   *Eastern States* is an agreement to exchange

21   information.  The agreement to exchange information

22   had the natural consequence of inducing refusals to

23   deal with parties on the list and that's sufficient.

24   There is no requirement that there be a separate

01:46:50 25   agreement let's boycott the parties on the list.  And

1    when the defendants suggested the contrary, again,

2    we're flying in the teeth of Supreme Court precedent.

3              Very quickly this idea that there needs to

4    be a boycott Homie rule is, you know, obviously

01:47:07  5    foreclosed by *Eastern States.*  But *McCready*, you

6    know, the *Blue Cross v McCready* case holds

7    specifically that there is no requirement that the

8    victim of anti-competitive conduct be specifically

9    targeted by the conspirators.

01:47:24 10             Okay.  So that brings me to my fourth point.

11   We've talked about NAR, what the agreement is, the

12   rules, how it is proven, direct evidence, who is in

13   the conspiracy, NAR members, what's the scope of the

14   conspiracy, conduct contemplated by the rule and the

01:47:39 15   foreseeable consequences.  That's the case against

16   NAR.

17             As to the corporate defendants, there is an

18   analytically separate question.  Did the corporate

19   defendants join that conspiracy?  Now, we're not

01:47:55 20   drawing against a blank slate here.  I heard one of

21   my able colleagues for the defendants say, well, this

22   is the same conspiracy that was at issue in *Burnett*.

23   Fine, we'll take it.  In *Burnett,* the court found a

24   triable issue of fact as to whether the corporate

01:48:11 25   defendants joined that conspiracy.  The jury in

1   *Burnett* later found that a subset of the corporate

2   defendants joined the conspiracy by a preponderance

3   of the evidence.  So we agree.  Now we're not trying

4   to hold the defendants to any estoppel arising out of

5   the *Burnett* case, we think they were free to

6   relitigate that issue.  But in terms of the indicia

7   of plausibility that the court can consider, *Burnett*

8   is relatively strong in indicia to plausibility.  But

9   let's turn to the allegations in the complaint,

10  right, that's what we need to do.  So how do we know

11  that the complaint plausibly alleges that the

12  corporate defendants were part of the conspiracy?

13  The first easy obvious answer is through their

14  governance of NAR.  The complaint alleges with

15  specificity the specific roles on the board of

16  executive -- Board of Directors at NAR and NAR's

17  management team that representatives of the four

18  corporate defendants held.  This isn't shotgun

19  fleeting.  We don't say the corporate defendants

20  generally engaged in the management of NAR.  We get

21  specific names, specific titles, specific corporate

22  affiliations, specific years.  And we place each of

23  the four corporate defendants through their

24  representatives on the board of NAR or in the NAR

25  management team over the last four years.

That alone is sufficient to show that the corporate defendants joined the conspiracy. To see that, consult the Fourth Circuit opinion in *Roberts.* So *Roberts,* the cite here I have in mind, 679 F.3d at 288, 289. *Robertson* is a similar case registered as an MLS, has anticompetitive rules. The plaintiffs want to challenge it. They name as defendant certain brokerages that were on the board of the MLS. And the Fourth Circuit, in reversing the grant of a motion to dismiss, says it is sufficient that the plaintiff alleges that those brokerage defendants agreed to participate on the board and facilitated in the formulation, promulgation and enforcement of the rules. Homie alleges all of that. We can stop there. Their participation in NAR is sufficient. But, of course, there is more. There is more in the complaint. The complaint alleges as to each four cooperate defendants that they required their members to join NAR and comply with the rules. The complaint alleges that each of the corporate defendants trained their affiliates in the use of the rules to exclude competitors like Homie in the implementation of the rules.

So all these allegations are sufficient to show, for purposes of a motion to dismiss, that the

corporate defendants join the conspiracy.  I just
want to say one point before I move on from the --
from the Sherman Act on this *Hartford Fire* point.
*Hartford Fire* is a case interpreting the
McCarran-Ferguson Act.  The term "group boycott" is a
defined term in the McCarran-Ferguson Act.  The
defendants don't cite any case, not one case outside
of the insurance context, on the grounds that a
plaintiff failed to satisfy the technical definition
of group boycott that the Supreme Court applied as a
matter of statutory interpretation when reading the
*Hartford Fire* case.  It has no applicability here.

Section 1 of the Sherman Act is a broad and
flexible statute.  It prohibits unreasonable
restraints of trade.  And we have alleged five
unreasonable restraints of trade and through direct
evidence in the form of NAR rules.  We don't need to
satisfy *Hartford Fire.*  Hartford Fire doesn't supply
any rule governing this case.

Okay.  Moving to the Clayton Act, so, again,
just context, Sherman Act provides the liability
standard, the Clayton Act provides the private right
of action.  I want to make two points under the
Clayton Act.  First, Homie's injury was directly and
proximately caused by the antitrust violation.  So

*Associated General Contractors*, I agree with Mr. Van
Oort that is the right case, *Associated General
Contractors* makes clear that customers and
competitors in the relevant market are the
paradigmatic examples of firms that suffer direct
proximately caused antitrust injury from
anticompetitive conduct.  Customers and competitors
in the relevant market are the paradigmatic examples
of parties that suffer direct injury.  They are the
presumptively proper plaintiffs who bring antitrust
claims.  There is no dispute Homie is a competitor.
It is the -- it is a presumptively proper plaintiff
under AGC.  Its injury is a direct one under AGC.

         Now, defendants make two different arguments
on this AGC issue and I'll unpack them for the court.
The first is that the defendants are fond of citing a
line of cases that involve derivative injuries of
more remote parties.  So, for example, they cite
cases where shareholders of the target of any
competitive conduct don't have -- don't suffer direct
injury.  So, for example, Homie's shareholders, under
the cases cited by the defendants, might have a hard
time showing the direct injury.  The Homie
shareholders aren't bringing this case, Homie is.
And Homie is a presumptively proper plaintiff under

AGC.  It's a competitor in the restrained market.

Another example of a case that the defendants cite stands for the proposition that the employees of a victim of anticompetitive conduct have not suffered a direct injury under AGC.  True enough.  Yes, that's not this case.  Homie's employees might have a hard time showing direct injury under AGC to challenge the conduct alleged in the complaint.  But again, it's not the case you're presented with.

Now, the second antitrust injury argument is an important one and we're back to Mr. Bonanno and we're back to who is in the conspiracy.  Mr. Bonanno repeats an argument that we see a lot in the briefs.  And the argument is, well, Homie was injured by third parties.  Homie was injured by strangers to the conspiracy.  Homie was supposed to have alleged that NAR agreed with the Utah brokers that caused the injury and damage.  But that's not true.  We have already shown how under black letter Sherman Act law that Utah brokers that caused Homie injury and damage, are conspiracy members.  They were NAR members implementing NAR rules, marketing properties through NAR MLSs, all under the enforcement of NAR.  If you look at --

THE COURT:  That's sufficient in your view,

correct?

MR. RENNER:  That's correct, Your Honor.
Yup.  And if you look at just a few examples of this,
because, again, this is a persistent fallacy,
speaking very respectfully to my learned colleagues
for the defendants, this is a persistent fallacy that
we see in the arguments.  So I just want to spend a
little bit of time addressing this.

Complaint Paragraph 64, that alleges
steering engaged in by NAR members participating in
the Wasatch Front Regional Multiple Listing Server.
The dominant MLS in Utah.  That is -- according to
the complaint, that's a NAR affiliated MLS.  It is
owned by NAR members and governed by NAR rules.

Complaint paragraph 65 through 66 alleges at
length steering engaged in by, quote, "NAR member
brokers."  These aren't third parties to the
conspiracy, these aren't strangers.  These are
conspiracy members.  They are NAR members
implementing NAR rules that our injury has suffered
directly at the hands of the conspirators.  Complaint
paragraphs 68 through 69, Facebook boycotts organized
by quote, "Local NAR members in Utah," and quote,
"Realtors in Utah."

I could go on.  Complaint paragraph 70, 72,

1   76 all of these are alleging implementation of NAR

2   rules by NAR members causing injury and damage to

3   Homie.

4           I would like to move -- the second point I

5   would like to make under antitrust -- under the

6   Clayton Act is antitrust injury.  We agreed we have

7   to show antitrust injury.  I think we all sort of

8   agree on what that looks like.  The purpose of the

9   antitrust injury doctrine, Your Honor, is to ensure

10  that when a competitor brings suit under the

11  antitrust laws, it is vindicating the public's

12  interest in free and competitive markets.  So what

13  you're looking for is you're looking for a scenario

14  where there is conduct that harms in a single stroke,

15  the excluded plaintiff, the competitor, consumers,

16  and the competition.  If the conduct harms all three,

17  consumers, competition, and competitors, that's

18  antitrust injury.  That's what you're looking for.

19  And we allege that.  We allege that the rules created

20  barriers to entry and expansion, and that those

21  barriers created to entry and expansion of new

22  competitors caused an elevation of consumer prices.

23          Now, what we're hearing at oral argument,

24  and we heard a lot about it in the reply briefs, is

25  that Homie hasn't actually alleged a barrier to

entry.  And Mr. Bonanno did a great job to point us

to the part of the complaint where we discuss Homie's

initial marketplace success.  This is a clean issue

of law teed up for Your Honor.  What does that

01:57:45  paragraph mean for purposes of the antitrust injury?

Mr. Bonanno cites Judge Easterbrook's opinion in

*Balmoro* for the proposition that any market will

barriers to entry -- any market where entry is

possible has low barriers to entry.  I would check

01:58:01  that cite again.  I think what Judge Easterbrook, I'm

going from memory, is talking about is I think he is

saying barriers to entry into the insurance market

are low.  I don't think he is making a general

proposition.  But let's look at the cases that are

01:58:11  binding on this court.  So first we know that we know

this in Homie's opposition brief.  *Associated General*

*Contractors* say that a conspiracy need not totally

foreclose a competitor from the market in order to be

actionable, right?  There is no such requirement.

01:58:30  NAR cites three cases in their reply in support of

this argument that Homie hasn't adequately alleged

barriers to entry.  So let's look at each one.  The

first is *Reazin,* the Tenth Circuit opinion in *Reazin.*

Note one thing first, Reazin was decided on a full

01:58:47  record after trial.  It is not a motion to dismiss

case.  But even after a full trial, what did the
Tenth Circuit say on this subject?  It said that even
a market with 200 competitors could be characterized
by barriers to entry.  The Tenth Circuit in *Reazin*
also cited with approval of *Oahu Gas,* the Ninth
Circuit case, and gave a parenthetical cite to *Oahu
Gas* for the proposition that the entry -- the
successful entry of a single firm is not inconsistent
with barriers to entry.  So *Reazin* doesn't help the
defendants.  In fact, it illustrates our point.

The second case NAR cites is *Epipen*.  *Epipen*
is a Tenth Circuit case, again, decided on summary
judgment.  What does *Epipen* say on the subject?  In
*Epipen* the Tenth Circuit accepted arguendo the
plaintiff's proposition that its, quote, "Ability to
enter and grow," close quote, was not inconsistent
with the finding of antitrust injury.  The Tenth
Circuit accepted that.

In *Epipen* the Tenth Circuit also cited to
*McWane* in the Eleventh Circuit.  *McWane* is an
interesting case frequently cited by the Tenth
Circuit.  In *McWane,* which again *Epipen* cites
approvingly, in *McWane*, the entrant, there was a
monopolist, there was an entrant, the entrant got
about a 10 percent share in a couple of years.  So

*McWane* argued in that case well, wait, the barriers
to entry can't be that high and my anticompetitive
conduct can't be that bad because look, the rival got
a 10 percent share in a couple of years.  The
Eleventh Circuit disagreed and said that is fully
consistent with actionable monopolization.  And the
Tenth Circuit in *Epipen* is citing us to *McWane*
approvingly as the way its directing us to think
about antitrust injury.

The third case that NAR cites, it cites a
district court case in the District of Kansas within
the Tenth Circuit, and that's *Suture Express.*  And
NAR's cite is accurate.  At summary judgment the fact
that the plaintiff had acquired some share was cited
against it on the subject.  We agree.  But if you
look at the motion to dismiss opinion in *Suture
Express*, which is the procedurally apt one for where
we are in this case, you get a contrary result.
There, the district court denied a motion to dismiss
on exactly these grounds.  I would like to cite the
language to Your Honor.  This is *Suture Express,* 963
F.Supp 2d at 1221.  And I quote, "Contrary to
defendant's contention, plaintiffs substantial
position in the relevant markets also does not
preclude plaintiff from alleging an antitrust

injury."  That's directly contrary to the argument the defendants are making and directly on point for this motion.

Now, because this is an important point and because it has been urged so strongly both in the reply brief and here in oral argument, I would like to direct Your Honor very briefly to two binding Tenth Circuit opinions.  I'm being very transparent. We didn't cite these in our opposition, we didn't think we needed to, we didn't think this had been fully briefed, but we want to bring them to your attention.  If you want to see how the Tenth Circuit thinks about this very issue that NARs is urging as grounds for dismissal, you can consult *Lenox MacLaren,* 762 F.3d 1125.  That's a section two case from 2014 reversing the entry of summary judgment. What does the Tenth Circuit say?  The district court viewed Stryker, one of the competitors, the district court viewed Stryker's success as indisputable proof that barriers to entry were insignificant.  We disagree.  A single competitor's breakthrough does not preclude a finding of significant barriers to entry.  That disposes of the argument NAR is making. It is directly contrary to Tenth Circuit law.  You can also, Your Honor, consult *Chase Manufacturing v*

*Johns Manville*, 79 F.4 at 1203.  There, the Tenth

Circuit -- and this is from two years ago, 2023, this

is the Tenth Circuit, quote, "But what matters is not

whether," I'm putting these in brackets, "Defendant

succeeded in totally excluding plaintiff from the

relevant market, but whether defendants actions

substantially foreclosed plaintiff from the market

and impeded plaintiffs market growth."  That's the

standard.  Did the conduct alleged by Homie plausibly

impede Homie's market growth?  We think the answer is

yes.  We think the motion to dismiss on this ground

should be denied.

          Those are the points I wanted to make on the

Sherman and Clayton Act merits.  Just very briefly on

the tort claim, Your Honor.  NAR is respectfully

submitted to making the same mistake on the tort

argument that they're making on the antitrust

argument.  Once again, NAR is arguing, well, but

parties in Utah that harmed Homie, they don't work

for us, they're not affiliated with us, we don't

control them and they cite to *SCO* for this

proposition.  But in *SCO,* the parties that were

affecting the defendant -- the plaintiff's contracts

were not controlled by the defendant.  Here, in Utah,

as alleged in the complaint, the parties causing

injury and damage to Homie and tortiously interfering
with its contracts, were NAR members bound by NAR
rules, enforced by NAR.  This isn't like *SCO.*

          I would like to turn to the statute of
limitations argument that Your Honor mentioned, if I
may?

                    THE COURT:  Yes, go ahead.

                    MR. RENNER:  Yes.  Thank you, Your Honor.
The first point and the most important one, is that
the statute of limitations argument is a procedurally
awkward one for the defendants to be making.  Statute
of limitations is an affirmative defense.  We don't
have an obligation to anticipate affirmative defenses
or to plead around them.  We agree there are cases
where it can be appropriate to grant dismissal on
these grounds, but this isn't one of them because it
is not clear from the face of the complaint that
Homie didn't suffer injury from an overt act in
furtherance of the conspiracy within the limitations
period.  And that is the standard.  This is *Zenith
Radio.*  Homie is entitled to pursue recovery of
damages from overt acts in furtherance of the alleged
conspiracy which occurred within the limitations
period.

                    It doesn't matter.  My learned friend from

1    the defendants in presenting the statute of

        2    limitations argument suggested that the relevant

        3    inquiry is, well, when did Homie know about the

        4    anticompetitive conduct and we saw the news article

02:05:32 5    from 2019.  But the knowledge of the anticompetitive

        6    conduct is irrelevant under -- that is not the --

        7    that is not the rule for determining when the statute

        8    of limitations begins to run in an antitrust claim or

        9    for the application of the Continuing Conspiracy

02:05:53 10   Doctrine.  The statute of limitations begins to run

        11   under *Zenith* with the commission of each overt act in

        12   furtherance of the conspiracy that causes damages.

        13   The statute of limitations with respect to those

        14   damages begins to run on that date.  So we have

02:06:11 15   alleged a continuing -- a continuing conspiracy and I

        16   would like to talk about the cases that we think

        17   should guide the court's analysis.

        18           The first and most important case is

        19   *Champagne Metals*.  *Champagne Metals* gave, I think, a

02:06:26 20   really illuminating description of what the Tenth

        21   Circuit is looking for in application of the

        22   Continuing Violation Doctrine.  And there, in

        23   *Champagne Metals,* the Tenth Circuit instructs us to

        24   look for quote, "Actions within the limitations

02:06:41 25   period that manifested a commitment to renewing and

```
 1    enforcing the terms of the alleged conspiracy."

 2    Looking for conduct that manifested a commitment to

 3    renewing and enforcing the conspiracy.

 4             And so we think we easily allege that on two

 5    grounds.  First, the rules -- we all agree by the way

 6    that the rules were first enacted outside of the

 7    limitations period.  That's fine.  That happens.  In

 8    all of the cases where the Tenth Circuit has applied

 9    the continuing violation that was true.  But, yes, it

10    is true that the rules were first adopted outside of

11    the limitations period.  What we want to find are

12    actions within the limitations period that manifest a

13    commitment to renewing or enforcing the agreement.

14    So where do we see those?  First, the complaint

15    alleges that not only were the rules in force during

16    the limitations period, that is a very important

17    point, all five rules were in place during the last

18    four years prior to the filing of the complaint.  But

19    not only that, not only were all five rules in place

20    during the four-year period preceding the filing of

21    the complaint, but the complaint alleges that each

22    year NAR and the corporate defendants met, reviewed,

23    and reissued the rules.  That's a fact that we think

24    alone would trigger the Continuing Violation

25    Doctrine, right?  Going back to the language from
```

1   *Champagne Metals* where looking for actions that

2   manifest a commitment to renewing the conspiracy.

3   Well the rules were reviewed and reissued every year.

4           THE COURT:  Did they change?  Did they

5   change in any material way?

6           MR. RENNER:  There is no material change

7   alleged in the complaint, Your Honor.

8           THE COURT:  Okay.

9           MR. RENNER:  And to be fair, there is a

10  material change alleged in *Auraria*, right?  Which is

11  one of the cases that the Tenth Circuit recited in

12  our opposition.  But I don't read *Auraria* to depend

13  upon the fact that the rules were changed in relevant

14  ways.  But yes, that was a fact in *Auraria* that's not

15  present here.  Arguably, we have a fact that wasn't

16  present in *Auraria*, meaning that the conspirators got

17  together and agreed and reissued the rules.

18           It's a fair point.  And the complaint does

19  not allege that.  Three cases we think -- so

20  *Champagne Metals*, *Hennegan*, which I'll get back to in

21  a moment, and *Auraria*.  *Champagne Metals* we've talked

22  about.  It's a group boycott case and the conspiracy

23  is formed outside of the limitations period.  Within

24  the limitations period there are overt acts in

25  furtherance of the conspiracy.  Pressure on third

parties not to do business with the plaintiff.  We
think the overt acts of steering that we have alleged
in the complaint within the limitations period
satisfy that aspect of *Champagne Metals.*

A second case that I would cite to Your
Honor is *Hennegan.  Hennegan* is a Ninth Circuit case.
Why are we talking about a Ninth Circuit case?
Because *Hennegan* is cited in Several Tenth Circuit
cases applying the Continuing Violation Doctrine.
The Tenth Circuit is endorsing *Hennegan* as a -- in
its reading of the Continuing Violation Doctrine.
*Hennegan* is a great case.  It is literally a
conspiracy to engage in steering.  So in *Hennegan*,
the competition is between souvenir shops and they're
competing for customers and the customers come on
tour buses.  And the conspiracy is we're going to
divert the tour buses away from the plaintiffs
souvenir shop and towards the defendants.  Very
similar to the steering we allege happened at the
expense of Homie.  So in *Hennegan*, yes, conspiracy
formed outside the period but there were overt acts
taken to steer the tour buses towards the defendants
shops within the limitations period.  Ninth Circuit
said that's a continuing violation.  That overt act
is sufficient to establish the continuing violation.

61

1     The Tenth Circuit cited *Hennegan* several times

2     approvingly.  So we think that is a great case for

3     Your Honor to take a look at.

4           And then finally, *Auraria,* we've talked

02:10:32  5     about that.  *Auraria* is also -- can be valid as a

6     conspiracy to steer, it's a conspiracy to foreclose

7     the plaintiff's access to customers.  So in *Auraria*,

8     the market is the market for residential housing for

9     undergraduates.  And the conspiracy is formed outside

02:10:47 10    of the limitations period, as here, but each year a

11    new cohort of freshmen show up on campus and each

12    year they get steered away from the plaintiff to the

13    defendant.  And the Tenth Circuit said those acts of

14    steering are similar to the acts of steering that

02:11:02 15    bothered us in *Champagne Metals* and analogous to what

16    we have seen in *Hennegan*.  And those overt acts in

17    steering within the limitations period are sufficient

18    to establish the continuing violation.

19          So what is defendant's best case on statute

02:11:18 20    of limitations?  Well, it's *Kaw Valley.*  That's the

21    only binding case they have cited to support their

22    argument that the statute of limitations applies.  A

23    couple of things about *Kaw Valley* and this takes us

24    back to the top of the argument, *Kaw Valley* was

02:11:31 25    decided on a full record.  And the Tenth Circuit

expressly held in *Kaw Valley* that the application to
the Continuing Violation Doctrine is normally a
question of fact, right?  There was -- which makes it
a very awkward fit for the use the defendants are
trying to make of it here.  But a few other factors
about *Kaw Valley* which distinguish it from *Champagne
Metals*, *Hennegan* or *Auraria*.  So in *Kaw Valley*, the
defendants exercise sole and despotic dominion over
the input that they withheld from the plaintiff.  It
was their electricity.  They decided not to sell the
electricity.  They decided not to sell the
electricity outside the limitations period.  They
didn't need anybody's help to implement the
conspiracy.  The conspiracy was self executed and it
required no acts of enforcement, or pressure, or
coercion, or steering into third parties.

      So in that context, yes, the Tenth Circuit
said on a full record and expressly labeling this at
the conclusion of fact not law, they said that the
initial decision not to sell the electricity to the
plaintiff was final and therefore the continuing
violation doctrine didn't apply.  But it was a
question of fact, not a question of law, not one
that's easy to reach on the pleadings.  And in any
case, factually distinguishable from our conspiracy.

When a conspiracy requires, the life blood of the
conspiracy is pressure on third parties not to do
business with Homie.

That's about it on statute of limitations.
Just one more point this -- the North Carolina case
that was cited, I just want to point out that that
case -- and we noticed this in the briefs, this is
*North Carolina Electric Membership Co. -- Corp*, *North
Carolina Electric Membership Corp*, the Middle
District of North Carolina case in 1991, the
defendants like this case, they cite it frequently in
the continuing violation statute of limitations
dispute. It's not really a continuing violation
statute of limitations case. That case is really
about whether recovery may be had for pre-limitations
conduct. More of a damages issue than it is a
continuing violation statute of limitations question.
In any event, it's not binding on the court and we've
presented the court with binding precedent in the
form of *Hennegan,* well, not *Hennegan*, the strong
persuasive precedent but *Champagne Metals, Auraria*,
and the way we distinguish *Kaw Valley*. So that's --
unless the court has further questions, those are the
points I would like to make on the merits and I
appreciate the court's very generous allocation of

```
 1    time and patience.

 2            THE COURT:  Thank you.  Rebuttal,

 3    Mr. Bonanno?

 4            MR. BONANNO:  Yes, Your Honor, and I'll try

 5    to move quickly to accommodate a number of voices

 6    that I'm sure will want to be heard here.

 7            Look, I'll start with counsel's claim about

 8    reversible error.  That's a loaded term.  I'll take

 9    it head on.  I think that it relies on the court

10    looking past the decades of case law around trade

11    associations that my brother across the aisle just

12    referenced.  Your Honor, I would encourage you to

13    look at the *Licua* case that Mr. Renner cited to.

14    Mr. Renner's theory appears to be a trade association

15    once it agrees to a rule or policy is then liable for

16    any action taken by its members without regard to its

17    participation.  That's not the law.  If you look at

18    *Licua* and you look at the *CVB,* the mattress case in

19    the District of Utah, the law is clear.  Not every

20    action taken by a trade association is concerted

21    action.  And even though a trade association involves

22    a collection of actions by competitors, it's not a

23    walking conspiracy.  It's not as though the

24    association can be imputed to be involved in every

25    action of its members.
```

1        For example, Your Honor, I think

2    Mr. Renner's theory would extend to a bid rigging

3    conspiracy to buy local properties among members of

4    NAR merely because NAR adopted policies at some point

02:15:34 5    that they all agreed to.  Even if the policies were

6    agreed to by NAR members, that doesn't mean that

7    every action that some subset of members may take

8    collectively is part of a conspiracy overseen by NAR.

9    That is not what the law says and frankly that's not

02:15:48 10   what the complaint says either.

11        I would like to turn to this idea that MLSs

12   were used as a tool to detect and punish discounting.

13   You heard Mr. Renner mention at the outset of his

14   presentation.  Apparently no one used the tool

02:16:04 15   between 2015 and 2021.  We're at the motion to

16   dismiss stage.  The court needs to evaluate whether

17   Homie has stated a plausible claim for relief.  And

18   what Homie is actually suggesting is that it entered

19   the market and no one abided by the supposed

02:16:21 20   agreement that encompassed all NAR members in the

21   State of Utah, at least, between 2015 and 2021 when

22   it ascended to be a top five brokerage in the state.

23        The reality is that if you look at the rules

24   that are actually at issue that Homie has challenged

02:16:36 25   in this case, none of them say we're not going to do

business with discounters, none of them say we should
steer away from discounters, in fact, NAR is a huge
trade association where discounters are members of
the association.  You have to necessarily make
inferences from these rules to get to the agreement
that Homie has alleged.  There is no smoking gun
here.  And if you draw those inferences, you have to
account for Homie's allegations that it started from
nothing and became one of the largest brokerages in
the state and held that for an extended period of
time.  It is implausible on its face, in a
circumstantial evidence case, which this is, it is
implausible in its case, that we all agreed to create
a tool to use the MLS to punish firms like Homie and
just everyone forgot about it or didn't do it for
several years right when Homie entered the market.

I'll close, Your Honor, by touching on
antitrust injury.  Look, this isn't a close call.
What Mr. Renner is suggesting is this all needs to go
to discovery because it is a matter of degree.  One
competitor entering a market doesn't demonstrate that
there aren't barriers to entry.  That's not what
Homie has alleged.  Homie alleged it went from
nothing to one of the largest brokerages in the state
in two years.  That is the definition of a lack of

1  barriers to entry.  I looked briefly, Your Honor, at

2  the cases --

3            THE COURT:  Excuse me, is the definition of

4  what?

02:17:53   5            MR. BONANNO:  That is a lack of barriers to

6  entry.  When a new entrant goes from zero to a

7  significant market share of the market in two years,

8  that is zero barriers to entry.  When I was at

9  Justice Department, Your Honor, we always looked at

02:18:06  10  entry of potential competitors on a two-year time

11  run, two to five, that's kind of how you thought

12  about it.  Here we're talking about the opposite of

13  -- and by the way, if you entered in two to five

14  years, it was zero barriers to entry.  Here, we have

02:18:19  15  entry and it was extremely successful to Homie's

16  credit.  They weren't struggling to get a toehold.

17  By their own allegations they were successful.

18            I looked, Your Honor, at the cases that

19  Mr. Renner cited for the first time in his argument.

02:18:31  20  And frankly, Your Honor, they're completely

21  distinguishable from what's at issue in this case.  I

22  would encourage the court to look at them.  Both of

23  them involve monopolization claims and the inquiry

24  that the court was undertaking at the time was

02:18:44  25  whether the defendant had monopoly power.  Which

1    under Section 2 of the Sherman Act, which isn't at

2    issue here, the question is whether the monopoly

3    power is durable.  Not just high market share, but

4    the ability to maintain it over time because entry

02:18:56  5    can't happen.

6            In both cases, it appears that a plaintiff

7    -- or sorry the defendant pointed to a non-party

8    having a successful entry into the market to

9    demonstrate that there were no barriers to entry and

02:19:07  10   that was the question before the court.  Neither of

11   those questions address antitrust injury.  Neither of

12   them involve a plaintiff who is complaining about

13   harm to competition from the duration of barriers to

14   entry who successfully overcame them.

02:19:20  15           If you want to see the most analogous case,

16   Your Honor, I point you to the *NicSand* decision that

17   was decided by the Sixth Circuit en banc, it's at 507

18   F.3d 442, and the pincite is 554 through 55.  That

19   case was spot on.  That case is about an existing

02:19:39  20   competitor that filed a lawsuit, it had significant

21   share of the market, something like 60, 70 percent,

22   and it lost it to a competitor coming in who offered

23   exclusive contracts to customers.  The plaintiff

24   competitor that was in the market successfully

02:19:54  25   competing, complained that the institution of

exclusive contracts created barriers to entry but
foreclosed it from continuing to compete in the
market.  It was still in the market, it wasn't driven
completely out of the market, but it said it was too
hard to compete, this is antitrust injury, we can't
compete against these exclusives, against this new
entrant.

The Sixth Circuit addressed the exact
question before the court, antitrust injury.  And
looking at those facts, found because the plaintiff
had the ability to compete in the marketplace, there
were no barriers to entry created by the conduct at
issue that would satisfy the antitrust injury test.
It's on all fours with this case, Your Honor, and it
provides grounds for dismissal here.

I'm going to pass it to Mr. Bershteyn to
take it from here on rebuttal points with respect to
the boycott argument.

THE COURT:  Mr. Bershteyn?

MR. BERSHTEYN:  Your Honor, I'll make three
brief points.  First, what we heard from Mr. Renner
is, about the boycotts, is that we, the defendants,
are painting a strawman.  Mr. Renner says, of course,
I don't have to allege an express boycott.  So the
trouble with that statement is that that's what he

tried to allege.  That statement is just at war with what the complaint says.  I'm going to read to Your Honor from Paragraph 51 of the complaint.  "Homie was subject to both express and tacit boycotts in Utah by incumbent brokerages, some affiliated with the corporate defendants.  Boycotts organized through the MLS, online social media platforms and public statements."  So it's that -- that conclusory myth that we wanted to dispel before Your Honor.  There are no factual allegations to back that up.  And as Mr. Van Oort predicted, now we seem to all be in agreement on that.  Mr. Renner says oh, of course, they would have to allege that.  He tried and he can't.  That's the first point.

          The second is that, you know, having -- having failed to allege that it's actually defendants that are engaging in any conduct on the ground in Utah.  What Mr. Renner says is, well, what matters is that -- is that defendants are members of NAR.  By the way, my client is not a member of NAR.  But let's just put that to the side.  The franchisees of defendants are members of NAR and that makes them all -- and this is, I think, quite literally what they said there, all NAR members in Utah are members of the conspiracy and that conspiracy is what caused

Homie injury.

So Mr. Bonanno just told you why as a matter of law that's not correct, it's also at war with plaintiff's own complaint. Because Homie alleges that it, too, is a member of NAR in paragraph 70 and 71 of the complaint. So Homie's theory here is that it too entered a conspiracy by virtue of agreeing to follow NAR rules. According to Homie, the foreseeable consequence of that conspiracy is to harm Homie. So this theory is not only at odds with the law, it is just at odds with common sense.

Third, what we heard from Mr. Renner is okay, it's not just that the defendants are somehow following NAR rules. They sit on boards, you know, their employees actually participate in making, and we have pages and pages of names. So let's take a look at what those names say. So I'm just -- just turn to those pages and I have picked one. So in Paragraph 112T as in Tom, which is on Page 39 of the complaint, Homie purports to list somebody affiliated with Keller Williams. Julie DeLorenzo, the owner of Julie DeLorenzo Realty/Keller Williams Realty in Boise. This is an owner of an independently owned and operated franchisee of Keller Williams that is not alleged to be controlled in any way in its

day-to-day operations by Keller Williams, let alone
in whatever participation Ms. DeLorenzo has in NAR.
So there is actually no pleaded connection between
any of these individuals and, you know, Keller
Williams, certainly.

So what -- so just to kind of wrap it up,
Your Honor, what all of this collapses into is that
Homie's theory is that all persons affiliated with
NAR at any point are all members of a walking
conspiracy and thus are -- can be held responsible by
anybody including apparently another member of NAR
from any purported economic harm that it might claim
would flow from NAR policies.  That proposition is an
enormous expansion of antitrust law and one doesn't
have to look any further than Supreme Court's
decision in *Associated General Contractors* which was
much, much quoted during this proceeding.  So here is
what the Supreme Court said.  "As this court has
observed, the lower federal courts have been
virtually unanimous in concluding that congress did
not intend the antitrust laws to provide a remedy in
damages for all injuries that might conceivably be
traced to an antitrust violation.  An antitrust
violation may be expected to cause ripples of harm to
flow through the nations economy.  But despite the

broad wording of the Clayton Act, there is a point
beyond which the wrongdoer should not be held
liable."

Now don't mistake, Your Honor, we deny that
any antitrust violation occurred.  But Your Honor
doesn't have to worry about that because one thing we
know for sure is that this claim, the theory that
Homie is bringing to the court, cannot possibly be
redressed by antitrust laws that they have been
interpreted by the Supreme Court.  So now --

MR. LEVEE:  Your Honor, may I make a
thirty-second argument following up?  This is Jeff
Levee on behalf Re/Max.

THE COURT:  Excuse me, were you done Mr.
Bershteyn?

MR. BERSHTEYN:  I was.  Thank you, Your
Honor.

MR. LEVEE:  My apologies if you were not.  I
thought he was done.  Just to follow up on what
Mr. Bershteyn said, there are no conspiratorial
allegations against the Re/Max entity that was sued
as a defendant in this case.  Re/Max is not a member
of NAR.  That happens to be in paragraph 20 of Ms.
Lessinger's declaration provided to the court on
jurisdictional grounds.  And because there are no

74

1    allegations against Re/Max based in Denver doing --

2    that has franchisees in Utah, but does not otherwise

3    do any of the things that are alleged in the

4    complaint in Utah, it cannot be that Re/Max which is

02:26:40  5    not a member of NAR, could conspire to injure Homie.

6    Plain and simple, the complaint does not contain

7    facts against Re/Max, or facts, for that matter,

8    against any of the other defendants.  Thank you.

9             THE COURT:  Thank you.  Mr. Murray?

02:26:59  10             MR. MURRAY:  Thank you, Your Honor.  I'll be

11    very quick on statute of limitations.  And I agree

12    with Mr. Renner.  Oftentimes statute of limitations

13    arguments are not decided at the motion to dismiss

14    stage.  But this is one of those cases where the

02:27:11  15    complaint lays out the dates that control the statute

16    of limitations question.  And so we, as we have

17    argued before, we think that it is perfectly

18    appropriate at this point for the court to dismiss

19    based on that ground.

02:27:26  20             And I would also like to point to *Kaw*

21    *Valley*.  Mr. Renner mentioned it in his argument.  We

22    think it is the most appropriate case from the Tenth

23    Circuit that's been cited.  And in that case I'll

24    just quote very quickly here, "The Tenth Circuit held

02:27:41  25    that you cannot revive a stale claim by pointing to

abatable but unabated inertial consequences of some

prelimitations action."  And that's precisely what

we're talking about here.  We have these NAR rules

that are decades and years old.  And remember, it is

02:28:01  the plaintiff's theory that those rules necessarily

caused these exclusions, the exclusion from the

market, these barriers to entry.  If that is true,

they are complaining about the inertial consequences

of rules that are years and years old.  And as Your

02:28:21  Honor pointed out with your question, they're not

alleging there was some material change to these

rules that have occurred within the statute of

limitations.  These are rules that were passed,

they're on the books, and they remained on the books.

02:28:34  There is no new damage, there is no new act that the

plaintiff points to that would revive the statute of

limitations.  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Van Oort?

MR. VAN OORT:  All right, Your Honor.  I'm

02:28:44  going to come back and try to put a bow on this

again.  I said that the plaintiffs were not going to

be alleging a price-fixing conspiracy and they

aren't.  That's how it -- I also said and made a

really big deal of saying they weren't going to

02:29:03  allege that there was an agreement among local

brokers not to do business with Homie.  Mr. Renner
agreed with that too.  He said I don't need to do
that.  The only antitrust violation that is alleged
here is an agreement to enact the rules.  And I went
through with Your Honor and said the problem with
that is that if you try to connect those rules to
people not dealing with Homie, you have to go through
four different steps.  That the rules just show what
the offer is and the brokers have to decide what to
do with it and their buyer/clients have to do with
sellers.  That is too extended, that's too
speculative under *Associated General Counsel*.
Mr. Renner didn't disagree with that.

So here's what he did and here's the heart
of it, Your Honor.  He said, no, the refusals to deal
weren't indirect, they were direct because they were
done by members of NAR.  And here's the problem with
that, Your Honor.  The nature of what is direct or
not depends on what the agreement is.  So if there is
an agreement not to deal with Homie, then not dealing
with Homie would be a direct effect of that
agreement.  But remember, that's the agreement that
nobody alleges.  There is no evidence of that.  Mr.
-- you can't trace it from the rules because they
pre-existed Homie and there is no direct.  So even if

1  there were an agreement, a concerted agreement not to

2  deal with Homie, not dealing with Homie would be a

3  direct effect.  But if the only agreement is entering

4  these NAR rules, say nothing about not dealing with

5  NAR members because Homie is a NAR member, you know,

6  that's the allegation, if that's the only agreement

7  then you have got to figure out how those rules would

8  just publicize offers from sellers to buyers are

9  connected and that's the causal chain that doesn't

10  work.

11         And the last part of this, Your Honor, what

12  Homie is trying to do, is you cannot take agreement

13  on the rules and turn it into an agreement to do

14  things that the rules don't provide for.  As

15  Mr. Bonanno pointed out, that is exactly the holding

16  of *Licua* from the Tenth Circuit, 2019.  It is 930

17  F.3d at 1177 and 78, because the plaintiff there

18  tried to do the same thing.  It said because you

19  agreed to some rules, then you are responsible for

20  what association members did on their own.  Tenth

21  Circuit said no, that's not how it works.  All we

22  have here is an allegation.  The people agreed to the

23  rules, the rules don't say don't deal with Homie or

24  anything like that and there is only an attenuated

25  speculative causation between what the rules actually

1     are that Homie suffered.  That, Your Honor, cuts

2     across everything.  It is supported by the law.

3     There are other reasons to dismiss, but if Your Honor

4     agrees with that one, then we're done.

02:32:11    5              THE COURT:  Thank you.  Now, is there

6     anything else we should argue today?

7              MR. BERSHTEYN:  Your Honor, this is Boris

8     Bershteyn again for Keller Williams.  There are some

9     motions to dismiss on personal jurisdiction grounds

02:32:27    10    and if Your Honor has the patience for it, we can

11    briefly argue those.

12             THE COURT:  Briefly.

13             MR. BERSHTEYN:  Absolutely, Your Honor.  I

14    will start and Mr. Murray, I think, has a motion on

02:32:37    15    behalf of his client.

16             THE COURT:  You have got five minutes.

17             MR. BERSHTEYN:  Perfect.  Your Honor, Keller

18    Williams is not subject to personal jurisdiction.

19    And this is an issue that, of course, the court only

02:32:49    20    needs to reach if it is a stay and it's their claims

21    on the merits.  It didn't do -- there is no

22    allegation that Keller Williams did anything in Utah

23    let alone actions sufficient for personal

24    jurisdiction.

02:33:02    25             Here is what's not disputed.  Keller

1   Williams is headquartered in Texas, has no offices in

2   Utah, doesn't offer brokerage services in Utah.  As I

3   -- as I have now said a couple of times, Keller

4   Williams is a franchisor.  It doesn't employ real

5   estate agents in Utah.  It doesn't exercise any

6   day-to-day control over the workings of its

7   independently owned and operated franchisees.  And it

8   is not a member of NAR let alone any Utah NAR

9   affiliates.

10          THE COURT:  Let me -- Section 12 of the

11   Clayton Act is fairly broadly read by the Tenth

12   Circuit, is it not, on jurisdictional grounds?

13          MR. BERSHTEYN:  So, Your Honor, as to

14   Section 12, even with the broad -- even construing

15   Section 12 broadly, the Tenth Circuit held in *Peay,*

16   P-E-A-Y, is the case, that even under those

17   circumstances the court must conduct a due process

18   inquiry and there it has to look at the extent of the

19   defendants contact with the place where the action

20   was filed.  And that is so even when the statute

21   provides for nationwide personal jurisdiction.

22          So in *Peay*, for example, the court conducted

23   that inquiry and it found that there was personal

24   jurisdiction.  But it was actually quite instructive

25   to look at the facts of that case, right?  So the

1  court said even with the nationwide service of

2  process, Section 12, so what happened with Utah?  So

3  in *Peay*, the defendant was an insurance company.  And

4  the insurance company pre-approved plaintiff's stay

02:34:45  5  at a mental hospital in Utah and then it refused to

6  pay for that stay in the hospital in Utah to a Utah

7  based medical facility.

8          And so the Tenth Circuit reasoned, all

9  right, well, on that basis, it is fair, consistent

02:35:01  10  with due process principles, to haul the insurance

11  company which is based outside of Utah into Utah

12  because it pre-approved that procedure.

13          Here, there is no tie, certainly no

14  requisite tie, between Keller Williams and Utah.  As

02:35:17  15  we've now heard ad nauseam, Keller Williams has

16  alleged to somehow generally support NAR rules, but

17  those rules aren't targeted to Utah in the way that

18  the insurance companies actions were targeted to

19  Utah.  And it's essentially the position that

02:35:32  20  plaintiff takes here is that if you have a franchise

21  in Utah, and you collect franchise fees in Utah, then

22  you -- then you can get hauled to Utah, you know,

23  under personal jurisdiction principles.  That's a

24  legal proposition even though the plaintiff here is

02:35:52  25  seeking jurisdictional discovery, there is -- one

         1    doesn't need discovery to explore it.  We don't deny

         2    that Keller Williams has franchisees in Utah.  So the

         3    question is is that enough.  The problem is that the

         4    plaintiff doesn't cite a single case showing that

02:36:09 5    that's enough.  And there is authority expressly

         6    saying it is not and that we think essentially

         7    focuses the issue and as to personal jurisdiction

         8    should end the case.  So hopefully I made it under

         9    five minutes.

02:36:22 10             THE COURT:  I think you did.  Mr. Murray,

        11    you wanted to say something about this?

        12             MR. MURRAY:  Yes, Your Honor, thank you.

        13    And I will aim for under five minutes as well.

        14             I'll quickly say just to your point about

02:36:31 15   the Clayton Act, two points I would like to make on

        16    that, Your Honor.  First of all, it only applies, the

        17    Clayton Act service of process clause only applies to

        18    corporations.  So for our -- I represent two clients

        19    Homeservices of America, Inc. and HSF Affiliates,

02:36:49 20   LLC.  The Clayton Act can't provide jurisdiction over

        21    HSF and the plaintiff hasn't argued otherwise.

        22             And then as we lay out in the brief, Your

        23    Honor, I don't think the Tenth Circuit has resolved

        24    the circuit split on which interpretation of the

02:37:04 25   Clayton Act is appropriate.  And we cite to the most

1  recent circuit court to have decided the issues.  The

2  Seventh Circuit we think that reasoning makes the

3  most sense and we would ask the court to adopt that

4  here.

02:37:13  5        With respect to the conspiracy theory of

6  jurisdiction, you know, throughout the plaintiff's

7  argument I was struck today by just how broad the

8  plaintiff says this alleged conspiracy was.  The

9  plaintiffs -- Mr. Renner said multiple times that

02:37:30  10  every member of NAR, whether in Utah or otherwise, is

11  a member of this conspiracy and that is a

12  breathtaking allegation to make.  We're talking about

13  1.5 million members of NAR.  And when you apply that

14  idea to the jurisdictional analysis, the plaintiff is

02:37:52  15  effectively arguing to this court that any one of

16  those 1.5 million members who they say is a

17  conspirator could be hauled into court in Utah or any

18  other state to answer these antitrust allegations.

19  That is really an extreme assertion for plaintiff to

02:38:10  20  be making.

21        And I would like to point the court to just

22  one authority that we didn't cite it in our brief.  I

23  came across it as we were preparing for the argument

24  today.  But, you know, there is a lot of states, Your

02:38:26  25  Honor, that don't even recognize the conspiracy

theory of jurisdiction because it's so controversial.
This idea that you're going to hold someone to
personal jurisdiction based on acts of these alleged
co-conspirators.

In the Utah Supreme Court, and I'm going to
share my screen just one more time, for one slide,
Your Honor, if you will indulge me, the Utah Supreme
Court has warned us that although it was recognizing
the conspiracy theory of jurisdiction it was doing so
warily.  And I've highlighted two sentences that I
would like to emphasize.  So the first, the yellow
sentence, the court said that, "Echoing concerns
expressed by other courts, we adopt this test warily
in order to prevent a broad extension of long-arm
jurisdiction.  And to curb the unintended and
improper expansion of long-arm jurisdiction, courts
applying this test will need to carefully assess the
relationship between each individual defendant and
the conspiracy to assess whether that defendant's
relationship with the conspiracy and the forum is
such that she could reasonably anticipate being haled
into court in the state."

So Your Honor, we have argued this in our
briefing, I don't want to take up the court's time,
but in this instance there is just one sentence in

1    the whole opposition, the 40-plus-page opposition the

2    plaintiff filed, there is only one sentence that

3    attempts to connect Homeservices and HSF to the

4    conspiracy.

02:40:01  5          We have submitted affidavits that rebut the

6    assertions made in that sentence and that shifts the

7    burden to plaintiff to come forward with evidence.

8    It can't rely on those allegations any longer.  It

9    has to come forward with evidence.  It hasn't done

02:40:18 10    so.

11          We briefed the issue of whether

12    jurisdictional discovery is appropriate at this

13    point.  We think the plaintiff waived the ability to

14    do that.  We don't think it is proper for the

02:40:27 15    plaintiff to come to this court and effectively ask

16    for an advisory opinion on jurisdiction and then hold

17    everything in suspension while plaintiff conducts

18    jurisdictional discovery.  We don't think that is the

19    way this should work.  If they wanted discovery they

02:40:41 20    should have asked for it before we went to the

21    trouble of filing all of the merits, filings, and

22    coming here for oral argument today.  But I'll rest

23    on the filings that we have submitted to the court,

24    Your Honor.  Thank you.

02:40:52 25          THE COURT:  Thank you.  Mr. Renner?

MR. RENNER:  Thank you very much, Your

Honor, I'll be brief.  On the issue of conspiracy

jurisdiction, there seems to be no dispute between

the parties that the Tenth Circuit recognizes the

doctrine of conspiracy jurisdiction.  Mr. Murray's

concern that the Utah State Supreme Court may not

recognize it but they claim that it did and antitrust

claim is a federal claim and so it seems like there

might be a choice of law confusion here.  It is not

obvious to me what the opinion of the Utah Supreme

Court would be with respect to the exercise of the

conspiracy jurisdiction on a cause of action that is

before this court on the federal question

jurisdiction.  And we have briefed this issue in the

opposition.

         Keller Williams is concerned about the broad

scope of Section 12 of the Clayton Act.  But as we

have explained in our brief, that was the choice of

congress and the Tenth Circuit has indeed instructed

district courts in the Tenth Circuit to take a broad

remedial and expansive view of jurisdiction under

Section 12.  So, you know, the defendants are urging

the court to create an intra-circuit split among the

district courts in interpreting Section 12 of the

Clayton Act.  And I haven't heard a good reason why

```
 1    that would be.

 2            Mr. Murray raised, and I don't think this

 3    was necessarily apposite to the question of

 4    jurisdiction, but Mr. Murray raised this sort of

 5    parade of horrible's concern with the liability

 6    theory articulated by Homie in the scope of the

 7    conspiracy.

 8            Again, it's black letter law that the

 9    members of a trade association are members of the

10    agreement.  That is an analytically distinct question

11    as to whether and under what circumstances you can

12    name members in the association as a defendant, or

13    attempt to haul them into court to the exercise of

14    conspiracy jurisdiction.  Those are two analytically

15    distinct points and I would suggest that the parade

16    of horrible's Mr. Murray presents to us just is not

17    present in this case.  And with that, I have no

18    further argument on jurisdiction unless Your Honor

19    has questions.

20            THE COURT:  No.  Thank you.

21            MR. MURRAY:  Thank you.

22            THE COURT:  Are we done arguing?

23            MR. BERSHTEYN:  I will just say very, very

24    briefly, Your Honor, that while Section 12 is broad,

25    it is not unlimited.  And I will just read to Your
```

1    Honor from the Tenth Circuit PA decision.  Under an

          2    approach called national contacts test, so that's

          3    what Mr. Renner is proffering here, a plaintiff could

          4    sue a defendant in any federal court in the United

02:43:33  5    States regardless of defendant's contacts in the

          6    forum or the burden on the defendant of litigating in

          7    that forum.  And then the Tenth Circuit says, "We are

          8    convinced that due process requires something more.

          9    What's required is a due process consistent showing

02:43:52 10    the connection between the forum and the defendant."

         11    And that's what hasn't been pleaded here.

         12          THE COURT:  Thank you.  Anything else?  All

         13    right.  I'll take these motions under advisement and

         14    get a ruling out in due course and we'll be in

02:44:05 15    recess.  Thank you, all.

         16          MR. BERSHTEYN:  Thank you, Your Honor.

         17          MR. RENNER:  Thank you, Your Honor.

         18          MR. BONANNO:  Thank you, Your Honor.

         19          (Court adjourned at 2:44 p.m.)

         20

         21

         22

         23

         24

         25

# REPORTER'S CERTIFICATE

       I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

       That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

       That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

       In witness whereof I have subscribed my name this 10th day of March, 2025.

             ___*Laura W. Robinson*_____

             Laura W. Robinson

             RPR, FCRR, CSR, CP