THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| **HOMIE TECHNOLOGY, INC.**, a Delaware corporation,<br><br>　　　　　**Plaintiff,**<br><br>vs.<br><br>**NATIONAL ASSOCIATION OF REALTORS**, an Illinois non-profit association; **ANYWHERE REAL ESTATE INC.**, a Delaware corporation; **KELLER WILLIAMS REALTY, INC.**, a Texas corporation; **HOMESERVICES OF AMERICA, INC.**, a Delaware corporation; **HSF AFFILIATES, LLC**, a Delaware limited liability company; and **RE/MAX, LLC**, a Delaware limited liability company; and **WASATCH FRONT REGIONAL MULTIPLE LISTING SERVICE, INC.**, a Utah corporation,<br><br>　　　　　**Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:24CV00616 DAK-JCB**<br><br>**Judge Dale A. Kimball**<br><br>**Magistrate Judge Jared C. Bennett** |

This matter is before the court on several motions to dismiss, filed by the various

defendants in this case, [1] and on Plaintiff Homie Technology Inc.'s ("Homie") Contingent Motion

---

[1] The specific motions before the court are: (1) HomeServices of America, Inc. and HSF Affiliates LLC's Motion to Dismiss Plaintiff's Complaint [ECF No. 69]; (2) Anywhere Real Estate Inc. and RE/MAX, LLC's Joint Motion to Dismiss Plaintiff's Complaint [ECF No. 71]; (3) RE/MAX, LLC's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2) [ECF No. 72]; (4) National Association of Realtors' 12(b)(6) Motion to Dismiss Plaintiff's Complaint [ECF No. 74]; and (5) Homie's Amended and Supplemental Contingent Motion for Jurisdictional Discovery [ECF No. 94].  Keller Williams Realty, Inc. ("KW") had also filed a Motion to Dismiss [ECF No. 70], but after oral argument on the motions, on April 2, 2025, Homie filed a Notice of Voluntary Dismissal of Action as Against KW [ECF No. 114], rendering KW's Motion to Dismiss moot. The court, therefore, does not address KW's motion.

for Jurisdictional Discovery. The court held oral argument on all pending motions on February

20, 2025.[2] At the hearing, Christopher G. Renner, Andrew K. Mann, Jonathan M. Shaw, and

Sterling Arthur Brennan represented Plaintiff Homie. For the Defendants, Scott E. Murray and

Bryon J. Benevento represented HomeServices of America, Inc. ("HomeServices") and HSF

Affiliates, LLC  ("HSF"); Aaron D. Van Oort, Kevin P. Wagner, Stacey Anne Mahoney, and Jason

W. Hardin represented Anywhere Real Estate Inc. ("Anywhere Real Estate"); Jeff Levee and

Juliette P. White represented RE/MAX, LLC ("RML") (collectively, HomeServices, HSF, Anywhere

Real Estate, and RML will sometimes be referred to as the "Brokerage Defendants"). Michael

Domenic Bonanno and Thomas R. Lee represented the National Association of Realtors ("NAR")

(the Brokerage Defendants and NAR are sometimes referred to together as "Defendants"). At

the conclusion of the hearing, the court took the matter under advisement. Now being fully

informed, the court issues the following Memorandum Decision and Order, dismissing Homie's

action.

**INTRODUCTION[3]**

In this lawsuit, Homie Technology claims that it was harmed by the anticompetitive

practices of the NAR and the Brokerage Defendants. Two additional defendants, Wasatch Front

---

[2] The hearing was held virtually on Zoom.

[3] Page references in this memorandum decision refer to the page numbers assigned by CM/ECF when each document was filed, which is the page number that appears at the top of each page. Oftentimes, however, when referring to the Complaint, the specific numbered paragraphs are identified.

Regional Multiple Listing Service, Inc. ("WFRMLS"), and KW, have been dismissed from this action.[4]

In its Complaint, Homie has asserted three claims for relief: (1) Violation of Section 1 of the Sherman Act; (2) Violation of the Utah Antitrust Act; and (3) Tortious Interference with Economic Relations.[5] As to the antitrust claims, Homie asserts that the "adoption and enforcement of NAR's Exclusionary Rules and Policies by Defendants reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers that restrain competition in the relevant markets" and this conspiracy "has had an anticompetitive effect in the relevant product and geographic markets and unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."[6] Regarding the Tortious Interference Claim, Homie contends that "Defendants and their co-conspirators knowingly and intentionally interfered with Homie's existing and potential economic relations, including by steering consumers away from Homie's clients, causing Homie's clients to cancel their contracts with Homie, and causing Homie's business partners not to renew their existing contracts with Homie."[7] It asserts that this interference was conducted by "improper means and for improper purposes, including by utilizing anticompetitive rules to steer consumers away from Homie and implementing an illegal group boycott against Homie."[8]

---

[4] *See* Notice of Dismissal, ECF No. 63 and 114, respectively.

[5] *See* Compl., ECF No. 1, at 51-53.

[6] *Id.* at 51.

[7] *Id.* at 52.

[8] *Id.*

In their motions to dismiss, Defendants argue that (1) all of Homie's claims are time-barred; (2) Homie has failed to state a federal or state antitrust claim because it lacks antitrust standing, it has failed to allege causation, and it has failed to allege antitrust injury; (3) the court lacks personal jurisdiction over several of the defendants (HomeServices, HSF Affiliates, and RML); and (4) Homie has failed to state a tortious interference claim. Homie, however, contends that all of these arguments lack merit, and that if the court agrees that it lacks personal jurisdiction over some of the Defendants, then Homie seeks to conduct jurisdictional discovery regarding those Defendants.

## FACTUAL BACKGROUND[9]

### A.  Overview of the Residential Real Estate Industry

Consumers often hire real estate brokers to help them sell and buy homes. "Seller brokers" help sellers find a buyer, negotiate a price and terms, and finalize a home sale. "Buyer brokers," on the other hand, help buyers find a property, negotiate a price and terms, and close the sale. Brokerage firms, like Homie and its competitors, offer both seller broker and buyer broker services.

According to Homie, brokers frequently use a "Multiple Listing Service" or "MLS" to help their clients buy and sell homes. MLSs are "joint ventures" comprised of "virtually all brokers operating in local or regional areas," which aggregate "members' home listings information into a database, usually in electronic form," and make this data "available to all licensed real estate

---

[9] As it must on a Rule 12(b)(6) motion, the court assumes that all well-pleaded allegations in Homie's Complaint are true and views them in the light most favorable Homie. *See Matney v. Barrick Gold of N. America*, 80 F.4th 1136, 1144.  (10th Cir 2023).

professionals who are members of the MLS."[10] The MLS at issue in this case is the Wasatch Front Regional Multiple Listing Service ("WFRMLS"). Seller brokers use MLSs to spread the word about the homes they are trying to sell, and buyer brokers use MLSs to efficiently find "information about all the listed homes in the area that match the buyer's housing needs."[11] The vast majority of homes marketed for sale and sold in the United States are marketed through an MLS.[12]

Homie alleges that the "substantial majority of MLSs nationwide are NAR-affiliated MLSs," and that "NAR's Board of Directors and its Multiple Listing Issues and Policies Committee (which reports to the NAR Board of Directors) issues the policies governing MLSs."[13] NAR promulgates rules, policies, and practices governing the conduct of NAR-affiliated MLSs that are "set forth annually in the Handbook on Multiple Listing Policy ("Handbook")."[14] According to Homie, "NAR and its affiliated state and local associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics."[15]

The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price, and

---

[10] Compl., ECF No. 1, ¶ 35

[11] *Id.*

[12] *Id.* ¶ 34.

[13] *Id.* ¶ 37.

[14] *Id.*

[15] *Id.*

commissions are paid when the home sells.[16]  A seller-broker's compensation is specified in a

listing agreement, a contract between the seller and the seller-broker that details the terms of

the listing. A listing agreement typically states that the seller-broker has the exclusive right to

market the seller's home, and it "specifies the total commission a home seller will pay the

seller-broker, often with a portion of that amount earmarked to be paid to the buyer-broker if

the buyer has a broker."[17]

In other words, buyer-brokers—who assist their clients in negotiating against the

seller—commonly receive their compensation from the total commission paid by the seller, not

from the buyer they represent.[18] Generally, "[c]ommissions of 5% to 6%, split between the

seller-broker and the buyer-broker, are common across the country and in Utah."[19]  Home

contends that "[t]hese high and elevated commissions are the result of rules promulgated by

the Defendants that restrained competition from brokers seeking to compete by offering lower

prices."[20]

**B.  The Challenged NAR Rules**

NAR is a trade association and has "over 1.4 million individual members (sometimes

called "realtors"),)" who provide residential real estate brokerage services across the United

States.[21] NAR "promulgates rules governing the operation of the approximately 500 MLSs

---

[16] *Id.* ¶ 30.

[17] *Id.* ¶ 31.

[18] *Id.* ¶ 32.

[19] *Id.* ¶ 38.

[20] *Id.*

[21] *Id.*

affiliated with NAR through their ownership or operation by NAR's state, local, and territorial associations," and thereby "governs the conduct of its members in all 50 states," including Utah.[22]

Homie alleges that five NAR Rules are anticompetitive, calling them the "Exclusionary Rules and Policies," but they will be referred to here as the "Challenged NAR Rules." The first challenged rule is the "Buyer-Broker Compensation Rule." Adopted in 1996, the Buyer-Broker Compensation Rule requires all home listings on an MLS to include an offer of compensation to buyer brokers.[23] Homie maintains that the Buyer-Broker Compensation Rule was exclusionary because "the blanket offer was required to be made available to every buyer broker using the MLS . . . and could be compared to the blanket offers that every other seller-broker must post to operate on the MLS," and thus, the Buyer-Broker Compensation Rule "created tremendous pressure on sellers to offer the high, standard commission that had long been maintained in this industry."[24]

According to Homie, "Seller-brokers knew that if the published blanket offer was less than the standard commission, many buyer-brokers would 'steer' home buyers to the residential properties that provide the higher standard commission."[25] Homie maintains that the Brokerage Defendants "understood and intended this effect of the Buyer-Broker Compensation Rule, and they instructed and trained their franchisees and agents to offer

---

[22] *Id.*

[23] *Id.* ¶¶ 59-60.

[24] *Id.* ¶ 60.

[25] *Id.*

relatively higher buyer-broker commissions as a seller-broker and, when acting as a buyer-broker, to avoid transacting with seller-brokers offering relatively lower buyer-broker commissions."[26] Homie asserts that "[b]y encouraging and facilitating steering, the Buyer-Broker Compensation Rule enabled brokers to avoid doing business with or otherwise retaliate against buyer-brokers who tried to compete by offering significant discounts."[27] Thus, the effects of the Buyer-Broker Compensation Rule "caused injury and damages to Homie in Utah and erected high barriers to Homie's entry into other markets controlled by NAR-affiliated MLSs nationwide."[28]

In addition to the Buyer-Broker Compensation Rule, Homie also challenges the following NAR rules:

- a NAR Rule adopted in 2012 that allegedly "allowed buyer-brokers to filter MLS listings that would be shown to buyers based on the level of buyer-broker commissions offered," the "Commission-Filter Rule");[29]

- a NAR Rule adopted in 1997 that allegedly permitted buyer brokers to represent to buyers that their services were "free," (the "Free-Service Rule");[30]

- a NAR Rule adopted in 2012 that "recommended that MLSs prohibit disclosing to prospective buyers the total commissions offered to buyer-brokers," (the "Commission-Concealment Rule");[31] and

- a NAR Rule adopted in 2019 that required the posting of public listings on an MLS "within one business day," (the "Clear Cooperation Policy").[32]

---

[26] *Id.*

[27] *Id.* ¶ 61.

[28] *Id.* ¶ 63.

[29] *Id.* ¶ 73.

[30] *Id.* ¶ 77.

[31] *Id.* ¶ 81.

Collectively, Homie alleges that the Challenged NAR Rules created "a market where consumers are simultaneously charged supracompetitive prices and deprived of the ability or incentive to search for alternatives," and thus, "Defendants and their co-conspirators diminished the ability and incentive of innovative new entrants such as Homie to compete away those supracompetitive prices by offering lower prices."[33] Stated a different way, Homie alleges that the Challenged NAR Rules worked in combination to facilitate the so-called "steering" of clients away from discount brokers, like Homie.  Homie summarizes its theory in its Complaint:

> Because the offer of compensation [to buyer brokers] was displayed in the MLS, buyer-brokers would steer their clients away from sellers offering low buyer-broker commissions and towards sellers offering high buyer-broker commissions. By giving buyer-brokers the ability through the MLS to detect and punish price discounting by seller-brokers, NAR's Buyer-Broker Compensation Rule . . . created a fundamentally anticompetitive market structure that systematically excludes brokers like Homie seeking to compete by offering lower commissions.[34]

### C.  Homie Was Successful and Gained Market Share in Utah from 2015 until 2021

Homie was launched in 2015, and as a "new entrant" in the Utah market, it sought to "disrupt the traditional real estate brokerage model by returning artificially inflated commissions to consumers," including through initial offerings in Utah of "discounted brokerage services to buyers." As a "discount broker," Homie asserts that it deployed "new technology, including a consumer-facing app that automated portions of the sales process for

---

[32] *Id.* ¶ 87.

[33] *Id.* ¶ 94.

[34] *Id.* ¶ 38.

both sellers and buyers," which "allowed it to lower the price of its brokerage services to
customers."

According to Homie, its 2015 "entry into the real estate brokerage market in Utah was
initially successful," and "at various times between 2017 and 2021," Homie was "among the
five largest brokerages by market share in the state." All of the Challenged NAR Rules were in
effect during all or some of this time period.

### D. Homie Alleges That a Competitor Boycott Scheme Harmed Its Business After 2021

According to Homie, its initial success "sparked an anticompetitive campaign among
Homie's competitors to exclude Homie" through "both express and tacit boycotts," which
Homie claims "was facilitated by [the Challenged NAR Rules], each and every one of which
hampered Homie's ability to compete in Utah, permanently depressing Homie's market share,
revenue, and profitability." [35]

For instance, Homie asserts that it received various messages in the "comment field" of
the WFRMLS that it claims illustrate the "exclusionary steering" facilitated by the Challenged
NAR Rules.[36] For example, a local buyer broker told Homie that the "effort [buyer brokers] put
into finding [their] clients the perfect home and helping them through the contract,
negotiations, inspections, financing, closing, etc.," made Homie's low commission offers "sad
and unprofessional on your part . . . ."[37] Homie sets forth several other similar alleged

---

[35] *Id.* ¶¶ 50-51.

[36] *Id.* ¶ 64.

[37] *Id.* ¶ 66.

communications from various unidentified competitors that it received, including in the comments field of WFRMLS, in emails and text messages, and on social media:[38]

- "If you up the commission, I will bring my buyers. If not, I will not. It's a disservice to your client. Please educate them. Please let them know that. I truly have a buyer that would possible [sic] buy this house. I won't show it until the commission is raised."

- "Put a unit number and better directions on the listing. And. [sic] Get a key for the supra box. And bac [sic] at 3%."  (BAC is the buyer-agent commission)

- "I'm sure it would sell if you changed the BAC to 3%."

- "[R]aise Commission to 3%."

- I had your home on a list of 4 to show to my buyers tonight. Removed it from the list after I saw the 1.5% BBC [i.e., the buyer-broker commission]. I could always show it and then negotiate up the BBC in the contract but figured, why go through the hassle when we have three other great listings paying 2.5-4%. Anyway. Please tell your sellers for me.

Homie asserts that these communications from unnamed local brokers complaining about their commission offerings and often seeking to negotiate them, show "exclusionary steering" which eventually rendered Homie "unable to compete effectively despite a business model that, before Defendants' predation, had proven its viability."[39]

Homie also claims that "[l]ocal NAR members in Utah used Facebook groups to coordinate boycotts of Homie's listings with low buyer-broker commissions during the period that the Buyer-Broker Compensation Rule was in effect, sometimes marked with the hashtag "#boycottHOMIE."[40] Specifically, Homie alleges, "[o]ne such Facebook group was called the

---

[38] *Id.* ¶¶ 64-66.

[39] *Id.* ¶ 51.

[40] *Id.* ¶ 68.

Wasatch Front Agents group, which had over a thousand members. On these Facebook groups, brokers exchanged information about their intent to steer buyer clients away from properties listed by Homie for sale in Utah. For example, one post stated: "I know several agents that omit [H]omie listings from their hotsheets. They would be wise to counsel their sellers on the affect [sic] of such low BAC."[41] According to Homie, "Realtors in Utah also encouraged one another on Facebook groups not to show homes to Homie-represented buyers during the period that the Buyer-Broker Compensation Rule was in effect." One agent wrote: "I'll admit right now I am NOT going to take time to show a Homie buyer one of my listings." Berkshire Hathaway and Coldwell Banker franchisees in Utah publicly advertised that they would not work with Homie-represented buyers."[42]

Homie maintains that NAR requires its members, including state and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned by local realtor associations, to fully comply with the Challenged NAR Rules.[43] Homie also contends that the Brokerage Defendants "have agreed to adopt, promote, implement, and enforce the Challenged NAR Rules through their intimate involvement in NAR governance and imposition of NAR rules on local real estate associations and the [Brokerage] Defendants' affiliated franchisees, brokers, and employees."[44] And further, "[b]y participating in an association that prevents member institutions from allowing their associates to compete

---

[41] *Id.*

[42] *Id.* ¶¶ 70-71.

[43] *Id.* ¶ 102.

[44] *Id.* ¶ 110.

with each other for commissions—and agreeing to follow and enforce its anticompetitive rules—the [Brokerage] Defendants have joined the conspiracy and have played a central role in its implementation and enforcement."[45]

According to Homie, the Brokerage Defendants participated in, implemented, and facilitated the conspiracy in at least four ways: "(1) their executives and franchisee representatives attended NAR meetings, supervise NAR's operations, and review and vote on NAR rules; (2) they and their franchisees assisted in NAR's enforcement of the rules; (3) they and their franchisees participated in local realtor associations that have adopted and enforced NAR's rules, including the Challenged NAR Rules; and (4) they required their franchisees and realtors to join NAR and the MLSs and comply with NAR rules, including the Challenged NAR Rules.[46]

Homie claims that by developing and reissuing the Challenged NAR Rules, enforcing the rules through NAR and local realtor association leadership, imposing the rules on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations, and MLSs and comply with their rules, each Brokerage Defendant has agreed to participate in and implemented and/or facilitated the conspiracy.[47]

---

[45] *Id.*

[46] *Id.* ¶ 111.

[47] *Id.* ¶ 129.

**LEGAL STANDARD**

To withstand a Rule 12 motion to dismiss, a complaint must "state a claim to relief that is plausible on its face."[48] A plaintiff must plead facts—not just legal conclusions.[49] When reviewing a Complaint, the court assumes the truth of "all well-pleaded facts in the complaint, and draw[s] all reasonable inferences therefrom in the light most favorable to the plaintiffs."[50] The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation."[51]

**DISCUSSION**

As explained below, the court finds that Homie's claims are time-barred and that the continuing violation doctrine does not save Homie's claims. Moreover, even if Homie's claims were not time-barred, Homie has failed to state a federal or state antitrust claim because it has not plausibly alleged an antitrust injury, and Homie has failed to state a claim for tortious interference with economic relations.  Each of these bases of dismissal are discussed in turn below.

**A.    Homie's Claims Are Time-barred.**

Homie's claims are time-barred because the applicable statute of limitations on each of Homie's claims is four years, and Homie's causes of action arose more than four years before

---

[48] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).

[49] *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.") (cleaned up).

[50] *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

[51] *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Homie filed its Complaint. Under the Sherman Act (as well as under the Utah Antitrust Act), claims must be brought within four years "after the cause of action accrued."[52] The same is true for the tortious interference claim.[53] "The general rule is that an antitrust 'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'"[54]

Homie alleges that the Challenged NAR Rules were adopted as early as 1996, and the most recent Rule—the Clear Cooperation Policy—was adopted in 2019. Thus, the Complaint acknowledges that all the Challenged NAR Rules were adopted more than four years prior to this lawsuit, which was filed on August 22, 2024. Where Homie alleges an agreement between competitors excluded it from competing, the date of the alleged exclusion controls: "When the injury at issue involves exclusion from an industry or market based on an antitrust violation, the excluded would-be competitor typically has knowledge of the 'public' act of exclusion, and thus, the injury is felt immediately."[55]

---

[52] 15 U.S.C. § 15b; Utah Code Ann. § 76-10-3117(2).

[53] *White v. Wiseman*, Case No. 2:16-cv-01179-DBB-JCB, 2020 WL 3922977, at *7 (D. Utah July 10, 2020).

[54] *Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)).

[55] *CSX Transportation, Inc. v. Norfolk Southern Railway Co.,* 648 F. Supp. 3d 679, 692 (E.D. Va. 2023). *Accord North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 331 (M.D.N.C. 1991) ("Judge Posner, a former antitrust professor, has explained that to a potential competitor 'exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs even though, in the nature of things, the victim's losses lie mostly in the future.'" (cleaned up)).

Here, Homie alleges to have entered the market in 2015.[56] All but one of the Challenged NAR Rules were already in place as of that time, and thus, to the extent those rules acted to exclude Homie from the market, their impact would have been felt immediately. And the last allegedly anticompetitive rule at issue was adopted in 2019, also more than four years before the filing of this action.

Even if it were legally relevant, Homie cannot claim to have been ignorant of the allegedly anticompetitive nature of the Challenged NAR Rules. To the contrary, Homie acknowledges in the Complaint that widely publicized class action lawsuits were filed in 2019 on behalf of home sellers challenging the very same rules that are at issue in this case and making the same exclusionary arguments as Homie.

Moreover, Homie admits in its Complaint that it was aware of other antitrust enforcement under Section 1 of the Sherman Act regarding the Challenged NAR Rules.[57] For example, Homie cites to the *Burnett* case in the Western District of Missouri, which was filed in April 2019 and tried to verdict in October 2023.[58] Plaintiff alleges that the *Burnett* litigation was "widely covered by the local media in Utah[,]" including in a local news story on KUTV2 entitled, "Realtors accused of conspiring to fix Commission in new lawsuit . . . ."[59] Defendants HSA and HomeServices attached a copy of the cited news story as an exhibit to its Motion to Dismiss.[60]

---

[56] Complaint, ECF No. 1, ¶ 44.

[57] *Id.* ¶ 42.

[58] *Id.* (citing *Burnett v. Nat'l Assoc. of REALTORS*, No. 4:19cv-00332 (W.D. Mo.)).

[59] *Id.* ¶ 67.

[60] Motion to Dismiss, Exhibit C, ECF No. 69-3. The court may properly consider documents incorporated into the complaint by reference or otherwise referred to in the complaint when

The article was published in April 2019 (more than four years before Homie filed its Complaint), and the story focused on home sellers who had actually hired Homie to sell their house.[61] The couple in the news story stated that, after hiring Homie as their agent, other real estate agents called to complain that the sellers and Homie were not offering a buyer broker commission on the MLS, and therefore those agents would not be showing the couple's home to their buyers. Homie itself that alleges this 2019 news story illustrates "[t]he exclusionary steering facilitated by NAR's Exclusionary Rules and Policies" that forms the basis of its claims in this lawsuit.[62]

The Complaint also cites another antitrust case filed in May 2020—still more than four years before the filing of this case—by another purported "disruptor" who challenged NAR's Clear Cooperation Policy (another of the Challenged NAR Rules) as anticompetitive.[63] Finally, the Complaint refers to a "Federal Trade Commission/Department of Justice workshop," where other discount brokers complained about having "bricks thrown through car windows," "cars egged," "hate mail sent to . . . sellers"—all purportedly in response to those brokers' offering "lower commission[s] on the MLS."[64] Homie omits the date of that workshop from the Complaint, but a written transcript published on the FTC's website shows that the workshop was held on June 5, 2018—more than four years before the filing of the Complaint in this

---

considering a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[61] A video of the accompanying newscast is also available at https://kutv.com/news/get-gephardt/realtors-accused-of-conspiring-to-fix-commissions-in-new-lawsuit (last accessed on July 13, 2025).

[62] *Id.* ¶ 67.

[63] *Id.* ¶ 42 (citing *PLS Com, LLC v. Nat'l Ass'n of REALTORS*, No. 3:20-cv-03198 (N.D. Cal.)).

[64] *Id.* ¶ 61.

action.[65]Therefore, to the extent Homie seeks to ground its claims on any of the Challenged NAR Rules, the claims are time-barred.

Moreover, Homie's continuing violation theory does not help save its claims because the Complaint does not include any "new and independent" acts inside the limitations period that "continue the same conspiracy."[66] To restart the statute of limitations, a plaintiff must plead acts that are "not merely a reaffirmation of a previous act," but instead constitute "a new and independent act that injured plaintiff anew."[67] "[T]he acts in question must be distinct from the acts outside the limitations period, but they must continue the same conspiracy."[68] "Merely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act" that restarts the statute of limitations.[69]

---

[65] *See* https://www.ftc.gov/news-events/events/2018/06/whats-new-residential-real-estate-brokerage-competition-ftc-doj-workshop (last accessed on July 13, 2025). The court may properly take judicial notice of the dates of this workshop as part of considering this motion to dismiss. *New Mexico ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1256-57 (D.N.M. 2020) ("Under Federal Rule of Evidence 201, judicial notice is permitted of a fact which is a matter of public record even if it is not incorporated into the pleadings if it is not subject to reasonable dispute because it is . . . capable of accurate and ready determination by resort to 'sources whose accuracy cannot reasonably be questioned.'").

[66] *E.g.*, *Seay v. Okla. Bd. of Dentistry*, 2021 WL 1394478, at *2 (W.D. Okla. Apr. 12, 2021) (explaining that a claim based on the effects of a rule or statute generally accrues when the rule is adopted), *aff'd*, 2022 WL 984378 (10th Cir. Apr. 1, 2022).

[67] *Kaw Valley Elec. Co-op. Co. v. Kan. Elec. Power Co-op., Inc.*, 872 F.2d 931, 934 (10th Cir. 1989) (citation omitted); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1087 (10th Cir 2006).

[68] *Kaw Valley*, 882 F.2d at 933.

[69] *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071-72 (N.D. Cal. 2016); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (affirming Rule 12(b)(6) dismissal of Section 1 conspiracy claim because defendant's alleged acts within the limitations period were reaffirmations of policies adopted prior to bankruptcy discharge); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884-85 (N.D. Cal. 2015) (dismissing antitrust claim as

Homie admits that Challenged NAR Rules were adopted as early as 1996, and the most recent Rule—the Clear Cooperation Policy—was adopted in 2019, while Homie was actively gaining market share in Utah.[70] Homie's Complaint does not include any "new and independent" acts inside the limitations period that "continue the same conspiracy."

To the extent Homie relies on annual reaffirmations of the Challenged NAR Rules, such acts are not distinct from the acts outside the limitations period, and there is no different type of alleged injury. Additionally, Homie's attempt to show a continuing violation through the "overt acts of steering as recently as earlier this year," such allegations also do not restart the limitations period because these alleged acts were committed by unnamed third parties—and not the Defendants.  Thus, there is simply no basis on which to restart the limitations period or otherwise find that the continuing violation theory applies in this case. Accordingly, Homie's claims for federal and state antitrust violations and tortious interference with economic relations are dismissed with prejudice because they are time-barred.

## II.    Homie's Antitrust Claims Fail Because It Has Not Plausibly Alleged an Antitrust Injury.

Homie has failed to plausibly allege an antitrust injury—and therefore an antitrust claim—because it has not shown that it suffered an injury of the type the antitrust laws were intended to prevent; it has not plausibly pleaded an antitrust injury based on some sort of market foreclosure, exclusion, or barriers to entry; and it fails to allege specific facts that establish that it sustained an antitrust injury from the alleged boycotts because it fails to allege

---

untimely because plaintiffs alleged "only that Microsoft maintained and reaffirmed its preexisting non-solicitation agreements after 2009," which did not plead a continuing violation that restarted the Sherman Act's limitations period).

[70] Compl., ECF No. 1, ¶¶ 49, 59, 87.

that Defendants participated in these boycotts in any way.  Each of these deficiencies are discussed below.

### A.    Homie's Claim That It Suffered an Antitrust Injury Flowing from High Commissions Allegedly Caused by the Challenged NAR Rules Is Insufficient.

A private antitrust plaintiff may not recover damages by simply showing that it has suffered an "injury causally linked to an illegal presence in the market."[71] Instead, "a plaintiff must prove the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[72] "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."[73] "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."[74] In other words, a plaintiff's injury must flow directly from the alleged manifestation of harm on competition (*i.e.*, higher prices, reduced output, or lower quality).[75]

---

[71] *Brunswick Corp. v. Pueblo Bowl-O- Mat, Inc.*, 429 U.S. 477, 489 (1977).

[72] *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) ("ARCO") (quoting Brunswick, 429 U.S. at 489)).

[73] ARCO, 495 U.S. at 344. (emphasis in original).

[74] *Brunswick*, 429 U.S. at 489.

[75] *Allergy Rsch. Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *4 (D. Utah Apr. 4, 2022) (unpublished) ("Anticompetitive effects [from which an antitrust injury may flow] include, for example, barriers to market entry, reduced output, or supracompetitive prices.").

The assessment of whether a plaintiff has sustained antitrust injury is "[t]he threshold inquiry in analyzing whether a plaintiff may pursue an antitrust claim."[76] And this threshold question must be resolved under both federal law and the Utah Antitrust Act.[77] Where a plaintiff fails to allege facts that plausibly suggest it has sustained an antitrust injury, dismissal is warranted under Rule 12 of the Federal Rules of Civil Procedure.[78]

As a threshold matter, Homie cannot claim it has suffered an antitrust injury flowing from higher prices allegedly caused by the Challenged NAR Rules. Courts, including the Supreme Court, have consistently reasoned that a plaintiff cannot suffer an antitrust injury caused by a conspiracy among its competitors to raise prices.[79] In such circumstances, the

---

[76] *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006) (citation omitted).

[77] *See Brixen & Christopher Architects, P.C. v. State*, 2001 UT App 210, ¶ 33 n.14, 29 F.3d 650 ("We note that the federal antitrust statute is nearly identical to the Utah counterpart . . . . Thus, we look to the expansive body of federal antitrust law for guidance in evaluating a civil antitrust claim under the Utah Antitrust Act.").

[78] *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) ("Because we conclude that Elliott has not alleged an antitrust injury, its antitrust claims necessarily fail . . . . The district court thus properly dismissed Elliott's antitrust claims for failure to state a claim."); *see Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) (affirming dismissal of antitrust claims because plaintiff "did not suffer a cognizable antitrust injury"); *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 408 (10th Cir. 1992) (affirming dismissal on a Rule 12 motion to dismiss because plaintiff's "alleged harm . . . [was] not necessarily the result or manifestation of a reduction in competition," but rather, "tangential to any alleged harm in those markets" and "at most an indirect consequence of the demise of an individual competitor").

[79] *ARCO*, 495 U.S. at 337 ("A competitor 'may not complain of conspiracies that . . . set minimum prices at any level.'" (internal citation omitted)); *CVB, Inc. v. Corsicana Mattress Co.*, 604 F. Supp. 3d 1264, 1294 (D. Utah 2022) (dismissing competitor antitrust claim which only alleged damages from being unable to charge prices as high as its own competitors); *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122–24 (2d Cir. 2007) (affirming an antitrust claim's dismissal because plaintiff "did not suffer an injury from increased prices," but instead the "consumers who were forced to buy at higher prices (or inferior quality)" due to market power); *Stiles v. Walmart, Inc.*, 639 F. Supp. 3d 1029, 1046 (E.D. Cal. 2022) (finding it

21

plaintiff stands to benefit from the alleged reduction in competition (higher prices) because it can make more money by unilaterally raising its own prices or lowering its prices to increase its own sales volume.[80]

In this case, Homie alleges that Defendants conspired to adopt and enforce policies through NAR to artificially inflate real-estate brokerage commissions.[81] In other words, Homie claims that Defendants and their alleged co-conspirators—including "traditional brokerages,"[82] which are Homie's competitors—conspired to raise prices. But as a competitor to the alleged

---

"unnecessary to decide whether a jury could agree that [competitors] kept prices too high" because a plaintiff cannot "sue her competitors for driving up prices").

[80] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582–83 (1986) ("Nor can respondents recover damages for any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct . . . could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price . . ."); *CVB, Inc. v. Corsicana Mattress Co.*, 2024 WL 4505044, at *7 (D. Utah Oct. 16, 2024) (unpublished) (dismissing amended complaint after finding that "CVB cannot recover for a conspiracy that raises market price, as these restrictions, though harmful to competition, actually benefit competitors by making supracompetitive pricing more attractive. If one or more of the Seller Defendants did raise prices, this would give CVB the opportunity to undercut their prices and possibly increase its market share.") (cleaned up); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777–78 (7th Cir. 1999) (a "conspiracy of a firm's competitors" to raise prices "could only help the firm, by providing an umbrella under which it could sell a large quantity at a supracompetitive price generating supracompetitive profits just by setting price in between the conspirators' price and the lower, competitive price that would prevail in the absence of the conspiracy;" such a firm has no antitrust injury) (Posner, J.); *Stiles*, 639 F. Supp. 3d at 1046 ("[Plaintiff] does not have standing to sue her competitors for driving up prices. She, like her competitors—and unlike consumers—would benefit from artificially inflated prices. If prices increased and consumers were forced to pay more, they could sue; [Plaintiff] cannot." (internal citations omitted)).

[81] Compl., ECF No. 1, ¶ 38 (alleging that NAR's "rules" produced "elevated commissions" of "5% to 6%").

[82] *Id.* ¶¶ 3, 6, 17,

conspirators, Homie actually stood to benefit from the higher prices imposed by the supposed conspiracy.

Homie alleges that the elevated commissions caused by the alleged conspiracy enticed Homie to enter the market and compete in the first place. According to Homie, as a result of NAR's longstanding policies, "[r]esidential real estate was ripe for disruption with technology, and consumers were primed for an alternative to the traditional, high-priced brokerage services offered by Defendants."[83] "Homie's business model was to disrupt the traditional real estate brokerage model by returning artificially inflated commissions to consumers, competing away the supracompetitive prices engendered by Defendants' decades-long conspiracy."[84]

Once Homie launched its business, it intentionally charged commissions slightly below the levels it now claims to have been imposed as a result of NAR's policies.[85] According to Homie, its clients would "commonly make an offer of compensation to buyer-brokers that was somewhat below the [commission] offered by sellers represented by traditional brokers."[86] Thus, Homie intentionally set its prices just below the allegedly inflated commission rates caused by NAR's policies to attract more business.

---

[83] *Id.* ¶ 45.

[84] *Id.*

[85] *Id.* ¶ 46 ("Sellers listing with Homie would pay a low flat fee or a low commission, in either scenario paying Homie less than they would have paid to traditional real estate brokers charging the industry standard 5%–6% of the selling price.").

[86] *Id.*

By its own account, this strategy succeeded. Homie started its business in Utah in 2015.[87] Within two years, it was "among the five largest brokerages by market share in the state."[88] And that success persisted through at least 2021.[89] In other words, Homie, as a competitor to the members of the alleged conspiracy, took advantage of the elevated prices it attributes to the conspiracy and experienced durable commercial success for several years. That means Homie has not suffered an antitrust injury flowing from the NAR policies that allegedly inflated brokerage commissions.[90]

### B.    Homie's Allegations Demonstrate That It Was Not Foreclosed or Excluded by the Challenged NAR Rules

Homie suggests that NAR's policies harmed competition by creating insurmountable barriers to entry for discount brokerages, like Homie.[91] But Homie's broad claims about barriers to entry and exclusion are not supported by allegations of fact that explain how the Challenged NAR Rules raised entry barriers or excluded competition. Indeed, Homie's specific factual allegations refute the notion that NAR's policies created barriers to entry or otherwise impeded competition from discount brokers. Homie specifically alleges that it overcame any impediments allegedly created by NAR's longstanding rules when it entered the market in

---

[87] *Id.* ¶ 44.

[88] *Id.* ¶ 49.

[89] *Id.*

[90] *See Matsushita*, 475 U.S. 574 at 586 (holding that "these alleged conspiracies could not have caused respondents to suffer an 'antitrust injury' . . . because they actually tended to benefit respondents").

[91] *See, e.g.*, Compl., ECF No. 1, ¶ 41.

2015,[92] "validated its model in Utah,"[93] and was "successful."[94] Indeed, according to Homie's account, it was "among the five largest brokerages by market share in the state" between 2017 and 2021.[95]

These allegations preclude a finding that Homie has adequately pleaded an antitrust injury based on some sort of market foreclosure, exclusion, or barriers to entry. When a plaintiff has an opportunity to compete and experiences commercial success, it cannot meet its burden to plead antitrust injury through conclusory allegations about foreclosure or exclusion.[96]

Homie's allegations also suggest that after Homie successfully competed and gained market share for years, NAR's longstanding policies somehow abruptly "hampered Homie's ability to compete in Utah, permanently depressing Homie's market share."[97] But even if the court were to credit these conclusory allegations, it would not be enough for Homie to plead antitrust injury. As a matter of law, injury to a single competitor, standing alone, is not enough to prove antitrust injury.[98] The reason for this principle is that antitrust laws are intended to

---

[92] *Id.* ¶ 49.

[93] *Id.* ¶ 48.

[94] *Id.* ¶ 49.

[95] *Id.*

[96] *See, e.g., In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1366 (D. Kan. 2020) (granting summary judgment based on a failure to show antitrust injury where the plaintiffs "had the opportunity to compete" and "in some instances . . . succeeded . . . when it offered more competitive pricing").

[97] Compl., ECF No. 1, ¶ 50.

[98] *See Stiles*, 639 F. Supp. 3d at 1051 ("The exclusion of one competitor is evidence of 'antitrust injury' only if it is emblematic of some broader effect on the market, such as the exclusion of an

protect competition, not individual competitors, and injuries to individual competitors are often the result of competition, not a symptom of harm to the consumers that antitrust laws were meant to protect.[99]

Homie attempts to cure this defect by alleging that "Homie's inability to compete effectively in Utah deprived it of the investment capital and scale necessary to enter markets nationwide," thereby "harm[ing] consumers in Utah and nationwide."[100] But that still does not suffice. These allegations are the type of conclusory claims that other courts have found to be insufficient to establish antitrust injury at the pleading stage.[101] Similarly, Homie's conclusory claims that Defendants foreclosed competition from Homie or excluded Homie from the market are not enough to establish antitrust injury in this case. While they may be enough to show Homie was harmed, the antitrust laws do not protect individual competitors. Homie must allege specific facts to explain how harm to a single firm in the market (Homie) is probative of

---

'entire class' of suppliers." (citation omitted)); *N.M. Oncology v. Presbyterian Healthcare Servs.*, 169 F. Supp. 3d 1204, 1212 (D.N.M. 2016) (dismissing plaintiff's antitrust claims on standing grounds because "Plaintiff has alleged only ordinary business losses and not an antitrust injury").

[99] *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972 (10th Cir. 1994) ("A producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than from each other." (quoting *Stamatakis Indus., Inc. v. King*, 965 F.2d 16 469, 471 (7th Cir. 1992))).

[100] Compl., ECF No. 1, ¶ 57.

[101] *See Iqbal*, 556 U.S. at 678 (holding that mere "conclusory statements" will not suffice to withstand a motion to dismiss); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1178 (10th Cir. 2019) (mere "inferences" and "circumstantial evidence" are insufficient to "nudge an antitrust conspiracy allegation beyond the line from possible to plausible*"); Allergy Research Group. LLC v. Rez Candles Inc.,* 2022 WL 1004214 (D. Utah Apr. 4, 2022) (unpublished) (court found that the reseller had failed to allege an antitrust injury because "[a]n antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare."). *Id.* at *4 (quoting *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012)).

harm to competition in the market as a whole.[102] Homie has not met that burden because it has not alleged facts suggesting that firms offering meaningful competition were in fact excluded from the market and that their exclusion (and not something else) harmed consumers in any way.[103]

Finally, Homie's allegation that the Clear Cooperation Policy "eliminated" the possibility of "marketing properties off the MLS, including through its website and mobile app"[104] is also insufficient to establish that Homie was excluded from the market by NAR's policies. As acknowledged in Homie's Complaint, the Clear Cooperation Policy does not "eliminate" the possibility of marketing listings outside of the MLS. Instead, the Clear Cooperation Policy requires only that participants must submit listings to the MLS within one business day of making them public in addition to any other location where the listing is marketed.[105] And Homie's Complaint fails to allege facts that explain how it was harmed by a requirement to market publicly advertised listings within the MLS—in addition to anywhere outside the MLS—as a condition of MLS participation. The Clear Cooperation Policy only required Homie to distribute its publicly marketed listings broadly, making them available to other brokerages participating in the MLS (where, in return, Homie could view listings marketed by other brokers

---

[102] *Reazin v. Blue Cross and Blue Shield of Kan.*, 899 F.2d 951, 960 (10th Cir. 1990) (holding that, to establish antitrust injury, the "adverse impact must be on competition, not on any individual competitor or on plaintiff's business" (emphasis in original)); *Bright v. Moss Ambulance Serv., Inc.*, 824 F.2d 819, 824 (10th Cir. 1987) ("Whether a practice violates the antitrust laws is determined by its effect on competition, not its effect on an individual competitor.").

[103] *Elliott Indus. Ltd. P'ship* 407 F.3d at 1125 (stating that an injury is not an antitrust injury if "it has no adverse effect on competition or consumers" (quoting *ARCO*, 495 U.S. at 337)).

[104] Compl. ECF No. 1, ¶ 56.

[105] *Id.* ¶ 87.

in a single location). Thus, there are no facts alleged in Homie's Complaint to suggest that the

Clear Cooperation Policy harmed Homie (or competition) in any way.

### C    Homie Does Not Allege that Defendants Participated in Any Boycott of Homie or That They Otherwise Agreed to Boycott Homie

Homie fails to allege specific facts that establish it sustained an antitrust injury from

these supposed boycotts because it fails to allege that Defendant participated in these boycotts

in any way. To plead antitrust injury, a plaintiff must plead specific facts to show that it was

harmed by a reduction in competition caused by the defendants. Injuries caused by the actions

of non-conspirators do not count.[106]

Homie's alleged boycotting harms flowed from the independent actions of local real

estate agents—not Defendants. In support of its boycott claims, Homie points to: (1) five vague

instances where real estate agents—none of whom are alleged to be Defendants—asked

Homie to increase its commissions or otherwise complained about the commissions offered for

Homie listings,[107] (2) comments made by individual real estate agents in Facebook groups that

suggest they might not show homes listed by Homie to their buyers,[108] (3) a billboard

advertisement placed by a local association to promote certain brokers,[109] and (4) one

---

[106] *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 126–27 (1969) (stating that a plaintiff cannot establish antitrust injury based on "other factors independent of [a defendant's] unlawful conduct"); *see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 118 (2d Cir. 2021) ("We thus reject the attempts of . . . Plaintiffs to impose liability for transactions that Defendants did not control and of which they were likely not even aware.").

[107] Compl., ECF No. 1, ¶¶ 64–66.

[108] *Id.* ¶¶ 68–69.

[109] *Id.* ¶ 71.

individual offering an opinion during a meeting of local real estate agents that Homie's model represented a "race to the bottom."[110]

None of these actions is alleged to have committed by Defendants. Homie does not allege that any Defendant directly commented on Homie or otherwise boycotted Homie. Nor has Homie alleged that the actions of any local real estate agent in Utah that purportedly boycotted Homie was controlled by any Defendant. "The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself,"[111] and to satisfy that requirement, a plaintiff must plead that the alleged participants had "a conscious commitment to a common scheme designed to achieve an unlawful objective,"[112] Yet, critically, Homie does not allege any agreement among Defendants—or with anyone else—to boycott Homie.

Homie claims that "some" of the brokerages that purportedly declined to show buyers' houses listed with Homie were "affiliated with the [Brokerage] Defendants,"[113] but it does not plead any facts sufficient to show that the Brokerage Defendants somehow controlled or directed their actions. Mere "affiliation," however defined, is not sufficient to impute liability for an antitrust conspiracy.[114] At bottom, none of Homie's boycott allegations establish a plausible claim for antitrust injury because none of them suggest any Defendant agreed with any local agent to boycott Homie.

---

[110] *Id.* ¶¶ 70, 72.

[111] *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006),

[112] *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

[113] Compl., ECF No. 1, ¶ 51.

[114] *See Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1561 (10th Cir. 1984) (noting that "affiliation does not by itself necessarily imply conspiracy to restrain trade") (citations omitted).

To the extent that Homie suggests that Defendants joined the supposed boycott solely based on their participation in NAR,[115] that alone is not evidence of an antitrust conspiracy. Indeed, such allegations are the "exact type . . . [that] Twombly considered in holding that parallel conduct, absent some additional type of contextual evidence, is generally not sufficient to nudge an antitrust conspiracy allegation beyond the line from possible to plausible."[116] If, indeed, Homie's claims "suffice to allege a plausible § 1 agreement, all members of [a trade] association could be deemed to have entered into an antitrust conspiracy simply because they joined the association, participated in its governance, and agreed to abide by its rules. . . . This is simply not the law."[117] Because Homie has failed to allege facts connecting Defendants to the supposed boycott activities of local real estate agents, it has failed to allege an antitrust injury flowing from Defendants' actions with respect to the purported boycotts.[118]

## II.    Homie's Claim for Tortious Interference Fails

"The elements of tortious interference under Utah law are: (1) intentional interference with existing or potential economic relations, (2) by improper means; (3) that causes injury to

---

[115] Compl., ECF No. 1, ¶ 9 ("By participating in an association that promulgates rules facilitating the exclusion of competitors, by requiring franchisees, groups, and individuals to join and adhere to the anticompetitive agreement alleged herein, and by taking numerous steps in furtherance of the conspiracy, the Corporate Defendants agreed with each other and NAR to participate in, facilitate, and implement the conspiracy."); *see also id.* ¶¶ 110–129.

[116] *Llacua*, 930 F.3d at 1178 (citing *Twombly*, 550 U.S. at 556–67).

[117] *Id.* at 1181.

[118] *See City of Chanute, Kan. v. Williams Nat. Gas Co.*, 955 F.2d 641, 652 (10th Cir. 1992) (stating that claims of antitrust injury "are compensable only when the injury flows directly from the [allegedly] unlawful act").

the plaintiff."[119] Homie has failed to show the requisite intent to state a valid tortious interference claim.

To sustain a claim for tortious interference, a plaintiff must demonstrate that a defendant has "intentionally and improperly cause[d] one of the [contracting] parties not to perform the contract."[120] And, critically, any determination of causation cannot be based on speculation."[121]

Here, Homie's tortious interference claim is based on the same underlying conduct as its antitrust claims; that is, that Defendants "utiliz[ed] anticompetitive rules . . . causing Homie's clients to cancel their contracts . . . and caus[ed] Homie's business partners not to renew their existing contracts."[122] In support of this theory and its allegation that it "lost business,"[123] Homie cites five anecdotal examples of customers cancelling contracts or listings.[124] Each one of these examples, however, fails to plead any causal link between Defendants and the alleged contractual interference. At best, they cast blame on individual real estate agents for being disinclined to work with Homie. But none of these examples shows how Defendants

---

[119] *VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329, 1336 (D. Utah 2023) (citing *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553).

[120] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) (citing Restatement (Second) of Torts § 766 (Am. Law Inst. 1979)).

[121] *See Triesault v. Greater Salt Lake Bus. Dist.*, 2005 UT App 489, ¶ 14, 126 P.3d 781 (citation omitted); *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 15, 199 P.3d 929 (there "must be evidence that rises above speculation and provides a reasonable . . . estimate of damages").

[122] *See* Compl. ECF No. 1, ¶¶ 147, 146.

[123] *Id.* ¶¶ 95.

[124] *Id.* ¶¶ 96–100.

31

"intentionally" induced any former Homie clients to cancel their contracts.[125] Indeed, Homie fails to provide any allegation of fact that connects any defendant to any of these anecdotes. Absent such allegations, Homie has failed to allege that any Defendant intentionally interfered with Homie's current or future business relationships, and its tortious interference claim should be dismissed.[126]

## CONCLUSION

Accordingly, because all of Homie's claims are time-barred and because it has not stated a claim for a federal or state antitrust violation or for tortious interference with economic relations:

(1)    HomeServices of America, Inc. and HSF Affiliates LLC's Motion to Dismiss Plaintiff's Complaint [ECF No. 69] is GRANTED;

(2)    Anywhere Real Estate Inc. and RE/MAX, LLC's Joint Motion to Dismiss Plaintiff's Complaint [ECF No. 71] is GRANTED;

(3)    National Association of Realtors' 12(b)(6) Motion to Dismiss Plaintiff's Complaint [ECF No. 74] is GRANTED;

(4)    RE/MAX, LLC's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2) [ECF No. 72] is DENIED AS MOOT;

(5)    Homie's Amended and Supplemental Contingent Motion for Jurisdictional Discovery [ECF No. 94] is DENIED AS MOOT, as is Homie's Request for Judicial

---

[125] *See VidAngel*, 703 F. Supp. at 1337 ("[M]erely attracting another business's customers with a competing product is not the same thing as driving them away."); *see also C.R. England v. Swift Trans. Co.*, 2019 UT 8, ¶ 17, 437 P.3d 343 ("'Where persons have merely pursued their own ends without any desire or intention of causing another to breach his contract, they should not be held liable for the other's breach.'") (quoting *Bunnell v. Bills*, 368 P.2d 597, 603 (Utah 1962)).

[126] *See, e.g., Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 306 (Utah 1982) (noting that even conduct that is "overly zealous," "aggressive," or "abrasive" fails to satisfy the required intent element in a claim for intentional interference with economic relations).

Notice of Burnett Jury Verdict [95]. Homie's Objection to HSA's Affidavits [ECF No. 88] is also MOOT.

Homie's action is therefore dismissed with prejudice, and judgment will be entered accordingly.

DATED this 15th day of July 2025.

BY THE COURT:

DALE A. KIMBALL
United States District Judge